Nos. 13-17154, 13-17102

**IN THE**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**FACEBOOK, INC.**,

*Plaintiff-Appellee*,

*v.*

**POWER VENTURES, INC. AND STEVEN VACHANI**,

*Defendants-Appellants*,

---

Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, Honorable Lucy Koh

---

**APPELLANTS' OPENING BRIEF**

---

Amy Sommer Anderson
AROPLEX LAW
156 2nd Street
San Francisco, California 94105
Telephone: 415-529-5148
Facsimile: 415-970-5016

Counsel for Defendant-Appellant,
POWER VENTURES, INC.

STEVEN VACHANI
2425B Channing, #216
Berkeley, CA 94704
Telephone: (917) 267-8823

*Pro se* Appellant

## CORPORATE DISCLOSURE STATEMENT

There is no parent corporation and no publicly held corporation that owns

10% or more of Power Ventures, Inc.'s stock.

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES**                                                    **v**

**JURISDICTIONAL STATEMENT**                                              **1**

**INTRODUCTION**                                                           **1**

**STATEMENT OF ISSUES**                                                    **4**

**PERTINENT LEGAL PROVISIONS**                                            **5**

**STATEMENT OF THE CASE**                                                  **5**

   **A. The Parties And Their Businesses**                   **5**

   **B. Power's Campaign—The Subject Of The Litigation**     **9**

   **C. Power's Pre-Litigation Cooperation With Facebook**   **15**

   **D. Proceedings In The District Court**                  **16**

     1. The Trial Court Denied Cross-Motions For Summary Judgment On The C.P.C. § 502 Claim.                                              17

     2. The Trial Court Granted Summary Judgment In Favor Of Facebook And Against Power Ventures, Inc. On All Claims.                     17

     3. The Trial Court Ordered A Renewed F.R.C.P. 30(b)(6) Deposition of Power And Ordered Power To Pay Reasonable Costs And Fees Of The Renewed Deposition.                                           18

     4. The Trial Court Granted Facebook's Request For $39,796.73 In "Reasonable Costs And Fees" For The Renewed Deposition Against Both Defendants.                                                        18

     5. The Trial Court Denied Defendants' Request For Reconsideration, Granted Facebook's Motion For Permanent Statutory Injunctive Relief, Found Vachani Liable On All Counts And Entered A Damages Award In Favor Of Facebook.                                              19

**SUMMARY OF APPELLANTS' ARGUMENT**                                       **19**

**ARGUMENT**                                                              **21**

**I. THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO FACEBOOK AND DENYING SUMMARY JUDGMENT AS TO**

DEFENDANTS. 21

*A. Standard of Review.* 21

*B. Overview of the Issues.* 22

*C. The District Court Erred In Finding Facebook Has Standing To Bring Each Claim At Issue.* 23

  1. The Trial Court Made An Improper Factual Determination And Erroneous Conclusions Of Law Regarding Damages Allowable Under the CAN-SPAM Act And Erred In Classification Of Damages In Its Determination. 25

  2. The Trial Court Made An Improper Factual Determination And Erroneous Conclusions Of Law Regarding Damages In Finding Facebook Has Standing Under The CFAA. 28

  3. The Trial Court Made An Improper Factual Determination And Erroneous Conclusions Of Law Regarding Damages In Finding Facebook Has Standing Under CPC § 502. 30

*D. The Trial Court Erred In Granting Facebook's Request For Summary Judgment And Denying Defendants' Request for Summary Judgment On All Claims.* 31

  1. The Elements of Facebook's CAN-SPAM Act Claim Were Not Established. 31

    **a. The Email Header Information And Contents Of The Messages At Issue Were Not Misleading And Properly Enabled A Recipient Or ISP To Identity The Sender.** 32

    **b. These Messages Fall Outside The Scope Of Control Congress Intended, As They Were Not Misleading, Pornographic Or Otherwise Offensive.** 35

  2. The Elements Of Facebook's CFAA Claim Were Not Established. 35

  3. The Elements Of Facebook's CPC § 502 Claim Were Not Established. 42

*E. The Trial Court Erred In Finding The Individual Defendant Liable For The Acts Of The Corporate Defendant.* 46

*F. Relief Requested.* 48

**II. THE TRIAL COURT EXCEEDED ITS POWER BY IMPOSING A VAGUE, OVER-BROAD PERMANENT INJUNCTION AGAINST**

DEFENDANTS.     48

    *A. Standard of Review.*     48

    *B. Overview of the Issues.*     49

    *C. Facebook Did Not Suffer Irreparable Harm Due To Defendants' Actions and Has Never Offered Proof Of Alleged Irreparable Harm.*     50

    *D. Defendants' Good Faith Collaboration and Cooperation With Facebook Render Facebook's Claimed Damages Avoidable And Future Damages Substantially Unlikely.*     50

    *E. The Harm to Facebook Absent An Injunction Is Speculative At Best, But The Harm To Defendants Is Catastrophic.*     51

    *F. Public Interest Urges Against Such Unnecessary And Unwarranted Injunctive Relief.*     52

    *G. Relief Requested.*     53

III. THE DISTRICT COURT'S IMPOSITION OF DISCOVERY SANCTIONS MUST FAIL UNDER ANY STANDARD OF REVIEW.     53

    *A. Standard of Review.*     53

    *B. Overview of the Issues.*     54

    *C. The District Court Failed To Make A Factual Finding Of The Witness's Culpability And, Thus, Abused Its Discretion When Imposing Liability For Costs.*     54

      1. The Court's Order Failed To Make A Factual Finding Regarding Vachani's Alleged Culpable Conduct And Merely Relied On Facebook's Unsupported Complaint.     55

      2. The Court's Order Should Be Reversed Because the Trial Court Abused Its Discretion In Ordering Vachani Liable For A Discovery Order Against Power Ventures.     56

    *D. Relief Requested.*     57

CONCLUSION AND SUMMARY OF REQUESTED RELIEF     57

CERTIFICATE OF COMPLIANCE     59

STATEMENT OF RELATED CASES     60

**CERTIFICATE OF SERVICE** 61

**ADDENDUM TO THE BRIEFS** 62

# TABLE OF AUTHORITIES

## Table of Cases

| | |
|---|---|
| *Adriana Int'l Corp. v. Thoeren*, <br> 913 F.2d 1406 (9th Cir. 1990) | 52 |
| *Arakaki v. Hawaii*, <br> 314 F.3d 1091 (9th Cir. 2002) | 21 |
| *ASIS Internet Servs. v. Azoogle.com, Inc.*, <br> 357 Fed.Appx. 112 (9th Cir. 2009) | 27 |
| *AtPac, Inc. v. Aptitude Solutions, Inc., et al.*, <br> 730 F.Supp.2d 1174 (2010) | 28, 29 |
| *Balint v. Carson City*, <br> 180 F.3d 1047 (9th Cir. 1999) | 25 |
| *Capitol Audio Access, Inc. v. Umemoto*, <br> Dist. Court, ED California 2013 (No. 2:13-cv-00134-GEB-EFB) | 39 |
| *Childress v. Darby Lumber, Inc.*, <br> 357 F.3d 1000 (9th Cir. 2004) | 53 |
| *Colacurcio v. City of Kent*, <br> 163 F.3d 545 (9th Cir. 1998) | 22 |
| *Davis v. Metro Productions, Inc.*, <br> 885 F. 2d 515 (9th Cir. 1989) | 36 |
| *Devereaux v. Abbey*, <br> 263 F.3d 1070 (9th Cir.2001) | 21 |
| *eBay Inc. v. MercExchange, L.L.C.*, <br> 547 U.S. 388 (2006) | 50 |
| *EEOC v. United Parcel Serv.*, <br> 424 F.3d 1060 (9th Cir. 2005) | 22 |
| *Facebook v. AdScend*, <br> No. 5:12-cv-00414 LHK, 2012 (N.D. Cal. Apr. 25, 2012) | 20 |
| *Facebook v. Fisher*, <br> No. C-09-5842 JF (PSG), 2011 (N.D. Cal. Jan. 26, 2011) | 20, 46 |

*Facebook v. Guerbuez*,
  No. 5:08-cv-03889-JF, 2008 (N.D. Cal. Nov. 25,
  2008) ..... 20

*Facebook v. Wallace*,
  No. C-09-00798 JF, 2009 (N.D. Cal. Nov. 6, 2009) ..... 19

*Farmers Insurance Exchange v. Steele Insurance
  Agency, Inc.*,
  No. 2:13-cv-00784-MCE-DAD, 2013 WL 3872950
  (E.D. Cal. July 25, 2013) ..... 29

*F.T.C. v. Sili Neutraceauticals, L.L.C.*,
  2008 WL 474116 ..... 46

*Goodman v. Staples The Office Superstore, LLC*,
  644 F.3d 817 (9th Cir. 2011) ..... 53

*Gordon v. Virtumundo, Inc.*,
  575 F.3d 1040 (9th Cir. 2009) ..... 26, 33

*Guatay Christian Fellowship v. County of San Diego*,
  670 F.3d 957 (9th Cir. 2011) ..... 21

*In re Vachani*,
  Bankr. N.D. Cal. 2012, Case No. 12-47150 RLE 13 ..... 17

*International Airport Centers, LLC v. Citrin*,
  440 F.3d 418 (7th Cir. 2006) ..... 42

*LVRC Holdings LLC v. Brekka*,
  581 F.3d 1127 (9th Cir. 2009) ..... 36-38, 40-42

*Momot v. Mastro*,
  652 F.3d 982 (9th Cir. 2011) ..... 49

*Multiven, Inc. v. Cisco Sys. Inc.*,
  725 F.Supp.2d 887 WL 2889262 (N.D. Cal., 2010) ..... 38-39

*Olsen v. Idaho State Bd. of Medicine*,
  363 F.3d 916 (9th Cir. 2004) ..... 22

*Omega World Travel v. Mummagraphics*, Inc.,
  469 F.3d 348 (4th Cir., 2006) ..... 33

*Paladin Assocs., Inc. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ..... 54

*Payne v. Exxon Corp.*,
  121 F.3d 503 (9th Cir. 1997) ..... 54

| | |
|---|---|
| *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676 (9th Cir. 2012) | 21 |
| *Simo v. Union of Needletrades*, 322 F.3d 602 (9th Cir. 2003) | 22 |
| *Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110 (9th Cir. 2003) | 21 |
| *Szajer v. City of Los Angeles*, 632 F.3d 607 (9th Cir. 2011) | 21 |
| *TrafficSchool.com, Inc. v. Edriver, Inc* 653 F.3d 820 (9th Cir. 2011) | 48-49 |
| *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co.*, 546 F.3d 1142 (9th Cir. 2008) | 21 |
| *United States v. Carr,* 513 F.3d 1164 (9th Cir. 2008) | 42 |
| *Universal Health Servs., Inc. v. Thompson,* 363 F.3d 1013 (9th Cir. 2004) | 21 |
| *U.S. v. Nosal,* 676 F. 3d 854 (9th Cir. 2012) | 36-37 |
| *Viceroy Gold Corp. v. Aubry,* 75 F.3d 482 (9th Cir. 1996) | 49 |

## Table of Statutes and Other Authorities Cited

### STATUTES

| | |
|---|---|
| 15 U.S.C. §7701 - Controlling the Assault of Non-Solicited Pornography And Marketing Act of 2003 ("CAN-SPAM Act") | 1-2, 4, 14-15, 16, 18, 22-23, 25-27, 30-34, 45 |
| 15 U.S.C. § 7701(b)(2) | 32 |
| 15 U.S.C. § 7704(a) | 32-33 |
| 15 U.S.C. § 7704(a)(1)(C) | 33 |
| 15 U.S.C. § 7704(a)(6) | 33 |
| 15 U.S.C. § 7706(g) | 25 |

## STATUTES

| | |
|---|---|
| 18 U.S.C. § 1030 - Computer Fraud and Abuse Act ("CFAA") | 1-2, 4, 14-16, 18, 22-23, 27-29, 36-40, 44-45 |
| 18 U.S.C. § 1030(a)(1)-(7) | 36 |
| 18 U.S.C. § 1030(a)(2) | 36-37, 39-40 |
| 18 U.S.C. § 1030(a)(2)(C) | 36-37, 39 |
| 18 U.S.C. § 1030(a)(4) | 39-40 |
| 18 U.S.C. § 1030(a)(5)(B) | 35-36 |
| 18 U.S.C. § 1030(e)(8) | 38 |
| 18 U.S.C. § 1030(e)(11) | 27 |
| 18 U.S.C. § 1030(g) | 36, 39 |
| 28 U.S.C. § 1291 | 1 |
| 28 U.S.C. § 1331 | 1 |
| 28 U.S.C. § 1367 | 1 |
| C.P.C. § 502 | 1-2, 4, 15-16, 22-23, 29, 37-38, 40-45 |
| C.P.C. § 502(a) | 39, 41-42 |
| C.P.C. § 502(c) | 1, 4, 41-42 |
| C.P.C. § 502(e) | 23, 29 |

**OTHER TEXTS**

| | |
|---|---|
| Chat reaches 1 billion messages sent per day, https://www.facebook.com/note.php?note_id=91351698919 | 2 |
| Facebook's Getting Started Page, http://www.facebook.com/gettingstarted.php? | 6 |
| Facebook's Invite Your Friends page, https://www.facebook.com/invite.php | 6 |
| Facebook for Business, https://www.facebook.com/business | 7 |
| Quickstart: Facebook SDK for JavaScript, https://developers.facebook.com/docs/javascript/quickstart/ | 7 |
| Facebook's Statement of Rights and Responsibilities, https://www.facebook.com/legal/terms | 7 |

**JURISDICTIONAL STATEMENT**

The United State District Court for the Northern District of California (the "District Court") had subject matter jurisdiction over this action against Plaintiff-Appellee Facebook, Inc. ("Facebook") pursuant to 28 U.S.C. §§ 1331 and 1367. The District Court entered final judgment on all claims for relief in the underlying action on September 25, 2013. 1-ER 3-36 (unsealed version only; no reference to redacted portion(s)). Appellants filed their effective notices of appeal on October 2, 2013 and October 6, 2013. 2-ER 89-93. This Court ordered consolidation of their appeals on January 8, 2014. 1-ER-1. This Court has jurisdiction under 28 U.S.C. § 1291.

**INTRODUCTION**

In December 2008, Plaintiff Facebook, Inc. ("Facebook") filed in the Northern District Federal Court of California a complaint against joint defendants Power Ventures, Inc.—a then-competitor of Facebook—and Power's CEO, Steven Vachani (hereafter "Power" and "Vachani" respectively or "Defendants" collectively), for, *inter alia*, violations of the Controlling the Assault of Non-Solicited Pornography And Marketing Act of 2003 (15 U.S.C. §2701 *et. seq*.; "CAN-SPAM Act"), the Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et. seq*.; "CFAA"), and California Penal Code § 502(c) ("C.P.C. § 502"). The actions underlying these tort claims consisted of approximately 60,627 electronic notifications sent through the Facebook server from Facebook users

communicating the terms of a Power.com promotional event to their friends via Facebook's communication tools—in other words, people used Facebook as Facebook is intended to be used. Notably, not a single user complaint was received by Facebook in response to the Power campaign event emails, and the only activity said campaign generated on Facebook's servers was a mere 60,627 messages out of approximately 30 billion total—roughly 0.0002% of all Facebook messages—sent from one Facebook friend to another over the term of nearly one month[1].

Understandably, the record over five years of litigation implies this case is unusually complex, but it is actually a simple matter that began with Facebook users promoting Power.com to their Facebook friends and resulted in Facebook's exploitation of seldom-litigation criminal statutes in persecution of a competitor who allegedly violated Facebook's Terms of Use. Instead of bringing an action for breach of contract or any other cause relevant to said grievance, however, Facebook expressly, in writing, allowed Power to continue operating their platform enabling Facebook users to communicate with other Facebook users through Power's interface for nearly one month before electing to pursue action under three criminal statutes for the transmission of electronic messages containing not a hint of misleading or offensive material but merely inviting friends of Facebook users to join Power.com. As the purpose of Power's campaign and, thus, the

---

[1] Facebook reported it reached 1 billion messages per day in June 2009. https://www.facebook.com/note.php?note_id=91351698919.

2

communications associated therewith was specific and exclusive to increasing Power.com usership, to be deceptive or intentionally misleading in any way would have defeated Power's very goal.

Facebook's claims are based on a single underlying theory that because Power's service enabled Facebook users to automate actions using their own data that users could have performed themselves manually, Power violated the law and Facebook, despite suffering no loss, is thus owed tens of millions of dollars. Given the innovative and utilitarian nature of Power's business and the messages sent by Facebook users in relation to Power's business activities, such proposition is facially absurd. In the actions at issue, each user had to provide her own valid username and password through Power to obtain access to Facebook and her own social networking data and to affirmatively opt in to a promotion to allow Power to automate Facebook's Event invitation feature, actions requiring user direction and consent. Misapplication of these criminal statutes to the innocuous facts of this case is dangerous as a matter of policy, thwarting consumer choice and giving service providers the power to manufacture and cherry-pick anti-competitive lawsuits against follow-on innovators.

After more than three years of discovery, summary judgment was awarded in favor of Plaintiff's claims in February 2012, erroneously ignoring Defendants' diligent and substantiated disputes of Facebook's purported evidence, finding no genuine issue of material fact as to whether Power committed acts sufficiently

violative of the CAN-SPAM Act, CFAA, and C.P.C. § 502. On September 25, 2013, the trial court entered its final order in favor of Facebook regarding damages, Vachani's liability and Facebook's request for permanent injunction.

The trial court's interpretation of select phrases in the CAN-SPAM Act, CFAA and C.P.C. § 502(c) give those statutes a broader application than previously established in the Ninth Circuit, which is particularly concerning as these statutes are criminal laws with very narrow private rights of action. Such broad application not only threatens to stifle innovation, but also creates legal uncertainty and the risk of capricious enforcement for those working in Facebook's seemingly endless-reaching technology sphere.

## STATEMENT OF ISSUES

1. Whether it was error to grant Facebook—and deny Defendants—summary judgment given Facebook's failure to meet standing requirements or establish the substantive elements of any of their alleged claims.

2. Whether the trial court exceeded its power when it imposed against Defendants and as yet unknown third parties a vague and over-broad permanent injunction prohibiting a swath of lawful activities where Facebook offered no evidence of actual or likely future harm.

3. Whether the District Court abuse its discretion when it ordered discovery sanctions against a cooperating individual witness for costs of a renewed corporate Fed. R. Civ. P. 30(b)(6) deposition based on alleged unpreparedness

of the corporate defendant and in light of a previous order imposing said sanctions on the corporate defendant alone.

## PERTINENT LEGAL PROVISIONS

The legal authorities pertinent to this appeal are set forth verbatim in the Addendum to the Briefs filed with this brief.

## STATEMENT OF THE CASE

This appeal arises from a dispute between Appellee-Plaintiff Facebook, Inc. and Appellants-Defendants Power Ventures, Inc. and Steven Vachani over promotional electronic messages sent by Facebook users while accessing their Facebook accounts using Power's Power.com web browser.

### A. The Parties And Their Businesses

Facebook, Inc. owns and operates the social media website Facebook.com, which allows its users to store their own information on Facebook's servers using Facebook's web interface for uploading and viewing information. This interface allows Facebook users to make lists of friends, publish status updates, post photographs and videos, create common interest groups, and manage pages on behalf of organizations and public figures. It also allows users to create virtual and actual "events" and invite their friends to attend, as well as enables users to invite friends to connect on Facebook through third-party services, as did Power.com and as is commonplace in the industry. 2-ER 173 at ¶ 3.

Facebook itself uses this step in the Facebook user account creation process[2]. On this page, Facebook solicits users to enter their account names and passwords for users' email accounts at Microsoft Outlook (Hotmail), AOL, Yahoo or other third party websites. *Id*. Facebook then uses the account information to allow the user to access those accounts through Facebook, and to import information – *i.e.*, to "scrape" data – from those third-party sites into Facebook. This practice fuels Facebook's growth by allowing Facebook to add millions of new users, and to provide users with convenient tools to encourage their friends and contacts to join Facebook as well[3]. The act of a user providing their user name and password and authorizing an agent to send invitations on their behalf inviting users to try new services is a truly standardized internet practice utilized by major internet companies. *See, Vachani's Pro Se Supplemental Brief Regarding Liability and Damages,* 2-ER 121:15-20. Facebook itself built a very significant portion of its 900+ million registered users through this similar practice of asking user to share their user name and password with Facebook and allowing the user to authorize Facebook to access a competitors sites. *Id.*

As part of its business model, Facebook has steadily increased the amount of information they offer to third parties about their users and user activities for

---

[2] http://www.facebook.com/gettingstarted.php?
[3] https://www.facebook.com/invite.php

commercial and noncommercial use[4]. Facebook has several Application

Programming Interfaces, or APIs, through which third parties can see the

information and activities of Facebook's users[5]. Through controversial changes to

its terms of service and the functionality of its API, Facebook offers to certain third

parties and advertisers as much information about any particular user and his or her

friends as that user personally could have accessed using Power's service[6].

Beginning in 2006, defendant Power operated a website known as

Power.com, which allowed users to access various social networking websites (*e.g.*

MySpace and Orkut) in one place. 2-ER 124. Power's service enabled individuals

with valid accounts on multiple social networks to aggregate their information

stored with each network, giving them the ability to view their data and friend lists,

as well as other information, across multiple services on a single screen. 2-ER at ¶

2. The user could then click through the Power.com interface to go to any of her

social networks and interact with them through that network's user interface.

Power's service was a follow-on innovation to social networking services, giving

the user more options to view and use her own information stored with them. For

instance, Power.com allowed a user to see all of her friends and contacts in a single

---

[4] *See, generally,* https://www.facebook.com/business.

[5] https://developers.facebook.com/docs/javascript/quickstart/.

[6] Facebook's Statement of Rights and Responsibilities confirms: "You own all of
the content and information you post on Facebook…" (last revised Nov. 15,
2013), https://www.facebook.com/legal/terms.

list, regardless of which social networks they used. Power also offered the user a tool by which she could easily export her information from social networks into a spreadsheet format, thus aiding users who might want to move their information from one social network to another. *Id.*

At the time this action commenced, Power was still in its infancy and striving to contribute to the world of social networking by improving user experiences across all platforms. *Id*. Power had a vision to create a truly open internet where users have complete control over their own data, and this vision reflected the efforts and support of some of the world's most respected Internet investors. *Id*. These factors—in addition to the fact that Power made prompt, good faith attempts to negotiate an amicable resolution upon Facebook's discovery of Power's campaign emails—differentiate Power from the types of ill-intentioned actors the statutes at issue were designed to regulate. The contrast of the bare nature of this case compared to those of the remainder of Facebook's own litigation history against purveyors of egregiously pornographic or intentionally deceptive messages makes strikingly apparent that Power's business activities are not within the intended regulations of these laws: In *Wallace*[7], Facebook pursued known scam artists who sent spam messages to Facebook users' message walls aimed at *deceiving recipients* into visiting defendants' phishing sites. In *Fisher*[8], Facebook

---

[7] *Facebook v. Wallace*, No. C-09-00798 JF, 2009.
[8] *Facebook v. Fisher*, No. C-09-5842 JF (PSG).

pursued defendants who sent more than 7.2 million spam messages to Facebook users after obtaining information for at least 116,000 Facebook accounts *without consent*. In *Guerbuez*[9], Facebook pursued defendants who sent more than 4 million *sexually explicit* spam messages from members' profiles. In *AdScend*[10], Facebook pursued defendants accused of running a $20 million-a-year spam scheme that leads social-media users to advertising sites by offering *fake links to salacious videos*.

For approximately one month in December 2008, Power offered Facebook users the ability to connect to Facebook through Power's browser. Power stopped providing its service to Facebook users when Facebook informed Power on December 30, 2008 they would not grant further extension of time to Power to complete the Facebook Connect integration. 2-ER 173 *at ¶ ¶ 11, 12*.

## B.  Power's Campaign—The Subject Of The Litigation

In late 2008, Power added Facebook to its social network collection and ran a launch campaign—"Bring 100 Friends, Win 100 Bucks!"—whereby users of Power.com could invite their Facebook friends to create a Power.com through a Facebook "event" page. 2-ER 172 at ¶ 3. When event invitations were created by Facebook users, Facebook automatically sent an email notification to everyone who was invited to the Launch Promotion event, which Facebook does, per their

---

[9] *Facebook v. Guerbuez*, No. 5:08-cv-03889-JF, 2008 (N.D. Cal. Nov. 25, 2008).
[10] *Facebook v. AdScend*, No. 5:12-cv-00414 LHK, 2012 (N.D. Cal. Apr. 25, 2012).

own design and policy, whenever a Facebook user is invited to an event. *Id*. The

recipient user was then notified of the invitation via whichever notification method

that user designated in his or her Facebook.com account settings. In other words,

invited friends who opted to receive email notifications from Facebook.com when

their friends sent communications received said invitation to view the contest event

via email.

  The screen captures from Facebook.com below illustrates the event creation

process:





2-ER 154-155.

      To the extent Power can be considered a "sender" of the emails at issue by virtue of their initiation, such activity merely involved user-prompted auto-population of a Facebook "event" in the same manner a website auto-populates an email message when a visitor clicks "Contact Us" or "Send Us Feedback".

      After the user has created the event and selected the friends to be invited, Facebook then sends the invitations by email:

```
Nik invited you to "Bring 100 friends and win 100 bucks!" on Friday, March 20
at 1:00am.

Nik says, "Bring 100 friends and win 100 bucks!".

Event: Bring 100 friends and win 100 bucks!
What: Reunion
Host: Power
Start Time: Friday, March 20 at 1:00am
End Time: Friday, March 20 at 11:55pm
Where: Power

To see more details and RSVP, follow the link below:
http://www.facebook.com/n/?event.php&eid=[redacted]

Thanks,
The Facebook Team
___

Want to control which emails you receive from Facebook? Go to:

http://www.facebook.com/editaccount.php?notifications&md=ZXZlbnRfaW52aXRlO2Zyb
209MTEzNTM3MDM4NztlaWQ9NDc0NjIwODYxODk7dG89MTEwNzc2ODMyOA==
```

2-ER 187 at ¶ 70.

This email is sent by Facebook per the user's Facebook notification settings.

If, for example, the recipient user elected not to receive email notifications from

Facebook, the user would be notified of the Event invitation upon logging into

their Facebook account. Facebook determines the address that appears in the

"From:" field. 2-ER 187 at ¶ 68. Facebook also adds the closing signature from

"The Facebook Team." Neither the user nor Power has any control over these

elements of the email message. Facebook's complaint alleges Power sent

"unsolicited" email messages to Facebook users which were "deceptive and

misleading." 2-ER 186 at ¶ 65-188 at ¶ 73. That allegation is false. Power was at

all times an authorized agent of its users while helping them complete actions they

could just as well have manually completed on their own. 2-ER 121:2-4. Further, Power did not send the email message referenced in the complaint. Facebook did[11].

To participate in Power.com's launch campaign, Power users would click a button on the Power.com website stating, "First 100 people who bring 100 new friends to Power.com win $100. Join now!" 2-ER 121:5-14. The user was then presented with options for how they wanted to share the promotion with their Facebook friends—i.e., through photos, events and/or status (see figure below). If the box authorizing the event was checked and Power users clicked "Yes, I do!," the user's friends were then invited to attend the launch promotion event. *Id.* If a Power user chose not to participate, he or she had four opportunities to decline: by ignoring the Launch Promotion notice, by unchecking the box authorizing the creation of a Facebook event, by clicking "No, thanks," or by clicking the "X" in the corner of the Launch Promotion to close the offer. *Id.*

The screen capture from Power.com below depicts the foregoing process as presented to Power.com users:

---

[11] Q: That "from" line was automatically generated by Facebook's computers; right?
  THE WITNESS: Automatically generated by Facebook's computers or their systems, based on a prompt from somebody outside. Right. Could be a user. Could be whoever – whoever's creating the event.
  2-ER 158:2-5.



2-ER 101.

Facebook failed to offer any evidence that anyone was misled or that there were any user and/or recipient complaints regarding messages send during Power's launch campaign. Facebook was unable to identify anyone who was misled by the events described in the complaint and was unable to produce any documents evidencing anyone being misled. 2-ER 150:16-21. Since no one was misled, no one complained:

Q. Have you seen general complaints about power.com?

A. No.

Q. All right. So you haven't seen any specific complaints and you haven't seen any general complaints. What kind of complaints have you seen?

A. I've not seen any complaints regarding Power.com based on my preparation for this deposition or otherwise.

*Id*.

14

## C.  Power's Pre-Litigation Cooperation With Facebook

In late December 2008, Facebook attempted to prevent Power's users from accessing Facebook through Power.com's browser by blocking one IP ("Internet Protocol") address utilized by Power.  2-ER 173 at ¶ 11. This IP block was ineffective because Facebook blocked only one outdated IP address Power had used and did not block other IPs that Power was using in the normal course of business. *Id.*. Contrary to Facebook's claims, Power did not undertake any effort to circumvent that block, did not provide users with any tools designed to circumvent it and did not make any contrary statements or admissions during the course of this action. *Id.*

During this time, Power was actively working with Facebook to develop its Facebook Connect infrastructure as Facebook had requested. 2-ER 173 at ¶ 11. Discussions between Power and Facebook ensued throughout most of December as Power worked diligently to integrate their system with Facebook Connect. 2-ER 96 at ¶ 6. Email correspondence exchanged between Vachani—as Power's CEO and on Power's behalf—and Facebook counsel on various dates in December 2008 unequivocally shows: 1) On December 15, 2008, Facebook expressly granted Power until December 26th to integrate the Facebook API and authorized Power to continue operating on their site with the then-current version of their software; 2) Power and Vachani kept Facebook abreast of their progress and emphatically communicated their intentions to work with Facebook to implement a system fully

compliant with Facebook's Terms of Use[12]; and 3) Facebook's focus was solely on getting Power to agree to operate within Facebook's Terms of Use. 2-ER 103-108.

Negotiations between Power and Facebook over the implementation of Facebook Connect broke down on December 26, 2008, and Power voluntarily shut down its Facebook integration completely as quickly as possible and no later than early January 2009. 2-ER 174 at ¶ 12. Power never made any additional attempts to connect to Facebook in any way. *Id*. Power went out of business in April, 2011. *Id*.

## D. Proceedings In The District Court

After working with Power and allowing Power to continue using their Facebook-related platform while integrating their platform with Facebook's Connect API, Facebook brought suit on December 30, 2008 claiming Power and its employee were liable under three criminal statutes—the CAN-SPAM Act, CFAA and C.P.C. § 502—for wholly transparent, non-offensive use of Facebook's services for the purposes such services were made to be used. Thus, Facebook's

---

[12] December 18, 2008, Vachani email to Cutler: "Based on the more detailed feedback, I am concerned that my goal of December 26th may have been too optimistic. Rather than waiting until the last day, I would like to have an open and transparent conversation with you about our progress and also early next week share with you a visual product plan on what is being implemented for you to fully appreciate the amount of resources and time we are putting into this reintegration with Facebook connect. It is my hope that after I present this that you and your team will see the good faith effort that our team is making to make this integration as smooth as possible." 2-ER 105 (emphasis added).

intent in bringing suit appears to be aimed *not* at protecting users from the sharing of their information with third parties or even at preventing commercialization of its service, but rather at ensuring Facebook's own control over—and the corresponding ability to monetize—user information, even against the users themselves.

1. The Trial Court Denied Cross-Motions For Summary Judgment On The C.P.C. § 502 Claim.

In 2009 and 2010, the parties each submitted motions for summary judgment on Facebook's C.P.C. § 502 claim. 1-ER-66. The Electronic Frontier Foundation (the "EFF") was permitted to submit a brief wholly in support of Defendants' motion. 1-ER 73:3-4. On July 20, 2010, the trial court issued an order, *inter alia,* denying the parties' Cross-Motions for Summary Judgment but finding that Facebook had standing to sue under C.P.C. § 502. 1-ER 65-88.

2. The Trial Court Granted Summary Judgment In Favor Of Facebook And Against Power Ventures, Inc. On All Claims.

Subsequent to the July 20, 2010 order, the parties conducted additional discovery and re-submitted cross-motions for summary judgment on the three remaining claims: CAN-SPAM Act, CFAA and C.P.C. § 502. 1-ER 46-47. Again, the EFF submitted a brief wholly in support of Defendants' motion. 1-ER 58 at Fn. 31.

On February 16, 2012, the District Court granted Summary Judgment in favor of Facebook on all three counts, finding that Facebook satisfied standing to

bring claims and that Power violated the substantive provisions of CAN-SPAM

Act, CFAA and C.P.C. § 502. The trial court based its summary findings on a series

of improper factual determinations and conclusions of law inconsistent with this

Court's prior and subsequent dictates.

3. The Trial Court Ordered A Renewed F.R.C.P. 30(b)(6) Deposition of Power And Ordered Power To Pay Reasonable Costs And Fees Of The Renewed Deposition.

On March 1, 2012, Judge Spero ordered responsive emails not copied to

Vachani to be produced to Facebook and a renewed 30(b)(6) deposition to be taken

of corporate defendant Power with reasonable costs and fees for the renewed

deposition to be paid by Defendant. 1-ER 44-45.

In late August 2012, both defendants filed for bankruptcy, and the action was

stayed until February 2013. The individual defendant, Steven Vachani, filed for

bankruptcy in August 2012 and that matter is currently proceeding as a Chapter 7

action in the Northern District of California Bankruptcy Court. *In re Vachani*,

Bankr. N.D. Cal. 2012, Case No. 12-47150 RLE 13, 7.

4. The Trial Court Granted Facebook's Request For $39,796.73 In "Reasonable Costs And Fees" For The Renewed Deposition Against *Both* Defendants.

Nearly 15 months following the District Court's sanctions order, *Id.*,

Facebook sought recovery of costs and fees for the renewed 30(b)(6) deposition of

Power in the outrageous amount of $39,796.73 posited as reasonable in their

Motion for Costs. 1-ER 37:18. On August 7, 2013, the District Court granted

Facebook's motion for costs of the renewed deposition against *both* defendants. 1-ER 37-43.

5. The Trial Court Denied Defendants' Request For Reconsideration, Granted Facebook's Motion For Permanent Statutory Injunctive Relief, Found Vachani Liable On All Counts And Entered A Damages Award In Favor Of Facebook.

On September 25, 2013, this Court granted to Facebook a statutory damages award of $3,031,350, compensatory damages as requested, and granted Facebook's motion for permanent injunction against "Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in- interest, and those in active concert or participation with them" from, *inter alia*, "Accessing or using, or directing, aiding, facilitating, causing, or conspiring with others to use or access the Facebook website or servers *for any purpose*, without Facebook's prior permission." 1-ER 35:4-6, 16-18 (*emphasis added*) (unsealed version only; no reference to redacted portion(s)).

**SUMMARY OF APPELLANTS' ARGUMENT**

This is a lawsuit where no one was misled, where no user complained, and where Facebook suffered no damage or loss, yet the lawsuit has been pending for more than five years, resulted in two bankruptcies and the effective foreclosure of a once thriving technology company. The trial court erroneously and improperly found meritorious Facebook's unsupported claims to significant adverse effects, including approximately $75,000 in time spent by their lawyers at Perkins Coie to

assess and file their complaint and approximately $5,500 in compensation to an employee who supposedly spent 3-4 days of his own engineering time "investigating" Power.com, as well as damage to Facebook's reputation and goodwill. 1-ER 52:10-53:1. Significantly, none of these "harms" is redressable under the CAN-SPAM Act, CFAA or CPC § 502 since there was no claim or evidence of any computer or network impairment, nor data manipulation or loss, nor threat to security. In fact, the only associated damages, if any, were at Facebook's own unnecessarily reactionary instigation during a time when Power was making good faith attempts to negotiate an amicable resolution to Facebook's demand that Power comply with their Terms of Use.

In addition to misapplying law that is relatively scant and recent in development, the trial failed to even consider 1) the practical nature of the messages at issue (i.e., innocuous and non-deceptive), 2) the functional effects of its ruling on social media users and innovators, and 3) whether the facts of the instant matter comport with intended Congressional regulation, as must be considered when the subject technology of the statute changes constantly and there exists so little in the way of controlling authority.

The individual Appellant-Defendant Vachani's further appeals the District Court's order finding him, an individual codefendant-witness, liable without proper legal or factual finding for payment of the discovery sanctions originally imposed against the corporate defendant-deponent.

**ARGUMENT**

**I.  THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AS TO FACEBOOK AND DENYING SUMMARY JUDGMENT AS TO DEFENDANTS.**

*A. Standard of Review.*

A district court's decision to grant or deny summary judgment, including decisions on cross motions for summary judgment, is reviewed *de novo*. *See, e.g., Szajer v. City of Los Angeles*, 632 F.3d 607, 610 (9th Cir. 2011); *Universal Health Servs., Inc. v. Thompson*, 363 F.3d 1013, 1019 (9th Cir. 2004); *Guatay Christian Fellowship v. County of San Diego*, 670 F.3d 957, 970 (9th Cir. 2011); *Travelers Prop. Cas. Co. of Am. v. ConocoPhillips Co*., 546 F.3d 1142, 1145 (9th Cir. 2008); *Arakaki v. Hawaii*, 314 F.3d 1091, 1094 (9th Cir. 2002). The appellate court's review is governed by the same standard used by the trial court under Fed. R. Civ. P. 56(c). *See Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). Summary judgment may be granted only where it appears that there is no genuine issue of triable fact and the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(c).

"Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir.2001).

On review, the appellate court must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues

of material fact and whether the district court correctly applied the relevant

substantive law. *See Olsen v. Idaho State Bd. of Medicine*, 363 F.3d 916, 922 (9th

Cir. 2004).

Summary judgment may be appropriate when a mixed question of fact and

law involves undisputed underlying facts. *See EEOC v. United Parcel Serv.*, 424 F.

3d 1060, 1068 (9th Cir. 2005); *Colacurcio v. City of Kent*, 163 F.3d 545, 549 (9th

Cir. 1998). However, summary judgment is not proper if material factual issues

exist for trial. *See Simo v. Union of Needletrades*, 322 F.3d 602, 610 (9th Cir.

2003).

The trial court's determination of whether a party has standing is reviewed

*de novo*. *See San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d

676, 699 (9th Cir. 2012).

### B. Overview of the Issues.

There are two sub-issues now before this Court subject to *de novo* review: 1)

whether genuine issues of material fact exist with respect to Facebook's standing to

bring each of their claims, and 2) whether the scant body of relevant substantive

law was properly applied to the facts of the instant matter.

The trial court erred in finding Facebook has standing to bring a private

action under the CAN-SPAM Act, CFAA and C.P.C. § 502 because Facebook did

not suffer damages sufficient to grant them standing under these statutes. Instead,

Facebook deliberately mischaracterized their claimed "damages" of approximately

$5,500 for 3-4 days' salary for one engineer to "investigate" the alleged spamming for which he found no harm to Facebook's network, computers or data, and $75,000 in legal fees to initiate litigation, which Facebook colored as "investigative costs" billed by "Cutler's Firm" (Perkins Coie LLP, who was Plaintiff's outside counsel at the time). Such self-imposed fees to investigate and litigate a competitor's use of their system does not qualify as "harm" under any interpretation or application of the statutes at issue.

Defendants further assert, without limitation, the trial court incorrectly applied the law as it relates to private action and erred in finding the email messages at issue were *materially misleading* in violation of the CAN-SPAM Act and incorrectly and detrimentally overlooked the critical issue of data ownership in its CFAA and CPC § 502 analyses in finding violations based on "unauthorized access" of data that Facebook did not own.

### C. The District Court Erred In Finding Facebook Has Standing To Bring Each Claim At Issue.

From the inception of this case, Defendants disputed Facebook's standing to assert the three claims at issue since both the types and provable amounts of damages claimed fall substantially short of the statutory thresholds for standing. Each of the statutes as issue provides specific standing requirements: CAN-SPAM requires that Facebook was adversely affected[13]; CFAA requires that Facebook

---

[13] 15 U.S.C. § 7704(f)(1).

suffered loss in excess of $5,000 related to computer impairment[14]; and C.P.C. §
502 requires that Facebook suffered damage or loss due to a violation of C.PC. §
502[15].

   To establish standing under their claims, Facebook offered two bases for
their alleged damages: 1) approximately $75,000 in legal fees paid to Facebook's
outside counsel at Perkins Coie LLP[16]; and 2) approximately $5,500 in fees paid to
their own employee who allegedly spent three to four days of "his own engineering
time" looking into Power's activities. 2-ER 52:16-17. Notably, the value of a few
days' of an employee engineer's time—an employee whose job is to conduct the
activities for which damages are claimed—is closer to $1,500 than the $5,500
claimed by Facebook[17], and Facebook's outside legal fees for assessing and filing
the core action appear to span far broader a time period than Power was even
actively integrated with Facebook[18].

---

[14] 18 U.S.C. §1030(c)(4)(A)(i)(I).

[15] Ca. Penal Code § 502(e)(1).

[16] Facebook claimed entitlement "to at least $80,543 in damages for internal and
external investigations related to Defendants' conduct and the implementation of
technical measures to restrict Defendants' access." 2-ER 109. Approximately
$75,000 of that total is attributed to legal fees paid to Perkins Coie LLP. 2-ER
52:16-17. *See also, Cutler Declaration In Support of Facebook's Motion for
Partial Summary Judgment* and *Exhibit C,* 2-ER 136-146.

[17] Based on three days of work at an estimated salary of $120,000.

[18] *See, generally, Cutler Declaration* and *Exhibit C,* 2-ER 136-146 (activities span
December 1, 2008 through at least June 10, 2009) (unsealed versions only; no
reference to redacted portion(s)).

Further, the trial court's order for summary judgment should be reversed because the court made numerous improper factual determinations in the face of Defendants' repeated challenges to the veracity of Facebook's facially suspect evidentiary offerings. *See Balint v. Carson City,* 180 F.3d 1047, 1054 (9th Cir. 1999) (the court must not weigh the evidence or determine the truth of the matter but only determine whether there is a genuine issue for trial).

Here, again, Defendants plead for the court's acknowledgement of Defendants' contentions as, at the least, a genuine issue of material fact to each and every one of Facebook's claims. Defendants request this Court recognize that the trial court's improper classification of "costs" unduly results in a new standard enabling an Internet Service Provider to drum up legal fees and/or permit an employee to take time away from his normal position to "investigate" network activity for which he charges an exorbitant fee in order to satisfy the damages requirement of each statute at issue. Indeed, such broad court sanction enables Facebook—an ever-expanding global power in the technology industry—to exercise their proven inexorable resolve to stifle budding competition.

1. The Trial Court Made An Improper Factual Determination And Erroneous Conclusions Of Law Regarding Damages Allowable Under the CAN-SPAM Act And Erred In Classification Of Damages In Its Determination.

The CAN-SPAM Act provides a very narrow private right of action under § 7706(g)(1) for (1) *internet service providers* (ISP) (2) *adversely affected* by

violations of this provision. *Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1049 (9th Cir., 2009). As Defendants concede Facebook is an ISP, the sole issue before the trial court in determining standing was whether Facebook was "adversely affected" by the alleged violations, and Facebook failed to produce any evidence demonstrating network crashes or other harm relating to bandwith utilization, hardware, network integrity, overhead costs, fees, staffing or equipment costs, which could have constituted recognizable harm under *Gordon*. *See Id.* at 1055-56.

In *Gordon,* this Court construed "adversely affected" to include: "the costs of investing in new equipment to increase capacity, customer service personnel to address increased subscriber complaints, increased bandwidth, network crashes, and the maintenance of anti-spam and filtering technologies. *Gordon*, 575 F.3d 1050, 1053. The Ninth Circuit was clear that these are "the 'sorts of ISP-type harms' that Congress intended to confer standing." *Id*. The *Gordon* court also provided "adversely affected" specifically does not include "the ordinary costs and burdens associated with operating an Internet access service." *Id*. at 1054.

In finding Facebook has standing to bring a private action under the CAN-SPAM Act, the trial court determined: "[A]s the undisputed evidence establishes that Plaintiff expended significant resources to block Defendants' specific spamming activity, the Court finds that Plaintiff has standing to maintain a CAN-SPAM action,"[19] yet all of the "harms" identified by Facebook's security manager

---

[19] 1-ER 54:10-12

Ryan McGeehan are vague and lacking in any sort of specificity. Mr. McGeehan identifies no unusual or extraordinary cost that Facebook incurred. *See ASIS Internet Servs. v. Azoogle.com, Inc.*, 357 Fed.Appx. 112, 113-114 (9th Cir. 2009) (holding ISP was not adversely affected by CAN-SPAM violations and lacked standing to sue where ISP argued harm based on employee time devoted to spam issues).

Contrary to the trial court's finding that "Defendants do not dispute the accuracy or veracity of this evidence of Plaintiff's expenditures," the record is rife with Defendants' disputes as to both the nature and amount of Facebook's claimed costs. 1-ER 53:2-3. It is truly perplexing how the trial court found Facebook's evidence to be uncontradicted when Defendants repeatedly pointed out Facebook's attempts to claim their "legal bills as part of its supposed 'harm.'" 2-ER 152:22-23.

Further to Facebook's failure to even allege qualifying "adverse effects" under their CAN-SPAM claim, Facebook produced no evidence of threat to their data or security. Indeed, Power did not access any nonpublic portion of Facebook's website. Power merely offered users a different and potentially superior browser through which they could access their Facebook accounts to copy, update, and/or port their own "User Content." And users did so by entering their own valid usernames and passwords. Power did not obtain any software, data, or other content of value from Facebook. The only data accessed through Power's utilities

were user's own "User Content," over which Facebook has disclaimed any ownership. 2-ER 169:25-170:3.

> 2. The Trial Court Made An Improper Factual Determination And Erroneous Conclusions Of Law Regarding Damages In Finding Facebook Has Standing Under The CFAA.

To allege a loss under the CFAA, "plaintiffs must identify *impairment of or damage to the computer system* that was accessed without authorization." *See, AtPac, Inc. v. Aptitude Solutions, Inc., et al.,* 730 F.Supp.2d 1174, 1184 (2010) (*emphasis added*). Plaintiff does not have standing under CFAA because they have not established allowing damage or loss as they failed to demonstrate or even claim that their network suffered disruption or slowdown[20].

In finding Facebook has standing to bring a private action under the CFAA, the trial court determined:

> Here, as discussed above with regard to Plaintiff's CAN-SPAM claim, Plaintiff has provided uncontradicted evidence of the costs of attempting to thwart Defendants' unauthorized access into its network…[t]he Court finds that on the basis of these costs, Defendants' unauthorized access of Plaintiff's network did cause sufficient loss to Plaintiff to confer standing upon Plaintiff.

1-ER 63:15-19.

Significantly, the CFAA does not count as loss the "costs of attempting to thwart" access where there has been no damage to the network or computer accessed. *See, AtPac, Inc., supra.* Neither Facebook nor the trial court was able to

---

[20] The CFAA defines "loss" as "any reasonable cost to any victim, including the cost of responding to an offense… incurred *because of interruption of service . . . .*" 18 U.S.C. § 1030(e)(11) (*emphasis added*).

point to any authority for the recovery under the CFAA of Facebook's legal fees and costs to investigate Power's activities, but the *Farmers* court, among others, made quite clear that neither attorney fees nor any other costs unrelated to the computer itself counts toward the $5,000 jurisdictional "loss" requirement to confer standing under the CFAA: "[c]osts *not related* to computer impairment or computer damages are not compensable under the CFAA." *Farmers Insurance Exchange v. Steele Insurance Agency, Inc.,* No. 2:13-cv-00784-MCE-DAD*, 2013 WL 3872950 (E.D. Cal. July 25, 2013) at 21 (*emphasis added*)*.

Plaintiff altogether failed to allege any kind of impairment or damage to their computer system. In fact, Facebook failed to cite interests other than their costs to litigate this matter and their desire for Power to comply with their Terms of Use when attempting to settle the dispute a mere six days after filing their lawsuit[21]. Plaintiff's sole claim of damages for attorney and engineer "investigation" fees, as described above, were incurred to assess and confirm that no such damage was sustained to Facebook's computers and to file this lawsuit after confirming no such damage was sustained. These are not compensable "losses" and cannot confer standing under the CFAA.

---

[21]  From the January 5, 2009 entry in an even log provided by Facebook: "Facebook communicates its willingness to settle the lawsuit against Power.com in return for the following: (a) a signed stipulated permanent injunction requiring Power.com *to comply with Facebook's Terms of Use in the future*; and (b) payment of to Facebook to *recoup the costs of having to litigate, rather than negotiate, to obtain compliance with its terms*." 2-ER 143-144.

3.  <u>The Trial Court Made An Improper Factual Determination And
    Erroneous Conclusions Of Law Regarding Damages In Finding
    Facebook Has Standing Under CPC § 502.</u>

Section 502(e) provides that "the owner or lessee of the computer, computer

system, computer network, computer program, or data *who suffers damage or loss*

by reason of a violation of any of the provisions of subdivision (c) may bring a

civil action against the violator for compensatory damages and injunctive relief or

other equitable relief." *See* C.P.C. § 502(e) (emphasis added).

Without performing a Section 502-specific analysis, the trial court

summarily found Facebook suffered sufficient harm to establish standing under

C.P.C. § 502: "[s]ince the undisputed facts demonstrate that Facebook has suffered

some damage or loss in attempting to block Power's access to Plaintiff's website,

the Court finds that Facebook has standing to bring suit under Section 502." 1-ER

72:Fn. 34. Contrary to the trial court's finding, Power presented evidence

specifically disputing Facebook's evidence in support of their claim for standing

under § 502, including Facebook's own admission. Mr. Clark, Facebook's in-house

counsel, admitted that Facebook has no evidence that it suffered any damage or

loss:

> Q: Can you identify anything that Power did that caused Facebook to lose
>    money?
> A: Same answer.
> Q: You can't answer?
> A: I can't answer that.
> …

> Q: Are you aware of any document concerning any injury that Facebook suffered as a result of the events described in the First Amended Complaint? Just the existence of a document.
> A: I don't know.
> Q: As you sit here today, you couldn't identify any document that would relate to that?
> A: No, I don't believe I can.

2-ER 160:4-14.

### D. The Trial Court Erred In Granting Facebook's Request For Summary Judgment And Denying Defendants' Request for Summary Judgment On All Claims.

Today's courts face inherent challenges not only in interpreting applications of new technologies through the narrowing lens of all-but-antiquated laws but also in applying these laws to modern, complex factual scenarios for which there is little, if any, precedent. The statutes at bar are particularly nuanced and rightfully so given that they primarily provide standards of criminal conduct. In that vein, Defendants offer to this Court as a candle in the dark the singularly consistent perspective of Congress that these laws serve to regulate intentionally deceptive and destructively larcenous practices.

1. The Elements of Facebook's CAN-SPAM Act Claim Were Not Established.

The CAN-SPAM Act provides "[i]t is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading." 15 U.S.C. § 7704(a) (1) (emphasis added). On summary judgment, the substantive CAN-SPAM issue

for the trial court was whether the message at bar contained or were accompanied by *materially false* or *materially misleading* header information. 1-ER 54.

Here, the presence of ample information identifying Power.com as the "host" of the Facebook event that was forwarded by Facebook users to their friends enabled Facebook, as well as users, to identify, locate or respond to Defendants without any delay or further investigation. Indeed, Power's campaign was launched for the sole purpose of attracting more users to join its social media aggregation site. Thus, it did not—and would have no reason to—disguise its identity or origin. This fact alone distinguishes this case from each case upon which Plaintiff bases their claims and removes the messages at issue from regulation as intended by Congress.

### a. The Email Header Information And Contents Of The Messages At Issue Were Not Misleading And Properly Enabled A Recipient Or ISP To Identity The Sender.

It cannot be overstated that this Circuit has made clear that to bring a private right of action under the CAN-SPAM Act—as opposed to criminal charges—a plaintiff is further burdened with showing the messages were "materially misleading" and not merely false. Though most CAN-SPAM case law to date deals with resolving preemption challenges, federal courts, including this Court, have quite specifically addressed the importance of the "materiality" requirement. In *Omega*, the Fourth Circuit expounded on the risks of attributing too much weight to mere inaccuracies:

If the alleged inaccuracies in a message containing so many valid identifiers could be described as "materially false or materially misleading,' we find it hard to imagine an inaccuracy that would not qualify as 'materially false or materially misleading.' Congress' materiality requirement would be rendered all but meaningless by such an interpretation.

*Omega World Travel v. Mummagraphics*, Inc., 469 F.3d 348, 358 (4th Cir., 2006).

In *Gordon*, this Court found:

Further scrutiny of congressional intent solidifies our reading of the preemption clause. As discussed *supra,* the CAN-SPAM Act prohibits only *deceptive* subject line headings or *materially* false or *materially* misleading header information. *See* 15 U.S.C. § 7704(a) (emphasis added); *accord* 15 U.S.C. § 7701(b)(2) ("[S]enders of commercial electronic mail should not *mislead* recipients as to the source or content of such mail." (emphasis added)).

*Gordon,* 575 F. 3d 1040, 1062.

In finding Power violated the substantive provisions of the CAN-SPAM Act then at issue, the trial court determined "Defendants initiated the sending of e-mails with false or misleading heading information under the CAN-SPAM Act[…]" 1-ER 59:1-4. Remarkably, the trial court makes no determination of "materiality"—a requirement quite expressly provided under the Act—and rests on a determination the message header information was merely *false* to summarily satisfy the criminal violation for which Facebook sought more than $18,000,000 in statutory and punitive damages.

The language of the CAN-SPAM Act provides two definitions of the materiality requirement:

> 1) A false or misleading statement is considered material if "the alteration or concealment of header information" would impair the ability of an [Internet Access Service] provider or a recipient to "identify, locate, or respond to a person who initiated the electronic mail message."

*Id.* § 7704(a)(6).

> 2) The Act further provides that "header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message *for purposes of disguising its origin*."

*Id.* § 7704(a)(1)(C) (*emphasis added*).

Of course, here, the IAS provider is the party who generated the header information, and the fact that the messages directed potential new users to Power.com very clearly also enabled Facebook as easily as any message recipient to "identify, locate, or respond to a person who initiated the electronic mail message." *Id.* § 7704(a)(6).

Likewise, neither Facebook nor the trial court pointed to any evidence implying the "false" header information was transmitted for the purpose of disguising the messages' origin, which at the very least draws into question whether the messages satisfy the definition of materiality under § 7704(a)(1)(C). It is not surprising that such evidence was not offered, as it takes little stretch of the imagination to find that a company promoting its service through Facebook users and, thereby, making its identity known for the purpose of increasing new usership is is not, by its very nature, disguising itself. It is further evident that a company

promoting its services through Facebook users is doing so for the purpose of

reaching the broad audience Facebook has amassed and not for some nefarious

purpose such as to falsely convey Facebook's promotion of Power's service.

Indeed, it is inconceivable that a recipient of an event invitation generated through

Facebook would misguidedly construe Facebook's personal sponsorship of "Joe's

25th Birthday Party" or "Mardi Gras Beer Fest 2014" or even "Bring 100 Friends,

Win 100 Bucks!"

> **b.  These Messages Fall Outside The Scope Of Control
> Congress Intended, As They Were Not Misleading,
> Pornographic Or Otherwise Offensive.**

With respect to Facebook activities for which users elect to receive

notification via email, Facebook, and Facebook alone, determines compliance with

CAN-SPAM requirements such as opt-out notices.  Facebook operates to enable

widespread sharing of information, and the undisputed evidence confirms that

Facebook transmitted the messages at issue. Irrespective of whether messages and/

or their headers failed to provide for all technical labeling requirements of the

CAN-SPAM Act, the undisputed evidence confirms there was no violation of this

section because the header information on the email was technically accurate and

no one was misled thereby.

> 2.  <u>The Elements Of Facebook's CFAA Claim Were Not Established.</u>

Following enactment of the Computer Fraud and Abuse Act in 1984, it is

quite telling that the unremitting emergence of new technology has failed to result

in any case law on topic. Understandably, it is utterly irrational to ascribe criminal conduct to a company that exists simply to provide an alternative tool for users to exercise expressly permissive access to data over which they—and they alone— exert ownership, especially where such alternative means of access causes no actual impairment to the host system nor to the copy of the user data stored on the host system.

Significantly, and as explained above, Power did not access any nonpublic portion of Facebook's website. The Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, is "designed to target hackers who accessed computers to steal information or to disrupt or destroy computer functionality, as well as criminals who possessed the capacity to access and control high technology processes vital to our everyday lives." *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009). The CFAA creates a civil right of action, in which the "plaintiff must prove that the defendant violated one of the provisions of [section] 1030(a) (1)-(7), and that the violation involved one of the factors listed in [section] 1030(a)(5)(B)." *Id.* at 1131.

In *Nosal*, the Ninth Circuit grappled with defining the functional bounds of the CFAA in resonance with 30-year old legislative concerns, discerning: "[W]e can properly be skeptical as to whether Congress, in 1984, meant to criminalize conduct beyond that which is inherently wrongful, such as breaking into a computer." *U.S. v. Nosal,* 676 F. 3d 854, 859 (9th Cir. 2012). Indeed, the Act

primarily serves to criminalize so-called "hacking" activities, such as identify theft, credit fraud, and espionage, and not to enable exploitation of the technicalities of progressive and ubiquitous technologies to criminalize innocuous activities of one's competitors.[22]

Despite their inability to identify any system impairment or data modification whatsoever, Plaintiffs brought suit under subsection (g) of the CFAA, which provides a private right of action for individuals injured by CFAA-prohibited crimes. 18 U.S.C. § 1030(g) requires a private plaintiff to prove the defendant violated one of the provisions of § 1030(a)(1)-(7), and the violation involved one of the factors listed in § 1030(a)(5)(B). See *Brekka*, 581 F.3d 1127, 1131.

In its order for summary judgment, the trial court found liability under the CFAA solely on § 1030(a)(2). To successfully bring an action under § 1030(g) for a violation of § 1030(a)(2)(C), Plaintiffs must allege facts sufficient to show Defendants: "(1) intentionally accessed a computer, (2) without authorization or exceeding authorized access, and . . . (3) thereby obtained information (4) from any protected computer . . . , and that (5) there was loss to one or more persons during any one-year period aggregating at least $5,000 in value." *Brekka*, 581 F.3d at 1132.

---

[22] "Congress enacted the CFAA in 1984 primarily to address the growing problem of computer hacking…" *U.S. v. Nosal*, 676 F. 3d 854, 858 (internal citations omitted).

In finding Power violated the substantive provisions of § 1030(a)(2)(C) of the CFAA Act then at issue, the trial court determined:

> In sum, for the reasons discussed above regarding Plaintiff's Section 502 claim, the Court finds that Defendants accessed Plaintiff's website without authorization and obtained information from Facebook. The Court further finds that Plaintiff suffered loss sufficient to confer standing [under the CFAA] as a result of such access.

1-ER 63-64.

In making its summary determination of Defendants' violation of the CFAA claim based on the prior determination of a violation of C.P.C. § 502, the trial court relied on a misinformed parallel to its own decision in *Mutiven, Inc. v. Cisco Sys., Inc.,* 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010). 1-ER 63:Fn. 43. The trial court's error in reliance on *Multiven* in this instance is fundamentally flawed in at least two respects:

1) The *Multiven* court's conclusion that the elements of C.P.C. § 502 and the CFAA do not materially differ was made after first applying the CFAA to the facts of *Multiven,* which is significant since, considered in context, the *Multiven* court is actually concluding that the provisions of § 502 are subsumed by those of the CFAA and not vice versa, leaving be any additional restrictions of the CFAA for that court's purposes. It should be noted that the *Multiven* court was quite clear in this regard: "Since the necessary elements of Section 502 do not differ materially from the necessary elements of the CFAA for purposes of this action, the Court finds that there are no genuine issues of material fact remaining as to Cisco Section

38

502 claim." *Id.* at 896. Interestingly, the presiding judge in the instant order—
which happens to be the same presiding judge in the court-cited *Multiven* order—
ignored his own previous finding in favor of adopting Facebook's re-interpretation
of *Multiven*'s findings in this regard.

2) Indeed, it is convenient for Facebook to have the trial court to adopt a
reverse parallel of these two statutes, as the CFAA's more stringent showing
requirements of both "access" and "damages" defeat Facebook's substantive CFAA
claim. For example, more than one court in this District has summarily rejected a
plaintiff's claim under CFAA where the plaintiff could not be found to have alleged
"damage" absent computer or data impairment nor "loss" absent interruption of
service.[23]

To the extent Facebook wishes to rely on the parallels of these statutes,
Defendants must note it it is well established that C.P.C. § 502 serves to regulate
the protection of data[24], and it is undisputed that Facebook users own their own
data[25].

---

[23] For example, the *Capitol Audio* court found "Plaintiff does not sufficiently
allege that Defendant caused 'any impairment to the integrity or availability of
data, a program, a system, or information.' 18 U.S.C. § 1030(e)(8). Nor does
Plaintiff sufficiently allege that Defendant caused 'loss' 'because of interruption
of service.' 18 U.S.C. § 1030(e)(11)." *Capitol Audio Access, Inc. v. Umemoto*,
Dist. Court, ED California 2013 (No. 2:13-cv-00134-GEB-EFB).

[24] *See, generally,* Cal. Penal Code § 502(a).

[25] *See* Facebook's Terms of Use, *supra.*

While the trial court ultimately found liability under the CFAA solely on § 1030(a)(2)(c), it should be noted that Facebook alleged violation of § 1030(a)(4) as well. To successfully bring an action under § 1030(g) based on a violation of § 1030(a)(4), Plaintiffs must show that Defendants: (1) accessed a "protected computer," (2) without authorization or exceeding such authorization that was granted, (3) "knowingly" and with "intent to defraud," and thereby (4) "further[ed] the intended fraud and obtain[ed] anything of value," causing (5) a loss to one or more persons during any one-year period aggregating at least $5,000 in value. *Brekka*, 581 F.3d 1127, 1132 (internal citation omitted).

Section 1030(a)(4) requires an intent to defraud and obtain a thing of value, which cannot be established in the present case since the thing "taken" was users' personal information to which Plaintiff had no proprietary rights and, thus, was of no legal value to Plaintiff. Even if the Court finds that users' data was of value to Plaintiff, users' voluntary, knowing and lawful sharing of their own exclusively owned data and Defendants' subsequent access to said data posed no threat to Plaintiff's value in said data since 1) Defendants did not destroy or otherwise impair the data in any way and no assertion nor evidence has been offered alleging as much, and 2) Plaintiff did not have ownership, let alone exclusive ownership, to the users' personal information[26].

---

[26] *See* Facebook's Terms of Use, *supra.*

Insofar as access to one's own data is authorized, neither the CFAA nor the C.P.C. § 502 is concerned with *how* said data is accessed or, likewise, from where it is accessed. Again, other causes of action may have been available to Facebook for Power's alleged violation of Facebook's Terms of Use, but Power's innocuous activity simply is not punishable under these primarily criminal statutes. In *Brekka*, the defendant used his login information to access his former employer's website statistics system. *Brekka,* 581 F.3d 1127 (9th Cir. 2009). The company discovered his access, disabled the account and sued Brekka, alleging that he violated 18 U.S.C. §§ 1030(a)(2) and (a)(4) by emailing files to himself for competitive purposes and for accessing the statistics website. *Id.* The Ninth Circuit upheld summary judgment in favor of Brekka. "For purposes of the CFAA, when an employer authorizes an employee to use a company computer subject to certain limitations, the employee remains authorized to use the computer even if the employee violates those limitations." In other words, "[a] person uses a computer 'without authorization' under [section 1030(a)(4) only] when the person has not received the permission to use the computer for any purpose (such as when a hacker accesses someone's computer without any permission), or when the employer has rescinded permission to access the computer and the defendant uses the computer anyway." Id. at 1135.

The plaintiff in *Brekka* had pointed to the Seventh Circuit case of *International Airport Centers, LLC v. Citrin*, 440 F.3d 418 (7th Cir. 2006), arguing

that an employee can lose authorization to use a company computer when the employee resolves to act contrary to the employer's interest. The Ninth Circuit explicitly rejected that interpretation because section 1030 is first and foremost a criminal statute that must have limited reach and clear parameters under the rule of lenity and to comply with the void for vagueness doctrine. *Brekka*, 581 F. 3d at 1134, citing *United States v. Carr,* 513 F.3d 1164, 1168 (9th Cir. 2008). As described further in Section IV, infra, Section 502(c) is also a criminal statute and must be narrowly drawn for the same reason.

3. The Elements Of Facebook's CPC § 502 Claim Were Not Established.

The California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502, "expand[s] the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). While there remains debate among the courts as to the proper interpretation of "unauthorized access", the statute itself leaves no doubt that it is specifically concerned with actual harm to the integrity of computers and data and/or the well-being of companies maintaining

such systems[27]. Where there is no breach of system integrity nor harm to one's wellbeing—neither of which has Facebook even alleged in the instant case—there can be no statutory violation of § 502.

Section 502(c) provides that a person is guilty of a public offense if he, *inter alia*: (1) knowingly accesses and *without permission* takes, copies, or makes use of any data from a computer, computer system, or computer network; (2) knowingly and *without permission* uses or causes to be used computer services; or (3) knowingly and *without permission* accesses or causes to be accessed any computer, computer system, or computer network. *See* Cal. Penal Code § 502(c)(2), (3) & (7) (emphasis added). The only question remaining before the Court in determining whether Defendants violated Section 502 was whether access was "without permission" within the meaning of § 502.

The trial court found in its July 20, 2010 order that since "Defendants do not directly admit that the tools Power provided to its users were designed to circumvent the technical barriers that Facebook put in place to block Power's access to the Facebook website," there was a genuine issue of material fact as to whether the access at issue was "without authorization" under C.P.C. § 502. 2-ER

---

[27] "[P]rotection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data." Cal. Penal Code § 502(a).

83:1-4. The court further found that to the extent Facebook can prove that Power circumvented Facebook's technical barriers in allowing users to access their Facebook accounts through Power's site, Power may be held liable for violation of Section 502. 1-ER 82:18-23.

Despite the utter lack of showing that Power took any steps whatsoever to "circumvent" Facebook's ineffective technical measures to limit—but admittedly not to block[28]—user access to their Facebook.com accounts via Power.com's browser, the trial court later concluded in its February 16, 2012 order that since Power's system was designed to be essentially immune to technical barriers (i.e., IP-blocking) *even prior to Power.com's integration with Facebook,* access of Facebook's public data by such system is sufficient to find that access is "without permission." 1-ER 62:2-15.

The potential breadth of the trial court's finding is dangerous, as it enables any website operator to spend a nominal amount of time and/or money blocking— or attempting to block—a single IP address from which a user has accessed that website and, subsequently, prevail on an action under C.P.C. § 502 if the source of that IP address has implemented a system designed to prevent IP-blocking, as so

---

[28] "Facebook has reviewed this letter, and is willing to accept your offer to have Facebook Connect implemented by EOD December 26 – which is two weeks from the date you sent the letter. Meanwhile, as you may know, Facebook has taken technical measures to limit the interaction between Power.com and its network at this time." 2-ER 105-106; Email from Facebook's counsel, Joseph Cutler, to Power's CEO, Steven Vachani.

many user-active website are. This is particularly astounding under the facts of the instant matter where 1) Facebook's so-called technical measure was merely to block a single outdated IP address[29], 2) Power did not take any action to circumvent Facebook's block, and such action would have been futile since Facebook's "block" was ineffective anyway[30], and 3) Facebook never even objected to their users' access of user data through Power's website, they objected to user access until Power became compliant with Facebook's Terms of Use[31], which this Court has already determined is not a factor in determining the "authorization" prong of § 502 or the CFAA[32].

To prevail on any of its § 502 claims, Facebook bears the burden to prove that it suffered "damage or loss." Facebook had every opportunity to attempt to substantiated their alleged "damage or loss" in discovery, yet they were unable to

---

[29] 2-ER 173:22-27.

[30] *Id.*

[31] In an email from Facebook's counsel, Joseph Cutler, to Power's CEO, Steven Vachani, Facebook offered to lift the "technical measures" they thought were in place if Power complied with their Terms of Use, specifically, if and when Power 1) purged any user data obtained prior to implementing Facebook Connect per *Facebook's Terms of Use*, 2) ceased displaying Facebook's trademarks on its website, *except as expressly permitted by Facebook's Terms of Use,* 3) implemented Facebook Connect *in strict adherence to Facebook's Terms of Use,* 4) removed all compatibility with Facebook's site that does not *comply with Facebook's Terms of Use*, and 5) agrees to *adhere to all of Facebook's Terms of Use* in the future. 2-ER 105-106.

[32] "In its July 20 Order, the Court explained at great length that a particular use of a computer network which violates that network's terms of use is insufficient to establish that the use was "without permission" pursuant Section 502." 1-ER 60:1-3.

produce any document evidencing such an injury or expenditure. Thus the

evidence the trial court contemplated in its prior order does not exist and Facebook

cannot be found to have standing under C.P.C. § 502.

### E. The Trial Court Erred In Finding The Individual Defendant Liable For The Acts Of The Corporate Defendant.

Ultimately, neither the trial court nor Facebook was able to cite a single case

where a non-exclusive owner or director was actually held liable, on the merits, for

any non-health related CAN-SPAM or other computer fraud-related actions of the

corporation, yet the court found Vachani "personally liable as a matter of law for

violations of CAN-SPAM, CFAA, and California Penal Code § 502" based on his

involvement in the corporation's activities as CEO. 1-ER 23:16-17.

In determining Vachani's personal liability, the trial court was urged to

recognize the utter lack of precedent for holding a CEO liable in this type of

computer fraud-related action where the CEO is not the exclusive owner or

director or where the action did not threaten the interest of public health (*See, e.g.,*

*F.T.C. v. Sili Neutraceauticals, L.L.C.*, 2008 WL 474116 at *3 (the company's sole

member was individually liable for the company's CAN-SPAM violations

involving misrepresentation of the nature and safety and of certain diet

supplements); *Davis v. Metro Productions, Inc.*, 885 F. 2d 515 (9th Cir. 1989) (two

individuals were the sole shareholders of the corporation); *Facebook, Inc. v. Fisher*,

No. C09-05842 JF (PSG), 2011 WL 250395 (N.D. Cal. Jan. 26, 2011) (the individual defendant was the "sole person to act" on behalf of the corporation);

Significantly, Vachani was never the sole owner of Power or even a controlling shareholder or board member, which had more than 100 full-time employees, seven executive officers, dozens of shareholders and a full board of directors. 2-ER 114. Power had sophisticated technology investors who shared in the decision making through a governance structure common among technology corporations that have received significant outside investment capital. 2-ER 114:20-26. While Vachani's role as CEO of Power Ventures, Inc. required him to be involved in most aspects of the business, in no way did he possess or exert unilateral control or decision-making. 2-ER 123:25-124:1. In fact, Vachani did not have the knowledge or training to exert the type of control over the corporation that Facebook alleged given his limited programming skills and necessary reliance on team members, including the Chief Technical Officer, to oversee all a wide set of technical employees of Power. 2-ER 115:1-8.

Further evidence of Vachani's personal irreproachability for the actions of Facebook's complaint is his prompt response and proactive communication with Facebook in an effort find an amicable solution during the approximately thirty days that Power's system was operational on Facebook. These efforts demonstrate professional cooperation between fellow technology companies, not the actions of a rogue spamming organization whose intent is the hack into, phish, and cause

damages to data of the target companies. 2-ER 122:26-123:3. *See also*, *Vachani and Cutler's Email Exchange*, 2-ER 103-108.

For the foregoing reasons, there is no basis to find Vachani jointly liability for the actions of the corporate defendant.

### F. Relief Requested.

As no genuine issue of material fact existed as to whether Facebook meets the standing and/or substantive requirements of any of the their claims, Defendants' motion for summary judgment on Facebook's three claims should have been granted in its entirety. Defendants thus request this Court reverse the trial court's finding of summary judgment and remand with an order for entry of summary judgment in Defendants' favor on all claims. Should the Honorable Court find existence of a genuine issue of material fact, Defendants request, in the alternative, this Court reverse the trial court's judgment on such related claim(s) and remand the action for trial.

## II. THE TRIAL COURT EXCEEDED ITS POWER BY IMPOSING A VAGUE, OVER-BROAD PERMANENT INJUNCTION AGAINST DEFENDANTS.

### A. Standard of Review.

Power appeals the District Court's Order imposing permanent injunctive relief, as said Order is purportedly founded on statutory grounds yet far exceeds the bounds of the statute(s) at issue and, thus, exceeds the District Court's power to regulate Power's behavior. The scope of injunctive relief is reviewed for an abuse of discretion or application of erroneous legal principles. *See TrafficSchool.com,*

*Inc. v. Edriver, Inc., 653 F.3d 820, 829 (9th Cir. 2011)*; *Momot v. Mastro, 652 F.3d 982, 986 (9th Cir. 2011)*; *Viceroy Gold Corp. v. Aubry, 75 F.3d 482, 488 (9th Cir. 1996)*.

### B. Overview of the Issues.

Defendants challenge the trial court's overbroad permanent injunction, which not only prohibits Defendants from engaging in unlawful behaviors but also prohibits Defendants and any third parties with whom they associate from otherwise lawful activities that are critical to conducting business and socializing on the internet. Facebook sought and was granted an injunction prohibiting Defendants from conducting otherwise entirely lawful activities—including using their own Facebook accounts and applying for implementation of Facebook Connect without prior permission from Facebook—for conduct comparable to that of ten of thousands of companies implementing Facebook connect today, conduct that Power, at the insistence of Steven Vachani, voluntary ceased prior to commencement of this lawsuit. *See, generally*, Supplemental Brief By *Pro Se* Defendant Steven Vachani Regarding Damages. 2-ER 110-127.

The trial court's imposition of a permanent injunction is unwarranted on the following bases: 1) Facebook has not suffered irreparable injury; 2) monetary damages are adequate and avoidable; 3) the balance of hardships overwhelmingly prejudice Defendants' business and livelihood and present no risk of harm to

Facebook; and 4) the public interest is substantially burdened by entry of this permanent injunction[33].

### C. Facebook Did Not Suffer Irreparable Harm Due To Defendants' Actions and Has Never Offered Proof Of Alleged Irreparable Harm.

Plaintiff shamelessly claims that irreparable injury was sustained in the form of harm to Facebook's goodwill and reputation, *not* because of any actual user confusion or complaint—Facebook offers proof of neither—but because users are likely to associate Defendants' messages and advertisements with Facebook, thereby harming Facebook's goodwill with its users, and, remarkably, the trial court found this argument persuasive. 1-ER 10-12.

As provided at length heretofore, Facebook altogether fails to demonstrate how they have been adversely affected, and they are unable to produce a single example of damage to their reputation due to Power's attempted integration with their system. Indeed, Facebook never alleged or demanded compensation for anything other than their own legal costs due to their discontent with Power's delay in bringing their system into compliance with Facebook's Terms of Use, *not* with any system impairment, data or computer damage, or any of the other harms redressable under the criminal statutes they pursued.

### D. Defendants' Good Faith Collaboration and Cooperation With Facebook Render Facebook's Claimed Damages Avoidable And Future Damages Substantially Unlikely.

---

[33] Based on the Ninth Circuit's four-factor test. *See, e.g., eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 390 (2006).

Contrary to the events of Plaintiff's recollection, Power responsively and actively worked with Facebook to bring their software into compliance with Facebook's specifications after receiving Facebook's first cease and desist letter. *See, generally,* Vachani Declaration In Support of Defendants' Opposition to Facebook's Motion for Injunctive Relief; 2-ER 96:18-97:16. In early December 2008, Facebook and Power conferred about Power's implementation of user access to Facebook accounts. Power actively and expeditiously adapted their system to comply with Facebook's demands over the brief few weeks between receiving Facebook's cease and desist notice and the filing of Facebook's complaint. Power's demonstrated cooperation with Facebook distinctly argues against the likelihood of potential harm to Facebook due to Power's future activities.

### E. The Harm to Facebook Absent An Injunction Is Speculative At Best, But The Harm To Defendants Is Catastrophic.

The trial court improperly enjoined Defendants from *far more* than unlawful conduct under the statutes at issue; it granted to Facebook complete discretion in controlling Defendants' perfectly lawful Facebook-related activities. Contrary to the court's reasoning, Facebook provided *no specific example of how they have been or would be harmed* by a permanent injunction. Defendants do, however, suffer unwarranted subjection to Facebook's discretion—as opposed to black letter of the law—each time they need approval to use Facebook's social network in ways akin to billions of Facebook users everyday.

The vague harm to Facebook's "goodwill" identified in the court's findings consists entirely of Facebook's allegations—absent a shred of evidentiary support —and Defendants have not only ceased the offending activity for five years now, they have taken all steps necessary to comply with this Court's injunction prohibiting activity that could possibly inflict such "harm" on Facebook. 1-ER 35-36. In contrast to the vague and speculative harm to consumers and competitors discussed in the court's findings, Defendants Vacahani and Power, including Power's employees, shareholders, business partners and customers, as well as the consuming public, suffer certain and immediate harm due to the vaguely indefinite reach of this injunction. That harm clearly outweighs any speculative injury that Facebook alleges—but, for which, they submit not a modicum of evidentiary support—might be suffered absent such permanent injunction.

### F. Public Interest Urges Against Such Unnecessary And Unwarranted Injunctive Relief.

Power's operations were specifically geared toward the public's interest in innovation and personal data control, and the trial court failed to identify in its order any harm or threat posed to the public whatsoever. Instead of protecting the public, such order signals potential for imposition of criminal liability, damages and injunctive relief for users attempting to easily move their data out of Facebook, as well as for developers, like Power, seeking to enhance social network technology by enabling such functionality. If sustained, such order poses

unacceptable risks for innovators and start-up companies that now stand to be handicapped in attracting technical talent and visionaries if associated individuals are subject to the level of damages and permanent prohibitions of otherwise lawful activity as presently enjoined.

### G. Relief Requested.

In light of Facebook's failure to establish irreparable harm, the adequacy of monetary relief, and the relative hardships showing far greater harm to Defendants and the public, the permanent injunction should be vacated. Alternatively, Defendants request this Court remand the issue requiring the trial court to amend the order for clarity in its prohibitions and to fully tailor its restrictions to the statutes at issue.

## III. THE DISTRICT COURT'S IMPOSITION OF DISCOVERY SANCTIONS MUST FAIL UNDER ANY STANDARD OF REVIEW.

### A. Standard of Review.

The individual Defendant-Appellant Steven Vachani contends the District Court abused its discretion when it ordered him to pay *all* costs of the renewed 30(b)(6) deposition in its order deciding the amount of said costs (August 7, 2012 order), which was based on the Court's March 1, 2012 order that actually imposed the sanctions and imposed them against the corporate defendant alone. The imposition of or refusal to impose discovery sanctions is reviewed for an abuse of discretion. *See Goodman v. Staples The Office Superstore, LLC*, 644 F.3d 817, 822 (9th Cir. 2011); *Childress v. Darby Lumber, Inc.*, 357 F.3d 1000, 1010 (9th Cir.

2004); *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1164-65 (9th Cir. 2003).

Vachani further contends the District Court ordered him to pay costs associated with corporate actions despite the Court's failure to make a factual finding regarding his liability for the late-produced documents. Where the district court fails to make factual findings, the decision on a motion for sanctions is reviewed *de novo*. *See Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1408 (9th Cir. 1990).

The court's refusal to hold an evidentiary hearing prior to imposing discovery sanctions is also reviewed for an abuse of discretion. *See Paladin*, 328 F.3d at 1164. Findings of fact underlying discovery sanctions are reviewed for clear error. *Payne v. Exxon Corp.*, 121 F.3d 503, 507 (9th Cir. 1997).

### B. Overview of the Issues.

Vachani's individual appeal, in summary, regards the trial court's order holding an individual witness liable for payment of the discovery sanctions originally imposed against the corporate defendant-deponent without proper legal or factual finding.

### C. The District Court Failed To Make A Factual Finding Of The Witness's Culpability And, Thus, Abused Its Discretion When Imposing Liability For Costs.

On August 7, 2013, the trial court entered an order for attorneys fees and costs for a renewed deposition in final adjudication of a discovery dispute between

the Facebook and Defendants. 1-ER 37-43. The court ordered both Defendants

Power Ventures, Inc. and the individual defendant Vachani to pay fees and costs in

the amount of $39,796.73[34]. 1-ER 40:2.

1. The Court's Order Failed To Make A Factual Finding Regarding
   Vachani's Alleged Culpable Conduct And Merely Relied On
   Facebook's Unsupported Complaint.

Reconsideration of the trial court's discovery order should lead to reversal

by the Honorable Ninth Circuit Court because clear error occurred in regard to the

findings of fact underlying the sanctions imposed.

Facebook claimed in their January 26, 2012 letter brief, which ultimately led

to the order hereon appeal, deponent Power's CEO, Vachani, was intentionally

"evasive" and " non-responsive" during his deposition, even though Vachani sat for

more than eight hours answering Facebook's questions. This deposition resulted in

a 392-page transcript, notably a remarkable amount of dialog for an individual who

was supposedly "non-responsive." Furthermore, Vachani was deposed on July 20,

2011 in the same matter as an individual defendant and sat for another nearly nine

eight hours of questioning by Facebook's counsel in that deposition as well.

---

[34] This amount reflects the combined total of: (1) the costs of the videographer and
court reporter services ($5,128.73); (2) the costs of the expedited, certified
translations of untimely produced 74.6 gigabytes of data and Power's deposition
($660.00); and (3) attorneys' fees associated with the work of attorneys and
paralegals to prepare for and undertake the renewed Rule 30(b)(6) deposition of
Mr. Vachani ($38,008.00). 1-ER 40:2-7.

Not only does Facebook's evidence fail to support their allegations of Vachani's evasiveness and non-responsiveness, their evidence specifically demonstrates one instance of many where Vachani remained calmly cooperative during arguably abusive and oppressive interrogation by opposing counsel, answering every question to the best of his knowledge. Thus, the trial court erred in issuing sanctions for a new deposition of Vachani because there was no proper finding of underlying facts to support such order.

   2. The Court's Order Should Be Reversed Because the Trial Court Abused Its Discretion In Ordering Vachani Liable For A Discovery Order Against Power Ventures.

Even if this Court concludes that the factual findings by the District Court were not erroneous, the order should be reversed because the trial court abused its discretion in ordering Vanachi to pay for a discovery order against Power Ventures, Inc. The trial court's order was specifically entered against the corporate defendant, Power, as appropriate given that F.R.C.P. § 30(b)(6) is directed at corporate deponents[35]:

> The *Defendant* shall produce, forthwith, the responsive emails that were not copied to Steve Vachani. The *Defendant* shall sit for a renewed 30(b)(6) deposition regarding the newly produced emails that are relevant to the issues that are still unresolved by the Court's Summary Judgment Order. The *Defendant* shall pay reasonable costs, including attorney fees, for the renewed 30(b)(6) deposition.

1-ER 45:1-5 (*emphasis added*).

---

[35] F.R.C.P. § 30(b)(6) section title: *Notice or Subpoena Directed to an Organization*.

Indeed, Vachani was not the "Defendant" of the order nor the party ordered to pay costs in the original discovery order, nor was he responsible for the delayed production of the data upon which Facebook was granted a new deposition[36]. As such, the trial court's later order (1-ER 37-43) entered against both defendants equally, from which Vachani appeals, was baseless and inconsistent with the trial court's prior order and, thus, a blatant abuse of discretion.

### D. Relief Requested.

Defendant Vachani requests the honorable Ninth Circuit Court vacate the August 7, 2013 order (1-ER 37-43) with respect to Vachani as there was an abuse of discretion in finding him liable for Defendant Power Ventures, Inc.'s discovery sanction.

## CONCLUSION AND SUMMARY OF REQUESTED RELIEF

Defendants respectfully ask this Court to end this litigation finally and fairly by reversing denial of Defendants' request for summary judgment entered in the district court on February 16, 2012 and vacating the order and final judgment entered in the district court on September 25, 2013. Alternatively, Defendants request this Court reverse grant of summary judgment entered in favor of Facebook on February 16, 2012 and remand this case for trial in the district court.

---

[36] "Following the 30(b)(6) deposition of Steve Vachani on January 9, 2012 Facebook's counsel inquired about Power's email server and whether its contents had been produced…The omission of the [] file in Power's previous production was unintentional and inadvertent." 2-ER 34 (*Joint Letter Brief re Renewed* Deposition, 2-ER 128-135; unsealed version only; no reference to redacted portion(s)).

Defendants further request this Court vacate the permanent injunction issued by the trial court on September 25, 2013 with respect to both defendants and vacate the order for discovery sanctions issued by the trial court on August 7, 2013 with respect to Defendant Vachani.

AROPLEX LAW

Dated: March 3, 2014                    By ___*s/* Amy Sommer Anderson___


FILER'S ATTESTATION: Pursuant to Circuit Rule 25-5(f), I attest under penalty of perjury that all other parties on whose behalf the filing is submitted concur in the filing's content.


Dated: March 3, 2014                    Respectfully submitted,

___s/ Amy Sommer Anderson___

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief uses a proportional typeface and 14-point font and contains 13,708 words.


Dated: March 3, 2014                              s/ Amy Sommer Anderson

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellants certify that in light of the

Court's consolidation of Case No. 13-17102 with the instant case, Appellants are

not aware of any related appeal pending in this court.


Dated: March 3, 2014                           s/ Amy Sommer Anderson

## CERTIFICATE OF SERVICE

I declare that:

      I am a citizen of the United States, employed in the City and County of San Francisco, over the age of eighteen years, and not a party to the within case.  My business address is AROPLEX LAW, 156 2nd Street, San Francisco, California 94105.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

      I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on March 3, 2014, at San Francisco, California.


                            s/ Amy Sommer Anderson

# ADDENDUM TO THE BRIEFS

## 15 USC §7701, et seq.. Controlling the Assault of Non- Solicited Pornography and Marketing Act of 2003; "CAN-SPAM Act"

### § 7701

…

(b) Congressional determination of public policy

On the basis of the findings in subsection (a), the Congress determines that—

(1) there is a substantial government interest in regulation of commercial electronic mail on a nationwide basis;

(2) senders of commercial electronic mail should not mislead recipients as to the source or content of such mail; and

(3) recipients of commercial electronic mail have a right to decline to receive additional commercial electronic mail from the same source.

### § 7702

In this chapter:

…

(8) Header information

The term "header information" means the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message.

### § 7704

(a) Requirements for transmission of messages

(1) Prohibition of false or misleading transmission information

It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading. For purposes of this paragraph—

(A) header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol

62

address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading;

(B) a "from" line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading; and

(C) header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin.

(2) Prohibition of deceptive subject headings

It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message if such person has actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that a subject heading of the message would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message (consistent with the criteria used in enforcement of section 45 of this title).

…

(6) Materially

For purposes of paragraph (1), the term "materially", when used with respect to false or misleading header information, includes the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

(b) Aggravated violations relating to commercial electronic mail

…

(3) Relay or retransmission through unauthorized access

It is unlawful for any person knowingly to relay or retransmit a commercial electronic mail message that is unlawful under subsection (a) from a protected computer or computer network that such person has accessed without authorization.

## § 7706

…

(g) Action by provider of Internet access service

(1) Action authorized

A provider of Internet access service adversely affected by a violation of section 7704 (a)(1), (b), or (d) of this title, or a pattern or practice that violates paragraph (2), (3), (4), or (5) of section 7704 (a) of this title, may bring a civil action in any district court of the United States with jurisdiction over the defendant—

(A) to enjoin further violation by the defendant; or

(B) to recover damages in an amount equal to the greater of—

(i) actual monetary loss incurred by the provider of Internet access service as a result of such violation; or

(ii) the amount determined under paragraph (3).

(2) Special definition of "procure"

In any action brought under paragraph (1), this chapter shall be applied as if the definition of the term "procure" in section 7702 (12) of this title contained, after "behalf" the words "with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a pattern or practice that violates this chapter".

(3) Statutory damages

(A) In general

For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations … by—

(i) up to $100, in the case of a violation of section 7704 (a)(1) of this title; or

…

…

(C) Aggravated damages

The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if—

(i) the court determines that the defendant committed the violation willfully and knowingly;

64

…

## 18 USC §1030. Computer Fraud and Abuse Act; "CFAA"

(a) Whoever—

…

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains - (A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602 of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.); (B) information from any department or agency of the United States; or (C) information from any protected computer;

…

(4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

(5)

(A) knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer;

(B) intentionally accesses a protected computer without authorization, and as a result of such conduct, recklessly causes damage; or

(C) intentionally accesses a protected computer without authorization, and as a result of such conduct, causes damage and loss.

…

(c) The punishment for an offense under subsection (a) or (b) of this section is—

(4)

(A) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of—

(i) an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)—

(I) loss to 1 or more persons during any 1-year period…aggregating at least $5,000 in value;

…

(e) As used in this section—

    (2) the term "protected computer" means a computer—

      …

      (B) which is used in interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;

    …

    (6) the term "exceeds authorized access" means to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter;

    …

    (8) the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

    …

    (11) the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service;

…

(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages.

…

## 28 U.S.C. § 1291

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the

district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292 (c) and (d) and 1295 of this title.

## 28 U.S.C. § 1331

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

## 28 U.S.C. § 1367

**(a)** Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties.

## California Penal Code § 502; "CPC § 502"

(a) It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.

The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b) For the purposes of this section, the following terms have the following meanings:

> (1) "Access" means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

…

(6) "Data" means a representation of information, knowledge, facts, concepts, computer software, computer programs or instructions. Data may be in any form, in storage media, or as stored in the memory of the computer or in transit or presented on a display device.

…

(8) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program.

(9) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access.

(c) Except as provided in subdivision (h), any person who commits any of the following acts is guilty of a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

(6) Knowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section.

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

…

(e) (1) In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

(2) In any action brought pursuant to this subdivision the court may award reasonable attorney's fees.