Nos. 13-17154, 13-17102

**IN THE**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

—————————————————————————————

**FACEBOOK, INC.**,

*Plaintiff-Appellee,*

*v.*

**POWER VENTURES, INC. AND STEVEN VACHANI**,

*Defendants-Appellants,*

—————————————————————————————

Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, Honorable Lucy Koh

—————————————————————————————

**APPELLANTS' EXCERPTS OF RECORD**
**Volume I of II**
**Pages 1 through 88**

—————————————————————————————

Amy Sommer Anderson
AROPLEX LAW
156 2nd Street
San Francisco, California 94105
Telephone: 415-529-5148
Facsimile: 415-970-5016

Counsel for Defendant-Appellant,
POWER VENTURES, INC.

STEVEN VACHANI
2425B Channing, #216
Berkeley, CA 94704
Telephone: (917) 267-8823

*Pro se* Appellant

Court of Appeals No. 13-17154, 13-17102

===============================================

*Facebook, Inc v. Power Ventrues, Inc, et al.*

_____

INDEX
EXCERPTS OF RECORD
VOLUME I

## VOLUME I

| Date | Dkt. No. | Page No. | Document |
|------|----------|----------|----------|
| 01/08/14 | 15 (9th. Cir. Dkt.) | 1 | Court Order Consolidating Case Nos. 13-17154 and 13-17102 |
| 09/25/13 | 374 | 2 | Final Judgment |
| 09/25/13 | 373 | 3 - 36 | Order denying Motion for Leave to File; granting Motion for Permanent Injunction; granting motion for summary judgment regarding liability of Vachani and motion for damages (unsealed version only; no reference to sealed portion(s)) |
| 08/07/13 | 356 | 37 - 43 | Order Re Attorney Fees and Costs for Renewed Deposition |
| 03/01/12 | 282 | 44 - 45 | Discovery Order re: Renewed Deposition |
| 02/16/12 | 275 | 46 - 64 | Order Granting Plaintiff's Motion for Summary Judgment |
| 07/20/10 | 89 | 65 - 88 | Order Denying Cross-Motions for Summary Judgment |

## VOLUME II

| Date | Dkt. No. | Page No. | Document |
|------|----------|----------|----------|
| 10/06/13 | 379 | 89 - 91 | Defendants-Appellants' Notice of Appeal to the United States Court of Appeals for the Ninth Circuit |
| 10/02/13 | 375 | 92 - 93 | Vachani's Amended Notice of Appeal Re: Sanctions Order |
| 09/06/13 | 360 | 94 | Vachani's Notice of Appeal Re: Sanctions Order |

| 08/15/13 | 357-1 | 95 - 99 | Vachani's Declaration In Support Of Defendants' Opposition to Facebook's Request for Injunctive Relief |
| 08/15/13 | 357-2 | 100 – 101 | Exhibit A to Vachani's Declaration In Support Of Defendants' Opposition to Facebook's Request for Injunctive Relief |
| 08/15/13 | 357-3 | 102 - 108 | Exhibit B to Vachani's Declaration In Support Of Defendants' Opposition to Facebook's Request for Injunctive Relief |
| 04/29/13 | 333 | 109 | Facebook's Case Management Statement (except) |
| 08/15/12 | 317 | 110 - 127 | Vachani's Supplemental Brief on Damages and Vachani's Liability |
| 02/10/12 | 269 | 128 - 135 | Joint Letter Brief Regarding Facebook's Request for Renewed Deposition (unsealed version only; no reference to sealed portion(s)) |
| 01/19/12 | 225-1 | 136 - 139 | Cutler Declaration In Support of Facebook's Motion for Partial Summary Judgment (unsealed version only; no reference to sealed portion(s)) |
| 01/19/12 | 225-2 | 140 - 146 | Exhibit C to Cutler Declaration In Support of Facebook's Motion for Partial Summary Judgment (unsealed version only; no reference to sealed portion(s)) |
| 05/09/11 | 98 | 147 - 170 | Defendants' Motion for Summary Judgment |
| 05/09/11 | 98-2 | 171 - 174 | Vachani Declaration in Support of Defendants' Motion for Summary Judgment |
| 01/13/09 | 9 | 175 -200 | Facebook's First Amended Complaint |
| N/A | N/A | 201 - 244 | Trial Court Docket |

FILED

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

JAN 8 2014

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| FACEBOOK, INC., a Delaware corporation, | Nos. 13-17102 |
| | 13-17154 |
| Plaintiff - Appellee, | |
| | D.C. No. 5:08-cv-05780-LHK |
| v. | Northern District of California, San Jose |
| STEVEN SURAJ VACHANI, et al., | |
| Defendants - Appellants. | ORDER |

Appellee's opposed motion to consolidate Nos. 13-17102 and 13-17154 is granted.  The opening brief(s) are due January 31, 2014.  The answering brief is due March 3, 2014.  The optional reply brief(s) are due within 14 days after service of the answering brief.

Appellants are reminded of the court's preference for a joint brief.  9th Cir. R. 28-4.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

Cole Benson
Supervising Deputy Clerk
Ninth Circuit Rules 27-7 and 27-10

1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | | |
|---|---|---|
| FACEBOOK, INC., | ) | Case No.: 08-CV-5780 |
| | ) | |
| Plaintiff, | ) | JUDGMENT |
| v. | ) | |
| | ) | |
| POWER VENTURES, INC., a Cayman Island | ) | |
| corporation, and STEVE VACHANI, an | ) | |
| individual, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

In ECF No. 373, the Court denied Defendants' motion for leave to file a motion for reconsideration of this Court's order granting Plaintiff summary judgment against Power Ventures (ECF No. 275), granted Plaintiff's motion for permanent injunctive relief, granted Plaintiff's motion for summary judgment regarding the liability of Defendant Vachani, and granted Plaintiff's motion for damages. Accordingly, the Clerk of the Court shall enter judgment in favor of Plaintiff. The Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: September 25, 2013

_Lucy H. Koh_
_____
LUCY H. KOH
United States District Judge

*United States District Court*
*For the Northern District of California*

1

United States District Court
For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | | |
|---|---|---|
| FACEBOOK, INC., | ) | Case No.: 08-CV-5780-LHK |
| Plaintiff, | ) | |
| v. | ) | ORDER DENYING LEAVE TO FILE |
| | ) | MOTION FOR RECONSIDERATION, |
| POWER VENTURES, INC., a Cayman Island | ) | FINDING DEFENDANT STEVEN |
| corporation, and STEVE VACHANI, an | ) | VACHANI LIABLE AS A MATTER OF |
| individual, | ) | LAW, AND GRANTING DAMAGES |
| | ) | AND PERMANENT INJUNCTIVE |
| Defendants. | ) | RELIEF |
| | ) | |

Defendant Power Ventures, Inc. ("Power Ventures") and Defendant Steve Vachani

("Vachani") (collectively, "Defendants") request leave to file a motion for reconsideration of the

February 16, 2012 summary judgment order issued by Judge James Ware. Plaintiff, Facebook, Inc.

moves for statutory and compensatory damages, permanent injunctive relief, and a grant of

summary judgment holding that Vachani is personally liable for violations of the Controlling the

Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-SPAM Act"), 15 U.S.C

§ 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030; and California Penal

Code § 502. Pursuant to Civil Local Rule 7-1(b), the Court finds a hearing unnecessary for

1

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

ER 3

1    resolution of these matters and accordingly VACATES the hearing and case management

2    conference set for September 26, 2013.  Having considered Defendants' papers and the record in

3    this case, Defendants' request for leave to file a motion for reconsideration is DENIED.  Plaintiff's

4    motion for statutory and compensatory damages, motion for permanent injunctive relief, and

5    motion for summary judgment on the issue of Vachani's personal liability are GRANTED.  The

6    Court proceeds to discuss each issue in turn.

7    **I.        BACKGROUND**

8              **A.        Factual Background**

9              Facebook owns and operates the eponymous social networking website located at

10   facebook.com.  First Amended Complaint ("FAC") ¶ 2.  Power Ventures is a corporation

11   incorporated in the Cayman Islands and doing business in California.  Answer ¶ 10.  It operates the

12   website www.power.com, which offers to integrate users' various social media accounts into a

13   single experience.  FAC ¶ 5; Answer ¶ 5.  Vachani is the Chief Executive Officer of power.com.

14   Answer ¶ 11.

15             Facebook brought this action against Defendants in December 2008, alleging violations of

16   the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-

17   SPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030;

18   California Penal Code § 502; and the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. §

19   1201; copyright infringement under 17 U.S.C. § 101; trademark infringement under 15 U.S.C. §§

20   1114 and 1125(a) and California law; and violations of California Business and Professions Code

21   Section 17200.  ECF Nos. 1, 9.  Facebook complains that Defendants employ Facebook's

22   proprietary data without its permission by inducing Facebook users to provide their login

23   information and then using that information to "scrape" Facebook's proprietary material.  FAC ¶¶

24   49, 50, 52.  Defendants then display Facebook's material on power.com.  FAC ¶ 52.  Facebook

25   asserts that it never gave Defendants permission to use its material in this way.  FAC ¶ 54.

26             Facebook also accuses Defendants of sending unsolicited and deceptive email messages to

27   Facebook users.  FAC ¶¶ 65-69.  To launch their site, Defendants promised power.com users a

28

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

chance to win $100 if they invited and signed up the most new users to Defendants' site. FAC ¶ 65. Defendants provided to their users a list of the users' Facebook friends from which the users could choose people to whom to send the invitation. FAC ¶ 66. Power.com sent unsolicited commercial emails to those friends that included on the "from" line a "@facebookmail.com" address. FAC ¶¶ 66, 68. The content of the message included a line that the message was from "The Facebook Team." FAC ¶ 69, 70. Facebook contends that it never gave permission to send these messages and that the emails were deceptive because they "do not properly identify the initiators of the messages, nor do they provide clear or conspicuous notice that the messages are advertisements for" power.com. FAC ¶ 71.

### B. Procedural Background

On February 18, 2011, Judge Ware granted the parties' stipulation to dismiss Facebook's DMCA claim, copyright and trademark infringement claims, and claims for violations of California Business and Professions Code Section 17200. ECF No. 97. On May 9, 2011, Defendants moved for summary judgment on Facebook's CFAA, Section 502, and CAN-SPAM Act claims. ECF No. 98. On November 17, 2011, Facebook moved for summary judgment on Facebook's § 502 and CFAA claims. ECF No. 214 ("§ 502/CFAA Motion"). On November 18, 2011, Facebook moved for summary judgment on Facebook's CAN-SPAM Act claim. ECF No. 215 ("CAN-SPAM Motion"). On February 16, 2012, Judge Ware issued an order denying Defendants' motion for summary judgment and granting summary judgment in Facebook's favor as to Facebook's § 502, CFAA, and CAN-SPAM Act claims. ECF No. 275 ("February 16 order").

In the February 16 order, Judge Ware requested additional briefing regarding Vachani's individual liability and the amount of damages Facebook should receive in light of the February 16 order. *Id.* at 19. On March 30, 2012, Facebook filed its supplemental brief regarding damages and the liability of Vachani. ECF No. 299 ("Facebook Damages/Liability Brief"). The same day, Defendants lodged with the court a brief regarding damages and the liability of Vachani. ECF No. 288 ("Defendants' Damages/Liability Brief"). On August 15, 2012, Vachani also submitted a

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

ER 5

United States District Court
For the Northern District of California

1    supplemental brief regarding damages and his personal liability.  ECF No. 317 ("Vachani

2    Damages/Liability Brief").

3         On June 4, 2012, the attorneys representing Vachani and Power Ventures moved to

4    withdraw as counsel.  ECF Nos. 302, 303.  On July 2, 2012, Judge Ware granted the motions to

5    withdraw.  ECF No. 306.  In the order granting the withdrawal requests, Judge Ware required

6    Vachani and Power Ventures to file Notices of Identification of Substitute Counsel no later than

7    July 17, 2012.  *Id.*  Judge Ware noted that although Vachani could proceed *pro se*, Power Ventures

8    had to be represented by a member of the bar pursuant to Civil L.R. 3-9(b).  *Id.*  Judge Ware

9    cautioned Defendants that a failure to file timely Notices of Identification of Substitute Counsel

10   may result in default of the case.  *Id.*

11        On July 19, 2012, after neither Vachani nor Power Ventures had filed a Notice of

12   Identification of Substitute Counsel, Judge Ware ordered both parties to appear on August 6, 2012

13   to respond to an Order to Show Cause regarding Defendants' failure to obtain counsel.  ECF No.

14   308.  On August 6, 2012, the parties appeared for the hearing, and on August 8, 2012, Judge Ware

15   issued an order regarding Defendants' failure to obtain counsel ("August 8 order").  ECF No. 313.

16   Because Power Ventures had failed to identify replacement counsel, Judge Ware found good cause

17   to strike Power Ventures' answer to Facebook's complaint and enter default against Power

18   Ventures.  *Id.*  Judge Ware permitted Vachani a short extension to find new counsel, which was

19   conditioned on Vachani's immediate filing of a Notice of Self-Representation.  *Id.*   The Clerk

20   entered default against Power Ventures on August 9, 2012.  ECF No. 314.

21        On August 15, 2012, new counsel filed a Notice of Appearance on behalf of Power

22   Ventures.  ECF No. 316.  That same day, Power Ventures moved for leave to file a motion for

23   reconsideration of Judge Ware's August 8 order requiring entry of default against Power Ventures.

24   ECF No. 318.  Judge Ware gave Power Ventures leave to file the motion for reconsideration on

25   August 21, 2012.  ECF No. 320.  On August 23, 2012, Power Ventures filed its motion for

26   reconsideration.  ECF No. 321.  On August 27, 2012, Facebook filed its response and

27   simultaneously requested entry of default judgment against Power Ventures.  ECF No. 322.

28

4

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1    On August 27, 2012, Defendants provided notice that both Power Ventures and Vachani

2 had filed for bankruptcy. ECF Nos. 323, 324. Noting that pursuant to 11 U.S.C. § 362(a)(1), a

3 voluntary petition for bankruptcy operates as an automatic stay of any judicial actions involving the

4 petitioners, Judge Ware stayed the proceedings and administratively closed the case on August 29,

5 2012. ECF No. 325. In the same order, Judge Ware denied as premature Power Ventures' motion

6 for reconsideration of the August 8 order requiring entry of default. *Id.*

7    On March 20, 2013, Facebook notified the Court that the Bankruptcy Court had dismissed

8 Power Ventures' bankruptcy case and had granted Facebook's request for relief from the automatic

9 stay in Vachani's bankruptcy case. ECF No. 327. Facebook sought to reopen the case. *Id.*

10 Facebook also sought reassignment to a new judge because on August 31, 2012, while the

11 automatic stay was in effect, Judge Ware resigned from the bench. *Id.* On April 8, 2013, the

12 undersigned judge, as the Duty Judge at the time Facebook filed its motion, granted Facebook's

13 request. ECF No. 328. The undersigned judge ordered that the stay be lifted, the case be reopened,

14 and the case be reassigned. *Id.* The case then was reassigned to the undersigned judge. ECF No.

15 329.

16    On April 25, 2013, Vachani moved for clarification of the February 16 order regarding

17 whether Vachani's liability had been determined in the February 16 order. ECF No. 332. On April

18 29, 2013, Facebook filed a case management statement in which Facebook again requested that

19 default judgment be entered against Power Ventures. ECF No. 333. On the same day, Defendants

20 filed a consolidated case management statement in which Power Ventures again sought to set aside

21 default. ECF No. 334. Defendants also stated their intent to request leave to file a motion for

22 reconsideration of the February 16 order. *Id.* In Facebook's and Defendants' respective case

23 management statements, the parties acknowledged that Vachani's liability and the issues of

24 damages and injunctive relief still need to be addressed. ECF No. 333, 334.

25    On May 2, 2013, following a case management conference, the Court issued a case

26 management order. ECF No. 340. In that order, the Court clarified that the February 16 order did

27 not decide Vachani's liability. *Id.* The Court granted Power Ventures' request to set aside default

28

5

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1    and denied Facebook's request for entry of default judgment against Power Ventures.  *Id.*  The

2    Court also set a briefing schedule for the damages and injunctive relief issues.  *Id.*  The Court set a

3    hearing date of September 26, 2013 to consider Vachani's liability, as well as the remedies issues.

4    *Id.*

5         On August 1, 2013, Power Ventures filed its request for leave to file a motion to reconsider

6    the February 16 order.  ECF No. 353.  On August 1, 2013, Facebook filed its supplemental

7    memorandum in support of its request for injunctive relief.  ECF No. 354 ("Facebook Injunction

8    Brief").  On August 15, 2013, Defendants filed a response to Facebook's request for injunctive

9    relief.  ECF No. 357 ("Defendants' Inj. Opp.")  On August 22, 2013, Facebook filed its reply.  ECF

10   No. 358 ("Facebook Injunction Reply").[1]

11   **II.    LEGAL STANDARDS**

12   **A.    Motion for Reconsideration**

13        Pursuant to Civil Local Rule 7–9, "[b]efore the entry of a judgment adjudicating all of the

14   claims and the rights and liabilities of all the parties in a case, any party may make a motion before

15   a Judge requesting that the Judge grant the party leave to file a motion for reconsideration of any

16   interlocutory order made by that Judge on any ground set forth in Civil L.R. 7–9(b).  No party may

17   notice a motion for reconsideration without first obtaining leave of Court to file the motion."  Civil

18   Local Rule 7-9(b) provides three grounds for reconsideration of an interlocutory order:

19        (1)    That at the time of the motion for leave, a material difference in fact or
20               law exists from that which was presented to the Court before entry of the
                 interlocutory order for which reconsideration is sought. The party also
21               must show that in the exercise of reasonable diligence the party applying
                 for reconsideration did not know such fact or law at the time of the
22               interlocutory order; or

---

23   [1] Vachani has appealed Magistrate Judge Joseph Spero's order granting Facebook fees and costs for
24   Vachani's second Rule 30(b)(6) deposition, which Judge Spero granted because of Defendants'
     misconduct during discovery.  ECF No. 356 (Order granting fees); ECF No. 360 (Notice of Appeal
25   by Vachani).  Vachani's appeal does not divest this Court of jurisdiction over the issues resolved in
     this order because the filing of a notice of appeal divests the district court of jurisdiction only over
26   the matters appealed.  *Masalosalo by Masalosalo v. Stonewall Ins. Co.*, 718 F.2d 955, 956 (9th Cir.
     1983) ("A notice of appeal only transfers jurisdiction to the appellate court over matters contained
27   in the appeal."); *Donovan v. Mazzola*, 761 F.2d 1411 (9th Cir. 1985) ("Appeal of one order does
     not necessarily deprive the district court of jurisdiction over issues not raised in that order.").

28   6
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

(2)    The emergence of new material facts or a change of law occurring after the time of such order; or

(3)    A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

Rule 7-9(c) further requires that "[n]o motion for leave to file a motion for reconsideration may repeat any oral or written argument made by the applying party in support of or in opposition to the interlocutory order which the party now seeks to have reconsidered." In general, motions for reconsideration should not be frequently made or freely granted. *See generally Twentieth Century–Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981).

## B.    Summary Judgment Regarding Liability of Vachani

Summary judgment is appropriate if, viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party, there are no genuine disputed issues of material fact, and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). "If the evidence is merely colorable, or is not significantly probative," the court may grant summary judgment. *Id.* at 249-50. (citation omitted). At the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual issue for trial." *House v. Bell*, 547 U.S. 518, 559-60 (2006).

The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *Celotex*, 477 U.S. at 323. It "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 310 F.3d 1099, 1102 (9th Cir. 2000) (citation omitted).

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

*United States District Court*
*For the Northern District of California*

United States District Court
For the Northern District of California

Once the moving party has satisfied its initial burden of production, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact. *Id.* at 1103.

**C.    Permanent Injunctive Relief**

A party seeking a permanent injunction must make a four-part showing: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 390 (2006).

**III.    ANALYSIS OF DEFENDANTS' MOTION FOR RECONSIDERATION**

Defendants proffer three grounds in support of their request for reconsideration, notably none of which arise out of a material difference in fact or law either at the time the February 16 order was issued or in the intervening period. Defendants instead assert that the February 16 order represents a "manifest failure" to consider "material facts or dispositive legal arguments which were presented" and that the order includes "conclusions of law counter to precedent controlling authorities." Mot. Recons. at 2. In support of their position, Defendants argue that (1) the February 16 order incorrectly applied the law by finding that the email messages were materially misleading; (2) the order incorrectly considered the issue of data ownership under the CFAA and § 502 claims; and (3) the order incorrectly classified Facebook's damages in determining that Facebook had standing to litigate its claims. Mot. Recons. at 3.

**A.    Materially Misleading Emails**

Defendants argue that the February 16 order incorrectly applied the law by finding that the email messages Defendants caused to be sent to Facebook users were materially misleading. Defendants assert that the header information was not materially misleading because within the body of the email, Defendants were identified and because no one complained about being misled. Mot. Recons. at 3-4.

8

To establish liability under the CAN-SPAM Act, Facebook had to establish that Defendants' emails were materially misleading. 15 U.S.C. § 7704(a)(1). The Act provides that "[i]t is unlawful for any person to initiate the transmission, to a protected computer of a commercial electronic mail message . . . that contains, or is accompanied by, header information that is materially false or materially misleading." *Id.* The Act defines "materially" "when used with respect to false or misleading header information" to include:

> the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

15 U.S.C. § 7704(a)(6).

Defendants' arguments fail to meet the standard for reconsideration for three reasons. First, Defendants presented essentially the same arguments to Judge Ware in their opposition to Facebook's CAN-SPAM Motion. ECF No. 239. In Defendants' opposition to the CAN-SPAM Motion, Defendants asserted that the header information was not materially misleading because Facebook in fact had generated the emails and because no one complained about being misled. ECF No. 239 at 11-12. The significant overlap in the arguments alone warrants denial of Defendants' request. Moreover, to the extent Defendants failed to present these arguments in Defendants' opposition to Facebook's CAN-SPAM Motion, Defendants have provided no reason why they could not have done so at that time.

Second, Judge Ware considered Defendants' arguments in his order. In the February 16 order, Judge Ware addressed whether the "from" line in the emails rendered the emails materially misleading as required under the CAN-SPAM Act. ECF No. 275 at 13. Judge Ware also addressed Defendants' argument that the body of the email corrected any misrepresentation in the header information. *Id.* Judge Ware therefore did not manifestly fail to consider Defendants' legal theories or material facts.

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

United States District Court
For the Northern District of California

Third, Judge Ware's consideration of Defendants' argument was not clear error. The February 16 order correctly states that a false or misleading statement is considered material if "the alteration or concealment of header information" would impair the ability of an Internet Service Provider ("ISP") or the recipient of the email to "identify, locate, or respond to a person who initiated the electronic mail message." 15 U.S.C. § 7704(a)(6). The parties did not dispute that the "from" line of the emails Defendants caused to be sent listed the address "@facebookmail.com." ECF No. 375 at 13. Judge Ware found that the "@facebookmail.com" failed to provide the recipient with an ability to identify, locate, or respond to Defendants. ECF No. 275 at 13. As a result, Judge Ware concluded that the headers were materially misleading as defined by the statute. *Id.* Judge Ware did not, as Defendants argue, hold that misleading header information is a per se violation of the CAN-SPAM Act.

Defendants have failed to meet their burden for leave to request reconsideration of the February 16 order on this issue.

**B.      Violations Under the CFAA and § 502**

Defendants next argue that reconsideration of the February 16 order is warranted because Judge Ware failed to address whether the information Defendants took from Facebook had value. Mot. Default J. at 4-5. Defendants assert that a determination of value was necessary because violations under the CFAA and § 502 require a showing that the taken information had value. *Id.* The Court first addresses Defendants' CFAA argument.

The CFAA prohibits several types of activities involving fraud and unauthorized access to protected computers. 18 U.S.C. § 1030(a)(1)-(7). The CFAA provides a civil cause of action for a violation of any of its provisions. Specifically, the CFAA provides that "[a]ny person who suffers damage or loss by reason of a violation of this section [i.e. Section 1030] may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g).

Notably, the CFAA defines "loss" and "damage" separately from the actions prohibited under the CFAA. *See* 18 U.S.C. § 1030(a)(1)-(7) (describing prohibited activities); § 1030(e)(8)

10

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1  (defining "damage"); § 1030(e)(11) (defining "loss").  The Court addresses in this section only the

2  violations of the CFAA that serve as the basis of Facebook's CFAA cause of action and addresses

3  the "damage or loss" requirement in Section C below.

4      In Facebook's § 502/CFAA Motion, Facebook alleged that Defendants had violated both

5  18 U.S.C. § 1030(a)(2)(C) and 18 U.S.C. § 1030(a)(4).  Either violation could serve as the basis for

6  Facebook's CFAA cause of action.  Section 1030(a)(2)(C) prohibits a person from "intentionally

7  access[ing] a computer without authorization or exceed[ing] authorized access, and thereby

8  obtain[ing] . . . information from any protected computer."  Section 1030(a)(4) meanwhile

9  prohibits a person from:

> knowingly and with intent to defraud, access[ing] a protected computer without
> authorization, or exceed[ing] authorized access, and by means of such conduct
> further[ing] the intended fraud and obtain[ing] anything of value, unless the object
> of the fraud and the thing obtained consists only of the use of the computer and
> the value of such use is not more than $5,000 in any 1-year period.

13  Notably, while Section 1030(a)(4) prohibits unauthorized access to a protected computer that

14  results in obtaining "anything of value," Section 1030(a)(2)(C) prohibits unauthorized access that

15  results in obtaining only "information."  Thus, Section 1030(a)(2)(C) does not require a showing

16  that the taken information had value.

17      In the February 16 order, Judge Ware determined that Defendants had violated Section

18  1030(a)(2)(C).  ECF No. 275 at 17-18.  In his analysis, Judge Ware found that an admission by

19  Defendants that Defendants had taken, copied, or used data from Facebook's site established that

20  Defendants had "obtain[ed] information" from Facebook, as required to establish a violation under

21  Section 1030(a)(2)(C).  ECF No. 275 at 18.  Because Judge Ware found a violation of the CFAA

22  under Section 1030(a)(2)(C), Judge Ware did not need to address Facebook's alternative argument

23  that Defendants had also violated Section 1030(a)(4), which would require a showing that the taken

24  information had value.  Accordingly, as Defendants correctly point out, Judge Ware in the

25  February 16 order did not explicitly analyze whether the taken information had value.  Thus,

26  Defendants' argument is meritless.  Defendants have not shown that Judge Ware manifestly failed

27  to consider a dispositive legal argument or that Judge Ware clearly erred.

28

11

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

Defendants' arguments regarding § 502(c) likewise are unavailing. Section 502(c) prohibits, among other things, a person from "knowingly access[ing] and without permission tak[ing], cop[ying] or ma[king] use of any data from a computer, computer system or computer network." Cal. Penal Code § 502(c)(2). Section 502(e)(1) confers standing for a civil cause of action on an "owner or lessee of the . . . data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c)." In Section C below, the Court addresses the "damage or loss" requirement.

Judge Ware determined that Defendants' admission established that Defendants had violated § 502(c), and Judge Ware further determined that Facebook had suffered a loss as a result of that violation. ECF No. 275 at 14-15; ECF No. 89 at 8. As with Section 1030(a)(2)(C) of the CFAA, the plain language of § 502(c) does not require that any data that was taken be valuable. Defendants offered no case law in their opposition to Facebook's § 502/CFAA Motion and do not offer any case law in this motion suggesting that § 502(c) requires that the data that was taken be valuable. *See* ECF No. 242 at 4-5; Mot. Default. J. at 5. Thus, Defendants have not shown that Judge Ware's finding that Defendants were liable under § 502(c) reflects a manifest failure to consider a dispositive legal theory or clear error.

Defendants also include a new argument in the motion for leave to seek reconsideration that because Defendants did not destroy any information or data Defendants are not liable under the CFAA or § 502.[2] Mot. Default J. at 5. Nothing in the plain language of either Section 1030(a)(2)(C) or § 502 requires that taken information be destroyed, and Defendants do not point to any case law suggesting otherwise. Furthermore, Defendants do not explain why Defendants did not or could not raise the new argument in their opposition to Facebook's § 502/CFAA Motion. The Court thus finds Defendants' new argument is not grounds for leave to request reconsideration.

## C. Standing

---

[2] Defendants also assert that Facebook never had ownership over the information and that the information did not have proprietary value. Mot. Recons. at 5. The Court finds these arguments to be duplicative of arguments that Defendants presented to Judge Ware in their opposition to Facebook's Section 502/CFAA Motion. The Court thus finds these arguments do not constitute grounds for leave to seek reconsideration.

12

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

ER 14

United States District Court
For the Northern District of California

1    Defendants finally argue that Judge Ware erred in finding that Facebook had established

2    sufficient harm to have standing under the CAN-SPAM Act, § 502, and the CFAA. Mot. Recons.

3    at 5-6. Defendants have not made the requisite showing to justify reconsidering the February 16

4    order.

5    **1.    CAN-SPAM Act**

6    To recover under the CAN-SPAM Act, Facebook had to establish that it was "adversely

7    affected by a violation of . . . or a pattern or practice that violates" the Act. 15 U.S.C. § 7706(g)(1).

8    In *Gordon v. Virtumundo, Inc.*, the Ninth Circuit held that to be "adversely affected" under the

9    CAN-SPAM Act, an ISP must experience harm that is "both real and the type experienced by

10   ISPs." 575 F.3d 1040, 1053 (9th Cir. 2009).

11   In this motion, Defendants argue that Facebook's harm evidence fails to meet the standard

12   under *Gordon*. Defendants' argument, however, is recycled from the argument Defendants made

13   before Judge Ware in opposition to Facebook's CAN-SPAM Motion. In their opposition to the

14   CAN-SPAM Motion, Defendants argued that under *Gordon* Facebook's claimed injuries do not

15   give rise to standing under the statute. ECF No. 239 at 14-15. Defendants repeat that argument in

16   this motion. Accordingly, Defendants have not established that leave for reconsideration is

17   warranted.

18   The Court further finds that Judge Ware considered Defendants' argument in the February

19   16 order. In his order, Judge Ware addressed *Gordon* and concluded that Facebook's evidence of

20   costs incurred as a result of investigating Defendants' unauthorized access and the legal fees

21   incurred in trying to stop Defendants' unauthorized access sufficed to confer standing on Facebook

22   under the CAN-SPAM Act. ECF No. 275 at 8-9. The analysis of *Gordon* and Facebook's

23   evidence in the February 16 order precludes any claim by Defendants that Judge Ware manifestly

24   failed to address either material facts or legal arguments. *See id.*

25   There is no clear error or manifest injustice in Judge Ware's analysis. The February 16

26   order describes how Facebook's evidence of injury from having to address Defendants'

27   unauthorized access amounts to the type of specialized harm against which the CAN-SPAM Act

28   
13

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

protects. ECF No. 275 at 7-8. *Gordon* advises that "the threshold of standing should not pose a high bar for the legitimate service operations contemplated by Congress" in instituting the CAN-SPAM Act, and so for "well-recognized ISPs or plainly legitimate [ISPs] . . . adequate harm might be presumed." 575 F.3d at 1055. In light of that advice, the Court finds no clear error or manifest injustice in Judge Ware's holding.

### 2. CFAA and § 502

In this motion, Defendants argue that the costs Facebook incurred from investigating Defendants' actions and having Facebook's attorneys respond to Defendants' activities are insufficient to show harm under the CFAA and § 502.

The CFAA defines "loss" as:

any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service[.]

18 U.S.C. § 1030(e)(11).

§ 502(e)(1) in turn provides that:

the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access.

§ 502 does not further define "loss."

Defendants' argument in support of its request for leave to move for reconsideration is unavailing. First, Defendants raised this argument in the opposition to Facebook's § 502/CFAA Motion. ECF No. 242 at 11. To the extent Defendants repeat arguments from their opposition to the § 502/CFAA Motion, Defendants have not established grounds for seeking reconsideration. Defendants add new case law in this motion, but Defendants offer no reasons why they did not or could not present these decisions in Defendants' opposition to Facebook's § 502/CFAA Motion.

14

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    Second, Judge Ware addressed Defendants' arguments regarding harm under the CFAA and

2    § 502. Judge Ware specifically determined that the costs Facebook incurred to block Defendants

3    from the site, to investigate Defendants' activities, and to have its attorneys attempt to stop

4    Defendants from continuing the activities were sufficient to establish loss under the CFAA and §

5    502. ECF No. 275 at 18; ECF No. 89 at 8. Defendants therefore cannot assert that the order

6    reflects a manifest failure to consider either material facts or dispositive legal arguments.

7    Third, the Court finds no manifest injustice or clear error in the February 16 order regarding

8    Facebook's "loss" under the CFAA or § 502. Given that the CFAA explicitly identifies the "cost

9    of responding to an offense" and "conducting a damage assessment" as types of losses for which

10   the CFAA confers standing, the Court finds no clear error in Judge Ware's determination that

11   Facebook's costs meet the definition of "loss" provided by the CFAA. *See Multiven, Inc. v. Cisco*

12   *Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010) ("Costs associated with investigating

13   intrusions into a computer network and taking subsequent remedial measures are losses within the

14   meaning of the statute."). The Court also finds that Judge Ware's determination that Facebook's

15   costs satisfy the "loss" requirement under § 502 is not clear error. *See Yee v. Lin*, No. C 12-02474

16   WHA, 2012 WL 4343778, at *3 (N.D. Cal. Sept. 20, 2012) (finding that plaintiff's expenses

17   "associated with responding" to defendant's unauthorized access were sufficient to meet loss

18   requirement under § 502).

19   The Court further finds no manifest injustice or clear error in the February 16 order based

20   on Defendants' late-added case law. *See AtPac, Inc. v. Aptitude Solutions, Inc.*, 730 F. Supp. 2d

21   1174, 1184 (E.D. Cal. 2010) (noting that under the CFAA, "[c]ognizable costs also include the

22   costs associated with assessing a hacked system for damage"); *Farmers Insurance Exchange v.*

23   *Steele Insurance Agency, Inc.*, No. 2:13-cv-00784-MCE-DAD, 2013 WL 3872950, at *21 (E.D.

24   Cal. July 25, 2013) (same).

25   Defendants have not established that leave to request reconsideration of the February 16

26   order is warranted.

27

28

15

## IV.   STEVEN VACHANI'S PERSONAL LIABILITY FOR VIOLATIONS OF THE CAN-SPAM ACT, CFAA, AND CALIFORNIA PENAL CODE § 502

The next issue before the Court is whether there is a genuine issue of material fact as to whether Defendant Steve Vachani, who was CEO of Power Ventures during the time period in question, is personally liable for statutory violations of the CAN-SPAM Act, CFAA, and California Penal Code § 502.  For the reasons explained below, the Court concludes Vachani is personally liable as a matter of law and is thus jointly and severally liable with Power Ventures for violations of these statutory provisions.

Before analyzing Vachani's personal liability, the Court first summarizes this Court's previous findings regarding the precise conduct by Power Ventures that led to Judge Ware's finding of Power Venture's liability under the CAN-SPAM Act, CFAA, and California Penal Code § 502.  *See* ECF No. 275.  The Court first held that Power Ventures, by creating the Launch Promotion and the software that caused Facebook's servers to send out the misleading emails with "@facebookmail.com" addresses to Facebook users, violated the provision of the CAN-SPAM Act which makes it unlawful "for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or misleading," 15 U.S.C. § 7704(a)(1).  ECF No. 275 at 9-14.  Second, the Court held that Power Ventures, by intentionally circumventing technical barriers to take, copy, or make use of data from the Facebook website without permission, violated California Penal Code § 502, which provides that a person is guilty of a public offense if he (1) knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network; (2) knowingly and without permission uses or causes to be used computer services; or (3) knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.  California Penal Code §§ 502(c)(2)(3) & (7).  ECF No. 275 at 14-17.  Third, the Court held that Power Ventures, by accessing Facebook without authorization, and obtaining information from the Facebook website, violated the provision of CFAA that imposes liability on any party that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby

16

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

ER 18

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  obtains . . . information from any protected computer," 18 U.S.C. § 1030(a)(2)(C).  ECF No. 275 at

2  17-19.

3        The Court must decide whether Vachani should be held personally liable for violating these

4  statutory provisions.  The Ninth Circuit has held that "a corporate officer or director is, in general,

5  personally liable for all torts which he authorizes or directs or in which he participates,

6  notwithstanding that he acted as an agent of the corporation and not on his own behalf."  *Comm.*

7  *for Idaho's High Desert, Inc. v. Yost*, 92 F.3d 814, 823 (9th Cir. 1996) (quoting *Transgo, Inc. v.*

8  *Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985)).  "Cases which have found

9  personal liability on the part of corporate officers have typically involved instances where the

10  defendant was the 'guiding spirit' behind the wrongful conduct, . . . or the 'central figure' in the

11  challenged corporate activity."  *Davis v. Metro Productions, Inc.*, 885 F.2d 515, 523 n.10 (9th Cir.

12  1989).  Under such circumstances, both the corporation and the officers or directors who

13  participated in the tortious conduct may be held liable.  *See Moseley v. U.S. Appliance Corp.*, 155

14  F.2d 25, 27 (9th Cir. 1946).  Thus, where an officer authorized, directed, or participated in a

15  corporation's tort or statutory violation, the officer can be held personally liable.  *See United States*

16  *v. Reis*, 366 Fed. Appx. 781, 782 (9th Cir. 2010) (finding personal liability where corporate officer

17  was an active participant in the acts giving rise to corporate liability under the Resource

18  Conservation and Recovery Act); *Dish Network, LLC v. Sonicview USA, Inc.*, 2012 WL 1965279,

19  at *11 (S.D. Cal. May 31, 2012), *reconsideration denied*, 2012 WL 4339047 (finding personal

20  liability of several corporate officers who were the "guiding spirits" of the corporation's statutory

21  violations of the Digital Millennium Copyright Act and the Federal Communications Act).

22        In this case, the Court must assess whether there is a genuine issue of material fact as to

23  whether Vachani directed and authorized the specific activities giving rise to Power Ventures'

24  liability to a degree that reflects more than simply his supervisory role as CEO of the company.

25  More specifically, the Court assesses whether he was a "guiding spirit" or "central figure" in Power

26

27

28

17

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

Venture's unlawful access to and use of the Facebook website.[3]  *Davis*, 885 F.2d at 523 n.10.

Again, the unlawful activities that led to Power Venture's liability under the three relevant statutes

were 1) creating the Launch Promotion and the software that caused Facebook's servers to send out

the misleading emails to Facebook users; 2) circumventing technical barriers to take, copy, or make

use of data from the Facebook website without permission; 3) accessing Facebook without

authorization and obtaining information from the Facebook website without authorization.  ECF

No. 275 at 9-19.  Drawing all reasonable inferences in the light most favorable to Vachani, the

Court concludes that the undisputed facts prove that Vachani authorized and directed these

activities.

First, with respect to the creation of the Launch Promotion[4] and the software through which

Power Ventures caused Facebook's servers to send out the misleading emails to Facebook users,

Vachani admitted he was "controlling and directing [Power's] activities as it related to Facebook,"

including "controlling and directing the activities related to the use of the Power 100 campaign in

conjunction with Facebook users."  ECF No. 299-3 at 27.  Vachani also admitted that the Power

100 Campaign was his very own idea, ECF No. 229 at 7, and Defendants admit he managed the

campaign's implementation.  ECF No. 232-2 at 5-6 (Power Venture's Response to Interrogatories,

noting Vachani was the "director responsible for developing the technology to allow Power or

Power users to continue to access the Facebook website following Facebook's IP blocking" and for

---

[3] The Court notes that Facebook does not argue an alter ego theory; namely, it does not ask the Court to pierce the corporate veil in order to hold Vachani liable.  In any event, courts have held that where officers direct, order, or participate in the company's tortious conduct, there is no need to pierce the corporate veil to establish the personal liability of the corporate officer. *Chase Inv. Servs. Corp. v. Law Offices of Jon Divens & Assocs.*, No. 09–9152, 2010 WL 4056022, at *28 (C.D .Cal. Oct. 14, 2010) ("This principle applies regardless of the piercing of the corporate veil.")
[4] Around December 2008, Power Ventures began integrating with Facebook by allowing users to enter their Facebook account information and access the Facebook site through Power.com.  FAC ¶ 49-50; Answer ¶ 49-50.  Later, Power Ventures initiated a "Launch Promotion," or the Power 100 Campaign, that promised Power Venture's users the chance to win a $100 award if they invited and signed up new users. FAC ¶ 65; Answer ¶ 65.  Power Ventures gave existing users a list of their Facebook friends Power Ventures had obtained from Facebook, and users had to select the friends who would receive a Power Ventures invitation, which would contain a "@facebookmail.com" sender address.  *Id.* ¶ 66-68; *Id.* ¶ 66-68.

18

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

United States District Court
For the Northern District of California

1  "creating the email messages sent to Facebook users asking Facebook users to use the Power

2  website to access the Facebook website").[5]  Given these admissions, the Court finds there is no

3  genuine dispute regarding whether Vachani actually led the effort to create the Launch Promotion

4  and to develop the software behind Power Venture's illegal actions.

5        Second, with respect to Power Venture's circumvention of Facebook's technical barriers to

6  take, copy, or make use of data from the Facebook website without permission, the undisputed

7  facts show that Vachani anticipated Facebook's attempts to block Power Venture's access and

8  oversaw the implementation of a system that would be immune to such technical barriers so that

9  Power Ventures could access Facebook's network.  Vachani admitted that he directed the

10  company's decision to circumvent Facebook's blocks of Power Venture's IP addresses.  ECF No.

11  299-3 at 6-7 (Vachani deposition in which he admits he "was the person making the executive

12  decision . . . to ensure that Facebook could not block Power.com"); ECF No. 299-3 at 28-29

13  (Vachani deposition admitting he controlled and directed employees' activities related to ensuring

14  that Power Ventures continued to have access to Facebook); *see also* ECF No. 232-2 at 5-6 (Power

15  Venture's Response to Interrogatories noting that Vachani was the "director responsible for

16  developing the technology to allow Power or Power users to continue to access the Facebook

17  website following Facebook's IP blocking").  There is also other evidence that Vachani instructed

18  employees to circumvent the blocks he anticipated.  ECF No. 236-6 at 2 (Email from Vachani to

19  staff members stating that "we need to be prepared for Facebook to try and block us . . ."); ECF

20  No. 299-5 at 2 (Email from Vachani to employee noting, "please just make sure they cannot block

21  us").[6]

22        Third, with respect to *obtaining* information from the Facebook website without

23  authorization, Defendants admitted that they "took, copied, or made use of data from the Facebook

---

[5]  Defendants also admitted to the court in other papers that Vachani has "been personally involved in all of Power's operations including the Facebook integration that occurred in December 2008 that gave rise to this litigation."  ECF No. 269 at 7 (response to Judge Joseph Spero regarding discovery dispute in this litigation).

[6]  There is evidence that Vachani took other actions himself as well.  ECF No. 299-3 at 8-9 (Vachani admitting he sent Facebook an email informing Facebook that Power Ventures would continue to try to access Facebook's services despite Facebook's request that the company stop).

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1   website without Facebook's permission to do so."  ECF No. 241-3 at 6 (Defendants' Reponses to

2   Interrogatories).  Vachani's admission that he controlled and directed "the activities related to the

3   use of the Power 100 campaign in conjunction with Facebook users," ECF No. 299-3 at 27,

4   suffices to show that there is no genuine dispute regarding whether he led the company's quest to

5   obtain proprietary Facebook information, as that information was a necessary ingredient to the

6   Power 100 Campaign.  Ultimately, the Court concludes that these uncontroverted facts demonstrate

7   Vachani was the "guiding spirit" behind Power Venture's efforts to send the misleading spam

8   emails to Facebook users, and thus should be held personally liable.

9          Defendants' arguments to the contrary are unpersuasive.  First, Defendants concede that

10  corporate officers may be held liable for torts they authorize or direct, *see* Defendants'

11  Damages/Liability Brief at 4-5, but claim that "corporate executives like Vachani cannot be held

12  liable merely by virtue of their office for the torts of the corporation." *Id.* at 5.  This argument

13  neglects to take into consideration Vachani's specific acts with respect to the Power 100 Campaign

14  that went above and beyond his merely advisory role as CEO of the company.  Second, Defendants

15  note that "there is no precedent for holding a CEO liable in this type of computer fraud and tort

16  action where the CEO is not the exclusive owner or director . . ." Defendants' Inj. Opp. at 6.

17  Vachani himself similarly argues he was never the sole owner, controlling shareholder, or

18  controlling board member of Power Ventures, which he claims had six other executive officers and

19  multiple board members who had significant influence in decision-making as well.  *See* Vachani

20  Damages/Liability Brief at 5-7, 15.  It is true that the cases holding corporate officers personally

21  liable for violations of CFAA, CAN-SPAM, or California Penal Code § 502 have involved factual

22  situations in which the officer was either the *sole* officer or a majority shareholder of the company

23  or some combination of both.  *F.T.C. v. Sili Neutraceauticals, L.L.C.*, No. 07-C-4541, 2008 WL

24  474116, at *3 (N.D. Ill. Jan. 23, 2008) (finding that sole officer of defendant corporation who

25  formulated, directed, and controlled the acts giving rise to CAN-SPAM liability by the corporation

26  was individually liable under CAN-SPAM); *Facebook v. Fisher*, No. C 09-05842, 2011 WL

27  250395 (N.D. Cal. Jan. 26, 2011) (finding that sole officer of defendant corporation who conducted

28
                                            20
    Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF

the acts giving rise to CAN-SPAM and CFAA liability by the corporation was individually liable under CAN-SPAM and CFAA); *Hanger Prosthetics &Orthotics, Inc., v. Capstone Orthopedic Inc.*, 556 F.Supp.2d 1122, 1134035 (E.D. Cal. 2008) (denying motion for summary judgment on CFAA and California Penal Code § 502 claims against CEO where CEO owned one third of the corporation and a reasonable jury could infer that he authorized and directed the unlawful acts). However, Defendants fail to argue why an officer's majority shareholder status or sole officer position should make any difference to the liability outcome, especially given clear Ninth Circuit law in various other statutory contexts that holds corporate officers liable regardless of whether they are majority shareholders or sole officers. *See, e.g.*, *Coastal Abstract Serv. Inc. v. First American Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (holding officer of insurance company personally liable for violations of the Lanham Act despite the fact that he was acting as a corporate agent when committing the illegal conduct, without any discussion of his shareholder status). Accordingly, given the overwhelming evidence of Vachani's personal involvement in the unlawful acts leading to the statutory violations in this case, Defendants have failed to show that there is a genuine disputed issue of material fact concerning Vachani's personal liability, and the Court finds Vachani personally liable as a matter of law for violations of CAN-SPAM, CFAA, and California Penal Code § 502.

## V.    DAMAGES

In its memorandum in support of its request for injunctive relief, Facebook expressly waives its entitlement to attorneys' fees under the CFAA and its right to exemplary damages under California Penal Code § 502. Facebook Inj. Brief at 2.[7] However, Facebook seeks statutory damages under CAN-SPAM, asks the Court to treble damages, and also seeks compensatory damages under either CFAA or California Penal Code § 502. *Id.* at 1-13.

### A.    Facebook is entitled to damages under the CAN-SPAM ACT

---

[7] Facebook had previously requested punitive damages under Penal Code § 502. Facebook's Damages/Liability Brief at 10.

21

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

United States District Court
For the Northern District of California

Under the CAN–SPAM Act, a plaintiff may elect to recover monetary damages in an amount equal to the greater of actual losses or statutory damages. 15 U.S.C. § 7706(g)(1)(B). Facebook elects to recover statutory damages. It is well established that "[a] plaintiff may elect statutory damages regardless of the adequacy of the evidence offered as to his actual damages and the amount of the defendant's profits . . . and if statutory damages are elected, the court has wide discretion in determining the amount of statutory damages to be awarded, constrained only by the specified maxima and minima." *Facebook v. Wallace*, No. 09-798, 2009 WL 3617789, at *2 (N.D. Cal. Oct. 29, 2009) (citation omitted) (internal quotations omitted). However, a statutory damages award may violate the due process rights of a defendant "where the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable." *United States v. Citrin*, 972 F.2d 1044, 1051 (9th Cir. 1992) (citation omitted).

CAN–SPAM Act statutory damages are calculated as follows:

(3) Statutory damages.

(A) In general. For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message that is transmitted or attempted to be transmitted over the facilities of the provider of Internet access service, or that is transmitted or attempted to be transmitted to an electronic mail address obtained from the provider of Internet access service in violation of section 5(b)(1)(A)(i) [15 USCS § 7704(b)(1)(A)(i) ], treated as a separate violation) by—

(i) up to $ 100, in the case of a violation of section 5(a)(1) [15 USC § 7704(a)(1)]; or
(ii) up to $ 25, in the case of any other violation of section 5 [15 USC § 7704].

(B) Limitation. For any violation of section 5 [15 USCS §7704] (other than section 5(a)(1) [15 USC 7704(a)(1) ]), the amount determined under subparagraph (A) may not exceed $ 1,000,000.

(C) Aggravated damages. The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if—

(i) the court determines that the defendant committed the violation willfully and knowingly; or
(ii) the defendant's unlawful activity included one or more of the aggravated violations set forth in section 5(b) [15 USC § 7704(b)].

15 U.S.C. § 7706(g)(3).

22

1   In this case, Facebook seeks to recover statutory damages pursuant to 15 U.S.C. §

2   7706(g)(3)(A)(i), which are calculated by multiplying the number of Header violations by up to

3   $100.[8]  The Court has already determined Defendants are liable for violating 15 U.S.C. §

4   7704(a)(1) because they initiated "a minimum of 60,000 instances of spamming."  ECF No. 275 at

5   9.  Facebook thus argues it is entitled to the maximum statutory damages of 100 dollars for each of

6   the 60,627 spam messages Defendants sent to Facebook users.  Facebook Damages/Liability Brief

7   at 2.  In its briefing, Defendants do not appear to contest the fact that they sent 60,627 email

8   messages.  Defendants' Damages/Liability Brief at 2-4.  Facebook argues that the maximum is

9   warranted because Defendants committed "egregious" actions by "designing their spamming

10  campaign to ensure that it would continue notwithstanding any actions Facebook took to stop it"

11  and "us[ing] cash payments to induce third parties to send deceptive electronic messages."  *Id.* at 2-

12  3.  Indeed, Defendants undisputedly utilized the incentive of monetary payments as a means to

13  access Facebook users' accounts.  FAC ¶¶ 66-70; Answer ¶¶ 66-70 (noting how Power's "Launch

14  Promotion" offered site users 100 dollars if they successfully invited and signed up the most new

15  Power.com users").  Defendants also undisputedly designed a system that would circumvent

16  Facebook's blocking efforts.  ECF No. 232-2 at 5-6 (Power Venture's Response to Interrogatories

17  answering that they "develop[ed] the technology to allow Power or Power users to continue to

18  access the Facebook website following Facebook's IP blocking").[9]  Facebook also asks the Court

19  ─────────────────────
    [8]  Under the CAN-SPAM Act, each message is considered a separate violation.  15 U.S.C.

20  § 7706(g)(3)(i).
    [9]  Facebook also argues that Defendants' actions were "egregious" because they "destroyed

21  evidence necessary to establish exactly how many messages, above the 60,627, they initiated."
    Facebook Damages/Liability Brief at 2-3.  There is some evidence that Defendants did in fact

22  delete evidence relevant to this lawsuit.  Facebook's source code expert testified that a database
    called "Power_Logger" was one of two databases that should have recorded information about how

23  many emails were sent to Facebook users throughout the Power 100 campaign.  ECF No. 217 at ¶
    31-34.  Defendants admitted that they deleted the Power_Logger database in April 2011.  ECF No.

24  299-15 at 4-5 (Vachani admitting he made the decision to delete the database).  *See also* ECF No.
    220 at 12 (engineer's declaration in support of Facebook's opposition to Defendants' motion for

25  summary judgment noting that "by deleting the Power_Logger database, Defendants effectively
    erased arguably the most relevant and useful information concerning the number of electronic mail

26  messages that Defendants initiated through execution of their PowerScript software associated with
    the 100x100x100 campaign."); ECF No. 299-36 at 3 (Email from Defendants' counsel answering

27
                                                      23

28  Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF

United States District Court
For the Northern District of California

1   to treble the damages, contending that Defendants willfully and knowingly sent the deceptive spam

2   messages to Facebook users.  *Id.* at 8-9.[10]  The record supports Facebook's contention that

3   Defendants acted knowingly and willfully, *see e.g.* ECF No. 232-2 at 5-6 (Power's Response to

4   Interrogatories answering that Vachani was "responsible for developing the technology to allow

5   Power or Power users to continue to access the Facebook website following Facebook's IP

6   blocking" and for "creating the email messages sent to Facebook users asking Facebook users to

7   use the Power website to access the Facebook website").

8        In light of this evidence, the Court finds that a statutory damages award is warranted in this

9   case.  While Defendants argue that the Court should not award any damages under the CAN-

10  SPAM Act because Facebook did not suffer "any specific harm" as a result of the email messages,

11  citing *Gordon v. Virtumundo Inc.*, 575 F.3d 1040 (9th Cir. 2009), *see* Defendants'

12  Damages/Liability Brief at 1-2, this argument fails for two reasons.  First, this Court has already

13  determined that under *Gordon*, Facebook has shown that it was "adversely affected" by

14  Defendants' actions within the meaning of the CAN-SPAM Act.  ECF No. 275 at 8-9.  Second,

15  *Gordon* is inapposite here because it deals with whether a plaintiff has standing to bring a claim

16  under the CAN-SPAM Act as opposed to whether the plaintiff deserves damages once liability

17  under the Act has been determined, as in this case.[11]  Nonetheless, exercising its broad discretion to

18  determine an appropriate damages award, the Court finds that the $18,000,000 award requested by

19  Facebook is unnecessary to address the deterrent and punitive purposes of a statutory damages

20  award.  Without deciding whether the requested $18,000,000 award would violate Defendants' due

21

22  Plaintiff's counsel's request to identify the "missing databases related to the number of Launch
    Promotion messages that were sent to Facebook users" and stating that the Power_Logger
23  database, which logs the activities on Power Venture's servers, has "missing tables" because
    Defendant chose not to back up those large files after it ceased operations and closed its server).
24  [10] A court may treble damages under the CAN-SPAM Act where (1) the court determines that the
    defendant committed the violation willfully and knowingly; or (2) the defendant's unlawful activity
25  included one or more of the aggravated violations in §7704(b).  15 U.S.C. § 7706(f)(3)(C).
    [11] Defendant Vachani's own arguments against damages, namely that a damages decision could
26  deter innovation and that "creating CAN-SPAM liability . . . would be unprecedented," are
    similarly unavailing.  Vachani Damages/Liability Brief at 12-13.  This Court has already found that
27  he is liable, *see supra*, Part IV, and more importantly, damages, not liability, are at issue here.

28
    Case No.: 08-CV-5780-LHK
    ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
    VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
    RELIEF

process rights, the Court declines to award that amount and finds it sufficient to award $50 per
email communication that was sent. This decision is consistent with other cases where courts have
declined to award the maximum statutory damages of $100 per violation, instead granting awards
of either $50 or $25 per violation of the CAN-SPAM Act. *See Fisher*, 2011 WL 250395 (awarding
plaintiffs $50 per violation of the CAN-SPAM Act); *Wallace*, 2009 WL 3617789 at *2 (same);
*Tagged, Inc. v. Does 1 through 10*, No. C 09–01713, 2010 WL 370331 (N.D. Cal. Jan. 25. 2010)
(awarding plaintiffs only $25 for each of 6,079 spam emails in violation of CAN-SPAM Act in
case where, unlike the instant case, *see supra* n.9, there was no evidence Defendants had actively
deleted relevant database information to conceal the number of spam messages sent). Thus,
Facebook will be granted $50 per email communication that was sent. It will be awarded
$ 3,031,350 ($50 for each of the estimated 60,627 spam messages sent) in CAN–SPAM damages.

   The Court also finds trebling unnecessary given the large size of the primary award amount.
This finding is consistent with past cases where, despite defendants' willful and knowing violation
of the statutes in question, courts refused to treble damages. *See Fisher*, 2011 WL 250395 (holding
that although defendants willfully and knowingly violated the statutes by engaging in the
circumvention of Facebook's security measures, the requested maximum statutory award was
disproportionate to the gravity of defendants' acts, and thus the court awarded plaintiffs $50 per
violation and declined to treble damages); *Wallace*, 2009 WL 3617789 at *2 (holding that although
defendant "willfully violated the statutes in question with blatant disregard for the rights of
Facebook and the thousands of Facebook users whose accounts were compromised by his
conduct," and even violated a temporary restraining order and preliminary injunction, the requested
maximum statutory award was not merited and the court awarded plaintiffs $50 per violation and
declined to treble damages); *Tagged*, 2010 WL 370331 (awarding $25 for each of 6,079 spam
emails for a total amount of $151,975 and declining to treble damages because although
defendant's violations were allegedly intentional and willful, a $2,000,000 award was not

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

1    justified).[12]  Ultimately, a statutory damages award of $3,031,350 along with a permanent

2    injunction which this Court grants, *see infra* Part VI, will adequately serve the purpose of

3    punishment and deterrence in this case.

4    **B.    Facebook is entitled to compensatory damages under the CFAA**

5         Under the CFAA, "[a]ny person who suffers damage or loss by reason of a violation of this

6    section may maintain a civil action against the violator to obtain *compensatory* damages and

7    injunctive relief or other equitable relief."  18 U.S.C. § 1030(g) (emphasis added).  This Court

8    previously held that Facebook suffered "loss" as a result of Defendants' violation of CFAA.  ECF

9    No. 275 at 18.  Facebook is thus entitled to recover compensatory damages under the statute.

10   Facebook has established through undisputed testimony[13] that it expended           to investigate

11   Defendants' actions and for outside legal services in connection with the Defendants' actions.

12   Accordingly, this Court grants Facebook compensatory damages in the amount of $        .

13   Defendants' arguments against a grant of compensatory damages are unavailing.  Defendants argue

14   that Facebook "makes no effort to quantify any real harm it suffered" or "identify anything that

15   Power misappropriated from Facebook's network."  Defendants' Damages/Liability Brief at 3.

16   Again, these arguments are irrelevant as they address issues on the merits that have already been

17

18   [12] Facebook cites two default judgment orders in support of its request for $18,000,000.  Facebook
     Damages/Liability Brief at 2-3.  In *Facebook v. Guerbuez*, No. C 08–03889 (N.D. Cal. Nov. 21,
19   2008), Facebook was awarded $873 million against a defendant who sent four million spam emails
     to other Facebook users.  In *Myspace v. Wallace*, 2008 U.S. Dist. LEXIS 75752 (C.D. Cal. May 28,
20   2008), Myspace was awarded $223 million against a defendant who had sent nearly 400,000
     messages and posted 890,000 comments from 320,000 Myspace.com user accounts which were
21   "hijacked."  Here, in contrast, Defendants sent an estimated 60,627 individual emails.
     Accordingly, the Court concludes that it is just to award $3,031,350.  Further, even if, as Facebook
22   asserts, there are "tens of thousands of additional messages that Defendants littered through
     Facebook that cannot be accounted for in the damages calculation" due to Defendants' alleged
23   destruction of the relevant database information, *see* Facebook Damages/Liability Brief at 6, the
     Court finds that a $3,031,350 award is sufficient, as courts in this district have granted awards
24   proportionate to this award for similar violations.  *See Tagged*, 2010 WL 370331 (awarding
     plaintiff $151,975 for 6,079 emails that violated the CAN-SPAM Act where defendants' actions
25   were intentional and willful and where defendant circumvented plaintiff's security measures like in
     this case).
26   [13] This Court previously recognized that "Defendants do not dispute the accuracy or veracity of
     [the] evidence of [Facebook's] expenditures."  ECF No. 275 at 8.  Indeed, Defendants never filed a
27   rebuttal brief to Facebook's expert report regarding the monetary damages Facebook incurred.
     ECF No. 299-26 (Expert Report of Richard Ostiller).
28                                                       26
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF
                                                                                        ER 28

United States District Court
For the Northern District of California

decided; this Court previously found that Facebook *did* incur a "loss" under CFAA, and that Power

Ventures *did* obtain information from Facebook without permission.  ECF No. 275 at 18.[14]

## VI.    PERMANENT INJUNCTIVE RELIEF

Facebook moves for permanent injunctive relief to prevent future statutory violations by

Defendants Vachani and Power Ventures.  The CAN–SPAM Act authorizes the Court to grant a

permanent injunction "to enjoin further violation by the defendant."  15 U.S.C. § 7706(g)(1)(A).

Likewise, the CFAA provides that "[a]ny person who suffers damage or loss by reason of a

violation of [§1030] may maintain a civil action against the violator to obtain compensatory

damages and injunctive relief or other equitable relief."  18 U.S.C.A. § 1030(g).  California Penal

Code § 502 also allows a plaintiff to obtain injunctive relief.  California Penal Code § 502(e)(1).

A party seeking a permanent injunction must make a four-part showing: (1) that it has

suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are

inadequate to compensate for that injury; (3) that, considering the balance of hardships between the

plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not

be disserved by a permanent injunction.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388,

390 (2006).[15]  The Court has discretion to grant or deny permanent injunctive relief.  *Id.* at 391.

---

[14] As the Court decides to grant Facebook compensatory damages under CFAA, the Court need not and does not analyze Facebook's alternative argument that Facebook deserves compensatory damages under California Penal Code Section 502(e)(1).  Facebook's Damages/Liability Brief at 9.
[15] Defendants cite Ninth Circuit law holding that when an injunction is sought to prevent the violation of a federal statute which specifically provides for injunctive relief, future violations are presumed once a statutory violation is shown and the standard requirements for equitable relief need not be satisfied before an injunction is granted.  Facebook Inj. Brief at 6 (citing *Silver Sage Partners, LTD v. City of Desert Hot Springs*, 251 F.3d 814, 826-27 (9th Cir. 2001) (Fair Housing Act context).  The Court notes that although some courts have granted statutory injunctions in similar contexts without analyzing the traditional four factor test, *see Tagged*, 2010 WL 370331(CFAA and California Penal Code §502); *Fisher*, 2011 WL 250395 (CAN-SPAM Act and CFAA context), this Court declines to do so in light of Supreme Court authority reemphasizing the traditional four factor test.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-93 (2006) ("According to well established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief" and noting that the Supreme Court "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed.")

27

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE RELIEF

ER 29

1    The Court will consider each of these factors in turn, and will then consider whether, on balance,

2    the principles of equity support the issuance of a permanent injunction in this case.[16]

3    **A.    Irreparable Harm**

4            Facebook has shown irreparable injury as a result of Defendants' violations of the law.

5    Judge Ware's previous order granting Facebook summary judgment cited undisputed evidence that

6    Defendants created a software program to access Facebook's website, scraped user information

7    from Facebook, repeatedly changed Power Venture's IP address in order to circumvent technical

8    barriers Facebook had installed, and used that information to cause Facebook's servers to send

9    spam emails to Facebook users with "@facebookmail.com" mailing addresses.  ECF No. 275 at 9-

10   13.  These activities constituted irreparable harm by harming Facebook's goodwill with its users

11   because Facebook users receiving these emails are likely to associate the spam messages with

12   Facebook.  ECF No. 213 at ¶¶ 4-5.  *Hotmail Corp. v. Van$ Money Pie Inc.*, 1998 U.S. Dist. LEXIS

13   10729, at *20-21 (N.D. Cal. Apr. 16, 1998) (holding that customer confusion from source of spam

14   emails, which can lead to loss of goodwill, constituted irreparable harm to plaintiff); *Meineke Car*

15   *Care Centers, Inc. v. Quinones*, 2006 WL 1549708, *3 (W.D.N.C. 2006) (finding, in preliminary

16   injunction context, that possible loss in customers resulting from defendants' deceptive suggestion

17   that they were associated with plaintiff constituted irreparable harm).  While Defendants argue that

18   Facebook has not produced evidence that its reputation or goodwill with its users has been

19   damaged as a result of Defendants' activities, *see* Defendants' Inj. Opp. at 5, 9, Defendants cite no

20   case law suggesting that such specific and direct evidence is needed to prove harm to goodwill.

21   *C.f. Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F.Supp.2d 1037, 1050 (N.D. Cal. 2004)

22   (emphasis added) ("Damage to a business' goodwill is typically an irreparable injury because it is

23   ────────────────

[16] Facebook objects to Vachani's declaration submitted in support of Defendants' Opposition to
24   Injunctive Relief on the grounds that Vachani lacks personal knowledge for his various
     conclusions, including whether Facebook received any complaints about Defendants' conduct, and
25   because he is not competent to testify regarding the various legal conclusions he makes, such as
     claiming "Power did not obtain [anything] . . . of value from Facebook."  ECF No. 357-1;
26   Facebook Injunction Brief at 2.  For purposes of this Order only, the Court finds that Vachani's
     lack of qualifications and personal knowledge affect the weight his testimony should be accorded
27   and not its admissibility.  Thus, Facebook's objection is OVERRULED.

28                                                      28
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

1    *difficult to calculate*"); *see also Beacon Mut. Ins. Co. v. OneBeacon Ins. Group*, 376 F.3d 8, 17 (1st

2    Cir. 2004) (rejecting argument that "only *direct* evidence (with no room for inference) may

3    establish harm to goodwill" in the trademark law context).[17]  As Facebook has shown irreparable

4    harm, this factor weighs in favor of a permanent injunction.

5    **B.      Inadequacy of Money Damages**

6            Facebook has established that "remedies available at law, such as monetary damages, are

7    inadequate to compensate for [its] injury," *eBay*, 547 U.S. at 391, for three reasons.  First, money

8    damages will not ensure that Defendants will not take steps again in the future to spam Facebook

9    users, which is a possibility.  Defendants may still possess the software that enabled their illegal

10   activities, and like in other cases in this district, Defendants also "deliberately implemented other

11   tactics to circumvent plaintiff's security measures."  *Tagged*, 2010 WL 370331, at *12.

12   Defendants may even still possess Facebook-user data which they misappropriated.  Because there

13   is a "reasonable likelihood of defendant's future violations," injunctive relief is warranted.  *Id;*

14   *Pyro Spectaculars North Inc. v. Souza*, 861 F.Supp.2d 1079, 1092 (E.D. Cal. March 21, 2012)

15   (granting injunction in part because defendant still possessed plaintiff's data).  Second, money

16   damages will not compensate for the loss of goodwill Facebook may have suffered due to any

17   confusion created by Defendants' emails.  *See Hotmail*, 1998 U.S. Dist. at *21 (holding that loss of

18   goodwill caused by confusion generated by misleading spam emails "is not easily quantified and

19   not adequately compensated with money damages.").  Last, the Ninth Circuit has held that a district

20   court has authority to issue an injunction "where the plaintiffs can establish that money damages

21   will be an inadequate remedy due to impending insolvency of the defendant . . ."  *In re Estate of*

22   *Marcos*, 25 F.3d 1467 (9th Cir. 1994).  Here, Defendants' voluntary petitions for bankruptcy, *see*

23   _____

24   [17]  Defendants also argue Facebook has not shown irreparable harm because Facebook has failed to
      submit proof of user complaints about the spam messages.  Defendants' Inj. Opp. at 9.  However,
25   Facebook has provided evidence that in general, deceptive spam messages detract from Facebook
      user experiences and have been the source of complaints by Facebook users.  ECF 218-8 at ¶ 5
26   (Declaration of Ryan McGeehan in support of Facebook's Motion for Partial Summary Judgment
      noting that "spam messages detract from the overall Facebook experience and are sometimes a
27   source of complaints by Facebook users.

28   29

**United States District Court**
For the Northern District of California

1    ECF No. 323, 324, suggest they may be unable to satisfy a damages award and that non-monetary

2    relief may be necessary.

3         In rebuttal, Defendants argue they never misappropriated Facebook user data.  Defendants'

4    Inj. Opp. at 8.[18]  Defendants emphasize that one of their "primary" objections to injunctive relief is

5    that "Defendants are not in possession of any Facebook data or any user data that was not expressly

6    granted to Power by the users themselves."  *Id.* at 3.  This argument is irrelevant to the issue at

7    hand because the Court has already ruled that Defendants did misappropriate data without

8    Facebook's permission.  ECF No. 275 at 14-18.  Defendants also argue that the Court should not

9    consider the fact that they may still possess the software that enabled the alleged violations because

10   Power Ventures ceased operations in 2011.  Defendants' Inj. Opp. at 8.  But this argument ignores

11   the fact that Defendants could easily start another company or give the data to other entities that

12   wish to engage in the illegal spamming conduct.[19]  Overall, as money damages will likely be

13   inadequate, this factor weighs in favor of a permanent injunction.

14   **C.    Balance of Hardships**

15        The balance of hardships analysis also weighs in favor of granting Facebook a permanent

16   injunction.  Defendants have been found liable for violating various laws, *see* ECF No. 275, and

17   while an injunction would simply serve to force their compliance with the law, *see Myspace v.*

18   *Wallace*, 498 F.Supp.2d 1293, 1306 (C.D. Cal. July 3, 2007) (holding defendant would experience

19   no hardship if enjoined from committing further violations of the CAN-SPAM Act), Facebook may

20   suffer harm if an injunction is not issued.  As this Court previously concluded in its summary

21   judgment order, Facebook has already suffered harm, as it incurred expenditures to both block

22   Defendants' continued access to Facebook and to respond to the spamming emails.  ECF No. 275

23

24   _____

     [18] *See also* Defendants' Inj. Opp. at 5 ("Facebook is unable to identify anything that Power
25   misappropriated from Facebook's network, as Power did not take anything that belonged to
     Facebook.")

26   [19] Defendants also argue that "damages were avoidable" because Defendants allegedly cooperated
     with Facebook through the litigation.  Defendants' Inj. Opp. at 3, 10.  This argument is irrelevant;
27   the issue is not whether damages were "avoidable" but whether damages are sufficient to
     compensate Facebook for its injury.

28
     Case No.: 08-CV-5780-LHK
     ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
     VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
     RELIEF

30

1   at 7-10. Absent an injunction Facebook may have to deal with future violations of the law.

2   *Tagged*, 2010 WL 370331, at *12 (granting a preliminary injunction against a defendant who

3   violated CFAA and California Penal Code § 502 in part because defendant might engage in future

4   violations). Indeed, Defendants have demonstrated a willingness to do so, as they did not stop

5   even after requests from Facebook. ECF No. 299-3 at 8-9 (Vachani admitting that he sent

6   Facebook an email informing Facebook that Power Ventures would continue to try to access

7   Facebook's services despite Facebook's request that the company stop). On the other hand,

8   Defendants claim that the requested injunction impermissibly threatens Vachani's employability

9   and livelihood. Defendants' Inj. Opp. at 10-11; Vachani Damages/Liability Brief at 9. However,

10   Defendants fail to provide a persuasive reason why this is the case, and in any event, given that

11   Vachani brought this risk upon himself by violating the law, the balance would not shift in favor of

12   Defendants even if there were evidence to support this speculative claim. Accordingly, the balance

13   of hardships weighs in favor of Facebook.

14   **D.**    **Public Interest**

15        The public interest weighs in favor of an injunction as well, and courts in this district have

16   reached this conclusion in analogous cases. *See, e.g.*, *Craigslist, Inc. v. Troopal Strategies, Inc.*,

17   2011 U.S. Dist. LEXIS 15625, at *11 (N.D. Cal. 2011) (holding injunction would be in the public

18   interest where defendant violated CFAA). Injunctive relief would serve the public interest by

19   preventing Defendants from impermissibly spamming Facebook users again and setting an

20   example to members of the public who may consider violating these various statutes as well. In

21   passing the CAN–SPAM Act, Congress recognized the burdens which commercial spam poses to

22   the public. 15 U.S.C. § 7701(a)(2) ("The convenience and efficiency of electronic mail are

23   threatened by the extremely rapid growth in the volume of unsolicited commercial electronic

24   mail."). Namely, the public "is forced to incur the costs of needlessly expended energy and time

25   evaluating and eventually discarding defendants' unsolicited messages[.]" *F.T.C. v. Phoenix*

26   *Avatar, LLC*, 2004 WL 1746698, *14 (N.D. Ill. July 30, 2004) (enjoining defendants for violations

27   of the CAN–SPAM Act). Because Defendants' activities fall within those activities Congress

28

31

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

1    deemed detrimental to the public, this factor weighs in favor of Facebook. Defendants' arguments

2    to the contrary are unavailing. While Defendants claim the injunction will pose "unacceptable

3    risks for innovators" and enhancements in social networking technology, Defendants' Inj. Opp. at

4    11, this argument fails to recognize that the injunction will serve to deter only conduct that violates

5    the law. The law explicitly provides for injunctive relief. Thus, to the extent that granting

6    Facebook injunctive relief for Defendants' violations of CFAA and CAN-SPAM may have

7    negative "impacts on innovation, competition, and the general 'openness' of the internet," courts

8    have held that it is up to Congress, not the courts, to decide whether to amend those statutes.

9    *Craigslist Inc. v. 3Taps*, No. CV 12–03816 CRB, 2013 WL 4447520, at *25 (N.D. Cal. Aug. 16,

10   2013) ("[I]t is for Congress to weigh the significance of those consequences and decide whether

11   amendment would be prudent.")

## E.    Balance of all four equitable factors

13       The balance of all four factors weighs strongly in favor of granting an injunction in this

14   case. Thus, the Court grants Facebook its request for permanent injunctive relief against both

15   Power Ventures and Vachani in his individual capacity.[20] This decision is in line with past

16   decisions of this Court. *See Tagged*, 2010 WL 370331, at *12 (granting injunctive relief for

17   violations of CFAA and California Penal Code § 502); *Facebook v. Fisher*, 2011 U.S. Dist. LEXIS

18   9668, at *7-8 (N.D. Cal. Jan. 26, 2011) (granting injunction for violations of CAN-SPAM Act and

19   CFAA); *Microsoft Corp. v. Neoburst Net LLC*, 2004 U.S. Dist. LEXIS 18733, at *2-4 (N.D. Cal.

---

[20] While Defendants claim Facebook provides "no basis for enjoining the individual defendant from any action given that Vachani never acted independently or otherwise in a personal or individual capacity while employed by Power during the period of Facebook's grievances," Defendants' Inj. Opp. at 6, this argument fails for two reasons. First, as this Court finds that Vachani is personally liable, he may be enjoined in his individual capacity. *FTC v. Sili Neutraceuticals LLC*, 2008 U.S. Dist. LEXIS 105683 (N.D. Ill. Jan. 23, 2008). Second, even assuming this Court found Vachani was *not* personally liable, Defendants' argument ignores Ninth Circuit law holding that Federal Rule of Procedure 65 "establishes that an injunction may bind not only parties to the action but also 'their officers, agents, servants, employees, and attorneys, and [upon] those persons in active concert or participation with them.'" *Comedy Club Inc. v. Improv West Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (citing FED. R. CIV. P. 65(d)). Here, Vachani may be enjoined under FRCP 65 as an officer of Power Venture.

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

2004) (granting injunctive relief for violations of CAN-SPAM Act, CFAA, and California Penal Code § 502).[21]  Facebook is hereby entitled to a permanent injunction against Power Ventures and Vachani as follows:

1. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in-interest, and those in active concert or participation with them, are permanently enjoined from:

A. Sending, or assisting others in the sending of, or procuring the sending of unauthorized or unsolicited commercial electronic text messages to users of the Facebook website, www.facebook.com, or via the Facebook website or service.

B. Making, or assisting others in making, any false or misleading oral or written statement or representation of material fact when advertising, promoting or selling any good or service, including, but not limited to any false or misleading statement or representation that Defendants, their representatives, or any other person is affiliated or associated with, under contract with, acting in partnership with, endorsed or approved by, or otherwise connected to Facebook or to a service offered by Facebook.

C. Accessing or using, or directing, aiding, facilitating, causing, or conspiring with others to use or access the Facebook website or servers for any purpose, without Facebook's prior permission.

D. Using any data, including without limitation Facebook-user data and data regarding Facebook's website or computer networks, obtained as a result of the unlawful conduct alleged in the operative complaint in this action.

E. Developing, using, selling, offering for sale, or distributing, or directing, aiding, or conspiring with others to develop, sell, offer for sale, or distribute, any software that allows the user to engage in the unlawful conduct alleged in the operative complaint in this action.

2. Defendants, their agents, officers, contractors, directors, shareholders, employees, subsidiary companies or entities, affiliated or related companies and entities, assignees, and successors-in-

---

[21] Defendants' brief fails to distinguish or otherwise discuss these relevant authorities.

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1  interest, and those in active concert or participation with them shall destroy any software, script(s)

2  or code designed to access or interact with the Facebook website, Facebook users, or the Facebook

3  service.  They shall also destroy Facebook data and/or information obtained from Facebook or

4  Facebook's users, or anything derived from such data and/or information.

5  3. Within three calendar days of entry of this permanent injunction and order, Defendants shall

6  notify their current and former officers, agents, servants, employees, successors, and assigns, and

7  any persons acting in concert or participation with them of this permanent injunction.

8  4. Within seven calendar days of entry of this injunction and order, Defendants shall certify in

9  writing, under penalty of perjury, that they have complied with the provision of this order.

10  5. The Court shall continue to retain jurisdiction over the parties for the purpose of enforcing this

11  injunction and order.

12  **VII.    CONCLUSION**

13       The Court finds Defendants have failed to set forth grounds pursuant to Civil L.R. 7-9(b)

14  for leave to file a motion for reconsideration of Judge Ware's February 16 order.  Thus, the request

15  for leave is DENIED.  The Court finds Vachani personally liable as a matter of law for violations

16  of the Controlling the Assault of Non-Solicited Pornography and Marketing Act of 2003 ("CAN-

17  SPAM Act"), 15 U.S.C § 7701; the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030;

18  and California Penal Code § 502.  The Court further finds Facebook is entitled to statutory

19  damages in the amount of $3,031,350, compensatory damages in the amount of $      , and

20  permanent injunctive relief as described above.  The Clerk shall close the file.

21  **IT IS SO ORDERED.**

22

23  Dated: September 25, 2013

LUCY H. Koh
LUCY H. Koh
United States District Judge

24

25

26

27

28

34

Case No.: 08-CV-5780-LHK
ORDER DENYING LEAVE TO FILE MOTION FOR RECONSIDERATION, FINDING DEFENDANT STEVEN
VACHANI LIABLE AS A MATTER OF LAW, AND GRANTING DAMAGES AND PERMANENT INJUNCTIVE
RELIEF

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FACEBOOK, INC., <br>       Plaintiff, <br><br>     v. <br><br> POWER VENTURES, INC., et al., <br>       Defendants. | Case No. 08-cv-05780-LHK   (JCS) <br><br> **ORDER RE ATTORNEYS FEES AND COSTS FOR RENEWED DEPOSITION** <br><br> **Dkt. Nos. 347, 350** |

## I.    INTRODUCTION

On March 1, 2012, in response to a discovery dispute between the parties, this Court ordered Defendants to "pay reasonable costs, including attorney fees, for the renewed 30(b)(6) deposition" of Mr. Vachani, the designated deponent for the Rule 30(b)(6) deposition of Power Ventures. *See* Dkt. No. 282 ("Discovery Order"). Facebook has since filed a letter brief requesting an order compelling Defendants Power Ventures and Mr. Vachani to pay $39,796.73 in reasonable attorney's fees and costs associated with the renewed deposition of Mr. Vachani. Defendants oppose Facebook's request. For the reasons stated below, the Court grants Facebook's request for fees and costs in its entirety and orders Defendants, including Mr. Vachani, to pay Facebook $39,796.73.

## II.    BACKGROUND

### A.    Background of Discovery Dispute

On February 24, 2012, this Court conducted a discovery hearing on three joint letter briefs, two of which are relevant to Facebook's instant request for costs and fees. The first joint letter brief concerned Facebook's request for a renewed Rule 30(b)(6) deposition of Power Venture's designated deponent, Mr. Vachani. *See* Dkt. No. 265. The next joint letter brief concerned

United States District Court
Northern District of California

1  Facebook's request for an order compelling Defendants' production of all Power Ventures'

2  company emails that were not copied to Mr. Vachani.  *See* Dkt. No. 269.

3       During discovery, Facebook had requested production of all communications between

4  Power employees related to how the company assessed the Facebook website, and what was

5  discussed concerning the Power 100 Launch Promotion.  Defendants produced the "ASA Drive"

6  which presumably contained 300,000 files which had been backed up by Defendants' server

7  hosted by Amazon and IWEB.  *See* Dkt. No. 166.  In July 2011, Mr. Vachani testified:

8  "Everything was instructed to be copied there, and so I'm assuming that it's all there.  I haven't

9  looked at it individually personally, but I made a backup of everything."  Dkt. No. 269-2 (July 20,

10  2011 Deposition of Mr. Vachani) at 62:13-63:6.

11       Discovery in this case closed on January 20, 2012.  On January 9, 2012, during the first

12  Rule 30(b)(6) deposition of Mr. Vachani, Facebook first learned that Power Ventures had failed to

13  produce any emails other than those which had been copied or forwarded to Mr. Vachani's

14  personal Yahoo! email account.

15       On January 26, 2012, Defendants produced what they termed the "Microsoft Exchange

16  File" which contained 76,457 files, 5,752 folders, and 74.6 gigabytes of data.  Declaration of

17  Morvarid Metanat in Supprot of Facebook, Inc.'s Motion for Costs ("Metanat Decl.") ¶ 3.  Ms.

18  Metanat states that "[t]his File contained emails and data that had not been previously produced to

19  Facebook, despite Facebook's repeated requests for this information.  As significant amount of

20  these files were written in Portuguese." *Id*.  In the joint letter brief submitted to the Court,

21  Defendants argued the "Microsoft Exchange File" was not disclosed due to inadvertence because

22  Mr. Vachani believed that file had been stored on the ASA Drive, which had been disclosed.  *See*

23  Dkt. No. 269 at 6.

24       **B.       The February 24, 2012 Discovery Hearing**

25       At the discovery hearing on the joint letter briefs, the Court informed Defendants that there

26  was no excuse for failing to timely disclose the emails that had not been copied to Mr. Vachani's

27  yahoo account.  *See* Dkt. No. 280 (Transcript of February 24, 2012 Discovery Hearing).  The

28  Court emphasized that these emails were relevant, responsive, and should have been produced

ER 38

United States District Court
Northern District of California

1    before the Rule 30(b)(6) deposition of Mr. Vachani. The Court also found that Mr. Vachani did

2    not adequately prepare for his deposition, thereby failing to fulfill the duty of a Rule 30(b)(6)

3    deponent. The Court further found that Mr. Vachani was "argumentative" and "evasive" in his

4    response to questioning. *Id*. at 8-9. The Court ordered that a new Rule 30(b)(6) deposition be

5    taken of Mr. Vachani and ordered all costs to be borne by Defendants. *Id*. at 8:3-8.

6          At the hearing, the Court addressed another issue that had not been adequately briefed by

7    Facebook—the alleged spoliation of documents in Defendants' possession. The Court declined to

8    make any decisions about this issue and informed Facebook that the Court would not forbid a

9    motion regarding spoliation in the future. *Id*. at 14-15.

10          **C.       The March 1, 2012 Discovery Order**

11          On March 1, 2012, the Court filed an order regarding the joint discovery letters. *See* Dkt.

12   No. 282 ("Discovery Order"). The Court outlined the rules to which both parties would adhere at

13   the renewed 30(b)(6) deposition of Mr. Vanchani, and further ordered that "Defendant shall pay

14   reasonable costs, including attorney fees, for the renewed 30(b)(6) deposition." *Id*. at 1. The

15   Court ordered Defendants to produce the responsive emails that were not copied to Mr. Vachani

16   and clarified that Mr. Vahcani would be deposed regarding these newly produced emails. *Id*. at 2.

17          With regard to the issue of spoliation, the Court made "no ruling on the spoliation of

18   documents" and wrote that "Plaintiff may file [a] formal Motion." *Id*.

19   **III.     LEGAL STANDARD**

20          Rule 30(d)(2) of the Federal Rules of Civil Procedure provides that a "court may impose

21   an appropriate sanction−including the reasonable expenses and attorney's fees incurred by any

22   party−on a person who impedes, delays, or frustrates the fair examination of the deponent."

23   Fed.R.Civ.P 30(d)(2). Rule 11(c)(4) provides that the "Nature of a Sanction" "must be limited to

24   what suffices to deter repetition of the conduct or comparable conduct by others similarly

25   situated," and "may include …. an order directing payment to the movant of part or all of the

26   reasonable attorney's fees and other expenses directly resulting from the violation." Fed.R.Civ.P.

27   11(c)(4).

28   //

ER 39

## IV. DISCUSSION

Facebook requests an order for fees and costs in the amount of $39,796.73.  This amount reflects the combined total of: (1) the costs of the videographer and court reporter services ($5,128.73); (2) the costs of the expedited, certified translations of untimely produced 74.6 gigabytes of data and Power's deposition ($660.00); and (3) attorneys' fees associated with the work of attorneys and paralegals to prepare for and undertake the renewed Rule 30(b)(6) deposition of Mr. Vachani ($38,008.00).  Facebook has submitted the invoices for the videographer and court reporter services as well as the expedited translations.  Metanat Decl. Exs. B - C.  Facebook has also submitted for *in camera* review the hours, rates and tasks performed for by all attorneys and paralegals for which it seeks fees, which the Court reviewed.  *See* Dkt. No. 351.

Defendants do not oppose Facebook's claim for cost and fees on the grounds that the hours or rates are unreasonable.  *See* Dkt. No. 350 ("Power Br.").  Indeed, the Court has reviewed the hours and rates in detail and finds them to be reasonable.  Defendants contend, however, that the request for fees should be reduced and/or modified for the following reasons: (A) this Court has made no determination as to whether there was a discovery violation with respect to the documents transferred to Facebook on January 26, 2010 because the Court did not rule on the issue of spoliation; (B) Facebook's request for fees and costs is beyond the scope of the Court's Discovery Order; and (C) Mr. Vachani is not personally liable for the costs and fees associated with the renewed Rule 30(b)(6) deposition.  The Court addresses each argument in turn.

### A. Effect of this Court Not Ruling on Spoliation

Defendants contend the Court has made "no determination as to whether a discovery violation was committed with respect to the documents transferred to Facebook on January 26, 2010" because the Court did not decide any issue with regard to spoliation, and Facebook failed to file a separation motion on spoliation despite being "instructed" by the Court.  Power Br. 1-2.  While it is true the Court made no determination as to spoliation, Defendants are incorrect to assert the Court did not already decide that Defendants committed a discovery violation.  It is clear from the transcript of the February 24, 2012 discovery hearing and the March 1, 2012 discovery

4

United States District Court
Northern District of California

1   order that this Court found Defendants committed discovery violations by (1) failing to timely

2   disclose relevant emails solely on the basis that they were not copied to Mr. Vachanie's Yahoo!

3   email account, and (2) because Mr. Vachani was not prepared for his Rule 30(b)(6) deposition,

4   read from his declaration, and was "argumentative" and "evasive." *See* Dkt. Nos. 280, 282. This

5   is the very reason why the Court ordered a new Rule 30(b)(6) deposition be taken and paid for by

6   Defendants. *See id.*

7        Moreover, the Court never "instructed" Facebook to file a motion regarding spoliation, as

8   Defendants contend. Rather, the Court merely clarified that Facebook would have the opportunity

9   to file such a motion, and the Court would not "forbid" it. Dkt. No. 280.

10       **B.       Scope of Discovery Order**

11       Defendants' main argument is that Facebook's request for fees and costs goes beyond the

12  scope of the Discovery Order. Defendants argue:

> Facebook's request is unreasonable because they seek recovery of
> fees for reviewing documents that otherwise would be borne by
> Facebook had they conducted review of said documents, *copies of
> which had been provided to them*, during discovery…. Facebook's
> failure to conduct thorough review of documents produced by
> Defendants during discovery does not make Defendants liable for
> fees associated with review of additionally produced copies of said
> documents following discovery. Costs and fees based on
> Facebook's actions in response to unadjudicated accusations are
> wholly outside the scope of this order and, thus, are patently
> *un*reasonable.

20  Power's Br. at 2. While Defendants *argue* that Facebook's preparation time includes time

21  reviewing documents already produced, Defendants produce *no evidence* to show that such files

22  had already been produced and their subsequent disclosures were mere "copies of said

23  documents." *See id.*

24       Defendants' argument has a fundamental flaw: they were ordered to sit for a renewed

25  deposition in part because new documents were produced after the close of discovery. To prepare

26  for that deposition, Plaintiff had to review the late produced documents. Defendants were ordered

27  to pay the costs and fees associated with that preparation. When accounting for attorney hours,

28  Facebook does not distinguish between time spent reviewing documents which were previously

1   produced and reviewing documents which were produced after the close of discovery.

2   Nevertheless, it is clear from Ms. Metanat's declaration that they spent time reviewing the

3   contents of the Microsoft Exchange File, which had been disclosed after the close of discovery,

4   and which contained emails and data that had not previously been produced. *See* Metanat Decl. ¶

5   3.

6        Defendants allude to the fact that the Microsoft Exchange File contained copies of

7   documents that had previously been produced, and that Defendants should not have to pay for

8   Facebook's review of such documents. However, Facebook had to comb through the entire

9   Microsoft Exchange File to determine what was new and what was old. Thus, if Defendants

10   wanted to save on the costs associated with Facebook reviewing files which had been timely

11   produced, then Defendants should have sent Facebook only new files. Defendants do not purport

12   to say they did so. In fact, it is clear from the joint letter discovery brief that when Defendants

13   gave Facebook the Microsoft Exchange File, Defendants did not even know its contents because

14   they were unable to open the file. *See* Dkt. No. 269.

15        Defendants also argue that translation fees should not be included, as Plaintiff would have

16   paid for the cost of certified translation anyway. While Defendants concede that "[a]rguably, the

17   costs for *expedition* are unique to the renewed deposition," Defendants still argue that "the basis

18   for such claim is outside the scope of the sanction order, as the Court expressly declined to rule on

19   the alleged spoliation of documents." Power Br. at 2. As discussed above, Defendants reference

20   to "spoliation" is a red herring; that issue bears no relevance on the issues. Defendants were

21   ordered to pay all of the costs of the renewed deposition. This included all of the costs of

22   reviewing the files produced after the close of discovery in preparation for that deposition. The

23   costs of the expedited and certified translations will be borne by Defendants.

24       **C.**     **Personal Liability of Mr. Vachani**

25        Defendants' last argument is that Mr. Vachani is not personally liable for the costs of the

26   renewed deposition. This argument arises because Facebook filed a claim in Mr. Vachani's

27   Chapter 13 bankruptcy case for $20,000 as sanctions under this Court's order (in addition to the

28   $18 million in damages). Declaration of Steven Vachani in Support of Power Ventures, Inc. and

1   Steven Vachani's Response to Facebook, Inc.'s Motion for Costs ¶ 2 and Ex. A thereto.  It does

2   not appear that Facebook filed any claim in Power Venture's Chapter 11 bankruptcy case.

3     The renewed deposition−as reflected in the Court's previous order−was caused by the

4   discovery misconduct by both Power Ventures and by Mr. Vachani.  It was in part Mr. Vachani's

5   personal conduct−being unprepared, evasive and argumentative−which required a renewed

6   deposition, and for which the Court awarded sanctions.   Therefore, Mr. Vachani is liable to pay

7   the costs and fees of the renewed deposition.

8   **V. CONCLUSION**

9     For the foregoing reasons, Defendants are ordered to pay Facebook $39,796.73.

10    IT IS SO ORDERED.

11  Dated: August 7, 2013

12

13  JOSEPH C. SPERO
    United States Magistrate Judge

14

7

1

2

3

4                     UNITED STATES DISTRICT COURT

5                   NORTHERN DISTRICT OF CALIFORNIA

6

7   FACEBOOK, INC.,                          No. C 08-05780 JW (JCS)

8          Plaintiff,
                                             **DISCOVERY ORDER RE: DOCKET**
9   v.                                       **NOS. 265, 267 AND 269**

10  POWER VENTURES, INC., et al.,

11         Defendants.
    _____/

12

13         On February 24, 2012, a hearing was held on the Joint Discovery Letters.

14         For reasons stated on the record, and good cause shown, IT IS HEREBY ORDERED THAT:

15         1.  The Motion for Supervised 30(b)(6) Deposition, docket no. 265: The Defendant shall sit

16  for a renewed 30(b)(6) deposition on topics remaining in this case.  There shall be no repeating

17  questions to which the witness provided a clear answer; the witness shall answer all the questions as

18  put to him and there shall be no instruction not to answer other than based on attorney client

19  privilege and attorney work product.  The witness may not testify by reading from his declaration.

20  The witness may not argue with the attorney.  The witness shall take all reasonable steps, including

21  contacting former employees, to be prepared on all topics listed in the Notice of Deposition that was

22  previously served so long as they are still at issue.  The Defendant shall pay reasonable costs,

23  including attorney fees, for the renewed 30(b)(6) deposition.  The witness may be deposed for seven

24  (7)  hours.  The deposition shall be held on **February 29, 2012, at 10:00 a.m.,** at the Orrick Office

25  located in Menlo Park, California.

26         2.  The Motion to Preclude Brazilian Witnesses, docket no. 267: A stipulated order was

27  entered that Defendants agree that they shall not call as witnesses, or provide a declaration from Eric

28  Santos, Felipe Herrera, and Bruno Carvalho.

**United States District Court**
For the Northern District of California

ER 44

1         3. The Motion Compelling Production of Emails, docket no. 269: The Defendant shall

2    produce, forthwith, the responsive emails that were not copied to Steve Vachani. The Defendant

3    shall sit for a renewed 30(b)(6) deposition regarding the newly produced emails that are relevant to

4    the issues that are still unresolved by the Court's Summary Judgment Order.   The Defendant shall

5    pay reasonable costs, including attorney fees, for the renewed 30(b)(6) deposition.

6         4. The Court makes no ruling on the spoliation of documents and Plaintiff may file formal

7    Motion.

8

9         IT IS SO ORDERED.

10

11   Dated:  March 1, 2012

12                                   JOSEPH C. SPERO
                                United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

2

United States District Court

For the Northern District of California

1

2

3

4

5          IN THE UNITED STATES DISTRICT COURT

6          FOR THE NORTHERN DISTRICT OF CALIFORNIA

7          SAN FRANCISCO DIVISION

8    Facebook, Inc.,                          NO. C 08-05780 JW

9              Plaintiff,                      **ORDER GRANTING PLAINTIFF'S**
                                              **MOTIONS FOR SUMMARY JUDGMENT;**
10       v.                                   **DENYING DEFENDANTS' MOTION FOR**
                                              **SUMMARY JUDGMENT**
     Power Ventures, Inc., et al.,
11
              Defendants.
12   _____/

13                    **I.  INTRODUCTION**

14       Facebook, Inc. ("Plaintiff") brings this action against Defendants[1] alleging violations of the

15   Controlling the Assault of Non-Solicited Pornography and Marketing Act ("CAN-SPAM Act"), 15

16   U.S.C. §§ 7701 *et seq.*, the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, and

17   California Penal Code § 502.  Plaintiff alleges that Defendants accessed its website in an

18   unauthorized manner, and then utilized this unauthorized access to send unsolicited and misleading

19   commercial e-mails to Facebook users.

20       Presently before the Court are Plaintiff's Motions for Summary Judgment on Counts One,[2]

21   Two and Three,[3] and Defendants' Motion for Summary Judgment on all counts.[4]  The Court

22   _____

23       [1] Defendants are Power Ventures, Inc. ("Power") and Steven Vachani ("Vachani").

24       [2] (Facebook, Inc.'s Corrected Notice of Motion and Motion for Partial Summary Judgment
     on Count 1; Memorandum of Points and Authorities in Support Thereof, hereafter, "CAN-SPAM
25   MSJ," Docket Item No. 215.)

26       [3] (Notice of Motion, Motion and Memorandum of Points and Authorities for Partial
     Summary Judgment under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18
27   U.S.C. § 1030, hereafter, "Fraud MSJ," Docket Item No. 214.)

28       [4] (Notice of Motion, Motion, and Memorandum of Law in Support of Defendants' Motion
     for Summary Judgment, hereafter, "Defendants' MSJ," Docket Item No. 98.)

United States District Court
For the Northern District of California

1    conducted a hearing on January 23, 2012. Based on the papers submitted to date and oral argument,

2    the Court GRANTS Plaintiff's Motions for Summary Judgment on all counts, and DENIES

3    Defendants' Motion for Summary Judgment.

4                                    **II. BACKGROUND**

5    A.    **Undisputed Facts**

6          Plaintiff owns and operates the widely popular social networking website located at

7    http://www.facebook.com.[5]  Defendant Power is a corporation incorporated in the Cayman Islands

8    doing business in the State of California.[6]  Defendants operate a website, www.power.com, which

9    offers to integrate multiple social networking accounts into a single experience on Power.com.

10   (FAC ¶ 5; Answer ¶ 5.)  Defendant Vachani is the CEO of Power.  (Id. ¶ 11; Id. ¶ 11.)

11         Users of Plaintiff's website register with a unique username and password.  (FAC ¶ 21;

12   Answer ¶ 21.)  Before Plaintiff activates a username and permits a user to access certain features of

13   Facebook, the user must agree to Plaintiff's Terms of Use.  (Id. ¶ 29; Id. ¶ 29.)  The Terms of Use

14   require users to refrain from using automated scripts to collect information from or otherwise

15   interact with Facebook, impersonating any person or entity, or using Facebook website for

16   commercial use without the express permission of Facebook.  (Id. ¶ 30; Id. ¶ 30.)

17         On or before December 1, 2008, Power began advertising and offering integration with

18   Plaintiff's site.  (FAC ¶ 49; Answer ¶ 49.)  Power permitted users to enter their Facebook account

19   information and access Facebook site through Power.com.  (Id. ¶ 50; Id. ¶ 50.)  At no time did

20   Defendants receive permission from Plaintiff to represent that solicitation of Facebook usernames

21   and passwords was authorized or endorsed by Plaintiff.  (Id. ¶ 53; Id. ¶ 53.)

22         On or before December 26, 2008, Power began a "Launch Promotion" that promised

23   Power.com's users the chance to win one hundred dollars if they successfully invited and signed up

24   _____

25         [5]  (First Amended Complaint ¶ 20, hereafter, "FAC," Docket Item No. 9; Amended Answer
     and Counterclaims of Defendants Power Ventures, Inc. and Steve Vachani ¶ 20, hereafter,
26   "Answer," Docket Item No. 54.)

27         [6]  (FAC ¶ 10; Answer ¶ 10.)

28                                           2

new Power.com users.  (FAC ¶ 65; Answer ¶ 65.)  As part of this promotion, Power provided

participants with a list of their Facebook friends, obtained by Power from Facebook, and asked the

participant to select which of those friends should receive a Power invitation.  (Id. ¶ 66; Id. ¶ 66.)

The invitations sent to those friends purport to come from "Facebook" and used an

"@facebookmail.com" address, not a Power.com address.  (Id. ¶ 68; Id. ¶ 68.)

On December 1, 2008, Plaintiff notified Defendant Vachani of its belief that Power's access

of Plaintiff's website and servers was unauthorized and violated Plaintiff's rights.  (FAC ¶ 57;

Answer ¶ 57.)  Facebook subsequently implemented technical measures to block users from

accessing Facebook through Power.com.  (Id. ¶ 63; Id. ¶ 63.)

**B.**     **Procedural History**

On December 30, 2008, Plaintiff filed its initial Complaint.  (See Docket Item No. 1.)  On

January 13, 2009, Plaintiff filed the First Amended Complaint naming both Power Ventures and

Vachani as Defendants.  (See FAC at 1.)  On March 23, 2009, Defendants moved to dismiss

Plaintiff's Complaint or, in the alternative, for a more definite statement.  (See Docket Item No. 17.)

On May 11, 2009, the Court denied Defendants' Motion to Dismiss as to all claims.  (See Docket

Item No. 38.)  On November 23, 2009, Defendants answered Plaintiff's First Amended Complaint

and asserted counterclaims under the Sherman Antitrust Act and California's Unfair Competition

Law.  (See Answer ¶¶ 167-185.)

On December 23, 2009, Plaintiff filed a Motion for Judgment on the Pleadings or, in the

Alternative, Partial Summary Judgment of Liability Under California Penal Code Section 502(c).

(See Docket Item No. 56.)  The same day, Plaintiff also filed a Motion to Dismiss Defendants'

Counterclaims and Strike Defendants' Affirmative Defenses.  (See Docket Item No. 58.)  On

January 15, 2010, Defendants filed a Cross-Motion for Summary Judgment.  (See Docket Item No.

62.)  On February 26, 2010, Judge Fogel recused himself from the case.  (See Docket Item No. 72.)

On March 2, 2010, the case was reassigned to Judge Ware.  (See Docket Item No. 73.)  On July 20,

2010, the Court denied Plaintiff's Motion for Judgment on the Pleadings or Summary Judgment,

United States District Court
For the Northern District of California

3

ER 48

1   denied Plaintiff's Motion to Strike Defendants' Affirmative Defenses, denied Defendants' Motion

2   for Summary Judgment and granted Plaintiff's Motion to Dismiss Defendants' Counterclaims.[7]

3       Presently before the Court are the parties' Motions for Summary Judgment.

4                                    **III.  STANDARDS**

5       Summary judgment is proper when the moving party shows that there is no genuine dispute

6   as to any material fact.  Fed. R. Civ. P. 56(a).  The purpose of summary judgment "is to isolate and

7   dispose of factually unsupported claims or defenses."  Celotex v. Catrett, 477 U.S. 317, 323-24

8   (1986).  The moving party "always bears the initial responsibility of informing the district court of

9   the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a

10  genuine issue of material fact."  Id. at 323.  If the moving party meets its initial burden, the "burden

11  then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue

12  for trial."  Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 987 (9th Cir. 2006) (citing Celotex, 477

13  U.S. at 324).

14      When evaluating a motion for summary judgment, the court views the evidence through the

15  prism of the evidentiary standard of proof that would pertain at trial.  Anderson v. Liberty Lobby

16  Inc., 477 U.S. 242, 255 (1986).  The court draws all reasonable inferences in favor of the non-

17  moving party, including questions of credibility and of the weight that particular evidence is

18  accorded.  See, e.g., Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992).  The court

19  determines whether the non-moving party's "specific facts," coupled with disputed background or

20  contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.

21      T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987).   In such a

22  case, summary judgment is inappropriate.  Anderson, 477 U.S. at 248.  However, where a rational

23  trier of fact could not find for the non-moving party based on the record as a whole, there is no

24  "genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

25

26      [7]  (See Order Denying Facebook's Motion for Judgment on the Pleadings; Denying the
    Parties' Cross-Motions for Summary Judgment; Granting Facebook's Motion to Dismiss
27  Defendants' Counterclaims; Denying Facebook's Motion to Strike Defendants' Affirmative
    Defenses, hereafter, "July 20 Order," Docket Item No. 89.)

28                                          4

United States District Court

For the Northern District of California

1    Although the district court has discretion to consider materials in the court file not referenced

2    in the opposing papers, it need not do so.  See Carmen v. San Francisco Unified Sch. Dist., 237 F.3d

3    1026, 1028-29 (9th Cir. 2001).  "The district court need not examine the entire file for evidence

4    establishing a genuine issue of fact."  Id. at 1031.  However, when the parties file cross-motions for

5    summary judgment, the district court must consider all of the evidence submitted in support of both

6    motions to evaluate whether a genuine issue of material fact exists precluding summary judgment

7    for either party.  Fair Housing Council of Riverside Cnty, Inc. v. Riverside Two, 249 F.3d 1132,

8    1135 (9th Cir. 2001).

9                                    **IV.  DISCUSSION**

10    Plaintiff moves for summary judgment on the grounds that: (1) the undisputed evidence

11    establishes that Defendants sent misleading commercial e-mails through Facebook's network in

12    violation of the CAN-SPAM Act;[8] and (2) the undisputed evidence also establishes that Defendants

13    utilized technical measures to access Facebook without authorization, in violation of both the CFAA

14    and California Penal Code Section 502.[9]  Defendants respond that: (1) because Plaintiff's own

15    servers sent the commercial e-mails at issue, Defendants did not initiate the e-mails as a matter of

16    law; and (2) Defendants did not circumvent any technical barriers in order to access Facebook site,

17    precluding liability under the CFAA or Section 502.[10]  Defendants further contend that Plaintiff

18    suffered no damages as a result of Defendants' actions, and thus lacks standing to bring a private suit

19    for Defendants' conduct.  (Id. at 15-16, 19-20.)

20    **A.    The CAN-SPAM Act**

21    At issue is whether the conduct of Defendants, as established by the undisputed evidence,

22    constitutes a violation of the CAN-SPAM Act.

23

24    _____

25    [8]  (CAN-SPAM MSJ at 12-16.)

26    [9]  (Fraud MSJ at 1.)

27    [10]  (Defendants' MSJ at 5, 16-17.)

28                                              5

United States District Court

For the Northern District of California

1    The CAN-SPAM Act provides that "[i]t is unlawful for any person to initiate the

2  transmission, to a protected computer, of a commercial electronic mail message, or a transactional or

3  relationship message, that contains, or is accompanied by, header information that is materially false

4  or materially misleading." 15 U.S.C. § 7704(a)(1). The Act also creates a private right of action for

5  internet service providers adversely affected by violations of this provision. See id. § 7706(g)(1).

6  To prevail on a CAN-SPAM Act claim, a plaintiff must establish not only that the defendant violated

7  the substantive provisions of the Act, but also that the plaintiff was adversely affected by this

8  violation such that it satisfies the statutory standing requirements. See Gordon v. Virtumundo, Inc.,

9  575 F.3d 1040, 1048 (9th Cir. 2009). The Court considers each requirement in turn.

10    **1.    Standing**

11    At issue is whether Plaintiff has standing to assert a claim under the CAN-SPAM Act.

12    Standing under Section 7706 "involves two general components: (1) whether the plaintiff is

13  an 'Internet access service' provider ('IAS provider'), and (2) whether the plaintiff was 'adversely

14  affected by' statutory violations." Gordon, 575 F.3d at 1049 (citation omitted).

15    Here, Defendants concede that Plaintiff is an IAS provider.[11] Therefore, the only question

16  before the Court in determining Plaintiff's standing is whether Plaintiff was "adversely affected" by

17  the alleged violations at issue.

18    In Gordon, the Ninth Circuit explained that not all possible harms to an IAS provider

19  constitute harm within the meaning of the Act, and distinguished those harms sufficient to confer

20  standing from those outside the scope of Congress' intent. See 575 F.3d at 1049-55. After

21  discussing the congressional decision to confer standing upon IAS providers but not end-consumers

22  affected by commercial e-mails, the court concluded that "[l]ogically, the harms redressable under

23  the CAN-SPAM Act must parallel the limited private right of action and therefore should reflect

24  those types of harms uniquely encountered by IAS providers." Id. at 1053. Thus, while the "mere

25

26    _____

27    [11] (See Defendants' MSJ at 13.)

28                                              6

United States District Court
For the Northern District of California

1  annoyance"[12] of spam encountered by all e-mail users is not sufficient to confer standing, the court

2  identified the costs of investing in new equipment to increase capacity, customer service personnel

3  to address increased subscriber complaints, increased bandwidth, network crashes, and the

4  maintenance of anti-spam and filtering technologies as the "sorts of ISP-type harms" that Congress

5  intended to confer standing.  Id. at 1053.  Thus, the court noted, "[i]n most cases, evidence of some

6  combination of operational or technical impairments and related financial costs attributable to

7  unwanted commercial e-mail would suffice."  Id. at 1054 (citation omitted).

8         Here, in support of its contention that it has standing to pursue a CAN-SPAM Act claim,

9  Plaintiff offers the following evidence:

   (1)        Around December 1, 2008 Ryan McGeehan, manager of Plaintiff's Security
10             Incident Response Team ("SIR Team"), determined that Power was running an
               automated scripting routine to harvest data and download it to the Power.com
11             website.[13]  McGeehan then spent substantial time and effort determining what steps
               were necessary to contain Power's spamming.  (Id. ¶ 12.)  It was determined that at
12             least 60,627 event invitations were sent to Facebook users due to Power's activities.
               (Id.)  On December 12, 2008, after Plaintiff's counsel sent Power a cease and desist
13             letter, and the activity did not stop, Plaintiff attempted to block Power's access by
               blocking what appeared to be its primary IP address.  (Id. ¶ 13.)  On December 22,
14             2008, McGeehan determined that Power was still accessing Facebook through new IP
               addresses.  (Id. ¶ 14.)  Plaintiff then attempted to block these IP addresses as well.
15             (Id. ¶ 13.)  In early 2009, Facebook blacklisted the term Power.com, preventing that
               term from appearing anywhere on the site.  (Id. ¶ 16.)  In implementing these
16             measures, McGeehan spent at least three to four days of his own engineering time
               addressing security issues presented by Power.  (Id. ¶ 17.)
17

   (2)        On December 1, 2008, Joseph Cutler sent a cease and desist letter to
18             Power.com.[14]  After this letter was sent Cutler was contacted by Steve Vachani, who
               identified himself as the owner and operator of Power Ventures.  (Id. ¶ 7.)  In this and
19             subsequent discussions, Vachani assured Cutler that the functionality of the Power
               website would be changed to comply with Facebook's requests.  (Id. ¶¶ 9-10.)  On
20             December 27, 2008, Cutler received an e-mail saying that Power Ventures would not
               change its website as earlier stated.  (Id. ¶ 13.)  From fall of 2008 through early 2009,
21

22  _____

23     [12]  Id. at 1053-54.

24     [13]  (See Declaration of Ryan McGeehan in Support of Facebook's Motion for Partial
       Summary Judgment on Count 1 Under the CAN-SPAM Act ¶¶ 1, 7, hereafter, "McGeehan Decl.,"
25     Docket Item No. 213-4.)

26     [14]  (See Declaration of Joseph Cutler in Support of Facebook, Inc.'s Motion for Partial
       Summary Judgment for Liability Under the CAN-SPAM Act ¶ 6, hereafter, "Cutler Decl.," Docket
27     Item No. 213-2.)

28
                                          7

United States District Court
For the Northern District of California

1  Facebook spent approximately $75,000 on Cutler's firm related to Power Venture's

2  actions.  (Id. ¶ 15.)

3      Defendants do not dispute the accuracy or veracity of this evidence of Plaintiff's

4  expenditures.  Instead, Defendants contend that, as a matter of law, these are not the sorts of harm

5  that give rise to standing under Gordon, as they fall within the category of negligible burdens

6  routinely borne by IAS providers.[15]  In support of this contention, Defendants rely on the following

7  evidence:

8      (1)      In the fourth quarter of 2008, Plaintiff received 71,256 user complaints that
        contained the word "spam."  (McGeehan Decl. ¶ 5.)  Facebook did not produce any
9        evidence of customer complaints specifically referencing the e-mails at issue in this
        case.[16]

10      (2)      Craig Clark, litigation counsel at Facebook, testified that he was not aware of
        any documents that would be responsive to any of the requests for production made
11        by Defendants.[17]  These requests for production included requests for all documents
        regarding any injury that Plaintiff suffered, expenditures Plaintiff made, or user
12        complaints that Plaintiff received as a result of the events complained of in Plaintiff's
        First Amended Complaint.[18]

13      Upon review, on the basis of these undisputed facts, the Court finds that Plaintiff has

14  demonstrated an "adverse effect" from Defendants' conduct sufficient to confer standing.  The

15  evidence submitted by Plaintiff is not limited to documenting a general response to spam prevention,

16

17

18      [15] (Defendants' Memorandum of Points and Authorities in Opposition to Facebook's Motion
    for Partial Summary Judgment on Count 1 (CAN-SPAM Act, 15 U.S.C. § 7704) at 14-15, hereafter,
19  "CAN-SPAM Opp'n," Docket Item No. 234.)

20      [16] (See Declaration of L. Timothy Fisher in Support of Defendants' Motion for Summary
    Judgment ¶ 4, hereafter, "Fisher Decl.," Docket Item No. 106; see also Fisher Decl., Ex. B,
21  Facebook, Inc.'s Objections and Response to Defendants' Requests for Production, Set One, Docket
    Item No. 106.)

22

23      [17] (Fisher Decl., Ex. C, Deposition of Craig Clark at 118:20-118:23, hereafter, "Clark
    Depo.," Docket Item No. 106.)  Plaintiff objects to Defendants' reliance on Mr. Clark's testimony
24  because Mr. Clark was deposed in his personal capacity, rather than pursuant to Fed. R. Civ. P.
    30(b)(6), and thus Plaintiff contends that Mr. Clark's answers to the questions presented to him are
25  irrelevant because he does not speak on behalf of Facebook.  (See Docket Item No. 240 at 17-23.)
    For the purposes of this Order only, Plaintiff's objection to the Clark deposition is OVERRULED
26  because harm to Plaintiff is established irregardless of Mr. Clark's testimony.

27      [18] (Fisher Decl., Ex. A, Defendants' First Requests for Production Pursuant to Fed. R. Civ.
    P. 34, Docket Item No. 106.)

28
                                            8

United States District Court
For the Northern District of California

1    but rather shows acts taken and expenditures made in response to Defendants' specific acts.[19] These

2    specific responses to Defendants' actions distinguish Plaintiff's damages from those in the cases

3    relied upon by Defendants, which asserted only the costs of general spam prevention as the basis for

4    standing.[20] In particular, since Plaintiff documented a minimum of 60,000 instances of spamming by

5    Defendants, the costs of responding to such a volume of spamming cannot be categorized as

6    "negligible." See Gordon, 575 F.3d at 1055-56. The Court finds that under Gordon and Azoogle,

7    though the general costs of spam prevention may not confer standing under the CAN-SPAM Act,

8    documented expenditures related to blocking a specific offender may. This is particularly true

9    where, as here, Defendants' spamming activity was ongoing, prolific, and did not stop after requests

10    from the network owner. Thus, as the undisputed evidence establishes that Plaintiff expended

11    significant resources to block Defendants' specific spamming activity, the Court finds that Plaintiff

12    has standing to maintain a CAN-SPAM action.

13           **2.      Merits of CAN-SPAM Act Claim**

14           At issue is whether Defendants' conduct, as established by the undisputed facts, violates the

15    substantive provisions of the CAN-SPAM Act. The Act makes it unlawful, *inter alia*, "for any

16    person to initiate the transmission, to a protected computer, of a commercial electronic mail

17    message, or a transactional or relationship message, that contains, or is accompanied by, header

18    information that is materially false or materially misleading." 15 U.S.C. § 7704(a)(1). Defendants

19    contend that Plaintiff's CAN-SPAM Act claim must fail because: (1) the undisputed facts establish

20    that Plaintiff itself, and not Defendants, initiated the e-mails at issue; and (2) because Plaintiff sent

21    the e-mails, the header information identifying Facebook as the sender was accurate and not

22    misleading.[21] The Court considers each element in turn.

23

------

24         [19] (See, e.g., McGeehan Decl. ¶¶ 8-17; see also id., Ex. 4, Electronic Ticket Documenting

25    McGeehan's Attempts to Block Defendant's Access to Facebook, Docket Item No. 213-7.)

26         [20] (See, e.g., CAN-SPAM Opp'n at 15 (citing ASIS Internet Servs. v. Azoogle.com, Inc.,
357 Fed. Appx. 112, 113-14 (9th Cir. 2009).)

27         [21] (Defendants' MSJ at 12-14.)

28               9

United States District Court
For the Northern District of California

### a.    Initiation of Commercial E-mails

At issue is whether Defendants initiated the e-mails associated with the Launch Promotion.

The CAN-SPAM Act provides that "[t]he term 'initiate,' when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message.  For purposes of this paragraph, more than one person may be considered to have initiated a message."  15 U.S.C. § 7702(9).  The word "procure," in turn, is defined to mean "intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf."  Id. § 7702(12).

In support of its claim that Defendants initiated the e-mails at issue, Plaintiff offers the following undisputed evidence:

(1)     On or before December 26, 2008, Defendant Power began a "Launch Promotion" that offered site users $100 if they successfully invited and signed up the most new Power.com users. (FAC ¶ 65; Answer ¶ 65.)  As part of the promotion, Power obtained a list of the user's Facebook friends and asked the participant to select which of those friends should receive a Power.com invitation.  (Id. ¶ 66; Id. ¶ 66).  Selected friends would then receive an e-mail in which Facebook was listed as the sender, promoting an event "Bring 100 Friends and win 100 bucks!"  (Id. ¶70; Id. ¶ 70.)  Defendant admits that Power.com's "offer of potential monetary compensation may have induced some Facebook users to participate in Power's launch program."  (Id. ¶ 72; Id. ¶ 72.)

(2)     The testimony of Vachani that Power.com both authored the text contained in the e-mails and provided the link contained therein that would allow recipients to sign up for Power.com.[22]

(3)     The launch promotion feature that offered the $100 reward was made available to Power.com users through Power.com.  (Vachani Depo. at 264:2-264:8.)  None of the social networking networks on Power.com created the contents of the launch promotion feature.  (Id. at 264:9-264:12.)

(4)     The declaration of Facebook's technical expert, Lawrence Melling, that based on his study of the software created by Defendant Power and its code, the script

---

[22]  (Declaration of Monte M.F. Cooper in Support of Facebook, Inc.'s Motion for Partial Summary Judgment on Count 1 under the CAN-SPAM Act, hereafter, "Cooper Decl.," Ex. 2, Deposition of Steven Vachani at 197:4-197:12, hereafter, "Vachani Depo.," Docket Item No. 229.)

10

United States District Court
For the Northern District of California

1   would automatically insert Power as the host of the event and the event location.[23]
2   The script also automatically generated a guest list for the event if one was not
    provided, and did so by accessing the user's Facebook friends list. (Id. ¶ 19.) The
3   script would then automatically send Facebook event invitations to each Facebook
    user on the guest list on behalf of Power. (Id. ¶ 20.)

4       (5)        The testimony of Vachani that Power eventually paid 30-40 people who got
                   100 or more friends to sign up. (Vachani Depo. at 189:5-9.)

Defendants, while not disputing the accuracy of the above facts, contend that as a matter of

law, they did not "initiate" the e-mails at issue because the e-mails were authorized by Facebook

users and sent from Facebook's own servers.[24] In support of this contention, Defendants rely upon

the facts, also undisputed, that after a user authorized the creation of an event as part of the Launch

Promotion, Facebook servers automatically filled in the header information and sent an e-mail to

each person on the event guest list.[25]

Upon review, the Court finds that based on these undisputed facts, Defendants initiated the e-

mails sent through the Launch Promotion. Although Facebook servers did automatically send the e-

mails at the instruction of the Launch Program, it is clear that Defendants' actions–in creating the

Launch Promotion, importing users' friends to the guest list, and authoring the e-mail text–served to

"originate" the e-mails as is required by the Act.[26] To hold that Plaintiff originated the e-mails

merely because Facebook servers sent them would ignore the fact that Defendants intentionally

caused Facebook's servers to do so, and created a software program specifically designed to achieve

that effect. Further, while Defendants emphasize that Facebook users authorized the creation of

events resulting in the e-mails,[27] the Court finds that Defendants procured these users to do so by

offering and awarding monetary incentives to provide such authorization. Thus, even if Facebook

---

[23]  (Declaration of Lawrence Melling in Support of Facebook, Inc.'s Motion for Partial
Summary Judgment on Count 1 of the CAN-SPAM Act ¶ 18, hereafter, "Melling Decl.," Docket
Item No. 217.)

[24]  (See Defendants' MSJ at 5-8.)

[25]  (See Clark Depo. at 98:18-99:25.)

[26]  See 15 U.S.C. § 7702(9).

[27]  (See, e.g., Defendants' MSJ at 7.)

11

United States District Court
For the Northern District of California

1    users may be viewed as initiators of the e-mails because of their participation in the Launch

2    Promotion, Defendants are nonetheless also initiators as a matter of law because of their

3    procurement of user participation.[28]

4         Accordingly, the Court finds that Defendants did initiate the e-mails at issue within the

5    meaning of the CAN-SPAM Act.

6         **b.    Whether the E-mails Are Misleading**

7         At issue is whether the e-mails sent as a result of the Launch Promotion contain header

8    information that is false or misleading.

9         The CAN-SPAM Act defines header information as "the source, destination, and routing

10   information attached to an electronic mail message, including the originating domain name and

11   originating electronic mail address, and any other information that appears in the line identifying, or

12   purporting to identify, a person initiating the message."  15 U.S.C. § 7702(8).  The Act further

13   provides that "header information shall be considered materially misleading if it fails to identify

14   accurately a protected computer used to initiate the message because the person initiating the

15   message knowingly uses another protected computer to relay or retransmit the message for purposes

16   of disguising its origin."  Id. § 7704(a)(1)(C).  A false or misleading statement is considered material

17   if "the alteration or concealment of header information" would impair the ability of an IAS provider

18   or a recipient to "identify, locate, or respond to a person who initiated the electronic mail message."

19   Id. § 7704(a)(6).

20        Here, for the reasons discussed above, Defendants were initiators of the e-mail messages at

21   issue.  But because Defendants' program caused Facebook servers to automatically send the e-mails,

22   these e-mails contained an "@facebookmail.com" address.[29]  These e-mails did not contain any

23   return address, or any address anywhere in the e-mail, that would allow a recipient to respond to

---

[28]  See 15 U.S.C. § 7702(12).

[29]  (FAC ¶¶ 68-69; Answer ¶¶ 68-69.)

12

United States District Court
For the Northern District of California

1   Defendants.[30]  Thus, as the header information does not accurately identify the party that actually

2   initiated the e-mail within the meaning of the Act, the Court finds that the header information is

3   materially misleading as to who initiated the e-mail.

4          Defendants contend that even if the Court finds that they did initiate the e-mails at issue, they

5   cannot be held liable for violations of the CAN-SPAM Act on the grounds that: (1) the text of the e-

6   mails itself includes information about Power.com; and (2) Defendants had no control over the

7   headers of the e-mails.[31]  The Court finds that both of these contentions are unavailing.  First, the

8   presence of a misleading header in an e-mail is, in and of itself, a violation of the CAN-SPAM Act,

9   insofar as the Act prohibits the use of misleading header information.[32]  Thus, the fact that the text of

10  the e-mails at issue may have included information about Power.com is irrelevant, for purposes of

11  liability under the Act.  Second, the question of whether Defendants had control over the headers is

12  also irrelevant.  In particular, the Court finds that the fact that Defendants used a program that was

13  created and controlled by another to send e-mails with misleading headers does not absolve them of

14  liability for sending those e-mails.[33]

15

16         [30]  (Declaration of Theresa Sutton in Support of Plaintiff Facebook, Inc.'s Opposition to
    Defendants' Motion for Summary Judgment, hereafter, "Sutton Decl.," Ex. 4, Defendant Power
17  Ventures, Inc.'s Responses to Facebook, Inc.'s First Set of Requests for Admissions at No. 50,
    hereafter, "Defendants' Admissions," Docket Item No. 241-3.)
18
           [31]  (Defendant's Motion at 14.)  The latter argument was also made by *Amicus Curiae*
19  Electronic Frontier Foundation ("EFF"), which contends that because the Facebook system auto-
    generates the header information provided in the e-mails, commercial users should not be held
20  responsible for their content.  (See Brief of Amicus Curiae Electronic Frontier Foundation in
    Support of Defendant Power Ventures' Motion for Summary Judgment on Count 1 (CAN-SPAM
21  Act, 15 U.S.C. § 7704) and Under California Penal Code § 502 and the Computer Fraud and Abuse
    Act at 18-19, hereafter, "EFF Brief," Docket Item No. 206-2.)
22
           [32]  See 15 U.S.C. § 7704(a)(1).
23
           [33]  Amicus EFF contends that the CAN-SPAM Act's prohibition on the sending of
24  misleading commercial e-mails should not be applied to e-mails sent through a system like that of
    Facebook, in which the headers are auto-generated by servers and not controlled by the individual
25  users.  (EFF Brief at 20.)  However, the Court finds no statutory basis for creating such an exception
    to the CAN-SPAM Act.  The Act makes it unlawful to "initiate the transmission" of any e-mail
26  message that is "accompanied by" misleading header information.  15 U.S.C. § 7704(a)(1).  Nothing
    in this language requires that the user actually create the misleading header information, as opposed
27  to utilizing a system already in place to auto-generate a header.

28                                              13

United States District Court

For the Northern District of California

1    In sum, the Court finds that the undisputed facts establish that Defendants initiated the

2  sending of e-mails with false or misleading heading information under the CAN-SPAM Act, and that

3  Plaintiff suffered adverse effects as contemplated by the Act sufficient to convey standing to

4  maintain a private cause of action.  Accordingly, the Court GRANTS Plaintiff's Motion for

5  Summary Judgment on Count One, and DENIES Defendants' Motion for Summary Judgment as to

6  Count One.

7  **B.**     **California Penal Code § 502**

8    At issue is whether Defendants' conduct, as established by the undisputed facts, violated

9  California Penal Code § 502 ("Section 502").

10    Section 502(c) provides that a person is guilty of a public offense if he, *inter alia*: (1)

11  knowingly accesses and without permission takes, copies, or makes use of any data from a

12  computer, computer system, or computer network; (2) knowingly and without permission uses or

13  causes to be used computer services; or (3) knowingly and without permission accesses or causes to

14  be accessed any computer, computer system, or computer network.  <u>See</u> Cal. Penal Code §

15  502(c)(2), (3) & (7).  Section 502(e) provides that "the owner or lessee of the computer, computer

16  system, computer network, computer program, or data who suffers damage or loss by reason of a

17  violation of any of the provisions of subdivision (c) may bring a civil action against the violator for

18  compensatory damages and injunctive relief or other equitable relief."  <u>See</u> <u>id.</u> § 502(e).

19    Here, the Court has already held that Plaintiff has suffered sufficient harm to have standing

20  under Section 502.  (<u>See</u> July 20 Order at 8.)  In addition, Defendants admit that they took, copied,

21  or made use of data from Facebook website without Facebook's permission to do so.  (Defendants'

22  Admissions at 22.)  Therefore the only question remaining before the Court, in determining whether

23  Defendants violated Section 502, is whether Defendants' access to Facebook was "without

24  permission" within the meaning of Section 502.[34]

25

26      [34] Defendants continue to contend that Plaintiff did not suffer any loss as is required by

27  Section 502 and therefore lacks standing to bring a private cause of action.  (<u>See</u> Defendants' MSJ at
19-20.)  In so doing, Defendants suggest that the Court's July 20 Order declined to reach the issue of

28                        14

United States District Court

For the Northern District of California

In its July 20 Order, the Court explained at great length that a particular use of a computer network which violates that network's terms of use is insufficient to establish that the use was "without permission" pursuant Section 502.[35]  Where, however, a party accesses the network in a manner that circumvents technical or code-based barriers in place to restrict or bar a user's access, then the access does qualify as being "without permission."  (See id. at 18-20.)  Accordingly, the question before the Court is whether the undisputed evidence establishes that Defendants circumvented technical or code-based barriers in order to access Facebook.

In support of the contention that Defendants did circumvent technical barriers designed to block their access to Facebook, Plaintiff relies on the following evidence:

(1)      In response to the question if he at any time became aware that Facebook was attempting to block Power, Vachani answered: "I don't know if they were–[o]bviously, we expected that they would but he we [sic] also know that our system doesn't get blocked because there's nothing–there's nothing it's technically doing.  It's just users accessing the site so that it can't really be blocked. . . .We know [sic] that they would try, but we also know that it was built to – it would not be blockable."[36]

(2)      The expert of report of Bob Zeidman and Lawrence Melling, who analyzed the code and software used by Power.com to determine if it was designed to circumvent technical barriers.[37]  The report concludes that the code used a number of routines to avoid being blocked by websites like Facebook, including the use of proxy servers if one server was blocked by a website.  (Id. ¶¶ 55-60.)  The code would routinely monitor each server to see if an IP address was blocked and change the IP address if it was.  (Id. ¶¶ 59-60.)  The report concludes that substantial effort went

_____

loss because it denied both parties' motions for summary judgment at that time.  (Id.)  The Court finds, however, that this interpretation of its Order is misguided, as it ignores the plain statement that "[s]ince the undisputed facts demonstrate that Facebook has suffered some damage or loss in attempting to block Power's access to Plaintiff's website, the Court finds that Facebook has standing to bring suit under Section 502."  (July 20 Order at 8.)

[35]  (See July 20 Order at 8-20.)

[36]  (Declaration of Morvarid Metanat in Support of Facebook's Motion for Partial Summary Judgment Under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, hereafter, "Metanat Decl.," Ex. 2, Deposition of Steve Vachani at 323:17-324:8, hereafter, "Vachani Depo. 2," Docket Item No. 236-2.)

[37]  (Expert Report of Bob Zeidman and Lawrence Melling ¶¶ 25, filed under seal.)  This Report was filed under seal.  However, the Court finds that the portions of the Report discussed in this Order were not appropriately sealed.  Accordingly, the Court UNSEALS the Report for purposes of discussing its contents in this Order.

15

into designing the proxy system and that one of the objectives of the design was to reconfigure the IP connections if an IP address was blocked. (Id. ¶ 61.)

(3)    The testimony of Ryan McGeehan that on December 12, 2008, Facebook attempted to block Power's access to the site by blocking what appeared to be its primary IP address. (McGeehan Decl. ¶ 13.) Following the block, Facebook determined that Powers was circumventing the block by using other IP addresses. (Id.) Facebook attempted to block these addresses as they discovered them "in a game of cat and mouse." (Id.)

(4)    An e-mail from Vachani to members of his staff, sent after Vachani received a cease and desist letter from Plaintiff, stating "we need to be prepared for Facebook to try and block us and then turn this into a national battle that gets us huge attention."[38]

(5)    A transcript of a discussion between Vachani and a member of his staff in which the they discuss the process of starting to fetch profile data from another social networking website, Orkut.[39] Vachani says "we also need to do some planning to make sure that we do it in a way where we are not really detected. [P]ossible rotating IP's or something. [D]on't really understand this too well. Greg may also have some ideas." (Id. at 3.) The staff member responds "yah. [R]otating IP if we can set then its very good as when [O]rkut will see so much band[w]idth use by particular [sic] IP then they will block that perticulat [sic] IP." (Id. at 3-4.) Vachani responds "We need to plan this very carefully since we will have only one chance to do it. . . we might need to rotate with over 200 IP's or even more to do it perfectly." (Id. at 4.)

In support of their contention that they did not circumvent technical barriers imposed by

Plaintiff, Defendants offer the following evidence:

Vachani's testimony that in December 2008, Facebook attempted to prevent Power's users from accessing Facebook through Power.com by blocking one IP address utilized by Power.[40] "Facebook's IP block was ineffective because it blocked only one outdated IP address Power had used, and did not block other IPs that Power was using in the normal course of business." (Id. ¶ 11.) "Power did not undertake any effort to circumvent that block, and did not provide users with any tools designed to circumvent it." (Id.) After it

---

[38] (Metanat Decl., Ex. 6, E-mail from Steven Vachani, Docket Item No. 236-6; see also Vachani Depo. 2 at 313:3-313:7.)

[39] (Declaration of I. Neel Chatterjee in Support of Reply Memorandum in Support of Facebook's Motions for Partial Summary Judgment Under: 1) on [sic] Count 1 the Can-Spam Act; and 2) California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, Ex. 2, Docket Item No. 248-2.)

[40] (Declaration of Steve Vachani in Support of Defendants' Opposition to Facebook's Motions for Partial Summary Judgment on Count 1 (Can-spam Act, 15 U.S.C [sic] § 7704) and Under California Penal Code § 502 and the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ¶ 10, Docket No. 189.)

16

became aware of the attempted IP blocking, Power undertook efforts to implement Facebook Connect as Facebook had requested. (Id. ¶ 12.)[41]

Upon review, the Court finds that the undisputed facts establish that Defendants circumvented technical barriers to access Facebook site, and thus accessed the site "without permission." Although the evidence shows that Defendants did not take additional steps to circumvent individual IP blocks imposed by Plaintiff after the fact, this does nothing to cast doubt on the overwhelming evidence that Defendants designed their system to render such blocks ineffective. The Court finds no reason to distinguish between methods of circumvention built into a software system to render barriers ineffective and those which respond to barriers after they have been imposed. This is particularly true where, as here, Defendant Vachani's own statements provide compelling evidence that he anticipated attempts to block access by network owners and intentionally implemented a system that would be immune to such technical barriers.[42] Thus, in light of the undisputed evidence that Defendants anticipated attempts to block their access by Plaintiff, and utilized multiple IP addresses to effectively circumvent these barriers, the Court finds that Defendants violated Section 502 by accessing Plaintiff's network without permission.

Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment as to Count Three and DENIES Defendants' Motion for Summary Judgment as to Count Three.

## C.   **The Computer Fraud and Abuse Act**

At issue is whether Defendants' conduct constitutes a violation of the CFAA.

The CFAA imposes liability on any party that "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains," *inter alia*, "information from any

---

[41] Plaintiff objects to Vachani's testimony regarding Facebook's blocks of the Power site on the grounds that Vachani lacks personal knowledge of how such technical measures worked and because he is not an expert qualified to opine on the functionality of a technical barrier. (See Docket Item No. 240 at 14.) For purposes of this Order only, the Court finds that Vachani's lack of qualifications as an expert affects the weight his testimony should be accorded and not its admissibility. Thus, Plaintiff's objection is OVERRULED.

[42] (See, e.g., Vachani Depo. 2 at 323:17-324:8.)

17

United States District Court
For the Northern District of California

1    protected computer."  18 U.S.C. § 1030(a)(2).  Suit may be brought by any person who suffers

2    damage or loss in an amount above $5000.  See id. §1030(g); §1030(c)(4)(A)(i)(I).

3         Here, for the reasons discussed above, the undisputed facts establish that Defendants' access

4    to Facebook was without authorization.  In addition, Defendants admit that they obtained

5    information from Facebook website.  (Defendants' Admissions at 22.)  Thus, the only finding

6    necessary for Plaintiff to prevail on its CFAA claim is whether Plaintiff's damages exceed $5000,

7    thereby giving Plaintiff standing under the statute.[43]

8         The CFAA defines "loss" to include "any reasonable cost to any victim, including the cost of

9    responding to an offense, conducting a damage assessment, and restoring the data, program, system,

10   or information to its condition prior to the offense, and any revenue lost, cost incurred, or other

11   consequential damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).

12   "Costs associated with investigating intrusions into a computer network and taking subsequent

13   remedial measures are losses within the meaning of the statute."  Multiven, 725 F. Supp. 2d at 895

14   (citation omitted).

15        Here, as discussed above with regard to Plaintiff's CAN-SPAM claim, Plaintiff has provided

16   uncontradicted evidence of the costs of attempting to thwart Defendants' unauthorized access into its

17   network.[44]  These documented costs were well in excess of the $5000 CFAA threshold.  (See Cutler

18   Decl. ¶ 15.)  Thus, the Court finds that on the basis of these costs, Defendants' unauthorized access

19   of Plaintiff's network did cause sufficient loss to Plaintiff to confer standing upon Plaintiff.

20        In sum, for the reasons discussed above regarding Plaintiff's Section 502 claim, the Court

21   finds that Defendants accessed Plaintiff's website without authorization and obtained information

22   from Facebook.  The Court further finds that Plaintiff suffered loss sufficient to confer standing as a

23

24   _____

25        [43]  See Mutiven, Inc. v. Cisco Sys., Inc., 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010)
     (explaining that elements of a CFAA claim do not differ materially from the elements of a claim
26   under Section 502).

27        [44]  (See, e.g., McGeehan Decl. ¶¶ 11-17; Cutler Decl. ¶¶ 7-15.)

28                                        18

1   result of such access. Accordingly, the Court GRANTS Plaintiff's Motion for Summary Judgment

2   as to Count Two and DENIES Defendants' Motion for Summary Judgment as to Count Two.

3                                    **V. CONCLUSION**

4        The Court GRANTS Plaintiff's Motions for Summary Judgment on all counts. The Court

5   DENIES Defendants' Motion for Summary Judgment on all counts.[45]

6        In light of this Order, the Court finds that additional briefing is warranted on two issues: (1)

7   the amount of damages Plaintiff should receive in light of this Order; and (2) the individual liability

8   of Defendant Vachani.

9        On or before **March 2, 2012**, the parties shall file simultaneous briefings addressing the two

10  issues identified above. Unless otherwise indicated by the Court, the matter will be taken under

11  submission for decision without a hearing. See Civ. L.R. 7-1(b).

12

13

14  Dated: February 16, 2012                    _____

15                                              JAMES WARE
                                                United States District Chief Judge
16

17

18

19

20

21

22

23

24  _____

25      [45] Because the Court finds that the undisputed evidence submitted by Plaintiff with its
    Motions for Summary Judgment establishes that Plaintiff is entitled to judgment as a matter of law,
26  the Court DENIES as moot Plaintiff's Motion to File Supplemental Evidence. (See Docket Item No.
    251.)
27      In addition, the Court DENIES as moot Plaintiff's Motion to Enlarge Time for Hearing
    Dispositive Motions. (See Docket Item No. 261.)
28                                      19

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| Facebook, Inc., | NO. C 08-05780 JW |
| Plaintiff, | **ORDER DENYING FACEBOOK'S** |
| v. | **MOTION FOR JUDGMENT ON THE** |
| | **PLEADINGS; DENYING THE PARTIES'** |
| Power Ventures, Inc., et al., | **CROSS-MOTIONS FOR SUMMARY** |
| | **JUDGMENT; GRANTING FACEBOOK'S** |
| Defendants. | **MOTION TO DISMISS DEFENDANTS'** |
| _____/ | **COUNTERCLAIMS; DENYING** |
| | **FACEBOOK'S MOTION TO STRIKE** |
| Power Ventures, Inc., et al., | **DEFENDANTS' AFFIRMATIVE** |
| | **DEFENSES** |
| Counterclaimants, | |
| v. | |
| Facebook, Inc., | |
| Counterdefendants. | |
| _____/ | |

## I. INTRODUCTION

Facebook, Inc. ("Plaintiff" or "Facebook") brings this action against Power Ventures, Inc. ("Defendant" or "Power") alleging, *inter alia*, violations of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("Section 502"). Facebook alleges that Power accessed the Facebook website in violation of Facebook's Terms of Use, and when Facebook tried to stop Power's unauthorized access, Power circumvented Facebook's technical barriers. Power brings counterclaims against Facebook alleging, *inter alia*, violations of the Sherman Act, 15 U.S.C. § 2.

United States District Court

For the Northern District of California

1    Presently before the Court are Facebook's Motion for Judgment on the Pleadings Pursuant to

2 Fed. R. Civ. P. 12(c) or, in the Alternative, Partial Summary Judgment of Liability Under California

3 Penal Code § 502;[1] Defendants' Motion for Summary Judgment;[2] and Facebook's Motion to

4 Dismiss Counterclaims and Strike Affirmative Defenses.[3]  The Court conducted a hearing on June 7,

5 2010.  Based on the papers submitted to date and oral argument, the Court DENIES Facebook's

6 Motion for Judgment on the Pleadings, DENIES the parties' Cross-Motions for Summary Judgment,

7 GRANTS Facebook's Motion to Dismiss Defendants' counterclaims for violations of Section 2 of

8 the Sherman Act, GRANTS Facebook's Motion to Dismiss Defendants' UCL counterclaim, and

9 DENIES Facebook's Motion to Strike Defendants' Affirmative Defenses.

10                                    **II.  BACKGROUND**

11   **A.    Factual Background**

12    A detailed outline of the factual allegations in this case may be found in the Court's May 11,

13 2009 Order Denying Motion to Dismiss and Granting in Part and Denying in Part Motion for More

14 Definite Statement.[4]  The Court will address the facts of the case, as they relate to the present

15 Motions, in the Discussion section below.

16   **B.    Procedural History**

17    In its May 11 Order, the Court denied Defendants' Motion to Dismiss Plaintiff's claims for

18 copyright infringement, violation of the Digital Millennium Copyright Act ("DMCA"), trademark

19 infringement under federal law, trademark infringement under state law, and violation of the

20 California Unfair Competition Law ("UCL"), and granted Defendants' Motion for a More Definite

21 Statement with respect to Plaintiff's UCL claim.

22

23  _____

24    [1]  (hereafter, "Facebook's Motion for Judgment on the Pleadings," Docket Item No. 56.)

25    [2]  (Docket Item No. 62.)

26    [3]  (hereafter, "Facebook's Motion to Dismiss," Docket Item No. 58.)

27    [4]  (hereafter, "May 11 Order," Docket Item No. 38.)

28                                         2

United States District Court

For the Northern District of California

1    On October 22, 2009, the Court issued an Order Granting Facebook's Motion to Dismiss

2  Counter-Complaint and Strike Affirmative Defenses. (hereafter, "October 22 Order," Docket Item

3  No. 52.) In its October 22 Order, the Court found that the counterclaims, as stated in Defendants'

4  Answer and Counter-Complaint, were insufficient because they consisted only of conclusory

5  recitations of the applicable legal standard and a general "reference [to] all allegations of all prior

6  paragraphs as though fully set forth herein." (Id. at 3.) Similarly, the Court found Defendants'

7  affirmative defenses deficient because they referenced the introductory section without delineating

8  which allegations supported each affirmative defense. (Id. at 3-4.) The Court granted leave to

9  amend the counterclaims and affirmative defenses. (Id. at 4.) On November 23, 2010, Defendants

10  filed the Amended Answer and Counterclaims of Defendants Power Ventures, Inc. and Steve

11  Vachani. (hereafter, "Amended Answer," Docket Item No. 54.) On February 26, 2010, Judge Fogel

12  recused himself from the case. (See Docket Item No. 72.) On March 2, 2010, the case was

13  reassigned to Judge Ware. (See Docket Item No. 73.)

14    Presently before the Court are the parties' various Motions. The Court addresses each

15  Motion in turn.

16               **III. STANDARDS**

17  A.    **Motion for Judgment on the Pleadings**

18    Under Federal Rule of Civil Procedure 12(c), any party may move for judgment on the

19  pleadings at any time after the pleadings are closed but within such time as not to delay the trial.

20  Fed. R. Civ. P. 12(c). "For the purposes of the motion, the allegations of the non-moving party must

21  be accepted as true, while the allegations of the moving party which have been denied are assumed

22  to be false." Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc., 896 F.2d 1542, 1550 (9th Cir.

23  1990). Judgment on the pleadings is proper when the moving party clearly establishes on the face of

24  the pleadings that no material issue of fact remains to be resolved and that it is entitled to judgment

25  as a matter of law." Id. When brought by the defendant, a motion for judgment on the pleadings

26  under Federal Rule of Civil Procedure 12(c) is a "means to challenge the sufficiency of the

27  complaint after an answer has been filed." New. Net, Inc. v. Lavasoft, 356 F. Supp. 2d 1090, 1115

28                          3

United States District Court
For the Northern District of California

1    (C.D. Cal. 2004).  A motion for judgment on the pleadings is therefore similar to a motion to

2    dismiss.  Id.  When the district court must go beyond the pleadings to resolve an issue on a motion

3    for judgment on the pleadings, the proceeding is properly treated as a motion for summary

4    judgment.  Fed. R. Civ. P. 12(c); Bonilla v. Oakland Scavenger Co., 697 F.2d 1297, 1301 (9th Cir.

5    1982).

6    **B.    Motion for Summary Judgment**

7            Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and

8    admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

9    material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P.

10   56(c).  The purpose of summary judgment "is to isolate and dispose of factually unsupported claims

11   or defenses."  Celotex v. Catrett, 477 U.S. 317, 323-24 (1986).

12           The moving party "always bears the initial responsibility of informing the district court of

13   the basis for its motion, and identifying the evidence which it believes demonstrates the absence of a

14   genuine issue of material fact."  Celotex, 477 U.S. at 323.  The non-moving party must then identify

15   specific facts "that might affect the outcome of the suit under the governing law," thus establishing

16   that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).

17           When evaluating a motion for summary judgment, the court views the evidence through the

18   prism of the evidentiary standard of proof that would pertain at trial.  Anderson v. Liberty Lobby

19   Inc., 477 U.S. 242, 255 (1986).  The court draws all reasonable inferences in favor of the non-

20   moving party, including questions of credibility and of the weight that particular evidence is

21   accorded.  See, e.g. Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 520 (1992).  The court

22   determines whether the non-moving party's "specific facts," coupled with disputed background or

23   contextual facts, are such that a reasonable jury might return a verdict for the non-moving party.

24   T.W. Elec. Serv. v. Pac. Elec. Contractors, 809 F.2d 626, 631 (9th Cir. 1987).   In such a case,

25   summary judgment is inappropriate.  Anderson, 477 U.S. at 248.  However, where a rational trier of

26   fact could not find for the non-moving party based on the record as a whole, there is no "genuine

27   issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587 (1986).

28                                                        4

**United States District Court**
For the Northern District of California

1    Although the district court has discretion to consider materials in the court file not referenced

2  in the opposing papers, it need not do so.  See Carmen v. San Francisco Unified School District, 237

3  F.3d 1026, 1028-29 (9th Cir. 2001).  "The district court need not examine the entire file for evidence

4  establishing a genuine issue of fact."  Id. at 1031.  However, when the parties file cross-motions for

5  summary judgment, the district court must consider all of the evidence submitted in support of both

6  motions to evaluate whether a genuine issue of material fact exists precluding summary judgment

7  for either party.  The Fair Housing Council of Riverside County, Inc. v. Riverside Two, 249 F.3d

8  1132, 1135 (9th Cir. 2001).

9  **C.    Motion to Dismiss**

10   Pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed against

11  a defendant for failure to state a claim upon which relief may be granted against that defendant.

12  Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient

13  facts alleged under a cognizable legal theory.  Balistreri v. Pacifica Police Dep't, 901 F.2d 696, 699

14  (9th Cir. 1990); Robertson v. Dean Witter Reynolds, Inc., 749 F.2d 530, 533-34 (9th Cir. 1984).  For

15  purposes of evaluating a motion to dismiss, the court "must presume all factual allegations of the

16  complaint to be true and draw all reasonable inferences in favor of the nonmoving party."  Usher v.

17  City of Los Angeles, 828 F.2d 556, 561 (9th Cir. 1987).  Any existing ambiguities must be resolved

18  in favor of the pleading.  Walling v. Beverly Enters., 476 F.2d 393, 396 (9th Cir. 1973).

19   However, mere conclusions couched in factual allegations are not sufficient to state a cause

20  of action.  Papasan v. Allain, 478 U.S. 265, 286 (1986); see also McGlinchy v. Shell Chem. Co., 845

21  F.2d 802, 810 (9th Cir. 1988).  The complaint must plead "enough facts to state a claim for relief

22  that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  A claim is

23  plausible on its face "when the plaintiff pleads factual content that allows the court to draw the

24  reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 129

25  S. Ct. 1937, 1949 (2009).  Thus, "for a complaint to survive a motion to dismiss, the non-conclusory

26  'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a

27  claim entitling the plaintiff to relief."  Moss v. U.S. Secret Serv., 572 F.3d 962, 969 (9th Cir. 2009).

28

5

United States District Court
For the Northern District of California

1  Courts may dismiss a case without leave to amend if the plaintiff is unable to cure the defect by

2  amendment.  Lopez v. Smith, 203 F.3d 1122, 1129 (9th Cir. 2000).

3  **IV.  DISCUSSION**

4  **A.  Statutory Standing**

5  As a threshold matter, Defendants contend that Facebook does not have standing to bring its

6  Section 502 claim because it has not made an adequate showing that it has suffered damage or loss

7  within the meaning of the statute.[5]

8  Section 502(e)(1) provides:

9  In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss
10  by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief.  Compensatory damages
11  shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not
12  altered, damaged, or deleted by the access. . . .

13  Facebook relies solely on the undisputed facts from the pleadings to support its Motion.  In

14  their Amended Answer, Defendants admit that: (1) Facebook communicated to Defendant Steven

15  Vachani ("Vachani"), the purported CEO of Power.com, its claim that "Power.com's access of

16  Facebook's website and servers was unauthorized and violated Facebook's rights, including

17  Facebook's trademark, copyrights, and business expectations with its users;"[6] (2) "Vachani offered

18  to attempt to integrate Power.com with Facebook Connect," a Facebook program that "permits

19  integration with third party websites," but "Vachani communicated concerns about Power's ability

20  to integrate Power.com with Facebook Connect on the schedule that Facebook was demanding;"[7]

21  and (3) "Facebook implemented technical measures to block users from accessing Facebook through

22

23

24  _____

25  [5]  (Defendants' Reply Brief in Support of Motion for Summary Judgment at 5-14, hereafter, "Defendants' Reply re Summary Judgment," Docket Item No. 68.)

26  [6]  (FAC ¶ 57, Amended Answer ¶ 57.)

27  [7]  (FAC ¶¶ 28, 58, 60, Amended Answer ¶¶ 58, 60.)

28  6

United States District Court
For the Northern District of California

1    Power.com," but nonetheless "Power provided users with tools necessary to access Facebook

2    through Power.com."[8]

3         In support of their contention that Plaintiff did not suffer damage or loss, Defendants provide

4    the declaration of Vachani, in which he states that Facebook had no cause for concern over Power's

5    access to its website, and that "in its communications with [Vachani], Facebook never suggested any

6    concern that its computers or data had been altered, deleted, damaged, or destroyed."[9]  Vachani

7    further declares that to his knowledge, "Facebook did not . . . make any expenditure to verify that its

8    computers or data had not been altered, deleted, damaged, or destroyed."  (Id.)

9         Upon review of the pleadings and evidence presented, the Court finds that the undisputed

10   facts show that Facebook suffered some damage or loss as a result of Power's actions.  Specifically,

11   Defendants' admissions that Facebook attempted to block Power's access and that Power provided

12   users with tools that allowed them to access the Facebook website through Power.com adequately

13   demonstrates that Facebook expended resources to stop Power from committing acts that Facebook

14   now contends constituted Section 502 violations.  Although Defendants contend that any steps that

15   Facebook took to block Power's access to the Facebook website were *de minimus*, and would

16   involve only a "a few clicks of a mouse . . . and ten keystrokes,"[10] Section 502 sets no threshold

17   level of damage or loss that must be reached to impart standing to bring suit.  Under the plain

18   language of the statute, any amount of damage or loss may be sufficient.

19        Moreover, Defendants provide no foundation to establish that Vachani has personal

20   knowledge of what steps Facebook took, or would reasonably have to take, to block Power's access

21   to the Facebook website.  Since information regarding Facebook's technical measures, and the cost

---

[8]  (FAC ¶¶ 63-64, Amended Answer ¶¶ 63-64.)

[9]  (Declaration of Steve Vachani in Support of Defendants' Opposition to Facebook Inc.'s
Motion for Judgment on the Pleadings Pursuant to Fed. R. Civ. P. 12(c) or, in the Alternative, Partial
Summary Judgment of Liability Under California Penal Code § 502(c) ¶ 12, hereafter, "Vachani
Decl.," Docket Item No. 65.)

[10]  (Vachani ¶ 9.)

7

United States District Court

For the Northern District of California

1    Facebook expended implementing those measures, is likely to be in Facebook's possession and not

2    Power's, the Court finds that Vachani's declaration alone cannot defeat Plaintiff's standing.

3           Defendants further contend that to impart standing, damage or loss must amount to an

4    "injury." (Defendants' Reply re Summary Judgment at 4.)  The statute defines an "injury" as "any

5    alteration, deletion, damage, or destruction of a computer system, computer network, computer

6    program, or data caused by the access, or the denial of access, to legitimate users of a computer

7    system, network, or program."  Cal. Penal Code § 502(b)(8).  However, Defendants provide no

8    authority for equating damage and loss with injury beyond the observation that the terms are

9    synonyms.  (Defendants' Reply re Summary Judgment at 4.)  In fact, the only place in Section 502

10   that the term injury appears, other than the clause defining the term itself, is in the criminal liability

11   provision, which has no bearing on the civil provision granting a private right of action.  See §

12   502(d) (setting more stringent penalties for violations that result in an injury).

13          Since the undisputed facts demonstrate that Facebook has suffered some damage or loss in

14   attempting to block Power's access to the Facebook website, the Court finds that Facebook has

15   standing to bring suit pursuant to Section 502(e).  The Court proceeds to examine Defendants'

16   liability under Section 502.

17   **B.      Defendants' Section 502 Liability**

18          Facebook contends that the undisputed facts prove that Defendants violated Section 502.

19   (Facebook's Motion for Judgment on the Pleadings at 1.)  Facebook bases its Section 502 claim

20   solely on facts that Defendants admit in their Amended Answer, which Facebook contends show

21   beyond dispute that Power accessed the Facebook website in violation of the Facebook terms of use,

22   and that when Facebook tried to stop Power, Power worked around Facebook's technical barriers.

23   (Id.)  Defendants respond, *inter alia*, that there is no evidence that Power ever accessed the

24

25

26

27

28                                                    8

United States District Court

For the Northern District of California

1    Facebook website without the express permission of the user and rightful owner of the accessed

2    data.[11]

3       On May 5, 2010, the Court granted the Electronic Frontier Foundation's ("EFF") Motion to

4    File Amicus Curiae in support of Defendants' Motion.[12] EFF contends that in order to avoid

5    constitutional vagueness concerns, the Court must construe the statutory phrase "without

6    permission" narrowly to exclude access to a website or computer network that merely violates a

7    term of use.[13] Allowing criminal liability based only on violation of contractual terms of service,

8    EFF contends, would grant the website or network administrator essentially unlimited authority to

9    define the scope of criminality and potentially expose millions of average internet users to criminal

10    sanctions without any meaningful notice. (Id.)

11       The Court finds that all of the subsections of Section 502(c) that potentially apply in this case

12    require that the defendant's actions be taken "without permission." See Cal. Penal Code §

13    502(c)(2), (3), (7). However, the statute does not expressly define the term "without permission."

14    In interpreting any statutory language, the court looks first to the words of the statute. Lamie v. U.S.

15    Trustee, 540 U.S. 526, 534 (2004). If the language is unambiguous, the statute should be interpreted

16    according to the plain meaning of the text. Id. at 534. The structure and purpose of a statute can

17    provide guidance in determining the plain meaning of its provisions. K-Mart Corp. v. Cartier, Inc.,

18    486 U.S. 281, 291 (1988). Statutory language is ambiguous if it is capable of being understood in

19    two or more possible senses or ways. Chickasaw Nation v. United States, 534 U.S. 84, 90 (2001). If

20

21

22       [11] (Defendants' Corrected Opposition to Facebook Inc.'s Motion for Judgment on the
Pleadings Pursuant to Fed. R. Civ. P. 12(c) or, in the Alternative, Partial Summary Judgment of
23    Liability Under California Penal Code § 502(c) at 11, hereafter, "Defendants' Opposition re
Summary Judgment," Docket Item No. 74.)

24

25       [12] (Docket Item No. 79.)

26       [13] (Brief of Amicus Curiae Electronic Frontier Foundation in Support of Defendant Power
Ventures' Motion for Summary Judgment on Cal. Penal Code 502(c) at 24-28, hereafter, "Amicus
27    Brief," Docket Item No. 83.) On July 6, 2010, Facebook filed its Reply to EFF's Amicus Brief.
(hereafter, "Amicus Reply," Docket Item No. 86.)

28

9

United States District Court

For the Northern District of California

1    a statutory provision is ambiguous, the court turns to the legislative history for guidance.  SEC v.

2    McCarthy, 322 F.3d 650, 655 (9th Cir. 2003).

3    　　　Here, the Court first looks to the plain language of the statute.  However, the term "without

4    permission" can be understood in multiple ways, especially with regard to whether access is without

5    permission simply as a result of violating the terms of use.  Thus, the Court must consider legislative

6    intent and constitutional concerns to determine whether the conduct at issue here falls within the

7    scope of the statute.  See F.C.C. v. Fox Television Stations, Inc., 129 S. Ct. 1800, 1811 (2009)

8    (noting that "the canon of constitutional avoidance in an interpretive tool, counseling that ambiguous

9    statutory language be construed to avoid serious constitutional doubts").

10   　　　**1.      Plain Language of the Statute**

11   　　　Here, Facebook does not allege that Power has altered, deleted, damaged, or destroyed any

12   data, computer, computer system, or computer network, so the subsections that require that type of

13   action are not applicable.  However, the Court finds that the following subsections of Section 502 do

14   not require destruction of data, and thus may apply here:

15   　　　(1)      Section 502(c)(2) holds liable any person who "[k]nowingly accesses and without
              permission takes, copies, or makes use of any data from a computer, computer
16            system, or computer network, or takes or copies any supporting documentation,
              whether existing or residing internal or external to a computer, computer system, or
17            computer network;"

18   　　　(2)      Section 502(c)(3) holds liable any person who "[k]nowingly and without permission
              uses or causes to be used computer services;" and
19
20   　　　(3)      Section 502(c)(7) holds liable any person who "[k]nowingly and without permission
              accesses or causes to be accessed any computer, computer system, or computer
              network."

21   　　　To support its claim that Defendants violated these provisions, Facebook relies solely on

22   facts that Defendants admitted in their Amended Answer.  Specifically, Facebook points to

23   Defendants' admissions that: (1) "Power permits users to enter their account information to access

24   the Facebook site through Power.com;"[14] (2) "Defendants developed computer software and other

25   automated devices and programs to access and obtain information from the Facebook website for

26   _____

27   　　　[14]  (Amended Answer ¶¶ 18, 45, 50.)

28   　　　　　　　　　　　　　　　10

United States District Court

For the Northern District of California

1    aggregating services;"[15] (3) Facebook communicated to Vachani its claims that "Power.com's access

2    of Facebook's website and servers was unauthorized and violated Facebook's rights, including

3    Facebook's trademark, copyrights, and business expectations with its users;"[16] (4) "Facebook

4    implemented technical measures to block users from accessing Facebook through Power.com;"[17] and

5    (5) "Power provided users with tools necessary to access Facebook through Power.com."[18]  Since all

6    three of the subsections at issue here require that Defendants' acts with respect to the computer or

7    computer network be taken without permission, the Court analyzes that requirement first.

8         Defendants and EFF contend that Power's actions could not have been without permission

9    because Power only accessed the Facebook website with the permission of a Facebook account

10   holder and at that account holder's behest.  (See Defendants' Opposition re Summary Judgment at

11   11; Amicus Brief at 11.)  Facebook, on the other hand, contends that regardless of whatever

12   permission an individual Facebook user may have given to Power to access a particular Facebook

13   account, Power's actions clearly violated the website's terms of use, which state that a Facebook

14   user may not "collect users' content or information, or otherwise access Facebook, using automated

15   means (such as harvesting bots, robots, spiders, or scrapers) without [Facebook's] permission."[19]

16        Since Power admits that it utilized "automated devices" to gain access to the Facebook

17   website, the Court finds that it is beyond dispute that Power's activities violated an express term of

18

19

20

21   _____

22        [15]  (Id. ¶ 74; FAC ¶ 74.)

23        [16]  (Amended Answer ¶ 57; FAC ¶ 57.)

         [17]  (Amended Answer ¶ 63.)

24        [18]  (Id. ¶ 64.)

25
         [19]  (Facebook Inc.'s Reply Brief in Support of its Motion for Judgment on the Pleadings or,
26   in the Alternative, Partial Summary Judgment of Liability Under California Penal Code Section 502
     and Opposition to Defendants' Motion for Summary Judgment at 5-6, hereafter, "Facebook's Reply
27   re Summary Judgment," Docket Item No. 66.)

28
                                              11

United States District Court
For the Northern District of California

1    the Facebook terms of use.[20]  The issue then becomes whether an access or use that involves a

2    violation of the terms of use is "without permission" within the meaning of the statute.  In the

3    modern context, in which millions of average internet users access websites every day without ever

4    reading, much less understanding, those websites' terms of use, this is far from an easy or

5    straightforward question.  Without clear guidance from the statutory language itself, the Court turns

6    to case law, legislative intent, and the canon of constitutional avoidance to assist in interpreting the

7    statute, and then analyzes whether the acts at issue here were indeed taken without permission.

8         **2.     Caselaw**

9         Since the California Supreme Court has not directly addressed the question of whether the

10   violation of a term of use constitutes access or use without permission pursuant to Section 502, the

11   Court looks to analogous state appellate court cases and federal court cases from this district for

12   guidance as to the statute's proper construction.  The Court also considers cases interpreting the

13   Computer Fraud and Abuse Act ("CFAA"), the federal corollary to Section 502, in evaluating how

14   broad an application Section 502 should properly be given.

15        EFF relies on two state appellate cases for the proposition that Section 502 should not apply

16   to persons who have permission to access a computer or computer system, but who use that access in

17   a manner that violates the rules applicable to that system.  Chrisman v. City of Los Angeles, 155

18   Cal. App. 4th 29, 32 (Cal. Ct. App. 2007); Mahru v. Superior Court, 191 Cal. App. 3d 545, 549 (Cal.

19   Ct. App. 1987).  In Chrisman, the court found that a police officer did not violate Section 502 when,

20   while on duty, the officer "accessed the Department computer system [] for non-duty-related

21   activities."  155 Cal. App. 4th at 32.  The court found that at essence, Section 502 is an anti-hacking

22   statute, and "[o]ne cannot reasonably describe appellant's improper computer inquiries about

23   celebrities, friends, and others as hacking."  Id. at 35.  The officer's "computer queries seeking

24   _____

25        [20]  This, of course, assumes that Power was in fact subject to the Facebook terms of use, an
     issue which was not briefed by either party.  However, the terms of use state, "By accessing or using
     our web site . . . , you (the 'User') signify that you have read, understand and agree to be bound by

26   these Terms of Use . . . , whether or not you are a registered member of Facebook."  (FAC, Ex. A.)
     Thus, in the act of accessing or using the Facebook website alone, Power acceded to the Terms of

27   Use and became bound by them.

28                                                12

United States District Court

For the Northern District of California

1    information that the department's computer system was designed to provide to officers was

2    misconduct if he had no legitimate purpose for that information, but it was not hacking the

3    computer's 'logical, arithmetical, or memory function resources,' as [the officer] was entitled to

4    access those resources." Id. While Chrisman does not address the specific issue before the Court

5    here, and focuses on the statutory definition of "access" rather than "without permission," the Court

6    finds that the case helps to clarify that using a computer network for the purpose that it was designed

7    to serve, even if in a manner that is otherwise improper, is not the kind of behavior that the

8    legislature sought to prohibit when it enacted Section 502.

9         In Mahru, the court found that the director and part owner of a data-processing firm was not

10   liable under Section 502 when he instructed the company's chief computer operator to make

11   specified changes in the names of two files in a former customer's computer program in retaliation

12   for that customer terminating its contract with the company.  191 Cal. App. 3d at 547-48.  These

13   changes had the effect of preventing the former customer's employees from being able to run their

14   computer programs without the assistance of an expert computer software technician.  Id.  In finding

15   that Section 502 had not been violated by the company's actions, the court stated:

16        The Legislature could not have meant, by enacting section 502, to bring the Penal Code into
          the computer age by making annoying or spiteful acts criminal offenses whenever a
17        computer is used to accomplish them.  Individuals and organizations use computers for
          typing and other routine tasks in the conduct of their affairs, and sometimes in the course of
18        these affairs they do vexing, annoying, and injurious things.  Such acts cannot all be
          criminal.

19

20   Id. at 549.  However, the court in Mahru based its finding of no liability in part on documentary

21   evidence establishing that the company, and not the former customer, owned the computer hardware

22   and software, which explains why the company's manipulation of files stored on that computer

23   hardware was merely vexatious and not unlawful hacking.  The Court finds that Mahru is not

24   applicable to the circumstances here, where it is undisputed that Power accessed data stored on

25   Facebook's server.

26        In support of its contention that Facebook users cannot authorize Power to access Facebook's

27   computer systems, Facebook relies on a previous order in this case and another case from this

28                                                    13

United States District Court
For the Northern District of California

1    District.  On May 11, 2009, Judge Fogel issued an order denying Defendants' Motion to Dismiss

2    Plaintiff's copyright infringement, DMCA, and trademark infringement claims.  In addressing

3    Plaintiff's copyright infringement claim, Judge Fogel found that, "[v]iewing the allegations in the

4    FAC as true, the utilization of Power.com by Facebook users exceeds their access rights pursuant to

5    the Terms of Use.  Moreover, when a Facebook user directs Power.com to access the Facebook

6    website, an unauthorized copy of the user's profile page is created."  (May 11 Order at 6-7.)  The

7    Court finds that whether or not Facebook users' utilization of Power.com exceeds their access rights

8    under Facebook's terms of use is not the issue presented in these Motions.  Instead, the Court must

9    determine whether such a violation of the terms of use constitutes use "without permission" within

10   the meaning of Section 502, a question that the May 11 Order did not directly address.

11          Finally, in Facebook, Inc. v. ConnectU LLC, Judge Seeborg found that a competing social

12   networking site violated Section 502 when it accessed the Facebook website to collect "millions" of

13   email addresses of Facebook users, and then used those email addresses to solicit business for itself.

14   489 F. Supp. 2d 1087, 1089 (N.D. Cal. 2007).  In that case, Judge Seeborg found unavailing

15   ConnectU's contention that it did not act without permission because it only "accessed information

16   on the Facebook website that ordinarily would be accessible only to registered users by using log-in

17   information voluntarily supplied by registered users."  Id. at 1090-91.  Judge Seeborg found that

18   ConnectU was subject to Facebook's terms of use and rejected ConnectU's contention that "a

19   private party cannot define what is or what is not a criminal offense by unilateral imposition of terms

20   and conditions of use."  Id. at 1091.  The court held that "[t]he fact that private parties are free to set

21   the conditions on which they will grant such permission does not mean that private parties are

22   defining what is criminal and what is not."  Id.

23          The Court finds that of the cases discussed so far, the holding in ConnectU is most applicable

24   to the present case.  However, the Court respectfully disagrees with ConnectU in one key respect.

25   Contrary to the holding of ConnectU, the Court finds that allowing violations of terms of use to fall

26   within the ambit of the statutory term "without permission" does essentially place in private hands

27   unbridled discretion to determine the scope of criminal liability recognized under the statute.  If the

28                                                    14

United States District Court
For the Northern District of California

1    issue of permission to access or use a website depends on adhering to unilaterally imposed

2    contractual terms, the website or computer system administrator has the power to determine which

3    actions may expose a user to criminal liability.  This raises constitutional concerns that will be

4    addressed below.

5         Although cases interpreting the scope of liability under the CFAA do not govern the Court's

6    analysis of the scope of liability under Section 502, CFAA cases can be instructive.  EFF points to

7    several CFAA cases for the proposition that the CFAA prohibits trespass and theft, not mere

8    violations of terms of use.  See, e.g., LVRC Holdings LLC v. Brekka, 581 F.3d 1127, 1130 (9th Cir.

9    2009) ("[F]or purposes of the CFAA, when an employer authorizes an employee to use a company

10   computer subject to certain limitations, the employee remains authorized to use the computer even if

11   the employee violates those limitations."); Diamond Power Int'l, Inc. v. Davidson, 540 F. Supp. 2d

12   1322 (N.D. Ga. 2007) ("Under the more reasoned view, a violation for accessing 'without

13   authorization' occurs only where initial access is not permitted."); But see Shurgard Storage Ctrs.,

14   Inc. v. Safeguard Self Storage, Inc., 119 F. Supp. 2d 1121, 1125-29 (W.D. Wash. 2000) (finding

15   employee may be held liable under CFAA for taking employer information from the company's

16   computer system to his next job on the ground that he was "without authorization" when he

17   "allegedly sent [the employer's] proprietary information to the defendant").

18        While there appears to be some disagreement in the district courts as to the scope of the term

19   "without authorization" in the CFAA context, the Court finds the Ninth Circuit's opinion in LVRC

20   Holdings to be particularly useful in construing the analogous term in Section 502.  In that case, the

21   Ninth Circuit found that access to a computer may be "authorized," within the statutory meaning of

22   the term, even if that access violates an agreed upon term of using that computer.  In general, the

23   Court finds that the more recent CFAA cases militate for an interpretation of Section 502 that does

24   not premise permission to access or use a computer or computer network on a violation of terms of

25   use.  However, since none of the cases discussed provides a definitive definition of without

26   permission under Section 502, the Court now looks to the legislative purpose of the statute to the

27   extent that it can be discerned.

28                                              15

United States District Court
For the Northern District of California

3. **Legislative Purpose**

Section 502 includes the following statement of statutory purpose:

> It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.
>
> The Legislature further finds that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

Cal. Penal Code § 502(a).

Facebook contends that this language evidences legislative intent to address conduct beyond "straightforward hacking and tampering." (Facebook's Reply re Summary Judgment at 2.) Specifically, Facebook contends that the legislature's use of the phrases "protection . . . from . . . unauthorized access" and "protection of the integrity of all types and forms of computers, computer systems, and computer data" demonstrates a far-reaching legislative purpose to protect the entire commercial computer infrastructure from trespass. (Id. at 2-3.)

The Court declines to give the statute's statement of legislative intent the sweeping meaning that Facebook ascribes to it. Section 502(a) speaks in general terms of a "proliferation of computer crime and other forms of unauthorized access to computers," but does not offer any further guidance as to what specific acts would constitute such crime or unauthorized access. It is far from clear what conduct the legislature believed posed a threat to the integrity of computers and computer systems, or if the legislature could even fathom the shape that those threats would take more than twenty years after the statute was first enacted.

Thus, the Court does not assign any weight to the statute's statement of legislative intent in construing the liability provisions of Section 502.

16

United States District Court

For the Northern District of California

1      **4.**      **Rule of Lenity**

2      EFF contends that interpreting Section 502 broadly to allow liability where the absence of

3 permission is based only on the violation of a contractual term of use or failure to fully comply with

4 a cease and desist letter would render the statute unconstitutionally vague, stripping the statute of

5 adequate notice to citizens of what conduct is criminally prohibited.  (Amicus Brief at 24-28.)  EFF

6 further contends that giving the statute the broad application that Facebook seeks could expose large

7 numbers of average internet users to criminal liability for engaging in routine web-surfing and

8 emailing activity.  (Id.)

9      "It is a fundamental tenet of due process that '[n]o one may be required at peril of life, liberty

10 or property to speculate as to the meaning of penal statutes."  Lanzetta v. New Jersey, 306 U.S. 451,

11 453 (1993).  Thus, a criminal statute is invalid if it "fails to give a person of ordinary intelligence

12 fair notice that his contemplated conduct is forbidden."  United States v. Harriss, 347 U.S. 612

13 (1954).  Where a statute has both criminal and noncriminal applications, courts must interpret the

14 statute consistently in both contexts.  Leocal v. Ashcroft, 543 U.S. 1, 11 n.8 (2004).  In the Ninth

15 Circuit, "[t]o survive vagueness review, a statute must '(1) define the offense with sufficient

16 definiteness that ordinary people can understand what conduct is prohibited; and (2) establish

17 standards to permit police to enforce the law in a non-arbitrary, non-discriminatory manner.'"

18 United States v. Sutcliffe, 505 F.3d 944, 953 (9th Cir. 2007).

19      The Court finds that interpreting the statutory phrase "without permission" in a manner that

20 imposes liability for a violation of a term of use or receipt of a cease and desist letter would create a

21 constitutionally untenable situation in which criminal penalties could be meted out on the basis of

22 violating vague or ambiguous terms of use.  In the words of one commentator, "By granting the

23 computer owner essentially unlimited authority to define authorization, the contract standard

24 delegates the scope of criminality to every computer owner."[21]  Users of computer and internet

25 services cannot have adequate notice of what actions will or will not expose them to criminal

---

[21] Orin S. Kerr, *Cybercrime's Scope: Interpreting "Acess" and "Authorization" in Computer Misuse Statutes*, 78 N.Y.U. L. Rev. 1596, 1650-51 (2003).

27

28                        17

United States District Court
For the Northern District of California

1   liability when a computer network or website administrator can unilaterally change the rules at any

2   time and are under no obligation to make the terms of use specific or understandable to the general

3   public.  Thus, in order to avoid rendering the statute constitutionally infirm, the Court finds that a

4   user of internet services does not access or use a computer, computer network, or website without

5   permission simply because that user violated a contractual term of use.[22]

6          If a violation of a term of use is by itself insufficient to support a finding that the user's

7   access was "without permission" in violation of Section 502, the issue becomes what type of action

8   would be sufficient to support such a finding.   The Court finds that a distinction can be made

9   between access that violates a term of use and access that circumvents technical or code-based

10  barriers that a computer network or website administrator erects to restrict the user's privileges

11  within the system, or to bar the user from the system altogether.[23]  Limiting criminal liability to

12  circumstances in which a user gains access to a computer, computer network, or website to which

13  access was restricted through technological means eliminates any constitutional notice concerns,

14  since a person applying the technical skill necessary to overcome such a barrier will almost always

15  understand that any access gained through such action is unauthorized.  Thus, the Court finds that

16  accessing or using a computer, computer network, or website in a manner that overcomes technical

17  or code-based barriers is "without permission," and may subject a user to liability under Section 502.

18         Applying this construction of the statute here, the Court finds that Power did not act "without

19  permission" within the meaning of Section 502 when Facebook account holders utilized the Power

20  website to access and manipulate their user content on the Facebook website, even if such action

21  violated Facebook's Terms of Use.  However, to the extent that Facebook can prove that in doing so,

22  Power circumvented Facebook's technical barriers, Power may be held liable for violation of

23  Section 502.  Here, Facebook relies solely on the pleadings for its Motion.  In their Answer,

24

25         [22]  This is not to say that such a user would not be subject to a claim for breach of contract.
26  Where a user violates a computer or website's terms of use, the owner of that computer or website
    may also take steps to remove the violating user's access privileges.

27         [23]  See generally Kerr, *supra* note 20.

28                                          18

United States District Court

For the Northern District of California

1    Defendants do not directly admit that the tools Power provided to its users were designed to

2    circumvent the technical barriers that Facebook put in place to block Power's access to the Facebook

3    website.  Thus, the Court finds that there is a genuine issue of material fact as to whether Power's

4    access or use of the Facebook website was "without permission" within the meaning of Section 502.

5         EFF contends that even if Power evaded the technical barriers that Facebook implemented to

6    deny it access, Power's conduct does not fall within the scope of Section 502 liability.  (Amicus

7    Brief at 19-28.)  More specifically, EFF contends that it would be inconsistent to allow liability for

8    ignoring or bypassing technical barriers whose sole purpose is to enforce contractual limits on

9    access while denying liability for violating those same contractual limits when technological means

10   of restricting access are not employed.  (Id. at 19.)  Thus, according to EFF, Power's efforts to

11   circumvent Facebook's IP-blocking efforts did not violate Section 502 because Facebook was

12   merely attempting to enforce its Terms of Use by other means.[24]  (Id. at 23-24.)  The Court finds

13   EFF's contentions unpersuasive in this regard.  EFF has not pointed to any meaningful distinction

14   between IP address blocking and any other conceivable technical barrier that would adequately

15   justify not finding Section 502 liability in one instance while finding it in the other.  Moreover, the

16   owners' underlying purpose or motivation for implementing technical barriers, whether to enforce

17   terms of use or otherwise, is not a relevant consideration when determining the appropriate scope of

18   liability for accessing a computer or network without authorization.  There can be no ambiguity or

19   mistake as to whether access has been authorized when one encounters a technical block, and thus

20

21

22

23
_____

24        [24]  The Court notes that although both parties discuss IP address blocking as the form of
     technological barrier that Facebook utilized to deny Power access, Facebook's use of IP-blocking
25   and Power's efforts to avoid those blocks have not been established as undisputed facts in this case.
     However, for purposes of this Motion, the Court finds that the specific form of the technological
26   barrier at issue or means of circumventing that barrier are not relevant.  Rather, the issue before the
     Court is whether there are undisputed facts to establish that such avoidance of technological barriers
27   occurred in the first instance.

28                                              19

United States District Court
For the Northern District of California

1  there is no potential failure of notice to the computer user as to what conduct may be subject to

2  criminal liability, as when a violation of terms of use is the sole basis for liability.[25]

3        Accordingly, the Court DENIES Facebook's Motion for Judgment on the Pleadings, and

4  DENIES the parties' Cross-Motions for Summary Judgment as to Facebook's Section 502 cause of

5  action.

6  **C.    Defendants' Counterclaims**

7        Facebook moves to dismiss Defendants' causes of action for violation of Section 2 of the

8  Sherman Act ("Section 2") on the ground that Defendants have failed to allege sufficient facts to

9  state a claim for monopolization or attempted monopolization.  (Facebook's Motion to Dismiss at 4-

10 9.)

11       To state a Section 2 claim for monopolization, the claimant must show that the alleged

12 monopolist (1) possesses monopoly power in the relevant market (2) through the willful acquisition

13 or maintenance of that power, as distinguished from growth or development as a consequence of a

14 superior product, business acumen, or historic accident, (3) that causes antitrust injury.  Verizon

15 Commc'ns v. Trinko, 540 U.S. 398, 407 (2004).

16       Since the Court finds that the element of willful acquisition or maintenance of monopoly

17 power is dispositive, the Court addresses this issue first.  Defendants allege, in pertinent part:

18       Facebook has acquired and maintained market power through two devices:
         Facebook solicited (and continues to solicit) internet users to provide their account names
19       and passwords for users' email and social networking accounts, such as Google's Gmail,
         AOL, Yahoo, Hotmail, or other third party websites.  Facebook then uses the account
20       information to allow the user to access those accounts through Facebook, and to run
         automated scripts to import their lists of friends and other contacts–i.e., to "scrape
21       data"–from those third-party sites into Facebook.  This practice fueled Facebook's growth by
         allowing Facebook to add millions of new users, and to provide users with convenient tools
22       to encourage their friends and contacts to join Facebook as well.  On information and belief
         it is estimated that at least approximately 35% to 50% of Facebook's "132 million active
23       users" . . . registered with Facebook as a result of an invitation generated using this device.

24

25       [25]  As Facebook contends in its Amicus Reply, the Court finds that evidence of Power's
    efforts to circumvent Facebook's technical barrier is also relevant to show the necessary mental state
26  for Section 502 liability.  (Amicus Reply at 10-11.)  Since the facts relating to such circumvention
    efforts are still in dispute, the Court finds that there is also a genuine issue of material fact as to
27  whether Defendants possessed the requisite mental state.

28                                            20

United States District Court
For the Northern District of California

1         Facebook simultaneously prohibited (and prohibits) users from using the same type
of utility to access their own user data when it is stored on the Facebook site.  Thus,
2    Facebook prohibits users from logging into Facebook through third-party sites, such as
Power.com, and also restricts users from running automated scripts to retrieve their own user
3    data from the Facebook site.

4    (Amended Answer ¶ 174.)

5         Facebook has also maintained its monopoly power by systematically threatening new
entrants, such as Power.com and others, who seek to attract users through the same device
6    . . . that Facebook itself used to fuel its own growth.  On information and belief, for
approximately the past 36 months, Facebook has threatened dozens of new entrants since
7    2006 with baseless intellectual property claims, and has engaged in systematic and
widespread copyright misuse . . . to discourage market entry and to stifle competition from
8    new entrants.

9    (Amended Answer ¶ 176.)

10       The Court finds that Defendants' allegations cannot support a Section 2 monopolization

11   claim.  Defendants cite no authority for the proposition that Facebook is somehow obligated to allow

12   third-party websites unfettered access to its own website simply because some other third-party

13   websites grant that privilege to Facebook.  In fact, the Ninth Circuit has held that merely introducing

14   a product that is not technologically interoperable with competing products is not violative of

15   Section 2.  See Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534 (9th Cir. 1983).

16       In response to Facebook's Motion, Defendants merely assert that Facebook's actions are

17   anticompetitive because Defendants have alleged so, and that the Court must accept this allegation

18   as true at the motion to dismiss stage.[26]  In maintaining this position, Defendants miss the fact that he

19   issue of whether or not a particular practice is anticompetitive is determinative of an essential

20   element of a monopoly claim, and is thus a question of law that may be determined by the Court.

21   The Court is not obligated to accept as true Defendants' allegations that amount to conclusions of

22   law, and the Court rejects Defendants' naked assertion here that Facebook's practices are predatory.

23   Papasan, 478 U.S. at 286.

24

25

_____

26       [26] (Defendants' Opposition to Motion of Facebook, Inc. to Dismiss Counterclaims and Strike
Affirmative Defenses at 4-5, hereafter, "Defendants' Opposition re Motion to Dismiss," Docket Item
27   No. 63.)

28                                              21

United States District Court

For the Northern District of California

1   The Court likewise finds that Defendants' allegation that Facebook maintained monopoly

2   power by threatening potential new entrants to the social networking market with baseless

3   intellectual property lawsuits cannot support a Section 2 claim.  If Facebook has the right to manage

4   access to and use of its website, then there can be nothing anticompetitive about taking legal action

5   to enforce that right.  Furthermore, whether or not a particular lawsuit is "baseless" is a legal

6   conclusion, and thus the Court need not accept Defendants' allegations as to the merits of

7   Facebook's lawsuits as true.  Again, Defendants cite no authority for the proposition that filing

8   lawsuits against competitors for infringing on one's intellectual property rights can be deemed an

9   anticompetitive or predatory practice.

10   In light of the Court's finding that Defendants do not plead sufficient facts to satisfy one of

11   the essential elements of their Section 2 claim, the Court need not address the sufficiency of

12   Defendants' pleadings as to the remaining elements.  Since anticompetitive conduct is also an

13   element of a claim for attempted monopolization under Section 2, the Court finds that Defendants'

14   pleadings are deficient as to that claim as well.  See Coalition for ICANN Transparency, Inc. v.

15   VeriSign, Inc., 567 F.3d 1084, 1093 (9th Cir. 2009).

16   Accordingly, the Court GRANTS Facebook's Motion to Dismiss Defendants' counterclaims

17   for violations of Section 2 of the Sherman Act.  Since Defendants have already had the opportunity

18   to amend their counterclaims once, the Court dismisses these claims with prejudice.

19   **D.   UCL Claim**

20   Facebook moves to dismiss Defendants' UCL claim on the ground that if Facebook's

21   conduct is not anticompetitive under Section 2 of the Sherman Act, a UCL claim cannot be premised

22   on that same conduct.  (Facebook's Motion to Dismiss at 8-9.)

23   The UCL prohibits "any unlawful, unfair or fraudulent business act or practice."  Cal. Bus.

24   & Prof. Code § 17200.  "The broad scope of the statute encompasses both anticompetitive business

25   practices and practices injurious to consumers.  An act or practice may be actionable as 'unfair'

26   under the unfair competition law even if it is not 'unlawful.'"  Chavez v. Whirlpool Corp., 93 Cal.

27   App. 4th 363, 375 (Cal. Ct. App. 2001).

28   22

United States District Court

For the Northern District of California

In <u>Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tele. Co.</u>,[27] the court concluded that an act or practice is "unfair" under the UCL if that conduct "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." Likewise,

> the determination that the conduct is not an unreasonable restraint of trade necessarily implies that the conduct is not "unfair" toward consumers.  To permit a separate inquiry into essentially the same question under the unfair competition law would only invite conflict and uncertainty and could lead to the enjoining of procompetitive conduct.

<u>Chavez</u>, 93 Cal. App. 4th at 375.

Here, the Court has found that Facebook's conduct is not anticompetitive.  Thus, Defendants cannot premise their UCL claim on Facebook's conduct under either the unlawful or the unfair prong.  Accordingly, the Court GRANTS Facebook's Motion to Dismiss as to Defendants' UCL counterclaim with prejudice.

**E.**     **Affirmative Defenses**

Facebook moves to strike Defendants' affirmative defenses of misuse of copyright and fair use.  (Facebook's Motion to Dismiss at 9-11.)

Pursuant to Federal Rule of Civil Procedure 12(f), "the court may order stricken from any pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  However, "[m]otions to strike are generally regarded with disfavor because of the limited importance of pleading in federal practice, and because they are often used as a delaying tactic."  <u>Neilson v. Union Bank of Cal., N.A.</u>, 290 F. Supp. 2d 1101, 1152 (C.D. Cal. 2003); <u>see, e.g.</u>, <u>Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.</u>, 217 F. Supp. 2d 1028 (C.D. Cal. 2002).  Accordingly, such motions should be denied unless the matter has no logical connection to the controversy at issue and may prejudice one or more of the parties to the suit.  <u>SEC v. Sands</u>, 902 F. Supp. 1149, 1166 (C.D. Cal. 1995); <u>LeDuc v. Kentucky Central Life Ins. Co.</u>, 814 F. Supp. 820, 820 (N.D. Cal. 1992).  When considering a motion to strike, the court "must view the pleading in a light

---

[27]  20 Cal. 4th 163, 187 (Cal. Ct. App. 1999).

23

United States District Court

For the Northern District of California

1    most favorable to the pleading party." In re 2TheMart.com, Inc. Securities Litig., 114 F. Supp. 2d

2    955, 965 (C.D. Cal. 2000).

3          Here, the Court previously struck Defendants' affirmative defenses because they

4    "contain[ed] no factual allegations." (October 22 Order at 3.) Instead, the pleadings merely referred

5    back to the "Introduction and Background" section with the phrase "conduct, as described herein."

6    (Id. at 4.) The Court found such barebones pleading inadequate, but gave Defendants leave to

7    amend. In their Amended Answer, Defendants plead in much greater detail their misuse of

8    copyright and fair use affirmative defenses. (Amended Answer ¶¶ 161-68.) The Court finds that

9    Defendants' amended allegations are sufficient to provide Facebook with "fair notice of the

10   defense." See Mag Instrument, Inc. v. JS Prods., 595 F. Supp. 1102, 1107 (C.D. Cal. 2008).

11         Accordingly, the Court DENIES Facebook's Motion to Strike Defendants' Affirmative

12   Defenses.

13                                    **V.  CONCLUSION**

14         The Court DENIES Facebook's Motion for Judgment on the Pleadings, DENIES the parties'

15   Cross-Motions for Summary Judgment, GRANTS Facebook's Motion to Dismiss Defendants'

16   counterclaims for violations of Section 2 of the Sherman Act with prejudice, GRANTS Facebook's

17   Motion to Dismiss Defendants' UCL counterclaim with prejudice, and DENIES Facebook's Motion

18   to Strike Defendants' Affirmative Defenses.

19         On **August 23, 2010 at 10 a.m.**, the parties shall appear for a Further Case Management

20   Conference. On or before **August 13, 2010**, the parties shall file a Joint Case Management

21   Statement. The Statement shall include an update on the parties' discovery efforts and proposed

22   schedule on how this case should proceed in light of this Order.

23

24   Dated:  July 20, 2010

25                                                    JAMES WARE
                                                      United States District Judge

26

27

28                                            24