Nos. 13-17102, 13-17154

**IN THE**

# United States Court of Appeals
# For The Ninth Circuit

_____

FACEBOOK, INC.,
*Plaintiff-Appellee*,

v.

POWER VENTURES, INC.

&

STEVEN SURAJ VACHANI,
*Defendants-Appellants*.

_____

Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, The Honorable Lucy Koh

_____

**BRIEF OF PLAINTIFF-APPELLEE FACEBOOK, INC.**

_____

Eric A. Shumsky
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
Columbia Center
1152 15th Street, N.W.
Washington, D.C. 20005
(202) 339-8400

I. Neel Chatterjee
Monte Cooper
Brian P. Goldman
Robert L. Uriarte
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

*Counsel for Plaintiff-Appellee*

## CORPORATE DISCLOSURE STATEMENT

Facebook, Inc. has no parent corporation, and no publicly held corporation owns 10% or more of Facebook, Inc.'s stock.

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ..................................................................iv

INTRODUCTION ...................................................................................1

ISSUES PRESENTED ...........................................................................3

STATUTORY AUTHORITIES ...............................................................3

JURISDICTION ....................................................................................3

FACTUAL AND PROCEDURAL BACKGROUND ...............................4

SUMMARY OF ARGUMENT ............................................................13

ARGUMENT .......................................................................................15

I.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO FACEBOOK ON ITS CLAIMS UNDER THE CFAA AND § 502. ......................................................................15

    A.    Circumventing Technical Barriers To Access A Computer Is Access "Without Authorization" Under The CFAA, And "Without Permission" Under § 502. ...................................16

    B.    Defendants Circumvented The Technical Barriers That Facebook Instituted To Block Access..................................19

    C.    Defendants' Remaining Arguments Are Contrary To Law...............26

    D.    Facebook Presented Undisputed Evidence Of "Damage Or Loss."........................................................................29

II.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO FACEBOOK ON ITS CLAIMS UNDER THE CAN-SPAM ACT...........................................................35

    A.    Defendants' Messages Had "Header Information That Is Materially False Or Materially Misleading."......................35

    B.    Facebook Presented Evidence Of Damages Sufficient To Maintain Its CAN-SPAM Claim.......................................44

III.    UNDISPUTED FACTS ESTABLISH VACHANI'S PERSONAL LIABILITY FOR THE UNLAWFUL CONDUCT HE DEVISED AND DIRECTED. ........................................................48

IV.    VACHANI DID NOT PROPERLY PRESERVE HIS APPEAL OF THE DISCOVERY SANCTIONS, WHICH WERE PROPERLY IMPOSED AGAINST HIM IN ANY EVENT. ...........................................50

    A.    Vachani Forfeited This Argument. ....................................52

    B.    Magistrate Judge Spero Properly Sanctioned Vachani. ....................53

V.    THE COURT EXERCISED SOUND DISCRETION WHEN IT PERMANENTLY ENJOINED DEFENDANTS' WILLFUL AND UNAPOLOGETIC MISCONDUCT. ............................................56

CONCLUSION ..................................................................................62

STATEMENT OF RELATED CASE

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adriana Int'l Corp. v. Thoeren*,
913 F.2d 1406 (9th Cir. 1990) ...................................................................54, 55

*Aitken v. Commuications Workers of America*,
496 F. Supp. 2d 653 (E.D. Va. 2007) ................................................................43

*ASIS Internet Services v. Azoogle.com Inc.*,
357 F. App'x 112 (9th Cir. 2009) ................................................................46, 47

*AtPac, Inc. v. Aptitude Solutions, Inc.*,
730 F. Supp. 2d 1174 (E.D. Cal. 2010) ............................................................33

*Beacon Mut. Ins. Co. v. OneBeacon Ins. Grp.*,
376 F.3d 8 (1st Cir. 2004) ...........................................................................57, 58

*Brock v. Big Bear Market No. 3*,
825 F.2d 1381 (9th Cir. 1987) .............................................................................58

*CFTC v. Co Petro Mktg. Grp., Inc.*,
680 F.2d 573 (9th Cir. 1982) ...............................................................................58

*CFTC v. Noble Metals International Inc.*,
67 F.3d 766 (9th Cir. 1955) .........................................................................53, 54

*Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*,
173 F.3d 725 (9th Cir. 1999) .......................................................................48, 50

*Craigslist Inc. v. 3Taps Inc.*,
964 F. Supp. 2d 1178 (N.D. Cal. 2013).........................................25, 27, 28, 30

*Creative Computing v. Getloaded.com, LLC*,
386 F.3d 930 (9th Cir. 2004) .......................................................................59, 62

*Cruz v. Int'l Collection Corp.*,
673 F.3d 991 (9th Cir. 2012) .......................................................................58, 61

*Davis v. Metro Prods., Inc.*,
    885 F.2d 515 (9th Cir. 1989) ............................................................... 50

*DocMagic, Inc. v. Ellie Mae, Inc.*,
    745 F. Supp. 2d 1119 (N.D. Cal. 2010) ............................................... 16

*eBay Inc. v. MercExchange, LLC*,
    547 U.S. 388 (2006) .............................................................................. 57

*In re Estate of Marcos*,
    25 F.3d 1467 (9th Cir. 1994) ............................................................... 58

*Facebook, Inc. v. ConnectU LLC*,
    489 F. Supp. 2d 1087 (N.D. Cal. 2007) ............................................... 27

*Facebook, Inc. v. Fisher*,
    No. C 09-05842 JF (PSG), 2011 U.S. Dist. LEXIS 9668
    (N.D. Cal. Jan. 26, 2011) ..................................................................... 50

*Farmers Ins. Exch. v. Steel Ins. Agency, Inc.*,
    No. 2:13-cv-00784-MCE-DAD, 2013 WL 3872950
    (E.D. Cal. July 25, 2013) ............................................................... 33, 34

*First Card v. Hunt*,
    238 F.3d 1098 (9th Cir. 2001) ............................................................. 55

*Fortyune v. Am. Multi-Cinema, Inc.*,
    364 F.3d 1075 (9th Cir. 2004) ............................................................. 57

*FTC v. Sili Neutraceuticals, LLC*,
    No. 07 C 4541, 2008 U.S. Dist. LEXIS 105683 (N.D. Ill. Jan. 23, 2008) ......... 50

*Glenbrook Homeowners Ass'n v. Tahoe Reg'l Planning Agency*,
    425 F.3d 611 (9th Cir. 2005) ............................................................... 52

*Gordon v. Virtumundo, Inc.*,
    575 F.3d 1040 (9th Cir. 2009) ............................................. 35, 44, 45, 46

*L & E Co. v. United States ex rel. Kaiser Gypsum Co.*,
    351 F.2d 880 (9th Cir. 1965) ............................................................... 55

*Lambright v. Ryan*,
    698 F.3d 808 (9th Cir. 2012) ............................................................... 53

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) .......................................................................... 30

*LVRC Holdings LLC v. Brekka*,
    581 F.3d 1127 (9th Cir. 2009) .................................................... *passim*

*Multiven, Inc. v. Cisco Sys., Inc.*,
    725 F. Supp. 2d 887 (N.D. Cal. 2010) ........................................ 16, 32

*MySpace, Inc. v. Wallace*,
    498 F. Supp. 2d 1293 (C.D. Cal. 2007) ............................................. 61

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ............................................................................ 6

*Omega World Travel Inc. v. Mummagraphics, Inc.*,
    469 F.3d 348 (4th Cir. 2006) ...................................................... 42, 43

*Perrin v. United States*,
    444 U.S. 37 (1979) ............................................................................ 18

*Peterson v. Highland Music, Inc.*,
    140 F.3d 1313 (9th Cir. 1998) .......................................................... 40

*R & R Sails, Inc. v. Ins. Co. of Pa.*,
    673 F.3d 1240 (9th Cir. 2012) .......................................................... 53

*Sambreel Holdings LLC v. Facebook, Inc.*,
    906 F. Supp. 2d 1070 (S.D. Cal. 2012) ...................................... 27, 61

*SEC v. Coldicutt*,
    258 F.3d 939 (9th Cir. 2001) ............................................................ 61

*Simpson v. Lear Astronics Corp.*,
    77 F.3d 1170 (9th Cir. 1996) ...................................................... 52, 53

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ............................................................ 24

*SuccessFactors, Inc. v. Softscape, Inc.*,
    544 F. Supp. 2d 975 (N.D. Cal. 2008) .............................................. 32

*Tagged, Inc. v. Doe,*
　　No. C09-01713 WHA, 2010 U.S. Dist. LEXIS 5428
　　(N.D. Cal. Jan. 25, 2010) ...................................................................62

*United States v. Forrester,*
　　512 F.3d 500 (9th Cir. 2007) .............................................................67

*United States v. Laerdal Mfg. Corp.,*
　　73 F.3d 852 (9th Cir. 1995) ................................................................59

*United States v. Nosal,*
　　676 F.3d 854 (9th Cir. 2012) ......................................................*passim*

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
　　562 F.3d 630 (4th Cir. 2009) ..............................................................32

*Walczak v. EPL Prolong, Inc.,*
　　198 F.3d 725 (9th Cir. 1999) ..............................................................59

**State Cases**

*People v. Lawton,*
　　48 Cal. App. 4th Supp. 11 (1996)..................................................17, 27

**Federal Statutes**

15 U.S.C. § 7701(a) .................................................................................47

15 U.S.C. § 7701(a)(7) ............................................................................36

15 U.S.C. § 7701(a)(8).................................................................36, 39, 41

15 U.S.C. § 7701(a)(9) ............................................................................36

15 U.S.C. § 7701(b)(2) .......................................................................36, 41

15 U.S.C. § 7701(b)(3) ............................................................................36

15 U.S.C. § 7702(8) .................................................................................36

15 U.S.C. § 7702(9) .................................................................................38

15 U.S.C. § 7704(a)(1).................................................................36, 41, 44

15 U.S.C. § 7704(a)(1)(A) ................................................................ 41

15 U.S.C. § 7704(a)(1)(B) ................................................................ 41

15 U.S.C. § 7704(a)(1)(C) ............................................................ 40, 41

15 U.S.C. § 7704(a)(3) ..................................................................... 42

15 U.S.C. § 7704(a)(5) ..................................................................... 42

15 U.S.C. § 7704(a)(6) ..................................................................... 42

15 U.S.C. § 7706(g)(1) ......................................................... 36, 44, 45

15 U.S.C. § 7706(g)(1)(A) ................................................................ 56

18 U.S.C. § 1030(a)(2) ................................................................ 18, 24

18 U.S.C. § 1030(a)(2)(C) ................................................................ 16

18 U.S.C. § 1030(a)(4) ................................................................ 18, 24

18 U.S.C. § 1030(c)(4)(A)(i)(I) ........................................................ 30

18 U.S.C. § 1030(e)(11) ....................................................... 30, 32, 34

18 U.S.C. § 1030(g) ..................................................................... 30, 56

**State Statutes**

California Penal Code § 502 ....................................................... *passim*

California Penal Code § 502(c)(2) ..................................................... 16

California Penal Code § 502(c)(3) ..................................................... 16

California Penal Code § 502(c)(7) ................................................. 16, 27

California Penal Code § 502(e)(1) ......................................... 30, 34, 56

**Rules**

Fed. R. Civ. P. 30(b)(6) ............................................................ *passim*

Fed. R. Civ. P. 30(d)(2) ................................................................. 54

viii

Fed. R. Civ. P. 60(b)(5) ........................................................... 60

Fed. R. Civ. P. 72(a) ............................................................... 52

**Other Authorities**

Model Penal Code § 221.2(2)(c) ................................................ 17

Orin S. Kerr, *Cybercrime's Scope: Interpreting 'Access' and 'Authorization' in Computer Misuse Statutes*, 78 N.Y.U. L. Rev. 1596 (2003) .............................. 17

Restatement (Second) of Torts § 158 ......................................... 17

S. Rep. No. 99-432 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2479 ....................... 16

**INTRODUCTION**

Steven Vachani's business model for Power Ventures took a familiar page out of an old playbook: Surreptitiously copy a competitor's content, and republish it as your own. Power harvested information about users from the websites of social networks like Facebook without authorization, and displayed Facebook content through Power's website, so that users would visit power.com rather than facebook.com. Power used similar tactics to get more users: When a user registered for a Power account, Power would co-opt her Facebook account, access her list of contacts (or "friends"), then bombard each friend with unsolicited advertisements for Power. These "spam" messages were designed to look like recommendations from a Facebook friend, rather than promotional messages from Power.

Not surprisingly, Facebook wanted Power to stop. Harvesting data from the Facebook website threatened the security of that information and the integrity of Facebook's network; spamming Facebook's users created the type of annoyance that previously generated thousands of complaints and diminished users' experience. Facebook therefore repeatedly instructed Power to cease and desist. When Power refused, Facebook implemented technological measures to prevent Power from accessing Facebook's systems. Like a landowner who ejects an unwelcome trespasser, Facebook put up a digital sign to "keep out," then built a digital fence.

Undeterred, Power implemented what it called "workaround solution 1," a plan to repeatedly change the Internet Protocol (or IP) address from which it accessed Facebook, so that Facebook's defense system would not recognize Power as a website *non grata*. As the district court recognized, Power's circumvention of Facebook's technical measures to access Facebook's network was "without authorization" and "without permission," and therefore violated state and federal law. Then, having broken in to Facebook, Power sent over 60,000 messages to Facebook users. That also violated federal law, which prohibits sending electronic messages with materially misleading return-address (or "header") information.

Ultimately, this litigation was the only way to halt Power's trespasses. Even then, however, Power's misconduct continued. Defendants resisted discovery, and deliberately destroyed evidence of their spamming. Such conduct necessitated multiple orders compelling Defendants to produce relevant evidence, and Power's CEO, Vachani, was sanctioned for his "inexcusable" litigation misconduct. Their defiant attitude—toward Facebook's legal rights, and toward the judicial proceedings—convinced the court that a permanent injunction was necessary to ensure Defendants' compliance with the law.

Defendants' arguments now have been carefully examined and unanimously rejected by four different judges. The district court's collective judgment was sound, and should be affirmed in its entirety.

2

## ISSUES PRESENTED

1.     Whether Defendants violated the Computer Fraud and Abuse Act and California Penal Code § 502 by circumventing technological barriers imposed by Facebook to restrict their access, and notwithstanding having been told clearly and repeatedly that Facebook was blocking their access.

2.     Whether Defendants violated the CAN-SPAM Act by sending over 60,000 electronic spam messages that were made to look like they were sent by Facebook and Facebook users.

3.     Whether Steven Vachani was properly held personally liable because he directed, controlled, or participated in Power's unlawful activities.

4.     Whether Vachani's challenge to the sanctions imposed on him are forfeited because he did not preserve his objection below, and whether in any event the court exercised sound discretion in sanctioning him for "inexcusable" discovery misconduct.

5.     Whether the district court acted within its discretion in issuing an injunction to prevent future violations, given its determination that "Defendants have demonstrated a willingness" to continue disregarding Facebook's rights.

## STATUTORY AUTHORITIES

Relevant statutory provisions appear in the Addendum.

## JURISDICTION

Facebook does not dispute Defendants' Jurisdictional Statement.

3

## FACTUAL AND PROCEDURAL BACKGROUND

### *Facebook's Social Network*

Facebook operates the popular social networking service of the same name, which had about 132 million active users when these events took place, and has over a billion users today. Facebook allows users to "friend" other users and join networks organized around common interests. SER36. Users can share personal information, photos, and commentary with their Facebook friends. SER36. Facebook also enables users to communicate directly with their friends. Users may send private messages (which are similar to email but sent and received within Facebook), and "Event" invitations to notify friends of upcoming functions. SER394. For many users, receiving a message through Facebook also triggers a notification to their external email addresses. ER55-56; SER376, 384-85.

Facebook's success has attracted businesses hoping to connect with Facebook's large user base. SER394. News outlets like the *Los Angeles Times*, for example, allow a reader to "share" articles with Facebook friends by posting articles directly from latimes.com to their personal Facebook "profile." Facebook has welcomed third-party developers to create programs that interact with Facebook, through channels Facebook designed to ensure the security of Facebook's website and the integrity of Facebook's services. ER181 ¶28; SER422 ¶28. These include Facebook Login (known at the time as Facebook Connect), which allows a user to

4

"connect" to external websites with her Facebook profile using a secure link, thereby protecting her sensitive passcode information from the third-party site. ER180-81; SER37, 422 ¶28. Facebook devotes great care to the quality of the Facebook experience, including by protecting users from unsolicited third-party marketing emails. ER52-54. After all, in a rapidly shifting digital world that gives consumers many options, people annoyed with a service will find an alternative.

**Power Harvests Facebook Users' Information**

Enter Power Ventures and Steven Vachani. Power is a Cayman Islands corporation that, according to Defendants, was "a competitor in the market for social networking websites"; Vachani was its CEO. SER421 ¶¶10-11, 434 ¶173. According to Power's "Internet User Bill of Rights," it "believes in a borderless Internet"—and, having proclaimed this, Power built a business model predicated on harvesting user information from, and co-opting the networks that users had built on, other social media websites. *See* SER413, 419, 485 (screen shot reflecting how power.com takes information from other websites). Thus, Power developed a software program called "PowerScript" to harvest (or "scrape") user information, including contact lists, from social media websites like Facebook. SER92, 160 ("I agree that what we are doing may be considered web scraping"), 396, 481-86; *see* SER37. Once Power had its users' credentials to access Facebook, Power would copy what the user could have viewed on Facebook, and display it on Power in-

5

stead. *Id.* And, because Power held the digital equivalent of the person's house keys, it could also take control of the Facebook user's account and thus appear to act on his behalf. Website operators including Facebook typically prohibit the use of scraping software because it may be used for undesirable purposes. SER379, 482.

Because, however, scraping was central to Defendants' business, SER37, they did not want to go through approved channels, like Facebook Connect, to access Facebook's network, SER372-73. Instead, they did so by soliciting users' credentials for logging into Facebook. SER278-81 (admissions 15, 18, 22, 37). Defendants knew that Facebook would disapprove for reasons related to security, and they "anticipated attempts to block [their] access by network owners." ER62 (citing SER273-74). Specifically, Defendants expected that Facebook would block access to the Facebook website originating from Power's IP address—the Internet equivalent of Power's telephone number or mailing address.[1] *See* ER62; SER386-87 (discussing technical measures to circumvent IP blocking). Defendants therefore "intentionally implemented a system" to circumvent such barriers. ER62.

---

[1] "Every computer or server connected to the Internet has a unique IP address. A website typically has only one IP address even though it may contain hundreds or thousands of pages." *United States v. Forrester*, 512 F.3d 500, 510 n.5 (9th Cir. 2007). Thus, "IP addresses identify computers on the Internet, enabling data packets transmitted from other computers to reach them." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 987 n.1 (2005).

They designed Power's software to circumvent IP blocking by connecting to Facebook not directly from their own IP address, but instead through "proxy servers" that would relay data and thereby conceal its origin. ER60-61 (citing SER273-74); SER495-98.

### Facebook Blocks Power, Which Then Circumvents The Block To Send Over 60,000 Messages

On December 1, 2008, Facebook detected scraping software operating on its network. ER52; SER396. Power was harvesting data about Facebook users, then downloading it to Power's website. ER52; SER376, 382, 396. Expert analysis later revealed that Power's software (which was designed to circumvent blocking measures) was automatically generating and sending electronic communications (including spam to Facebook users) through Facebook's communications systems. ER55-56, 61; SER376.[2] Facebook immediately notified Power that its conduct was unauthorized, and demanded that Power stop. SER298-300.

Defendants responded that they would stop using the scraper to access Facebook's network; purge Power's database of data obtained from Facebook; and implement Facebook Connect by December 12. ER137-38, 141. When that date ar-

---

[2] Even after the district court granted Facebook's motion to compel production of source code materials for this program, *see* Doc.127, Power did not produce all relevant source code and related documentation, and Facebook's expert concluded that some of this data was deleted after litigation commenced. ER25; SER 387-88.

rived, Defendants said they would need still more time. SER307-08. Facebook informed Defendants that it would allow them to access the service via Facebook Connect if Defendants were ready in two weeks, but explicitly notified Defendants that it had blocked Power's access to Facebook's network in the meantime. SER305-06.

Defendants received this notice, SER330 (admission 53), but were undeterred. They deployed "workaround solution 1"—their plan to use proxy servers to change their IP address to circumvent Facebook's block. SER88. Facebook blocked the new IP addresses, but Defendants changed them again, "'in a game of cat and mouse.'" ER61; *see* SER398. Finally, Defendants adopted the "Amazon solution," SER292—they switched to an IP address associated with the popular website amazon.com, which Facebook could not block without effectively blocking many authorized users of its system. ER60-61; SER387, 399.

When the December 26 deadline arrived, Vachani informed Facebook that Power would not be able to implement Facebook Connect for at least *another* month. SER302-03. Moreover, Vachani said, Power had made the "business decision" to continue accessing Facebook's network in the meantime, even though Defendants knew "this is not your desired action." SER302. Complying with Facebook would be "a serious strategic mistake," Vachani said, because "[t]he floodgates are about to open" to "hundreds of other well intentioned developers who are

only looking to create new innovations for Facebook," and Facebook should welcome them regardless of whether they agreed to comply with Facebook's policies. SER303-04.

As a result of their efforts to circumvent Facebook's blocks, Defendants accessed Facebook to engage in a massive marketing campaign in December 2008. They offered Power users $100 if they signed up 100 new users within 100 days. ER47. What Defendants did not say was that if a user signed up, Defendants would co-opt his Facebook account to send mass unsolicited commercial messages to the user's friends (including online calendar invitations to fictitious "Events"), which were styled to trick recipients into thinking the user was personally recommending Power's service. ER47-48, 54; *see infra* at 36-39 (discussing this process in greater detail). All told, the records that Power did retain showed that Defendants sent over 60,000 such messages. *Id.* In addition, a user's friends whose Facebook accounts were set to relay email notifications would also receive a message purporting to be from Facebook, stating that "[Facebook user name] says, 'Bring 100 friends and win 100 bucks!'" ER55, 187.

### Facebook Files Suit, And Four Judges Rule Against Power

Having failed to stop Power's access with cooperative discussion, formal demands, or technical blocks, Facebook ultimately brought suit. When Facebook notified Defendants that it intended to seek a TRO unless Power stopped accessing

the Facebook system, Defendants' gamesmanship continued. Defendants said that it would take a week; Facebook reiterated its intent to seek a TRO; Defendants promised to comply the next day. ER143. Even so, Facebook continued to detect access to its network from IP addresses traced to Power into early 2009, even after Power promised to terminate these connections. ER144-45; SER399.

Protracted litigation ensued. Judge Fogel denied Defendants' motion to dismiss, SER43, and granted Facebook's motion to dismiss Defendants' counter-claims, Doc.52, before ultimately recusing himself, Doc.72. Turbulent discovery followed, which included multiple orders requiring Defendants to follow the rules. *Infra* at 50-51; *e.g.*, Docs.127, 166, 282 (granting discovery motions). At one point, an exasperated Magistrate Judge Spero required Vachani to swear under oath that Defendants had produced all relevant emails and documents stored on a hard drive in Vachani's possession. SER408. Yet three months later, after the close of discovery and following the completion of briefing on summary judgment, Defendants produced 74.6 gigabytes of additional information from that same hard drive, prompting the court to sanction Defendants. ER37-45.

Ultimately, Chief Judge Ware entered summary judgment for Facebook in April 2012. ER64. With respect to the Computer Fraud and Abuse Act (CFAA) and § 502, "the undisputed facts establish that Defendant circumvented technical barriers to access [the] Facebook site, and thus accessed the site 'without permis-

sion.'" ER62. The court relied on "Vachani's own statements," which "provide compelling evidence that he anticipated attempts to block access by network owners and intentionally implemented a system that would be immune to such barriers"—a system Defendants then "utilized ... to effectively circumvent those barriers." *Id.*

As to the CAN-SPAM Act, "the undisputed facts establish that Defendants initiated the sending of e-mails with false or misleading heading information." ER59. Defendants "creat[ed] the Launch Promotion, import[ed] users' friends to the guest list, and author[ed] the e-mail text," which Defendants sent via "a software program specifically designed" to make "Facebook's servers" transmit them. ER56. The messages were "materially misleading as to who initiated the e-mail" because their "header information [did] not accurately identify the party that actually initiated the e-mail"—Power. ER58.

Judge Koh (who received the case when then-Chief Judge Ware retired) subsequently reaffirmed Chief Judge Ware's order, and denied Defendants' motion for reconsideration. ER3-36. For Defendants' computer fraud violations, she awarded $80,543—the amount Facebook expended in the course of investigating and trying to stop Defendants' actions. SER26. Regarding the CAN-SPAM violation, Judge Koh concluded that Defendants' conduct was "'egregious'"—they "undisputedly utilized the incentive of monetary payments as a means to access Facebook users'

accounts"; they "undisputedly designed a system that would circumvent Facebook's blocking efforts"; and they acted "knowingly and willfully." ER25-26. Defendants' violation subjected them to potential liability of over $18 million ($100 per message, trebled) but, "exercising [her] broad discretion to determine an appropriate damages award," Judge Koh awarded only $50 per message, and declined to treble. ER26-28.

Next, Judge Koh determined that Vachani should be held jointly and severally liable with Power for these violations. "Drawing all reasonable inferences in the light most favorable to Vachani …, the undisputed facts prove that Vachani authorized and directed" the unlawful activities. ER20. Vachani's own admissions established conclusively that he was the "guiding spirit" behind Power's malfeasance. ER20-23. Vachani "admitted that the Power 100 campaign was his very own idea" and that "he managed the campaign's implementation." ER20. He also "admitted that he directed the company's decision to circumvent Facebook's blocks of Power['s] IP addresses." ER21.

Judge Koh next issued an injunction. Citing Defendants' clear willingness to keep violating the law in the face of clear and repeated requests to stop, she found that injunctive relief was necessary, among other reasons, to prevent additional violations. ER33. Judge Koh also noted that Defendants' insolvency and

the irreparable harm to Facebook's goodwill with its users weighed in favor of equitable relief.  ER30-35.

The judgment also included a discovery sanction of approximately $39,000. Power and Vachani were sanctioned for failing to timely produce the reams of important internal emails on Vachani's hard drive, and for Vachani's lack of preparation and "argumentative" and "evasive" responses during a Rule 30(b)(6) deposition.  SER184-86, 189-90.  Magistrate Judge Spero ordered Defendants to pay Facebook's costs incurred in connection with a second deposition necessitated by their misconduct.  ER43; *cf. also* ER25 (Judge Koh noting evidence that Defendants deleted documents while district-court proceedings were underway).

## SUMMARY OF ARGUMENT

I.     Power had no right to access the Facebook website after Facebook demanded that Power keep out, and imposed technical measures to enforce that command.  The undisputed facts show that Power deliberately circumvented this IP block, repeatedly changing its IP address so that Facebook's servers would no longer recognize it as a banned user.  Like a trespasser who jumps a fence—here, a digital fence targeted at Defendants themselves, accompanied by repeated demands to stay out—this circumvention constituted access "without authorization" and "without permission" in violation of federal and state law.

13

II.     Once inside Facebook's system, Defendants initiated over 60,000 unsolicited electronic advertisements to Facebook users, which were disguised to look like messages from the users themselves, not Power. Because these messages contained "materially misleading" header information, Defendants violated the CAN-SPAM Act.

III.     The district court properly held Vachani personally liable for Power's unlawful actions, because he personally directed and controlled them. By Vachani's own admission, he was the architect of Power's actions—he instructed programmers to create software to circumvent Facebook's technical measures, devised the Launch Promotion, and personally authored the messages giving rise to Power's CAN-SPAM violation.

IV.     Magistrate Judge Spero properly imposed discovery sanctions against both Power and Vachani. Only Vachani now appeals them, and his challenge is forfeited; he did not object to the magistrate judge's order in the district court. Judge Spero did not abuse his discretion in any event. Vachani withheld critical documents despite his own sworn statement that he had complied with all production orders, and he was so unprepared and combative during his deposition that a second deposition was needed. Magistrate Judge Spero properly determined that Vachani's personal conduct gave rise to this unnecessary expense.

V.    The district court did not abuse its discretion when it enjoined Defendants from accessing Facebook. The court correctly balanced the required factors, all of which favored equitable relief given Defendants' willfully defiant conduct. In finding that misconduct was likely to recur without an injunction, the court did not clearly err.

## ARGUMENT

## I.    THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO FACEBOOK ON ITS CLAIMS UNDER THE CFAA AND § 502.

Defendants Power and Vachani are modern-day trespassers who climb digital rather than physical fences. Facebook repeatedly told Defendants to keep out of the Facebook website, and erected technological barriers to enforce that demand. Yet Defendants circumvented Facebook's countermeasures with their "workaround solution" in order to bombard Facebook users with misleading Power advertisements. Because accessing a computer "without authorization" or "permission" violates federal and state law, and because the material facts are undisputed, the district court correctly granted summary judgment. Reviewing de novo, *see LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1130 (9th Cir. 2009), this Court should affirm.

A.   **Circumventing Technical Barriers To Access A Computer Is Access "Without Authorization" Under The CFAA, And "Without Permission" Under § 502.**

For centuries, the law has protected private land by prohibiting physical trespass; now, the digital domain receives similar protection.  The CFAA prohibits "intentionally access[ing] a computer without authorization or exceed[ing] authorized access, and thereby obtain[ing] information from any protected computer." 18 U.S.C. § 1030(a)(2)(C).  Similarly, the California Comprehensive Computer Data Access and Fraud Act imposes liability on anyone who "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, [or] computer system"; "knowingly and without permission uses or causes to be used computer services"; or "knowingly and without permission accesses … any computer system."  Cal. Penal Code § 502(c)(2), (3), (7).

The aim of the federal statute—and the California provision, which is materially identical[3]—is to prohibit "acts of computer trespass" by those who are not "authorized user[s]" of a computer system.  S. Rep. No. 99-432, at 9-10 (1986), *reprinted in* 1986 U.S.C.C.A.N. 2479, 2487.  Just as an intruder who jumps a fence

---

[3] *See DocMagic, Inc. v. Ellie Mae, Inc.*, 745 F. Supp. 2d 1119, 1150 (N.D. Cal. 2010); *Multiven, Inc. v. Cisco Sys., Inc.*, 725 F. Supp. 2d 887, 895 (N.D. Cal. 2010); ER63 (decision below).  Defendants now assert (Br.38-39) that the two statutes are different, but they treated the statutes the same in the district court, *see* SER262-63, and identify no difference.

will be liable for trespass, *see* Restatement (Second) of Torts § 158; Model Penal Code § 221.2(2)(c), the digital intruder is liable for "the circumvention of technological access barriers." *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012) (en banc); *see also* SER160 (Power's general counsel likening Power's activity to "trespass to chattels").

As this Court has explained, the CFAA provides robust protection against "violations of restrictions on *access* to information," but stops short of enforcing "restrictions on its *use*." *Nosal*, 676 F.3d at 864 (emphasis in original); *see also id.* at 863 (no liability for mere "violations of a company or website's computer use restrictions"). Thus, one who "circumvents the security measures" put in place to keep him out of a computer, in order to "obtain[] access to information in [that] computer," violates the statute. *Id.* at 858; *accord People v. Lawton*, 48 Cal. App. 4th Supp. 11, 12 (1996) (§ 502 liability for a library patron who used a public computer "to bypass security and penetrate levels of software not open to the public"); Orin S. Kerr, *Cybercrime's Scope: Interpreting 'Access' and 'Authorization' in Computer Misuse Statutes*, 78 N.Y.U. L. Rev. 1596, 1649 (2003) ("access 'without authorization'" should be defined as "access that circumvents restrictions by code").

*Nosal* (at 863) reaffirmed *LVRC Holdings LLC v. Brekka*, which held that the "'ordinary, contemporary, common meaning'" of the statutory term "authoriza-

17

tion" is "'permission or power granted by an authority.'" 581 F.3d at 1132-33 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). A computer's owner gives a user "'authorization' to access a … computer when the [owner] gives the [user] permission to use it." Otherwise, a person "has no rights, limited or otherwise, to access the computer in question." *Id.* at 1133. It is "the [owner]'s decision to allow or to terminate a[] [user's] authorization to access a computer" that "determines whether the [user] is with or 'without authorization.'" *Id.* And so "a person uses a computer 'without authorization' under §§ 1030(a)(2) and (4) when the person has not received permission to use the computer for any purpose …, or when the [owner] has rescinded permission to access the computer and the defendant uses the computer anyway." *Id.* at 1135.

The clearest form of access without authorization is when a user "circumvent[s] technological access barriers" erected to keep that person out. *Nosal*, 676 F.3d at 863. As Defendants' own amicus acknowledges, "[i]f a particular technological restriction seeks to control access to or use of data from an entity unauthorized to obtain it, and the person has notice of that fact, then evasion of the technological restriction is likely" a statutory violation. Brief Amicus Curiae of the Electronic Frontier Foundation (EFF Br.) 12. That is precisely what occurred here.

### B.    Defendants Circumvented The Technical Barriers That Facebook Instituted To Block Access.

"[T]he undisputed facts establish that Defendant circumvented technical barriers to access [the] Facebook site, and thus accessed the site 'without permission.'"  ER62.  As the district court explained, "Defendants admit that they took, copied, or made use of data from [the] Facebook website without Facebook's permission to do so," ER59—and Defendants were forced to admit that they did so even after "receiving notice that [their] use of or access to FACEBOOK was not permitted by FACEBOOK," SER280 (admission 22).   Indeed, the evidence is "overwhelming … that Defendants designed their system" to evade Facebook's attempts to block their access, which Defendants knew were put in place to keep them out.  ER62.  Defendants now claim that their admitted access without permission was not access "without permission" or "without authorization" as the statutes use those terms.  *E.g.*, Br.43.  Defendants are wrong.

Facebook sent Defendants a cease-and-desist letter on December 1, 2008—the very first day Power connected to and began harvesting data from the Facebook website.  It wanted them to use available integration tools; to stop scraping Facebook content to display on power.com, which compromised the security of Facebook data; and to stop their spamming, an annoyance that diminished the experience on Facebook.  ER48; *see* SER298-99; *supra* at 4-7.  Facebook instructed

Power to "remove[] compatibility with Facebook from your website," SER299—
an unequivocal message to "keep out" of Facebook's computers.

Defendants fully understood this, acknowledging internally that "they want
us to … [r]emove the compatibility with Facebook from our site," and that "what
we are doing may be considered web scraping," which could create "liab[ility] for
'trespass to chattels.'" SER159-60. Nonetheless, Vachani instructed his staff,
"'we need to be prepared for Facebook to try and block us and then turn this into a
national battle that gets us huge attention.'" ER61 (quoting SER285). And he ex-
claimed that "[t]his is exciting." SER285. As Defendants admit, "after receiving
FACEBOOK's December 1, 2008 letter, [they] used automated scripts or COM-
PUTER CODE to collect information from, or otherwise interact with, the FACE-
BOOK WEBSITE." SER281 (admission 37).

To enforce its demand, on December 12 Facebook walled off "Power's ac-
cess to the site by blocking what appeared to be its primary IP address." ER61;
SER398. And Facebook wrote Power to provide notice that it "ha[d] taken tech-
nical measures to limit the interaction between Power.com and its network,"
SER312 (response 5), 330 (admission 53).

Power then "use[d] the computer anyway," *Brekka*, 581 F.3d at 1135, by
"circumvent[ing] [those] technological access barriers." *Nosal*, 676 F.3d at 863.
Power "circumvent[ed] the block by using other IP addresses" so it could recon-

nect to Facebook, ER61, just as a harassing caller whose phone is blocked might start calling from a different phone. Vachani had been developing this strategy since at least 2005, when he told a colleague that "'we also need to do some planning to make sure that we [scrape a website's content] in a way where we are not really detected. [P]ossible rotating IP's or something…. [W]e need to plan this very carefully…. [W]e might need to rotate with over 200 IP's or even more to do it perfectly.'" ER61 (quoting SER250-51). Thus, Power set up its "proxy server software … to ensure that it is not being blocked by Facebook," by "continuously monitor[ing]" which IP addresses Facebook had detected and begun to block, and "replac[ing]" those addresses "with another IP address from the Power Proxy Manager." SER386-87. This "workaround solution" allowed Defendants to avoid Facebook's blocks.

Then, on December 18, Vachani directed his staff to "make sure that our Amazon[.com] solution is working." SER292. This meant routing Power's "connections to Facebook through new IP addresses associated with" the giant online retailer, which Facebook could not block because these "new IP addresses … were shared with numerous innocent third parties." SER399. By deliberately and repeatedly circumventing Facebook's blocks of Power's IP addresses, Defendants retained access to the Facebook website, which allowed them to send thousands of messages through Facebook advertising Power's "Launch Promotion." ER47-48,

21

55. Vachani then notified Facebook that Power had "made the business decision" to ignore Facebook's demand. SER302.

That Defendants' circumvention was planned and deliberate is further proven by evidence improperly withheld until late in the district court proceedings—conduct for which they were sanctioned, *see infra* at 51-52. Vachani's marching orders were clear: "'please just make sure they cannot block us,'" ER21 (quoting SER82), because "if they can't block us, this will give us a lot of power … we can then create lots of media attention at the right time." SER82. Internal e-mails reveal that shortly after Facebook's blocks went up, Defendants implemented their "workaround solution 1"—"a proxy solution that allows access to Facebook through different IPs from our web servers." SER88.

When Power was "blocked by Facebook yet again" a few days later, Defendants again circumvented the block by "configur[ing] a server at Amazon to serve as [a] Proxy." SER87. This prompted Defendants to try "to develop a solution to create proxy servers every six hours automatically," because they were "sure [Facebook] will continue blocking our service." SER87. As Vachani acknowledged, Defendants kept making "updates" and "adjustment[s]" to its serv-

ers, which were "necessary to continue access[ing]" Facebook. SER66, 70.[4] These "undisputed facts show that Vachani anticipated Facebook's attempts to block [Power's] access," then "instructed employees to circumvent the blocks he anticipated." ER21.

For all of these reasons, Defendants are simply wrong to assert that Facebook made no "showing that Power took any steps whatsoever to 'circumvent' Facebook's ineffective technical measures," and that Facebook sought only "to limit—but admittedly not to block" Power's access to the Facebook site. Br.44; *see also* EFF Br.14. The only evidence Defendants cite is Vachani's bald assertion in an early declaration that "Power did not undertake any effort to circumvent that block." Br.15 (quoting ER173). Not only is this conclusory statement legally in-

---

[4] At the time Chief Judge Ware ruled, the evidence improperly withheld by Defendants had not yet come to light. The evidence at that time indicated that Power had preemptively "implemented a system that would be immune" to the blocks it anticipated Facebook would impose. ER62. The court properly held that the sequence of events was irrelevant because whether Power designed its circumvention methods before or after Facebook blocked Power, Power's use of those methods *once the blocks were in place* constituted access without authorization. ER62. That was correct; an intruder who digs a tunnel below where he knows a fence will be built, then uses that tunnel to circumvent the fence once it is up, is no less a trespasser. And ultimately, Judge Koh explained that "the undisputed facts show[ed]" that Defendants did "circumvent Facebook's blocks of [Power's] IP addresses" after the fact, "to ensur[e] that Power Ventures continued to have access to Facebook." ER21; *see* SER66, 70.

sufficient to create a factual dispute;[5] Vachani later disavowed it. When confronted at a later deposition, Vachani admitted that Defendants *had* taken efforts to circumvent the block, and that his earlier statement "should be updated to more accurately reflect" the facts. SER71-72.

The undisputed evidence shows that Defendants intentionally circumvented Facebook's blocks, and accordingly violated both statutes. Defendants had no "authorization to access [Facebook's] computer[s]" when Facebook blocked Power's IP address and communicated the reason for that block. *Brekka*, 581 F.3d at 1133. Under *Nosal* and *Brekka*, this rendered Defendants "without authorization" under the CFAA, and "without permission" under § 502. *Id.* at 1135.[6]

In a thoughtful and persuasive decision, another court recently reached the same conclusion on very similar facts. The online classifieds service Craigslist sued a company that "copies (or 'scrapes') all content posted to Craigslist" and "aggregates and republishes" that content on its own website. *Craigslist Inc. v. 3Taps Inc.*, 964 F. Supp. 2d 1178, 1180 (N.D. Cal. 2013). Like Facebook here,

---

[5] *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) ("[c]onclusory ... testimony in affidavits and moving papers is insufficient to raise genuine issues of fact").

[6] Having ruled for Facebook under § 1030(a)(2), the district court did not reach Facebook's alternative claim that Power violated 18 U.S.C. § 1030(a)(4) by using unauthorized access to commit "fraud and obtain[] something of value." If summary judgment on § 1030(a)(2) were overturned, the case should be remanded to consider § 1030(a)(4).

Craigslist "sent a cease and desist letter," and "configured its website to block access from IP addresses associated with 3Taps." And, like Defendants, "3Taps bypassed that technological barrier by using different IP addresses and proxy servers to conceal its identity, and continued scraping data." *Id.* The court explained that although "Craigslist gave the world permission (i.e., 'authorization') to access the public information on its public website," it had "rescinded that permission for 3Taps," "just as *Brekka* instructed that an 'authority' can do." *Id.* at 1184. The combination of Craigslist's "cease-and-desist letter and IP blocking efforts" put "3Taps on notice that Craigslist had banned 3Taps, … so it indisputably knew that Craigslist did not want it accessing the website at all." *Id.* Consequently, any "[f]urther access by 3Taps after that rescission was 'without authorization.'" *Id.* The same is true here.

"The law of trespass on private property provides a useful, if imperfect, analogy. Store owners open their doors to the public, but occasionally find it necessary to ban disruptive individuals from the premises." *Id.* at 1187. In the same way that a restaurant may eject an unruly patron and direct the maître d' to keep him out, Facebook prohibited Power from accessing its website by telling Defendants to stay away and blocking Power's IP addresses. And, like the patron who sneaks back in through a window, Defendants then accessed Facebook "without authorization" or "permission."

## C.    Defendants' Remaining Arguments Are Contrary To Law.

Defendants identify no issue of disputed fact, nor offer any serious explanation how someone who is told to stay out, then circumvents an IP block, is operating with "authorization."  The arguments that Defendants do make misunderstand the statute.

*First*, Defendants contend that "Power did not access any nonpublic portion of Facebook's website."  Br.36.  The question, however, is not whether the website was "public," but whether Facebook authorized Power to access it.  *Supra* at 17-18.  Defendants' argument seems motivated by a basic unwillingness to accept that Facebook is entitled to determine who may access its service.  Br.44 (discussing Defendants' claimed right to "access … Facebook's public data"); Br.52 (suggesting Defendants are entitled to "seek[] to enhance social network technology" they do not own); SER303-04 (letter from Vachani cautioning Facebook that "[t]he borderless web is inevitable" and advising that the "floodgates are about to open").[7]  *Brekka*, however, makes clear that the computer owner has the power to

_____

[7] EFF similarly seeks an exemption for "follow-on innovators who seek to create tools to improve a user's experience with a particular service."  EFF Br.15.  That policy argument is unmoored from the statutory text, and is properly directed to Congress.  *See Craiglist*, 964 F. Supp. 2d at 1187.  The law clearly entitles Facebook to restrict access to its computers, including by those who abuse their welcome.  For similar reasons, EFF is mistaken to argue that Defendants did not "access[] data without a [Facebook] user's knowledge and permission."  EFF Br.10.  Permission to access Facebook's servers is Facebook's to give or withdraw.  *See*

26

"deci[de] [whether] to allow or to terminate a[] [user's] authorization to access a computer." 581 F.3d at 1135; *cf. Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1080 (S.D. Cal. 2012) ("There is no fundamental right to use Facebook.").

*Second*, Defendants assert that "[w]here there is no breach of system integrity nor harm to one's wellbeing … there can be no statutory violation of § 502." Br.43. Defendants cite no authority for this proposition, and there is none. Section 502(c)(7) extends to *any* knowing and unpermitted "access[]" of a computer. The fact that "mere browsing … may cause little or no harm" is not a defense to liability; it is why "the statute appropriately sets modest penalties for unaggravated behavior." *Lawton*, 48 Cal. App. 4th Supp. at 16 (internal quotation marks omitted).

*Third*, Defendants call the court's order "astounding" because "Facebook's so-called technical measure was merely to block a single outdated IP address," and any action "to circumvent Facebook's block … would have been futile since Facebook's 'block' was ineffective anyway." Br.45. But the undisputed evidence shows that Facebook blocked multiple IP addresses associated with Power, in an ongoing attempt to keep up with Defendants' repeated circumventions. *Supra* at 8, 20-22. And whether Facebook's blocks were effective is beside the point; "IP

---

*Brekka*, 581 F.3d at 1133; *cf. Facebook, Inc. v. ConnectU LLC*, 489 F. Supp. 2d 1087, 1091 (N.D. Cal. 2007).

blocking may be an imperfect barrier to screening out a human being who can change his IP address, but it is a real barrier, and a clear signal from the computer owner to the person using the IP address that he is no longer authorized to access the website." *Craigslist*, 964 F. Supp. 2d at 1186 n.7. The lack of authorization, as evidenced by the creation of a technical barrier, is what matters under the statute, not the sophistication of the barrier imposed to give notice of that prohibition on access. A landowner who erects a three-foot fence and posts a "Keep Out" sign is not barred from asserting trespass because the fence was easily jumped.

For similar reasons, EFF's discussion of hypothetical innocuous reasons for changing IP addresses misses the point. EFF Br.4-9. The statutes create liability for unauthorized access. Defendants changed their IP addresses repeatedly for the express purpose of obtaining access to Facebook that they knew was unauthorized, not for innocuous reasons. Indeed, EFF ultimately must agree that "§ 502 or the CFAA could … prohibit bypassing a technological block" if "a service provider blocked to prevent access by unauthorized persons who evaded that block in order to gain access." EFF Br.11. That is this case.

*Finally*, Defendants argue that Facebook's technical blocks are unenforceable because they were motivated by Power's noncompliance with Facebook's "Terms of Use, which this Court has already determined is not a factor in determining the 'authorization' prong of § 502 or the CFAA." Br.45; *see also* EFF

28

Br.12. *Nosal* did hold that violating a computer owner's terms of use is not by it-self *sufficient* to violate the CFAA. 676 F.3d at 860-63. But nowhere did *Nosal* suggest that unauthorized access (i.e., by "circumvent[ing] technological access barriers," *id.* at 863) is *immunized* if the barriers were put in place to enforce terms of use. In the digital realm as well as the physical, the decision to ban someone from the premises is likely to be motivated by violations of a proprietor's rules ("No shirt, no shoes, no service"). While the use restrictions may not themselves be enforceable through the CFAA, the denial of access is. ER83.

*Nosal*'s concern was that "[s]ignificant notice problems arise if we allow criminal liability to turn on the vagaries of private polices that are lengthy, opaque, subject to change and seldom read." 676 F.3d at 860. But "[t]he calculus is differ-ent where a user is altogether banned from accessing a website. The banned user has to follow only one, clear rule: do not access the website. The notice issue be-comes limited to how clearly the website owner communicates the banning," and a "cease-and-desist letter" coupled with "IP blocking efforts" will suffice. *Craigslist*, 964 F. Supp. at 1184. Here, it is undisputed that Defendants were on clear notice in just those ways. *E.g.*, SER159-61, 330 (admission 53).

### D. Facebook Presented Undisputed Evidence Of "Damage Or Loss."

Both the CFAA and § 502 require a private plaintiff to establish damage. As relevant here, a CFAA claim is available to one "who suffers damage or loss by

reason of a violation of this section," 18 U.S.C. § 1030(g), if the violation caused at least $5,000 of loss during a one-year period, *id.* § 1030(c)(4)(A)(i)(I), (g); *see Brekka*, 581 F.3d at 1131-32.  Section 502 requires only that the plaintiff "suffer[] damage or loss by reason of a violation."  Cal. Penal Code § 502(e)(1).  The district court correctly determined that Facebook made the required showing.  ER 63, 70-72.[8]

1.  The CFAA defines "loss" in relevant part as "*any* reasonable cost to any victim, including the cost of responding to an offense, [or] conducting a damage assessment."  18 U.S.C. § 1030(e)(11) (emphasis added).  Facebook "provided uncontradicted evidence of the costs" it incurred in "attempting to thwart Defendants' unauthorized access into its network."  ER63.  These "documented costs were well in excess of the $5000 CFAA threshold."  *Id.*

As discussed in detail in the uncontroverted declaration of Facebook's Security Manager, Ryan McGeehan, "Stopping the activity originating from Power.com was a substantial effort taking a considerable amount of time."  SER398.  The company's Security Incident Response team had to

---

[8] Defendants call this a question of "standing," Br.28, but there is no dispute that Facebook suffered injury-in-fact.  Whether a plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" is a question of the "element[s] of a cause of action," not "standing."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 & n.4, 1391 n.6 (2014); *accord Brekka*, 581 F.3d at 1132 (listing the loss requirement as an element of the CFAA).

- "analyz[e] the complexity of the attack";

- "determine how many IP addresses were being used to send spam";

- "investigat[e] the harvesting and use of Facebook user data by the operators of the Power website";

- "block[] what appeared to be the Power website's primary IP address";

- block Power's new IP addresses in a time-consuming "game of 'cat and mouse'"; and

- coordinate with Facebook's Site Integrity team on "prevent[ing] further attacks" by "stop[ping] the Power website from proxying Facebook."

SER396-98. All this cost Facebook $5,000 in personnel time, SER50, and the evidence on this point was undisputed, *see* ER28 & n.13 ("Defendants never filed a rebuttal brief to Facebook's expert report regarding the monetary damages Facebook incurred").[9] In addition, Facebook's representatives spent many hours investigating Power's activities and communicating to Defendants that Facebook had rescinded their access—a process that Vachani prolonged when he deceived Facebook, promising to comply while instructing his staff to do the opposite. SER390-

---

[9] Defendants' newly asserted estimate of the value of these services (Br.24 & n.17) is unsupported by any evidence in the record.

92; *compare* SER302-08 (Vachani's correspondence with Facebook) *with* SER82, 87-88 (internal Power emails from the same time). This response cost Facebook about $75,000 more in fees in late 2008 and early 2009. SER50, 392.

These expenditures fall within the plain terms of "the cost of responding to an offense" and "conducting a damage assessment," 18 U.S.C. § 1030(e)(11), as other courts have held in analogous circumstances. The Fourth Circuit, for example, has explained that "[t]his broadly worded provision plainly contemplates … costs incurred as part of the response to a CFAA violation, including the investigation of an offense." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009); *see also Multiven*, 725 F. Supp. 2d at 895 ("Costs associated with investigating intrusions into a computer network and taking subsequent remedial measures are losses ….."); *SuccessFactors, Inc. v. Softscape, Inc.*, 544 F. Supp. 2d 975, 980-81 (N.D. Cal. 2008) (the costs of investigating and identifying the offense, including "time away from day-to-day responsibilities," were recoverable).

Notwithstanding the statute's plain definition of "loss," Defendants contend that Facebook had to "demonstrate … that their network suffered disruption or slowdown" to state a claim. Br.28. Even assuming that the diversion of key engineering personal is not a disruption, the statute imposes no such requirement; Defendants' argument depends on aggressively editing the statutory text. Compare

Defendants' characterization against the full text (with the language omitted by

Defendants in strikethrough):

| Defendants' characterization | 18 U.S.C. § 1030(e)(11) |
|---|---|
| "The CFAA defines 'loss' as 'any reasonable cost to any victim, including the cost of responding to an offense … incurred *because of interruption of service* ….'" | "[T]he term 'loss' means any reasonable cost to any victim, including the cost of responding to an offense, ~~conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages~~ incurred because of interruption of service." |

The phrase "incurred because of interruption of service" modifies the second half

of the provision (i.e., "and any revenue lost, cost incurred, or other consequential

damages"); it does not apply to the first half of the definition. As Defendants' own

authority (Br.28) recognizes, "'Loss,' … means *two things*: 'any reasonable cost to

the victim' *and* lost revenue or other damages incurred as a result of an interrup-

tion of service." *AtPac, Inc. v. Aptitude Solutions, Inc.*, 730 F. Supp. 2d 1174,

1184 (E.D. Cal. 2010) (emphases added); *Farmers Ins. Exch. v. Steel Ins. Agency,*

*Inc.*, No. 2:13-cv-00784-MCE-DAD, 2013 WL 3872950, at *21 (E.D. Cal. July 25,

33

2013) (same). The costs of investigating and responding to unauthorized access are "reasonable costs."[10]

2.     For the same reasons, Facebook even more easily satisfies § 502(e)(1), which requires "damage or loss" but (unlike the CFAA) imposes no minimum dollar figure. Defendants' sole response is to point to the deposition of one of Facebook's attorneys. Br.30-31. The attorney—who "was deposed in his personal capacity, rather than pursuant to [Rule] 30(b)(6)," ER53—merely said that, "[a]s [he] sit[s] here today [he] couldn't identify any document" showing "injury that Facebook suffered." Br.31. The fact that one particular, nontechnical witness could not at that moment think of documents associated with his company's technical efforts hardly means that there was no evidence—and as set forth above (at __), the evidence was uncontradicted that Facebook spent considerable sums investigating and responding to Power's scraping and spamming of its system. The district court correctly found no issue of material fact as to whether Facebook suffered "loss."

---

[10] Defendants assert that *Farmers* "made quite clear" that "attorney fees" cannot count toward the $5,000 minimum. Br.29. But *Farmers*'s discussion of the CFAA makes no mention at all of legal fees, let alone holds that they must be excluded. *See generally* 2013 WL 3872950.

## II. THE DISTRICT COURT PROPERLY GRANTED SUMMARY JUDGMENT TO FACEBOOK ON ITS CLAIMS UNDER THE CAN-SPAM ACT.

Having evaded the barriers put in place to exclude them from Facebook, Defendants co-opted users' accounts to send at least 60,000 electronic junk messages through the Facebook system to Facebook users. Defendants sent those messages in a way that deliberately obscured the fact that they came from Power itself, and instead made the messages appear to have been sent by the recipients' Facebook friends. As the district court properly recognized, the material facts were undisputed, and when Defendants initiated these materially misleading messages, they violated the CAN-SPAM Act. ER58-59. That judgment was correct, and reviewing de novo, *see Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1045, 1047 (9th Cir. 2009), this Court should affirm.

### A. Defendants' Messages Had "Header Information That Is Materially False Or Materially Misleading."

1. The CAN-SPAM Act of 2003 was enacted to address the "rising tide" of "unsolicited commercial e-mail, more commonly referred to as 'spam.'" *Id.* at 1044-45. Cheap and easy to send *en masse*, these messages are "a nuisance and a source of frustration to e-mail users." *Id.* at 1045. Congress thus sought to ensure that "senders of commercial electronic mail [w]ould not mislead recipients as to the source or content of such mail," and that recipients of such messages could "decline to receive additional commercial electronic mail from the same source."

15 U.S.C. § 7701(b)(2), (3). Congress specifically authorized Internet service providers like Facebook to enforce these anti-spam rules. § 7706(g)(1).

The Act targets electronic messages "that contain[], or [are] accompanied by, header information that is materially false or materially misleading." § 7704(a)(1). "Header information" is like a return address label: It is "the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message," § 7702(8). This is information a recipient would need "to reject (or 'opt-out' of) receipt of commercial electronic mail from such senders in the future." § 7701(a)(9). Congress also focused on header information because "[m]any senders of unsolicited commercial electronic mail purposefully disguise the source of such mail" and "purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages," which recipients might otherwise have ignored. § 7701(a)(7), (8).

Defendants' messages involved just this sort of deception. They sent two types of messages, which they made appear to come from Facebook users rather than from Power. *First*, Defendants sent messages *within* the Facebook system via an automated program they called "PowerScript." SER381-82. The program began by presenting the user with this image on power.com:



ER101.  The "share with friends" options were pre-selected, and the user was not

told what would happen if she clicked the "Yes, I do!" button.   What happened, in

fact, was that without warning the user, Defendants' program employed her Face-

book login credentials to access her list of friends, harvested that list, generated the

content for an outgoing message or "event invitation," and sent messages under her

name promoting Power to her friends.  SER381-82, 486-89, 492-93; *see* SER218

(Defendants' concession that no evidence contradicts Facebook's expert report de-

tailing how Power's system operated).

So the undisputed evidence showed that these messages were not "created

by Facebook users" themselves, as Defendants now suggest (Br.9), but rather by

Defendants' automated system; users never saw nor completed the forms Defend-

ants depict (Br.10-11).   Indeed, at no point could the user review or approve the

language of the message she purportedly was sending.  Yet the messages—whose

text was conceived and drafted by Vachani—were written to sound like the user was writing to her friends directly:

> I am competing for the $100 prize in the 100x100x100 promotion and recommend you to participate too!

> Learn more at [power.com website]. First 100 people who bring 100 new friends to Power.com earn $100. Come and participate too!

SER382-83, 488.

*Second*, these internal messages caused emails to be sent to many Facebook users' *external* email addresses. SER381-85, 396-97, 489-91. Those messages also appeared to come from the recipient's friend, notwithstanding that they (like the others) were initiated by Defendants.[11]   The messages were titled "[user name] in-

---

[11] Defendants have not challenged the court's conclusion that they "initiat[ed]" the messages within the meaning of the Act. *See* Br.31-35; *see generally Cruz v. Int'l Collection Corp.*, 673 F.3d 991, 998 (9th Cir. 2012) (issues not "'argued specifically and distinctly in a party's opening brief'" are waived). This is with good reason. Facebook's expert provided uncontradicted analysis that, exploiting their access to users' Facebook accounts, Defendants used an automated script to "automatically send Facebook event invitations"—containing text "authored" by Defendants alone—from Facebook users to each "user's Facebook friends list" "on behalf of Power." ER55-56; *see* SER376, 381-85, 396-97; *see generally* 15 U.S.C. § 7702(9) (defining "initiate"). "To hold that" it was Facebook, not Defendants, who "originated the e-mails … would ignore the fact that Defendants intentionally caused Facebook's servers to do so, and created a software program specifically designed to achieve that effect." ER56. EFF (Br.21-24) cannot resurrect an argument that Defendants forfeited; they only address the external messages in any event; and they ignore that it was Defendants who caused the headers to misleadingly state that it was the Facebook user who "invited you to the event." ER187 ¶70; SER425 ¶70.

vited you to the event 'Bring 100 friends and win 100 bucks!'" Moreover, the "from" line of the messages stated that they came from "Facebook" and an "@facebookmail.com" address. And the body of the message was signed, "Thanks, The Facebook Team." ER187 ¶70; SER425 ¶70.

In short, the header information in both types of messages named the Facebook user and sometimes Facebook itself, but not the party that actually wrote and sent the message: Power.

Defendants respond that they had no "control over these elements of the email message." Br.12; *see also* EFF Br.26-27. As the district court recognized, this is "irrelevant." ER58. Nothing in the Act "requires that the user actually create the misleading header information, as opposed to utilizing a system already in place to auto-generate a header." ER58 n.33. And Defendants admitted they did not have to use Facebook's system at all. SER220. Rather, Defendants *wanted* to do so—both to gain easy access to a list of all a user's friends, SER220-21, and to "induce" message recipients "to view the messages," by making them look like a recommendation from a friend, § 7701(a)(8). In the words of Power's own technology director, "It is important that we ensure the [Launch Promotion] campaign achieves the maximum exposure possible and therefore PRIVATE MESSAGES TO ALL FRIENDS must also be sent as part of it." SER100. In short, "the header

information is materially misleading as to who initiated the e-mail" because it "does not accurately identify the party that actually initiated the e-mail." ER58.[12]

2. Defendants also contend that, even if the header information was false or misleading, it was not *materially* so. Br.32-35. They call it "remarkabl[e]" that the district court "[made] no determination of materiality," Br.33—but in fact, the court specifically found "that the header information is materially misleading." ER58. If Defendants mean to criticize the court for not discussing materiality at length, that is their own fault: Defendants never raised this issue below. *See* Doc.234. Accordingly, this Court should apply its "'general rule' against entertaining arguments on appeal that were not presented or developed before the district court." *Peterson v. Highland Music, Inc.*, 140 F.3d 1313, 1321 (9th Cir. 1998).

Defendants are wrong anyway. They argue that "'false' header information" must be "transmitted for the purpose of disguising the messages' origin" to "satisfy the definition of materiality under § 7704(a)(1)(C)." Br.34. But § 7704(a)(1)(C) does not state an exclusive definition of "materiality." It is one of three different circumstances that § 7704(a)(1) identifies as *sufficient* (or insufficient) to establish

---

[12] EFF is therefore mistaken to argue that if Power is liable here, then "individual users who compose" Facebook messages also would violate the statute. EFF Br.17-18, 29-30. Unlike here, when a *user* initiates the message, including his name in its header would be accurate. *See* ER187 ¶70 ("[User] invited you to …").

40

materiality—but none of the three is *necessary* for materiality. And even if they were, Defendants' conduct satisfies them all. Defendants "obtained" access to the "originating electronic mail address … by means of false or fraudulent pretenses or representations" when they did not tell Facebook users that Power would use their login credentials to run automatic scripts that would spam their friends from their account, § 7704(a)(1)(A); the "'from' line" does not "accurately identif[y] any person who initiated the message"—i.e., Power, *see* § 7704(a)(1)(B); and Defendants used Facebook's "protected computer[s] to relay or retransmit the message[s] for purposes of disguising [their] origin," § 7704(a)(1)(C), as we have explained (*supra* at 37-39).

Defendants also find significant that, in the messages, Power "[made] its identity known." Br.34-35. But the relevant question is whether the *header information* is accurate. Moreover, the references to Power in no way suggest that Power initiated the messages. On the contrary, the internal messages were written to suggest that the user was "recommend[ing]" the Power website, SER382-83, and the external email messages invited the recipient to a fictitious "Reunion" for which Power was the "host." Congress was concerned with people whose purpose was to disguise their messages' true nature, 15 U.S.C. § 7701(b)(2), "in order to induce the recipients to view the[ir] messages," § 7701(a)(8). That is just what happened here, and it is why "the presence of a misleading header in an e-mail is,

in and of itself, a violation of the CAN-SPAM Act." ER58.[13] (Whether anyone actually was "misled thereby," Br.35, is not the test.)

In the end, Defendants' messages contained far more than "mere inaccuracies," Br.32, or "trivial misrepresentations," EFF Br.26. Defendants took advantage of their access to Facebook users' accounts to masquerade as those users, in an attempt to lure the users' friends. This case therefore is unlike *Omega World Travel, Inc. v. Mummagraphics, Inc.*, which found minor "inaccuracies" in the header to be immaterial. 469 F.3d 348, 357 (4th Cir. 2006), *cited in* Br.32-33. Those headers merely contained nonfunctioning return email addresses—but not ones that purported to be someone else's, let alone the recipient's friend. And the header did list the true sender; contained a link to a site where the user could be

---

[13] Defendants also argue that there is no violation because the message would enable a recipient to "'identify, locate, or respond to a person who initiated the electronic mail message.'" Br.34 (quoting 15 U.S.C. § 7704(a)(6)). Because this argument is being raised for the first time on appeal, it too is waived. *See supra* at 40. Moreover, this statutory criterion is an example of what "the term materially … includes," § 7704(a)(6)—i.e., it is sufficient but not necessary to establish a violation. Defendants are incorrect in any event—their messages provided no return address for Power that would allow the recipient to "locate" or "respond" to the company. ER57-58; *cf.* §§ 7704(a)(3), 7704(a)(5) (specifying information required to be included in commercial email). And as a legal matter, Defendants again lose sight of the provision's scope: It is the "header information" that must allow the "recipient of the message to respond to a person who initiated the electronic message," not details buried in the text. § 7704(a)(6).

removed from future mailings; and "prominently displayed" phone numbers and a mailing address for the company. *Id.* at 357-58.

Much closer to this case is *Aitken v. Communications Workers of America*, in which a union "misappropriate[ed] … the identities" of Verizon managers by "creat[ing] Yahoo email addresses using the[ir] names" "for the purpose of sending pro-union, anti-Verizon e-mails to Verizon employees under the managers' names." 496 F. Supp. 2d 653, 655-56 (E.D. Va. 2007). *Aitken* explained that, "[w]hile the inaccurate 'from' line in *Omega World Travel* referred to a non-functional email address that was otherwise meaningless to the email's recipients, the inaccurate 'from' line here identified the email author as a Verizon manager"— a distinction that went to the "credibility" of the message. *Id.* at 667. Accordingly, the false header information was material, notwithstanding the union's argument that "it would be apparent to a reasonable reader that the emails did not actually originate from Verizon managers, but from union organizers." *Id.*

Sending a mailing so it appears to come from a friend rather than a commercial solicitor is plainly "material": one will be read with care, while the other is liable to be deleted before being opened. That is why Power proceeded as it did, and that is why the material falsity of these messages was obvious to Power's own staff; as a senior Power employee wrote Vachani, "Jesus Christ, man… [S]igning

43

someone else's name in a commercial email is just obvious to any layman that it is fraud." SER256.

**B.    Facebook Presented Evidence Of Damages Sufficient To Maintain Its CAN-SPAM Claim.**

Like the CFAA and § 502, the CAN-SPAM Act includes an element of harm.  Under § 7706(g)(1), "[a] provider of Internet access service *adversely affected* by a violation of section 7704(a)(1) … may bring a civil action … to enjoin further violation by the defendant; or … to recover damages" (emphasis added). The district court had little trouble finding that Facebook was "adversely affected" by "Defendants' spamming activity," which "was ongoing, prolific, and did not stop after requests from the network owner."  ER54.  The "significant resources" Facebook had to spend to "block Defendants' spamming activity" more than sufficed to show the required harm.  ER54.[14]

To prove a claim under the CAN-SPAM Act, an Internet service provider (ISP) must establish "harm" that is "both real and of the type experienced by ISPs"—"something beyond the mere annoyance of spam and greater than the negligible burdens typically borne by [ISPs] in the ordinary course of business."  *Gor-*

---

[14] This Court has previously referred to § 7706(g)(1)'s terms as "statutory standing requirements."  *Gordon*, 575 F.3d at 1048; *see* Br.23.  Nothing turned on that characterization which, the Supreme Court has made clear, is a misnomer.  *Supra* at 30 n.8.

*don v. Virtumundo, Inc.*, 575 F.3d 1040, 1053-54 (9th Cir. 2009). These harms may "include 'network crashes, higher bandwidth utilization, and increased costs for hardware and software upgrades, network expansion and additional personnel,'" although the Court hastened to clarify that it did "not purport to enumerate each and every harm that might satisfy" § 7706(g)(1), nor did it "suggest that the list is finite." *Id.* at 1053. Rather, the statute requires "common sense not dogma," *id.* at 1053 (internal quotation marks and brackets omitted), and it "should not pose a high bar for the legitimate service operations contemplated by Congress," *id.* at 1055. Indeed, "where … well-recognized ISPs or plainly legitimate Internet access service providers file suit[,] adequate harm might be presumed because any reasonable person would agree that such entities dedicate considerable resources to and incur significant financial costs in dealing with spam." *Id.*

Facebook is a "plainly legitimate" provider, *id.*, and easily satisfies *Gordon*'s standard. Defendants sent "at least 60,627" unsolicited messages to Facebook users. ER52. (The actual number is likely much larger; as the court noted, "[t]here is some evidence that Defendants … delete[d] evidence" after litigation began—an entire database "that should have recorded information about how many emails were sent to Facebook users." ER25-26 n.9; *see* SER144-45, 387-88; *see also* SER133-34, 150, 179. The volume of this activity required Facebook's security manager to assess what Defendants were doing, then "spen[d] substantial

45

time and effort" formulating a response "to contain Power's spamming." ER52-53; *see also* SER397-98. When Defendants refused to stop, Facebook was forced to implement "software upgrades," *Gordon*, 575 F.3d at 1053, "to block Power's access by blocking what appeared to be its primary IP address." ER52; *see also* SER398. Facebook then expended further resources to identify the new IP addresses Power adopted to circumvent Facebook's blocks, and block those ones too. ER52; *see also* SER398-99.

These were not the "negligible" and "ordinary costs and burdens associated with operating an Internet access service," like "secur[ing] adequate bandwidth and storage capacity and tak[ing] reasonable precautions" to reduce spam generally. *Gordon*, 575 F.3d at 1054. Rather, Facebook was drawn into a weeks-long battle with a determined opponent that forced Facebook to build a shield against its "on-going, prolific" bombardment. ER54. Facebook had to "dedicate considerable resources to and incur significant financial costs in dealing with [Defendants'] spam onslaught—a classic form of harm. *Gordon*, 575 F.3d at 1055.

Defendants respond that these costs were not "unusual or extraordinary," but they don't explain why not. Br.27. And the only authority they cite—an unpublished disposition applying *Gordon*—actually supports Facebook. In *ASIS Internet Services v. Azoogle.com, Inc.*, this Court found that the "mere cost of carrying SPAM emails over Plaintiff's facilities," and "ordinary [e-mail] filtering costs"

46

that "did not increase due to the emails at issue," were not cognizable. 357 F. App'x 112, 113-14 (9th Cir. 2009). The Court also could not credit the assertion that "employee time was spent on spam-related issues" because the provider had failed to substantiate that claim. *Id.* But here, Facebook documented the actions it took in direct response to Defendants' spamming operation. The many hours of engineering time spent wrangling with Defendants were not routine, preventative operations; they were lost solely because of Defendants' aggressive misconduct. "These specific responses to Defendants' actions distinguish [Facebook's] damages from those in the cases relied upon by Defendants, which asserted only the costs of general spam prevention." ER54.

Defendants next contend (Br.27) that "the record is rife with Defendants' disputes as to both the nature and amount of Facebook's claimed costs," but they cite no disputes of fact, nor did they below, as the district court recognized. ER53. This claim is therefore both impermissibly conclusory and waived. Finally, Defendants suggest (Br.27-28) that only a "threat to … data or security," or theft of "software, data, or other content of value from Facebook" should qualify as harm. But that is neither what the statute says, nor the sole sort of harm Congress set out to address when it enacted the CAN-SPAM Act. *See* § 7701(a). Moreover, by masquerading as Facebook users within the Facebook system, Defendants were themselves such a threat.

\*   \*   \*

Defendants circumvented Facebook's technical barriers for the express purpose of sending tens of thousands of misleading messages under the names of Facebook users and Facebook itself. In the process, Defendants violated the CFAA, § 502, and the CAN-SPAM Act, and imposed substantial costs on Facebook. Based on the undisputed facts, the district court was correct to grant summary judgment, and its decision should be affirmed.

## III. UNDISPUTED FACTS ESTABLISH VACHANI'S PERSONAL LIABILITY FOR THE UNLAWFUL CONDUCT HE DEVISED AND DIRECTED.

"A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf." *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 734 (9th Cir. 1999) (citing multiple authorities; adjudicating Lanham Act claim). Applying the traditional summary judgment standard, Judge Koh determined that "the undisputed facts prove that Vachani authorized and directed these activities." ER20.

*First*, with regard to creating the Launch Promotion and the software that caused Facebook's servers to send misleading emails, Vachani admitted that the "Power 100 Campaign" was his idea, and that he managed its implementation, and "control[ed] and direct[ed]" it, including with regard to Facebook. ER20-21 & n.5

(citing SER77, 205, 313-14); *see also* SER58-59, 69-71, 77-79, 82, 153-54, 165 (response 7); *supra* at 37-38. *Second*, Vachani was the mastermind behind Defendants' efforts to circumvent Facebook's technical barriers in order to harvest data. "Vachani admitted that he directed the company's decision to circumvent Facebook's blocks of Power Venture's IP addresses"—an admission supported by Vachani's deposition testimony, responses to interrogatories, and contemporaneous emails. ER21 (citing SER56-57, 78-79, 82, 285, 313-14); *see also* SER137-39, 165 (response 7), 172, 205; *supra* at 21-22. *Third*, Vachani's admissions are equally clear with regard to his essential role in accessing and obtaining information from Facebook without authorization. *See* ER21-22.

This comprehensive record easily satisfies the *Coastal Abstract* standard of authorization, direction, or participation—which presumably is why Vachani makes no serious argument that there is any genuine issue of fact. Instead, as he did below, Vachani argues only that there can be no liability "in this type of computer fraud-related action where the CEO is not the exclusive owner or director or where the action did not threaten the interest of public health." Br.46. No court has articulated or applied any such rule, which—as the district court recognized— is a cobbling-together of the facts underlying certain unpublished district-court decisions, not a legal rule recognized by this or any court. ER20-21. Indeed, the

cases cited by Vachani (Br.46-47) either articulate the legal standard set forth in *Coastal Abstract*,[15] or do not even address the issue.[16]

In short, the record is clear, and it is uncontroverted: Vachani personally directed every unlawful and duplicitous act Power took.

## IV. VACHANI DID NOT PROPERLY PRESERVE HIS APPEAL OF THE DISCOVERY SANCTIONS, WHICH WERE PROPERLY IMPOSED AGAINST HIM IN ANY EVENT.

On January 9, 2012, Facebook took Steven Vachani's deposition pursuant to Rule 30(b)(6). *See* ER38 (order addressing attorney's fees). As Magistrate Judge Spero later found, Vachani "was not properly prepared." SER190 (transcript of hearing); *see* ER39. "[T]here were aspects of the business on which … the deposition was noticed that the witness did not have knowledge and would have had to have asked somebody, but didn't." SER189-90. Moreover, Vachani's "conduct" during the deposition "was inexcusable."

---

[15] *FTC v. Sili Neutraceuticals, LLC*, No. 07 C 4541, 2008 U.S. Dist. LEXIS 105683, at *7 (N.D. Ill. Jan. 23, 2008) (the individual defendant "formulated, directed, controlled or participated in the acts").

[16] *Facebook, Inc. v. Fisher*, No. C 09-05842 JF (PSG), 2011 U.S. Dist. LEXIS 9668 (N.D. Cal. Jan. 26, 2011) (no mention of standards for individual liability); *compare Davis v. Metro Prods., Inc.*, 885 F.2d 515, 520 (9th Cir. 1989) (cited in Br.46-47; addressing due process limitations on personal jurisdiction under a veil-piercing theory, but not individual liability), *with Coastal Abstract*, 173 F.3d at 734 (an officer who was "'an actual participant in the tort'" "cannot 'hide behind the corporation'") (citation omitted).

He thought it was a game. He was argumentative and he was evasive. He refused to give straightforward answers to straightforward questions that were put to him. He improperly just read answers out of his declaration, and that certainly was an obstruction of the deposition process.

SER190.

Were that not enough, it came to light during the deposition "that Power Ventures had failed to produce any emails other than those which had been copied or forwarded to Mr. Vachani's personal Yahoo! email account," ER38—notwithstanding that Vachani had sworn under oath, following prior discovery abuses, that Power had made a comprehensive document production. SER406-08. Judge Spero determined that there was "no excuse for not producing those emails. They are responsive. They are relevant." And "[t]hey should have been produced before the 30(b)(6) deposition was taken.... There is no reasonable excuse for them not being produced before the 30(b)(6)." SER185. On January 26—two weeks after the deposition, and a week after the close of discovery—Defendants produced some 74.6 gigabytes of data, containing more than 75,000 files, ER38, including the highly probative emails discussed above. *Supra* at 22.

Given Vachani's omissions and evasions at the first deposition, and the fact that Facebook could not ask him at that deposition about the numerous important documents that were not produced until later, Judge Spero ordered Vachani to sit for a second Rule 30(b)(6) deposition, to be paid for by Defendants. SER185

51

(hearing transcript; discussing missing documents), SER192 (hearing transcript; discussing deposition misconduct); ER44-45 (sanctions order); ER38-39 (further order). Counsel for Defendants agreed that the documents should have been produced, and while Defendants thought no deposition was necessary because liability already had been adjudicated against them, ultimately, they said, "We do not disagree with the Court's ruling." SER186. No one objected or sought review by the district court.

On appeal, Power does not contest the sanctions. Vachani appeals by himself, arguing that he should not be personally liable for the sanctions resulting from his discovery misconduct. Br.56-57. But his argument is forfeited, because he failed to object to the magistrate judge's order. In any event, his misconduct richly merited the sanction, which certainly was no abuse of discretion.

## A. Vachani Forfeited This Argument.

Federal Rule of Civil Procedure 72(a) "sets a deadline for the filing of objections in the district court to a nondispositive order" issued by a magistrate judge, "and prohibits challenge of the order thereafter if objections are not filed." *Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 n.1 (9th Cir. 1996); *accord Glenbrook Homeowners Ass'n v. Tahoe Reg'l Planning Agency,* 425 F.3d 611, 619 (9th Cir. 2005). And, directly relevant here, a party that fails to object to a magistrate judge's imposition of sanctions is "barred from pursuing appellate review of that

order." *Simpson*, 77 F.3d at 1174. Because neither Defendant ever challenged to the district court any aspect of the sanctions imposed by Magistrate Judge Spero— and indeed conceded that the sanctions were warranted, SER186—Vachani is barred from appealing the issue now.

### B. Magistrate Judge Spero Properly Sanctioned Vachani.

Even if the issue were not forfeited, Vachani's challenge to the order imposing discovery sanctions is reviewed only for abuse of discretion, and Magistrate Judge Spero was well within his discretion. *R & R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1245 (9th Cir. 2012). "'[A] district court abuses its discretion when it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when [the decision gives rise to] a definite and firm conviction that the district court committed a clear error of judgment.'" *Lambright v. Ryan*, 698 F.3d 808, 817 (9th Cir. 2012) (citation omitted).

None of those things occurred here. Judge Spero himself reviewed Vachani's deposition, SER187, determined that Vachani's conduct was inexcusable, and accepted Defendants' concession that they should have produced the missing documents. The imposition of sanctions under these circumstances was a proper exercise of discretion. When a corporate representative obstructs a Rule 30(b)(6) deposition, a court may impose sanctions on the corporate representative individually. In *CFTC v. Noble Metals International, Inc.*, this Court affirmed the

harshest of consequences—a terminating sanction—against all of the defendants (including individuals) for obstructionist conduct in conjunction with depositions, and did so even though just one of the individual defendants had participated in the obstruction. 67 F.3d 766, 769-70 (9th Cir. 1995); *see also Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1413-14 (9th Cir. 1990) (affirming terminating sanctions against corporation and its individual employees based on failure to appear at deposition and failure to produce documents).

Vachani challenges the sanctions on three grounds. *First*, he argues that the court "fail[ed] to make factual findings regarding his liability for the late-produced documents." Br.54. This is both irrelevant and mistaken. It is irrelevant because the sanction was also based on Magistrate Judge Spero's finding that Vachani was unprepared, evasive, and argumentative during his deposition. ER43; SER184-86, 189-90. This alone justifies the sanction. *See* Fed. R. Civ. P. 30(d)(2) advisory committee's note. Vachani's factual premise also is mistaken. Judge Spero specifically highlighted Vachani's role in the failure to produce the documents. SER185. And properly so: During a hearing on a motion to compel that took place several months earlier, and in the face of earlier failures to produce documents, Vachani

had represented under oath that Power's document production was complete. SER406-08.[17]

*Second*, Vachani argues that Magistrate Judge Spero clearly erred in finding that he was evasive and non-responsive. Br.55-56. But Vachani identifies no evidence to support his argument; he merely says that his deposition was long. *Id.* This bare assertion is patently insufficient to establish clear error—and especially where he has not even satisfied the basic requirement of putting the relevant materials in the record. *L & E Co. v. United States ex rel. Kaiser Gypsum Co.*, 351 F.2d 880, 883 (9th Cir. 1965) ("Appellants did not designate, for inclusion as a part of the record on appeal, the portions of the transcripts on which they now attempt to rely. Theirs is the burden of showing error—not by assertion, but by the record."); *see also First Card v. Hunt*, 238 F.3d 1098, 1105 (9th Cir. 2001). In fact, the deposition (which is in the district court record at Doc.271) clearly reflects that the magistrate judge had things exactly right.

---

[17] Vachani's argument for de novo review (Br.54) fails for the same reason: There were in fact ample findings. In addition, the case he cites is inapposite; it arises in the context of a court's failure to make the findings that are necessary for a default judgment—and even there, the question remains "whether the dismissal was an abuse of discretion." *Adriana Int'l Corp.*, 913 F.2d at 1412. Vachani also argues that the court "refus[ed] to hold an evidentiary hearing." Br.54. But he identifies no request for a hearing that was made or denied—and the magistrate judge conducted a full hearing on sanctions. *See generally* SER182-98.

*Third*, Vachani argues that the original sanctions order did not apply to him, and that it was "a blatant abuse of discretion" to apply it to him later. Br.57. But Magistrate Judge Spero's criticism was aimed directly at Vachani's conduct, *see supra* at 50-51; he made clear during the initial hearing that "the defendants" (plural) "will pay … for the renewed 30(b)(6) deposition," SER192; and Magistrate Judge Spero, who was in the best position to assess what his earlier sanctions order had meant, ruled squarely that it applied to both "Defendants," ER41. Thus, he explained:

> The renewed deposition—as reflected in the Court's previous order—was caused by the discovery misconduct by both Power Ventures and by Mr. Vachani. It was in part Mr. Vachani's personal conduct—being unprepared, evasive and argumentative—which required a renewed deposition, and for which the Court awarded sanctions. Therefore, Mr. Vachani is liable to pay the costs and fees of the renewed deposition.

ER43. The sanctions should be affirmed.

## V. THE COURT EXERCISED SOUND DISCRETION WHEN IT PERMANENTLY ENJOINED DEFENDANTS' WILLFUL AND UNAPOLOGETIC MISCONDUCT.

All three statutes violated by Defendants authorize a court "to enjoin further violation by the defendant," or to grant "injunctive relief." 15 U.S.C. § 7706(g)(1)(A); 18 U.S.C. § 1030(g); *see* Cal. Penal Code § 502(e)(1). The district court weighed all of the required factors, carefully considered Defendants' misconduct, and properly concluded that their "demonstrated … willingness" to

continue violating the law made injunctive relief proper. ER33; *see generally* ER29-36. This Court reviews a permanent injunction for abuse of discretion. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1079 (9th Cir. 2004). Given the extensive, materially undisputed record of Defendants' willful misconduct, their efforts to avoid detection and evade barriers placed in their path, and their continued protestations of innocence, Judge Koh did not abuse her discretion in determining that an injunction was appropriate to prevent future violations.

The district court applied the "traditional four factor test" for an injunction. ER29 n.15 (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391-93 (2006)). *First*, the court found that Defendants' circumvention, scraping, and spamming activities "constituted irreparable harm by harming Facebook's goodwill with its users because Facebook users receiving these emails are likely to associate the spam messages with Facebook." ER30 (citing SER394-95). Defendants object that Facebook has not documented "any actual user confusion or complaint" resulting from Defendants' own spamming activities. Br.50. But Facebook did "provide[] evidence that in general, deceptive spam messages detract from Facebook user experiences and have been the source of complaints by Facebook users." ER31 n.17; *see* SER395. As the court recognized, no "such specific and direct evidence" of complaints linked to Defendants' particular spam messages "is needed to prove harm to goodwill." ER30 (citing, *e.g.*, *Beacon Mut. Ins. Co. v. OneBeacon Ins.*

*Grp.*, 376 F.3d 8, 17 (1st Cir. 2004)). The district court was well within its discretion to consider the irreparable harm that spam poses to Facebook in addition to the more concrete costs (*see supra* at 30-32) that Defendants imposed on Facebook.

*Second*, the court found that money damages would provide inadequate redress. Monetary relief (a) "will not ensure that Defendants will not take steps again in the future to spam Facebook users"; (b) "will not compensate for the loss of goodwill Facebook may have suffered due to any confusion created by Defendants' emails"; and (c) is inadequate because of the "'impending insolvency of the defendant[s],'" who had petitioned for bankruptcy. ER31 (quoting *In re Estate of Marcos*, 25 F.3d 1467, 1480 (9th Cir. 1994)). The district court was properly focused on the likelihood of Defendants' recidivism, which fully justifies the injunction. A defendant's "pattern of repetitive violations or a finding of bad faith are factors weighing heavily in favor of granting a prospective injunction." *Brock v. Big Bear Market No. 3*, 825 F.2d 1381, 1383 (9th Cir. 1987); *see also Creative Computing v. Getloaded.com, LLC*, 386 F.3d 930, 937 (9th Cir. 2004) (belligerent litigation conduct including false deposition testimony justified "an especially aggressive prophylactic injunction"). An injunction is also warranted when the defendant's conduct "was carefully planned, tightly controlled, and systematically carried out." *CFTC v. Co Petro Mktg. Grp., Inc.*, 680 F.2d 573, 583 n.16 (9th Cir. 1982). Here, Defendants continue to insist that their conduct was lawful and pub-

lic-spirited, despite the undisputed facts establishing that Defendants engaged in repeated statutory violations (including at least 60,000 spam messages); and that those violations were carried out in a planned, systematic fashion that was meant to avoid detection and evade countermeasures, *supra* at 19-24.

Defendants do not contest any of these findings. Their sole response is that they pose no risk of future harm because they have "demonstrated cooperation with Facebook" from the start. Br.51; *id.* at 50 (asserting "good faith collaboration and cooperation with Facebook" (capitalization omitted)); *see also, e.g.*, Br.47 (asserting "Vachani's personal irreproachability"). Their actions tell a different story. The district court repeatedly found that Defendants' conduct was evasive and defiant, and it was entitled to rely on those facts in determining that an injunction was appropriate. *See* ER21, 25-26, 31, 33, 38-41, 54, 62-63; *see also supra* at 50-51 (discussing discovery misconduct). The court's underlying finding of fact is reviewed for clear error, *see Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 730 (9th Cir. 1999), and Defendants have not remotely met that burden. Moreover, the fact that, even now, Defendants engage in "repeated self-justification is sufficient to show a likelihood of future violation." *United States v. Laerdal Mfg. Corp.*, 73 F.3d 852, 856 (9th Cir. 1995); *id.* (a defendant's "continued insistence on justifying its actions in committing the violation 'is an important factor in deciding

59

whether future violations are sufficiently likely to warrant an injunction'") (citation omitted).

*Third*, the balance of hardships "weigh[s] in favor of granting Facebook a permanent injunction," because "while an injunction would simply serve to force [Defendants'] compliance with the law, … Facebook may have to deal with future violations of the law"—particularly given that "Defendants have demonstrated a willingness to do so, … even after requests from Facebook" to stop. ER32-33. As noted above (at 58), Defendants' intransigence and self-justification only serve to confirm the district court's judgment, and this Court repeatedly has affirmed injunctions resting upon such findings. The court's assessment was particularly sound in light of Defendants' "ongoing" and "prolific" spamming activity, and the "overwhelming evidence" that Defendants built an entire "system to render [Facebook's technical] blocks ineffective." ER54, 62.

Defendants say that the injunction is unnecessary because they "have taken all steps necessary to comply." Br.52. But that is no response; the success of an injunction does not mean that it was an abuse of discretion to issue it. If Defendants believe that applying the injunction "prospectively is no longer equitable," their recourse is in the district court, not here. Fed. R. Civ. P. 60(b)(5). Even there, however, their claim would fail; "the mere passage of time does not provide a sufficient reason to terminate the injunction," notwithstanding that the defendant

"has fully complied during that time," because "[c]ompliance is just what the law expects." *SEC v. Coldicutt*, 258 F.3d 939, 942-43 (9th Cir. 2001) (injunction remained appropriate notwithstanding nine years of compliance).

Defendants also complain that the injunction harms them by requiring them to seek Facebook's "approval to use Facebook's social network in ways akin to billions of Facebook users everyday," Br.51, but that contention rings hollow: Defendants' wound is self-inflicted. *See Creative Computing*, 386 F.3d at 937-38 (affirming an injunction against accessing a public website; defendant was "in a position analogous to one who has repeatedly shoplifted from a particular store, so the judge prohibits him from entering it again, saving the store's security guards from the burden of having to follow him around whenever he is there"); *cf. Sambreel Holdings*, 906 F. Supp. 2d at 1077 ("Facebook has a right to determine with whom it will deal and on what terms").

And *fourth*, the court determined that "[i]njunctive relief would serve the public interest by preventing Defendants from impermissibly spamming Facebook users again and setting an example to members of the public who may consider violating these various statutes as well." ER33. As the court noted, issuing an injunction is consistent with the decisions of many other courts that have confronted similar violations of these statutes. ER33-34 (collecting cases); *see also, e.g.*, *MySpace, Inc. v. Wallace*, 498 F. Supp. 2d 1293, 1306 (C.D. Cal. 2007) (public in-

61

terest favored injunction to stop CAN-SPAM violations); *Tagged, Inc. v. Doe*, No. C09-01713 WHA, 2010 U.S. Dist. LEXIS 5428, at *33-34 (N.D. Cal. Jan. 25, 2010) (granting injunction under CFAA and § 502 based on conduct similar to Defendants').

Defendants respond that their "operations were specifically geared toward the public interest," because they were simply "seeking to enhance social network technology" when they scraped Facebook's content and reproduced it elsewhere. Br.52. That Defendants fail to appreciate the wrongfulness of their actions, even at this late stage, only underscores just how sensible the district court's exercise of discretion was. Defendants refused to keep out when Facebook asked them to. They refused again when Facebook built a technological fence to protect its system and its users from Defendants' harassing incursions. The district court's decision to enjoin Defendants was no abuse of discretion.

## CONCLUSION

For the foregoing reasons, the judgment should be affirmed in full.


Respectfully submitted,

Dated: June 5, 2014              ORRICK, HERRINGTON & SUTCLIFFE LLP


*/s/ I. Neel Chatterjee*

I. Neel Chatterjee

*Attorney for Plaintiff-Appellee*

## STATEMENT OF RELATED CASE

Pursuant to Ninth Circuit Rule 28-2.6, Facebook is unaware of any related case pending in this Court.

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,996 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 14 point Times New Roman font.

Date: June 5, 2014                     */s/ I. Neel Chatterjee*
                                          I. Neel Chatterjee
                                  *Attorney for Plaintiff-Appellee*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on June 5, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ I. Neel Chatterjee*

I. Neel Chatterjee
*Attorney for Plaintiff-Appellee*

**ADDENDUM**

# TABLE OF CONTENTS

**Pages**

**CAN-SPAM Act of 2003**

    15 U.S.C. § 7701............................................................................A1

    15 U.S.C. § 7702............................................................................A2

    15 U.S.C. § 7704............................................................................A4

    15 U.S.C. § 7706............................................................................A7


**Computer Fraud and Abuse Act**

    18 U.S.C. § 1030............................................................................A9


**California Penal Code**

    § 502............................................................................A12

## 15 U.S.C. § 7701

### Congressional Findings and Policy

(a) Findings

The Congress finds the following:

. . . .

(7) Many senders of unsolicited commercial electronic mail purposefully disguise the source of such mail.

(8) Many senders of unsolicited commercial electronic mail purposefully include misleading information in the messages' subject lines in order to induce the recipients to view the messages.

(9) While some senders of commercial electronic mail messages provide simple and reliable ways for recipients to reject (or "opt-out" of) receipt of commercial electronic mail from such senders in the future, other senders provide no such "opt-out" mechanism, or refuse to honor the requests of recipients not to receive electronic mail from such senders in the future, or both.

. . . .

(b) Congressional determination of public policy

On the basis of the findings in subsection (a) of this section, the Congress determines that--

(1) there is a substantial government interest in regulation of commercial electronic mail on a nationwide basis;

(2) senders of commercial electronic mail should not mislead recipients as to the source or content of such mail; and

(3) recipients of commercial electronic mail have a right to decline to receive additional commercial electronic mail from the same source.

**A1**

## 15 U.S.C. § 7702

## Definitions

In this chapter:

. . . .

(8) Header information

The term "header information" means the source, destination, and routing information attached to an electronic mail message, including the originating domain name and originating electronic mail address, and any other information that appears in the line identifying, or purporting to identify, a person initiating the message.

(9) Initiate

The term "initiate", when used with respect to a commercial electronic mail message, means to originate or transmit such message or to procure the origination or transmission of such message, but shall not include actions that constitute routine conveyance of such message. For purposes of this paragraph, more than one person may be considered to have initiated a message.

. . . .

(12) Procure

The term "procure", when used with respect to the initiation of a commercial electronic mail message, means intentionally to pay or provide other consideration to, or induce, another person to initiate such a message on one's behalf.

. . . .

(15) Routine conveyance

The term "routine conveyance" means the transmission, routing, relaying, handling, or storing, through an automatic technical process, of an electronic mail message for which another person has identified the recipients or provided the

**A2**

recipient addresses.

. . . .

## 15 U.S.C. § 7704

## Other Protections For Users of Commercial Electronic Mail

(a) Requirements for transmission of messages

  (1) Prohibition of false or misleading transmission information

It is unlawful for any person to initiate the transmission, to a protected computer, of a commercial electronic mail message, or a transactional or relationship message, that contains, or is accompanied by, header information that is materially false or materially misleading. For purposes of this paragraph--

  (A) header information that is technically accurate but includes an originating electronic mail address, domain name, or Internet Protocol address the access to which for purposes of initiating the message was obtained by means of false or fraudulent pretenses or representations shall be considered materially misleading;

  (B) a "from" line (the line identifying or purporting to identify a person initiating the message) that accurately identifies any person who initiated the message shall not be considered materially false or materially misleading; and

  (C) header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message for purposes of disguising its origin.

  (2) Prohibition of deceptive subject headings

It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message if such person has actual knowledge, or knowledge fairly implied on the basis of objective circumstances, that a subject heading of the message would be likely to mislead a recipient, acting reasonably under the circumstances, about a material fact regarding the contents or subject matter of the message (consistent with the criteria used in enforcement of section 45 of this title).

  (3) Inclusion of return address or comparable mechanism in commercial electronic mail--

A4

(A) In general

It is unlawful for any person to initiate the transmission to a protected computer of a commercial electronic mail message that does not contain a functioning return electronic mail address or other Internet-based mechanism, clearly and conspicuously displayed, that--

    (i) a recipient may use to submit, in a manner specified in the message, a reply electronic mail message or other form of Internet-based communication requesting not to receive future commercial electronic mail messages from that sender at the electronic mail address where the message was received; and

    (ii) remains capable of receiving such messages or communications for no less than 30 days after the transmission of the original message.

(B) More detailed options possible

The person initiating a commercial electronic mail message may comply with subparagraph (A)(i) by providing the recipient a list or menu from which the recipient may choose the specific types of commercial electronic mail messages the recipient wants to receive or does not want to receive from the sender, if the list or menu includes an option under which the recipient may choose not to receive any commercial electronic mail messages from the sender.

(C) Temporary inability to receive messages or process requests

A return electronic mail address or other mechanism does not fail to satisfy the requirements of subparagraph (A) if it is unexpectedly and temporarily unable to receive messages or process requests due to a technical problem beyond the control of the sender if the problem is corrected within a reasonable time period.

    . . . .

(5) Inclusion of identifier, opt-out, and physical address in commercial electronic mail

(A) It is unlawful for any person to initiate the transmission of any commercial

**A5**

electronic mail message to a protected computer unless the message provides--

(i) clear and conspicuous identification that the message is an advertisement or solicitation;

(ii) clear and conspicuous notice of the opportunity under paragraph (3) to decline to receive further commercial electronic mail messages from the sender; and

(iii) a valid physical postal address of the sender.

(B) Subparagraph (A)(i) does not apply to the transmission of a commercial electronic mail message if the recipient has given prior affirmative consent to receipt of the message.

(6) Materially

For purposes of paragraph (1), the term "materially", when used with respect to false or misleading header information, includes the alteration or concealment of header information in a manner that would impair the ability of an Internet access service processing the message on behalf of a recipient, a person alleging a violation of this section, or a law enforcement agency to identify, locate, or respond to a person who initiated the electronic mail message or to investigate the alleged violation, or the ability of a recipient of the message to respond to a person who initiated the electronic message.

. . . .

## 15 U.S.C. § 7706

## Enforcement Generally

. . . .

(g) Action by provider of Internet access service

(1) Action authorized

A provider of Internet access service adversely affected by a violation of section 7704(a)(1) of this title, 7704(b) of this title, or 7704(d) of this title, or a pattern or practice that violates paragraph (2), (3), (4), or (5) of section 7704(a) of this title, may bring a civil action in any district court of the United States with jurisdiction over the defendant--

(A) to enjoin further violation by the defendant; or

(B) to recover damages in an amount equal to the greater of--

(i) actual monetary loss incurred by the provider of Internet access service as a result of such violation; or

(ii) the amount determined under paragraph (3).

(2) Special definition of "procure"

In any action brought under paragraph (1), this chapter shall be applied as if the definition of the term "procure" in section 7702(12) of this title contained, after "behalf" the words "with actual knowledge, or by consciously avoiding knowing, whether such person is engaging, or will engage, in a pattern or practice that violates this chapter".

(3) Statutory damages

(A) In general

For purposes of paragraph (1)(B)(ii), the amount determined under this paragraph is the amount calculated by multiplying the number of violations (with each separately addressed unlawful message that is transmitted or

attempted to be transmitted over the facilities of the provider of Internet access service, or that is transmitted or attempted to be transmitted to an electronic mail address obtained from the provider of Internet access service in violation of section 7704(b)(1)(A)(i) of this title, treated as a separate violation) by--

(i) up to $100, in the case of a violation of section 7704(a)(1) of this title; or

(ii) up to $25, in the case of any other violation of section 7704 of this title.

(B) Limitation

For any violation of section 7704 of this title (other than section 7704(a)(1) of this title), the amount determined under subparagraph (A) may not exceed $1,000,000.

(C) Aggravated damages

The court may increase a damage award to an amount equal to not more than three times the amount otherwise available under this paragraph if--

(i) the court determines that the defendant committed the violation willfully and knowingly; or

(ii) the defendant's unlawful activity included one or more of the aggravated violations set forth in section 7704(b) of this title.

. . . .

## 18 U.S.C. 1030

## Fraud and Related Activity In Connection With Computers

(a) Whoever--

 . . . .

(2) intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains--

(A) information contained in a financial record of a financial institution, or of a card issuer as defined in section 1602(n) of title 15, or contained in a file of a consumer reporting agency on a consumer, as such terms are defined in the Fair Credit Reporting Act (15 U.S.C. 1681 et seq.);

(B) information from any department or agency of the United States; or

(C) information from any protected computer;

 . . . .

(4) knowingly and with intent to defraud, accesses a protected computer without authorization, or exceeds authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value, unless the object of the fraud and the thing obtained consists only of the use of the computer and the value of such use is not more than $5,000 in any 1-year period;

 . . . .

(c) The punishment for an offense under subsection (a) or (b) of this section is--

 . . . .

(4)(A) except as provided in subparagraphs (E) and (F), a fine under this title, imprisonment for not more than 5 years, or both, in the case of--

(i) an offense under subsection (a)(5)(B), which does not occur after a conviction for another offense under this section, if the offense caused (or, in the case of an attempted offense, would, if completed, have caused)--

(I) loss to 1 or more persons during any 1-year period (and, for purposes of an investigation, prosecution, or other proceeding brought by the United States only, loss resulting from a related course of conduct affecting 1 or more other protected computers) aggregating at least $5,000 in value;

(II) the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;

(III) physical injury to any person;

(IV) a threat to public health or safety;

(V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; or

(VI) damage affecting 10 or more protected computers during any 1-year period; or

. . . .

(e) As used in this section--

(1) the term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device;

(2) the term "protected computer" means a computer--

. . . .

(B) which is used in or affecting interstate or foreign commerce or communication, including a computer located outside the United States that is used in a manner that affects interstate or foreign commerce or communication of the United States;

**A10**

. . . .

(8) the term "damage" means any impairment to the integrity or availability of data, a program, a system, or information;

. . . .

(11) the term "loss" means any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service; and

. . . .

(g) Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief. A civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i). Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages. No action may be brought under this subsection unless such action is begun within 2 years of the date of the act complained of or the date of the discovery of the damage. No action may be brought under this subsection for the negligent design or manufacture of computer hardware, computer software, or firmware.

. . . .

**A11**

## Cal. Penal Code § 502

## Unauthorized Access To Computers, Computer Systems and Computer Data

(a) It is the intent of the Legislature in enacting this section to expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems. The Legislature finds and declares that the proliferation of computer technology has resulted in a concomitant proliferation of computer crime and other forms of unauthorized access to computers, computer systems, and computer data.

The Legislature further finds and declares that protection of the integrity of all types and forms of lawfully created computers, computer systems, and computer data is vital to the protection of the privacy of individuals as well as to the well-being of financial institutions, business concerns, governmental agencies, and others within this state that lawfully utilize those computers, computer systems, and data.

(b) For the purposes of this section, the following terms have the following meanings:

(1) "Access" means to gain entry to, instruct, or communicate with the logical, arithmetical, or memory function resources of a computer, computer system, or computer network.

. . . .

(8) "Injury" means any alteration, deletion, damage, or destruction of a computer system, computer network, computer program, or data caused by the access, or the denial of access to legitimate users of a computer system, network, or program.

(9) "Victim expenditure" means any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, deleted, damaged, or destroyed by the access.

. . . .

(c) Except as provided in subdivision (h), any person who commits any of the

A12

following acts is guilty of a public offense:

. . . .

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

. . . .

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

. . . .

(e)(1) In addition to any other civil remedy available, the owner or lessee of the computer, computer system, computer network, computer program, or data who suffers damage or loss by reason of a violation of any of the provisions of subdivision (c) may bring a civil action against the violator for compensatory damages and injunctive relief or other equitable relief. Compensatory damages shall include any expenditure reasonably and necessarily incurred by the owner or lessee to verify that a computer system, computer network, computer program, or data was or was not altered, damaged, or deleted by the access. For the purposes of actions authorized by this subdivision, the conduct of an unemancipated minor shall be imputed to the parent or legal guardian having control or custody of the minor, pursuant to the provisions of Section 1714.1 of the Civil Code.

. . . .

(h)(1) Subdivision (c) does not apply to punish any acts which are committed by a person within the scope of his or her lawful employment. For purposes of this section, a person acts within the scope of his or her employment when he or she performs acts which are reasonably necessary to the performance of his or her work assignment.

(2) Paragraph (3) of subdivision (c) does not apply to penalize any acts committed

**A13**

by a person acting outside of his or her lawful employment, provided that the employee's activities do not cause an injury, as defined in paragraph (8) of subdivision (b), to the employer or another, or provided that the value of supplies or computer services, as defined in paragraph (4) of subdivision (b), which are used does not exceed an accumulated total of two hundred fifty dollars ($250).