Nos. 13-17154, 13-17102

IN THE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

**FACEBOOK, INC.**,

*Plaintiff-Appellee*,

*v.*

**POWER VENTURES, INC. AND STEVEN VACHANI**,

*Defendants-Appellants*,

---

Appeal from the United States District Court
for the Northern District of California
Case No. 5:08-cv-05780-LHK, Honorable Lucy Koh

---

## APPELLANTS' REPLY BRIEF

---

Amy Sommer Anderson
AROPLEX LAW
156 2nd Street
San Francisco, California 94105
Telephone: 415-529-5148
Facsimile: 415-970-5016

Counsel for Defendant-Appellant,
POWER VENTURES, INC.

STEVEN VACHANI
2425B Channing, #216
Berkeley, CA 94704
Telephone: (917) 267-8823

*Pro se* Appellant

## CORPORATE DISCLOSURE STATEMENT

There is no parent corporation and no publicly held corporation that owns 10% or more of Power Ventures, Inc.'s stock.

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**            **iii**

**INTRODUCTION**            **1**

**ARGUMENT**            **5**

    **I.**       **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF FACEBOOK'S CFAA AND § 502 CLAIMS. 5**

        A. DEFENDANTS DEMONSTRATE NO TECHNICAL BARRIERS WERE CIRCUMVENTED BECAUSE THEY WERE ACTING ON BEHALF OF—AND WITH EXPRESS PERMISSION FROM—FACEBOOK USERS.     6

        B. DEFENDANTS DEMONSTRATE FACEBOOK'S ATTEMPTED BLOCKS WERE INHERENTLY INEFFECTIVE AND NO ACTION WAS REQUIRED NOR TAKEN TO CIRCUMVENT SUCH BLOCKS.     7

        C. FACEBOOK FAILS TO DEFEAT DEFENDANTS' ADDITIONAL ARGUMENTS.     8

        D. FACEBOOK FAILS TO PROVIDE ANY QUALIFYING SUPPORT FOR ITS CLAIMED DAMAGE/LOSS UNDER THE CFAA AND § 502.     10

    **II.**       **THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF FACEBOOK'S CAN-SPAM ACT CLAIM. 12**

        A. FACEBOOK STILL FAILS TO SHOW THAT THE SUBJECT MESSAGES CONTAINED ANY MATERIALLY MISLEADING INFORMATION.     13

        B. FACEBOOK FAILS TO PROVIDE ANY QUALIFYING SUPPORT FOR ITS CLAIMED DAMAGE AND/OR LOSS UNDER THE CAN-SPAM ACT.     17

    **III. THE DISTRICT COURT ERRED IN FINDING VACHANI PERSONALLY LIABLE FOR THE ACTIONS OF POWER VENTURES, INC. AND ITS MANAGEMENT AND STAFF.**     **19**

    **IV.**   **VACHANI'S APPEAL OF THE DISTRICT COURT'S SANCTIONS**

**ORDER WAS TIMELY PER THE NINTH CIRCUIT'S OWN FINDING AND SHOULD BE GRANTED BASED ON THE TRIAL COURT'S ABUSE OF DISCRETION.** 21

**V. FACEBOOK FAILS TO JUSTIFY THE DISTRICT COURT'S GRANT OF A PERMANENT INJUNCTION AGAINST USE OF FACEBOOK'S WEBSITE BY DEFENDANTS.** 22

**CONCLUSION** 24

**CERTIFICATE OF COMPLIANCE** 26

**STATEMENT OF RELATED CASES** 27

**CERTIFICATE OF SERVICE** 28

# TABLE OF AUTHORITIES

## Table of Cases

| *Case* | *Page(s)* |
|---|---|
| *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725 (9th Cir. 1999) | 19 |
| *Gordon v. Virtumundo, Inc.,* 575 F.3d 1040, 1053 (9th Cir. 2009) | 18 |
| *In re iPhone Application Litig.,* 2011 U.S. Dist. LEXIS 106865 | 11,12 |
| *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012) | 18 |
| *Sprint Solutions, Inc. v. Pacific Cellupage Inc.*, 2014 U.S. Dist. LEXIS 101397 | 8,9,10 |
| *United States v. Nosal*, 676 F.3d 854 | 8 |

## Table of Statutes and Other Authorities Cited

| *Statute* | *Page(s)* |
|---|---|
| 15 U.S.C. §7701 - Controlling the Assault of Non-Solicited Pornography And Marketing Act of 2003 ("CAN-SPAM Act") | 1,3,12,13,14,16, 17,18,19 |
| 15 U.S.C. § 7704(a)(1) | 16 |
| 15 U.S.C. § 7706(g) | 18 |
| 18 U.S.C. § 1030 - Computer Fraud and Abuse Act ("CFAA") | 1,5,7,8,9,10,11, 12 |
| 18 U.S.C. § 1030(a)(4) | 9 |
| 18 U.S.C. § 1030(c)(4)(A)(i) | 10,11 |
| 18 U.S.C. § 1030(e)(8) | 11 |
| C.P.C. § 502 | 1,5,7,8,9,10,12 |

| *Other Texts* | *Page(s)* |
|---|---|
| http://dealbook.nytimes.com/2012/02/01/tracking-facebooks-valuation/?_php=true&_type=blogs&_r=0 | 20 |

**INTRODUCTION**

Defendant-Appellants respectfully submit this reply brief in further support of their appeal from the judgment of the United States District Court for the Northern District of California.

Facebook fails to provide evidence in satisfaction of each and every element of the Controlling the Assault of Non-Solicited Pornography And Marketing Act of 2003 (15 U.S.C. §7701 *et. seq*.; "CAN-SPAM Act"), the Computer Fraud and Abuse Act (18 U.S.C. § 1030 *et. seq*.; "CFAA"), and California Penal Code § 502(c) ("§ 502"). Facebook attempts to obfuscate the facts that, in their fidelity, defeat Facebook's claims, and these attempts should be rejected in full.

1. Facebook asserts that Power's use of a commonly used Internet Protocol ("IP") routing system is, on its own, sufficient to constitute "without authorization" and "without permission" in violation of federal and state law, yet there is no legal basis for such conclusion. FB Br.16. Facebook likens use of an IP proxy server to a trespasser jumping a fence, which is not, absent any actual or attended taking, punishable under anti-theft statutes such as the CFAA and § 502. Building on Facebook's metaphor, the CFAA and § 502 serve to prevent unauthorized acquisition of an authorization-holder's property. The fact that one might trespass on another's territory to collect their own property or that of another by whom they have been commissioned does not constitute violation of the CFAA or § 502. Such fence-jumping further requires existence of a fence, which, under the present

metaphor, is akin to agreement to Facebook's terms of use. Jumping that fence might amount to breach of contract, but that is not what Facebook claims. Instead, Facebook continues to argue that they have been burglarized despite the fact that the property "taken" is user data that 1) the users expressly authorized Power to copy, and 2) Facebook expressly disclaims ownership in their own terms of use. 2-ER 169.

2. Facebook continues to misrepresent the fact that each electronic communication transmitted in promotion of Power's launch campaign was initiated by Facebook and Power users, personally. Power merely served as the user interface for users accessing Facebook through Power's internet browser, just as Facebook serves as the user interface for users accessing Facebook directly through Facebook's site. The fact that users sent such messages through Power's interface as opposed to directly through Facebook's interface did not affect the content or presentation of the resulting invitations sent by Facebook users to their Facebook friends; after all, the messages were actually sent by Facebook. Power merely served as an intermediary where Facebook users could access Facebook as well as their other social media accounts in one convenient site. Having no effect on the messages sent, Power's user interface no more renders such messages as "spam" than the messages sent and received by Facebook users directly through Facebook's site. As such, these messages are no more of a drain on Facebook's servers than if they had been sent directly through Facebook, and they bear the

exact header, subject and message body information as if they had been send directly through Facebook's site. The fact that users sent the invitations through a third party interface and, thus, were not exposed to the paid ads on Facebook's interface understandably displeases Facebook, but it certainly does not violate the CAN-SPAM Act.

3. Facebook claims Vachani is personally liable for actions taken while CEO of Power Ventures, Inc., drawing attention to general admissions of Vachani's involvement in Power's activities but ignores denial of involvement in the specific activities that Facebook alleges are unlawful. Absent clear admission of involvement in Power's activities upon which Facebook's claims are based, there exists issue of material that cannot be decided on summary judgment.

4. Facebook fails to make arguments sufficient to defeat the timeliness of Vachani's appeal from the magistrate judge's sanctions order. Facebook further fails to make persuasive arguments in support of the order for discovery sanctions against the individual defendant, Vachani, for inadvertent actions taken by the corporate defendant, Power.

5. Facebook further fails to demonstrate 1) any threat of offensive activity by Power, a long-defunct business, especially in light of Power's implementation of the Facebook-approved Connect API, 2) any damage to Facebook's goodwill caused by Power's brief service as an intermediary between users and Facebook services, and 3) any valid threat of future actual and irreparable harm posed to

Facebook even if Power were to re-activate its service, enabling Facebook users to access their own information through the Power interface. Thus, the District Court's permanent injunction is not only over-broad in requiring the defendants and their associates to obtain express permission from Facebook prior to so much as using their own, personal Facebook accounts, it is altogether unwarranted since there is no threat of continued activity—lawful or otherwise—and no evidence of actual or potential harm arising therefrom.

Relevant to each of Facebook's claims are three critical facts:

*First*, it is indisputable that Facebook users accessed their own user accounts through the power.com social media interface, an action Facebook characterizes as "co-opting" users' Facebook accounts. FB Br.1. 1-ER-47 (Judge Ware: "Power permitted users to enter their Facebook account information and access Facebook site through power.com").

*Second,* it is also indisputable that Facebook's own users were the originators of the electronic messages and specifically authorized transmission of the messages to their Facebook friends. 1-ER-48,56 (Judge Ware specifically noted that user creation of the event and resulting message notifications is an undisputed fact, finding "Power provided participants with a list of their Facebook friends… and asked the participant to select which of those friends should receive a Power invitation," and "after a *user authorized the creation of an event* as part of the

Launch Promotion, Facebook servers automatically filled in the header information and sent an e-mail to each person on the event guest list." (*emphasis added*)).

*Finally*, it is further indisputable that the messages sent by Facebook users through the Power interface to their Facebook friends inviting their friends to join Power.com are identical to those that would have been sent by Facebook users directly through the Facebook interface. 1-ER-56.

**ARGUMENT**

**I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF FACEBOOK'S CFAA AND § 502 CLAIMS.**

Facebook continues to mislead this Court as to the nature of the benign, commonplace activities forming the basis of Facebook's complaint: Facebook users sent invitations in the form of electronic communications to their Facebook friends through Defendants' third-party interface. Further, Facebook attempts to divert attention from the primary issue of data ownership to that of "trespass," which Facebook defines as Defendants' continued utilization of a universally used IP service against Facebook's wishes. The fact that Facebook's attempted "blocks" were ineffective and that Defendants did not jump to acquiescence when Facebook first stomped its feet and snapped its fingers does not render Defendants' actions "trespass" or violative of the CFAA or § 502.

A. <u>DEFENDANTS DEMONSTRATE NO TECHNICAL BARRIERS WERE CIRCUMVENTED BECAUSE THEY WERE ACTING ON BEHALF OF —AND WITH EXPRESS PERMISSION FROM—FACEBOOK USERS.</u>

Inherent in Facebook's complaint and further arguments is a blurring of the issue of whether one has permission to access certain data verses whether one has permission to access certain data in a particular manner. Facebook complains that Defendants "trespassed" onto Facebook property even though they were merely acting as agents of Facebook users who had valid, active Facebook accounts, carrying out the desires of Facebook users to access to access their account information and send messages to their Facebook friends through their Facebook accounts. Facebook even acknowledges that Power was apparently acting as an agent of the Facebook users while allow the users to access their accounts through the Power interface. FB Br.6.

Facebook raises the issue of security, citing its own concern for the safety of its users' data as justification for attempting to punish Defendants for accessing their site in a manner not expressly approved by Facebook, but security is irrelevant to the facts of this case. Here, the users themselves requested and authorized the third-party access to their own data, and Power did not take any action or use the user data beyond that expressly commanded by the users themselves. Facebook takes great stride in blurring the fact that Power served as a mere intermediary, but the fact remains that Power had as much authority to access user accounts as the users themselves while acting as their agent. The fact that

6

access was routed through a third-party interface that Facebook was ineffective in "blocking" does not change the fact that the specific users' access was authorized. The fact that Facebook prefers its users to access their accounts through the Facebook interface does not render access to the same information and to conduct the same activities through a third-party interface "unauthorized" or "without permission" in violation of the CFAA and § 502.

B. <u>DEFENDANTS DEMONSTRATE FACEBOOK'S ATTEMPTED BLOCKS WERE INHERENTLY INEFFECTIVE AND NO ACTION WAS REQUIRED NOR TAKEN TO CIRCUMVENT SUCH BLOCKS.</u>

Facebook claims that Defendants implemented blocks following Facebook's initial cease and desist letter in early December 2008. FB Br. 20. In reality, Defendants did not effect any change to their standard operations with respect to Facebook or any other social media site between receipt of Facebook's initial notice and the ultimate withdrawal of Power's Facebook integration altogether the following month.

As detailed in the Electronic Frontier Foundation's amicus brief, it is common for online business to use IP proxy servers, such as Amazon, for any number of reasons, and such practice is not inherently improper or unlawful. Even Facebook's expert explains:

> Proxy servers are used for a number of purposes, including the following activities: (a) keeping machines behind the proxy (such as the website's actual host servers) anonymous; (b) speeding up access to resources

frequently used by multiple users behind the proxy by using caching techniques; (c) controlling access to website content or services; (d) accessing websites from a computer whose own IP address otherwise would be blocked by the accessed website; (e) logging or auditing Internet use; and (f) circumventing security procedures or controls aimed at limiting access to or blocking a particular IP address.

SER475-476.

## C. FACEBOOK FAILS TO DEFEAT DEFENDANTS' ADDITIONAL ARGUMENTS.

Facebook argues that Defendants are unwilling to accept that Facebook can decide who may access its services, but, again, that is not an issue where the actual Facebook users were accessing their own Facebook account through the power.com interface. FB Br.26. Defendants do not deny that Facebook users have Facebook's permission to access their accounts, and as explained heretofore, Power acted as an agent of those users to the extent authorized and directed by those users. Here, Power users were registered users with Facebook's site who granted account access to Power to copy the information that the users were entitled to access, and Power accessed and copied *only* that information.

Ninth Circuit civil CFAA and § 502 cases, to date, exclusively deal with accessing, taking or copying data (property) belonging to the plaintiff. *See, for example, United States v. Nosal*, 676 F.3d 854; *see, also, Sprint Solutions, Inc. v. Pacific Cellupage Inc.*, 2014 U.S. Dist. LEXIS 101397 at 18 (argument that loss allegations related to "conducting a damage assessment" must fail where there is no claimed impairment or damage to a computer system was rejected solely

8

because plaintiff actually made a claim of system damage). Thus, no existing case law adequately provides for liability absent any actual damage to the accessed computer or taking of any proprietary data given the mere facts that (1) Defendants' access might have circumvented technical barriers through utilization of commonplace IP routing; and (2) Facebook expended resources identifying the party whose name and internet address were on the messages themselves and assessing damage not found to exist. Thus, this Court must finally decide the issue of CFAA and § 502 liability where no actual harm was intend or caused, and the Court is not without the assistance in this regard:

(1) The CFAA statutory language provides that liability is specifically limited to instances where the offensive action is committed with an intent to defraud. 18 USC § 1030(a)(4). While § 502 does not specifically refer to an intent to defraud in the same language as the CFAA, the fact that § 502 is codified under "CHAPTER 5: LARCENY [THEFT]" of the CA Penal Code strongly implies legislative intent that the statute apply to instances of theft or, more generally, possession. Where there is no actual or attempted defrauding or threat of loss of possession, as in the instant case, the CFAA and § 502 are unconcerned.

(2) A very recent Central District of California ruling strongly implies that at least one court in the Ninth Circuit has contemplated this issue. In *Sprint Solutions*, the defendants argued that loss allegations related to "conducting a damage assessment" are insufficient unless a CFAA claimant also alleges that

impairment or damage to a computer system actually occurred. *See, Sprint Solutions, Inc. v. Pacific Cellupage Inc*., 2014 U.S. Dist. LEXIS 101397 at 18. This argument failed specifically because the Plaintiff alleged such impairment or damage and not irrespective of whether the plaintiff made such allegations as the Plaintiff in the instant case would like the Court to believe. Here, Facebook made no such claims of damage or impairment.

(3) Principals of equity and judicial economy caution against so broadly construing this requirement as to encompass expenditures to investigate whether any actual damage has been incurred when no actual damage was found to be incurred. It creates an incentive for such plaintiffs to continue expending resources "investigating" to reach that $5,000 mark at which point they can seek recovery. It incentives plaintiffs to commit waste and has potential to result in otherwise frivolous lawsuits based on commonplace electronic activities where no actual harm is caused and nothing proprietary is obtained.

D. <u>FACEBOOK FAILS TO PROVIDE ANY QUALIFYING SUPPORT FOR ITS CLAIMED DAMAGE/LOSS UNDER THE CFAA AND § 502.</u>

Contrary to the trial court's characterization of the § 1030(c)(4)(A)(i) standing requirements, the CFAA therein provides clear, albeit subtle, resolution of this issue. The CFAA provides a fine for "an offense under subsection (a)(5)(B) [] if the offense caused (or, in the case of an attempted offense, would, *if completed*, have caused)—" loss of at least $5,000 in a 1-year period. § 1030(c)(4)(A)(i)

10

(e*mphasis added*). The existence of a provision for anticipated loss had an attempted act been completed is dispositive of the drafters' intent that standing be determined by a non-discretionary measure of damage or loss. Had the legislature intended "damage" or "loss" under this section to include expenditures for discretionary tasks where no actual damage was sustained, § 1030(c)(4)(A)(i) would have been written "… if the offense or attempted offense caused—" loss of at least $5,000 in a 1-year period, as opposed to setting the standard of loss at a value determinable only following a completed act. Where an act is merely attempted, it is impossible for one to determine with any certainty what investigation and damage assessment resources would be required had the act been completed, especially where, as in this case, the act caused no actual damage or loss. The only speculative loss one could assess with a reasonable degree of certainty is the value of the data attempted to be taken or the value of the property attempted to be damaged. The fact that an act was completed as opposed to merely attempted in the instant case does not justify applying a different standard since the drafters clearly intended a common assessment among all such scenarios.

With respect to damages under the CFAA, 18 U.S.C. § 1030(e)(8) provides the term "damage" means "any impairment to the integrity or availability of data, a program, a system, or information." In *In re iPhone Application,* Judge Koh clarified "'economic damages' arise only when an individual or firm's money or property are impaired in value; money or property is lost; or money must be

spent to restore or maintain some aspect of a business affected by the alleged violation." *In re iPhone Application Litig.*, 2011 U.S. Dist. LEXIS 106865 at 34-35. Here, Facebook fails to claim any money or property was impaired in value, any money or property was lost, or any part of its business had to be restored or maintained. Per Judge Koh's own prior ruling, Facebook has not proved sufficient economic damage to satisfy its CFAA claim. Facebook simply states that it satisfies the harm requirement of § 502 by virtue of satisfying the harm requirement under the CFAA. FB Br.34. Defendants likewise offer that a failure to satisfy the harm requirement under the CFAA should translate to a failure to satisfy the harm requirement of § 502.

## II. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN FAVOR OF FACEBOOK'S CAN-SPAM ACT CLAIM.

In addition to the primary arguments refuted below, Facebook claims that Defendants failed to deny that they were initiators of the subject messages in their opening brief and, thus, forfeit any opportunity to do so now. In fact, Defendants did so at Br.9 where Defendants made evident "event invitations were created by Facebook users" and at Br.32 where defendants squarely clarified that Power was the "'host' of the Facebook event" but that the messages were "forwarded by Facebook users to their friends." Defendants also made clear that to the extent Power can be considered a "sender" of the emails at issue by virtue of their initiation, such activity merely involved user-prompted auto-population of a

Facebook "event" in the same manner a website auto-populates an email message when a visitor clicks "Contact Us" or "Send Us Feedback". Br.11. Ultimately, however, this point is far less relevant than the innocuous character of the subject messages and Facebook's failure to establish damages sufficient to constitute violation of the CAN-SPAM Act.

As applied throughout Facebook's Opposition Brief, and specifically within the corresponding section, Facebook uses intentionally inflammatory language such as "co-opted" and "highjacked" and "masquerading" with respect to Power's interaction with facebook.com at the express direction and authorization of Facebook and Power users. Defendants trust this Court will not be unduly influenced by such inappropriate language and by now understands facebook.com and user accounts were accessed—and the subject messages were transmitted— solely at users' direction, as Defendants have established heretofore and Facebook has failed to refute. Br.9-12; see, also, 1-ER-47,48,56.

A. FACEBOOK STILL FAILS TO SHOW THAT THE SUBJECT MESSAGES CONTAINED ANY MATERIALLY MISLEADING INFORMATION.

By this point, both positions have been thoroughly briefed, but the sheer volume of materials produced and time spent litigating has undoubtedly made an originally simple matter unnecessarily complex. While the trial court neglected to analyze the issue of materiality with respect to whether the subject messages were false or misleading—or at the very least failed to articulate its rationale for such

finding—the issue on review before this Court is simple: Determination of whether the subject messages contain *materially* false or misleading information is a factual determination improperly decided on summary judgment.

Facebook acknowledges that liability under the CAN-SPAM Act requires the subject message information to contain *materially* false or *materially* misleading information. FB Br.40-41. In their opening brief, Defendants provided ample evidence supporting their claim that the issue of materiality was not only overlooked by the trial court but also that the issue was anything but objectively conclusive. FB Br. 32-35. In its most distilled form, the object of Facebook's complaint—the subject electronic messages—were created, transmitted and received through Power's interface as follows:

**THROUGH POWER.COM**

1. User logs into Facebook through Power.com
   ↓
2. User clicks on the Launch Promotion link and selects which Facebook friends will receive the invitation.
   ↓
3. PowerScript prompts the promotion event invitations to be send through the user's Facebook account to the selected Facebook friends.    ↓
4. User's Facebook friends receive the following electronic message:

```
Nik invited you to "Bring 100 friends and win 100 bucks!" on Friday, March 20
at 1:00am.

Nik says, "Bring 100 friends and win 100 bucks!".

Event: Bring 100 friends and win 100 bucks!
What: Reunion
Host: Power
Start Time: Friday, March 20 at 1:00am
End Time: Friday, March 20 at 11:55pm
Where: Power

To see more details and RSVP, follow the link below:
http://www.facebook.com/n/?event.php&eid=[redacted]

Thanks,
The Facebook Team
——
Want to control which emails you receive from Facebook? Go to:

http://www.facebook.com/editaccount.php?notifications&md=ZKElbnRfaW52aXRl02Syb
2O9MTExNTM3MCM4Nnt1aWQ9NDc0NjIwODYxODk?dG89MTEwNzc2OCMyOA==
```

14

For comparison, the manner in which such messages would have been created, transmitted and received had the users done so through Facebook's interface is as follows:

| **THROUGH FACEBOOK.COM** | **THROUGH POWER.COM** |
|---|---|
| 1. User logs into Facebook through Facebook.com | 1. User logs into Facebook through Power.com |
| 2. User creates an "event" using Power-provided promotion event details and selects which friends to invite. | 2. User clicks on the Launch Promotion link and selects which Facebook friends will receive the invitation. |
| 3. Facebook sends the promotion event invitations to the user's select friends. | 3. PowerScript prompts the promotion event invitations to be send through the user's Facebook account to the selected Facebook friends. |
| 4. User's Facebook friends receive the following electronic message: | 4. User's Facebook friends receive the following electronic message: |

```
Nik invited you to "Bring 100 friends and win 100 bucks!" on Friday, March 20
at 1:00am.

Nik says, "Bring 100 friends and win 100 bucks!".

Event: Bring 100 friends and win 100 bucks!
What: Reunion
Host: Power
Start Time: Friday, March 20 at 1:00am
End Time: Friday, March 20 at 11:55pm
Where: Power

To see more details and RSVP, follow the link below:
http://www.facebook.com/n/?event.php&eid=[redacted]

Thanks,
The Facebook Team
----
Want to control which emails you receive from Facebook? Go to:
http://www.facebook.com/editaccount.php?notifications&md=ZKZlbnRfaW52aXRlO22yb
2O9MTEsNTM3MGM4NztlaWQ9NDcON9lIwUOYaOOk7dG89MTEwNzc2OZMyOA==
```

```
Nik invited you to "Bring 100 friends and win 100 bucks!" on Friday, March 20
at 1:00am.

Nik says, "Bring 100 friends and win 100 bucks!".

Event: Bring 100 friends and win 100 bucks!
What: Reunion
Host: Power
Start Time: Friday, March 20 at 1:00am
End Time: Friday, March 20 at 11:55pm
Where: Power

To see more details and RSVP, follow the link below:
http://www.facebook.com/n/?event.php&eid=[redacted]

Thanks,
The Facebook Team
----
Want to control which emails you receive from Facebook? Go to:
http://www.facebook.com/editaccount.php?notifications&md=ZKZlbnRfaW52aXRlO22yb
2O9MTEsNTM3MGM4Nzt1aWQ9NDcON9lIwUOYaOOk7dG89MTEwNzc2OZMyOA==
```

The above comparison cleanly shows the commonalities among the two most significant steps: (1) In both instances, the Facebook user accessed his Facebook account and authorized transmission of a Power launch promotion event message. (2) In both instances, the recipient, who is a Facebook friend of the user, receives an electronic notification from Facebook containing information identifying power.com and linking to the Facebook event page, which contained full details of the launch promotion. Br.12.

Further, Facebook's assertion that technically incomplete email header information is necessarily *materially* false or *materially* misleading is logically inconsistent. FB Br.36. If mere inaccuracy in an email header were sufficient to establish liability under the CAN-SPAM Act, the drafters would not have included the "materially" qualifier. The black letter of the statute requires something beyond falsities or inaccuracies as provided in the Act:

> The Act further provides that "header information shall be considered materially misleading if it fails to identify accurately a protected computer used to initiate the message because the person initiating the message knowingly uses another protected computer to relay or retransmit the message *for purposes of disguising its origin*."

15 U.S.C. § 7704(a)(1)(C) (*emphasis added*).

Facebook argues that Defendants arguments fail because they merely address the prohibitions under § 7704(a)(1)(C) whereas the three paragraphs under § 7704(a)(1) each provide a different circumstance establishing materiality under the CAN-SPAM Act. FB Br.40-41. Defendants' opening arguments were tailored to § 7704(a)(1)(C), as that is the standard of "materially" referenced in the trial court's order for summary judgment, as well as in the final judgment. 1-ER-57; 1-ER-11. Facebook fails to refute Defendants' arguments against materiality per § 7704(a)(1)(C) and further fails to provide any support for a finding of materiality under § 7704(a)(1)(A) or (B) in the trial court record. Indeed, the trial court did not make any finding with respect to § 7704(a)(1)(A) or (B) as Facebook inappropriately and summarily concludes. FB Br. 41.

B. FACEBOOK FAILS TO PROVIDE ANY QUALIFYING SUPPORT FOR ITS CLAIMED DAMAGE AND/OR LOSS UNDER THE CAN-SPAM ACT.

Addressing first the most blatantly unqualified of Facebook's claimed damages under the CAN-SPAM Act, Facebook declined to refute or even address Defendants' long-argued assertion that more than $75,000 of Facebook's claimed $80,543 in damages for so-called "investigation costs" was spent on outside legal counsel on various non-computer-related activities, including drafting and filing this lawsuit. Br.24 fn.16. Instead, Facebook accuses Defendants of failing to argue in their opening brief precisely how "the record is rife with Defendants' disputes as to both the nature and amount of Facebook's claimed costs" and claims Defendants, thus, waive their right to such claim. FB Br.47. Defendants' opening brief specifically states: "Defendants repeatedly pointed out Facebook's attempts to claim their 'legal bills as part of its supposed "harm.'" Br.27; see, also, 2-ER-109; 2-ER-167. Even if Defendants failed to make these arguments below, such failure is not a jurisdictional limitation; the court retains discretion to consider claims and issues asserted for the first time on appeal. *In re Mercury Interactive Corp. Securities Litig.*, 618 F3d 988, 992 (9th Cir. 2010).

Irrespective of Defendants' reference to specific arguments in the trial court record, the issue of Facebook's falsely claimed legal fees as "damages for internal and external investigations" goes to the issue of standing and, thus, is reviewed by

this court *de novo*. 2-ER-109; *San Luis & Delta-Mendota Water Auth. v. United States*, 672 F.3d 676, 699 (9th Cir. 2012) (trial court's determination of whether a party has standing is reviewed *de novo*.).

Facebook's opposition included but did not reference an excerpt of the Ostiller Report—an expert report prepared for Facebook by Richard J. Ostiller of Navigant Consulting, Inc. on December 19, 2011—which discloses Facebook incurred $75,543 in compensatory damages for outside legal services during the "Relevant Period." SER49-50. Facebook failed to include the page from that report defining the "Relevant Period" as "starting in the late 2008 and continuing into early 2009." DSER-2.

Facebook relies, in part, on the trial court's finding that Facebook spent "significant resources" to "block Defendants' spamming activity" as being more than sufficient to show the required harm. FB Br.44; 1-ER-54. Aside from Defendants' claim that such resources were unnecessarily expended, the question of what amount of expenditure is sufficient to qualify as "harm" for the purpose of determining a plaintiff's standing under the CAN-SPAM Act is quite subjective and, thus, presents a material fact that is anything but readily conclusory. Facebook even agrees with the *Gordon* court that qualification of "harm" under § 7706(g)(1) requires "common sense not dogma." FB Br.45; *Gordon v. Virtumundo, Inc.,* 575 F. 3d 1040, 1053 (9th Cir. 2009). In December 2008, Facebook was valued between

$10-15B[1]. Assuming this Court now recognizes that legal fees in preparation for litigation do not qualify as "harms" for the purposes of establishing standing under the CAN-SPAM Act, and further assuming for the moment that Facebook actually, if coincidentally, expended precisely $5,000 on personnel to address Power's temporary interaction with facebook.com, the questions become: Can $5,000 really be considered "significant resources" as Facebook claims? And does $5,000 really constitute a "harm" to a company then-worth 10-15 billion dollars? Common sense says 'no', but at the very least this is a question of fact for a jury and not one that can be decided on summary judgment.

## III. THE DISTRICT COURT ERRED IN FINDING VACHANI PERSONALLY LIABLE FOR THE ACTIONS OF POWER VENTURES, INC. AND ITS MANAGEMENT AND STAFF.

Facebook insists that *Coastal Abstract*'s holding that "a corporate officer or director is, in general, liable for all torts which he authorizes or directs of in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf" is controlling here, despite an absence of case law finding an individual director or officer personally liable in this type of computer fraud-related action where the CEO is not the exclusive owner or director or where the action did not threaten the interest of public health. FB Br.48-49; *Coastal Abstract Serv., Inc. v. First Am. Title Ins. Co.,* 173 F.3d 725, 734 (9th Cir. 1999).

_____

[1] http://dealbook.nytimes.com/2012/02/01/tracking-facebooks-valuation/?
    _php=true&_type=blogs&_r=0

In support of their contention, Facebook relies on various statements by Vachani and filings by Power and Vachani where, if isolated, appear to support an admission that Vachani controlled and directed the specific conduct at the heart of this litigation. FB Br.49. In fact, such "admissions," when viewed in context, either relate exclusively to negotiations with Facebook or clearly state Vachani's denial of any knowledge regarding the allegedly unlawful actions taken by Power in furtherance of its integration of Facebook into its social media aggregation browser. For example, Facebook cites SER69-71, which includes a sample of Vachani's March 7, 2012 deposition transcript where Vachani admits he approved various steps of the Facebook implementation process but also clarifies he was under the impression Power engineers where taking "neutral steps." SER73. As further example, Facebook cites SER77-79, which includes a sample of the same transcript where Vachani admits he authorized, generally, Power activities with respect to the Facebook integration but also clarifies that he largely delegated and did not specifically authorize every action of the employees with respect to any activity. SER78. Vachani was never the sole owner of Power or even a controlling shareholder or board member, which had more than 100 full-time employees, seven executive officers, dozens of shareholders and a full board of directors. 2-ER 114. Power had sophisticated technology investors who shared in the decision making through a governance structure common among technology corporations that have received significant outside investment capital. 2-ER 114:20-26. While

Vachani's role as CEO of Power Ventures, Inc. required him to be involved in most aspects of the business, in no way did he possess or exert unilateral control or decision-making. 2-ER 123:25-124:1. Absent clear admission of involvement in Power's activities upon which Facebook's claims are based, there exists issue of material that cannot be decided on summary judgment.

## IV. VACHANI'S APPEAL OF THE DISTRICT COURT'S SANCTIONS ORDER WAS TIMELY PER THE NINTH CIRCUIT'S OWN FINDING AND SHOULD BE GRANTED BASED ON THE TRIAL COURT'S ABUSE OF DISCRETION.

Magistrate Judge Spero ordered a renewed 30(b)(6) deposition of Defendant Power Ventures, Inc. on March 1, 2012. 1-ER 45. In that order, the magistrate judge also ordered:

> The *Defendant* shall produce, forthwith, the responsive emails that were not copied to Steve Vachani. The *Defendant* shall sit for a renewed 30(b)(6) deposition regarding the newly produced emails that are relevant to the issues that are still unresolved by the Court's Summary Judgment Order. The *Defendant* shall pay reasonable costs, including attorney fees, for the renewed 30(b)(6) deposition.

1-ER 45:1-5 (*emphasis added*). As the renewed deposition was of the corporate defendant, the sole defendant to whom the order refers with respect to costs and fees is, no doubt, Power Ventures, Inc. On August 7, 2013, Judge Spero issued an order on Facebook's motion for damages for the renewed deposition, finding both defendants liable for the entirety of Facebook's demand. 1-ER 37-43. As such, the trial court's later order (1-ER-37-43) entered against both defendants equally, from which Vachani appeals, was baseless and inconsistent with the trial court's prior

order and, thus, a blatant abuse of discretion. Following Judge Koh's September 25, 2013 final judgment, Vachani refiled his appeal of, *inter alia*, the August 7, 2013 sanctions order.

## V. FACEBOOK FAILS TO JUSTIFY THE DISTRICT COURT'S GRANT OF A PERMANENT INJUNCTION AGAINST USE OF FACEBOOK'S WEBSITE BY DEFENDANTS.

Facebook sought and was granted an injunction prohibiting Defendants from conducting otherwise entirely lawful activities—including using their own Facebook accounts and applying for implementation of Facebook Connect without prior permission from Facebook—for conduct comparable to that of ten of thousands of companies implementing Facebook connect today, conduct that Power, at the insistence of Steven Vachani, voluntary ceased prior to commencement of this lawsuit. 2-ER 110-127.

Facebook argues that the trial court's imposition of a permanent injunction is sound on the following bases:

1) Facebook argues it has suffered irreparable injury. Facebook attempts to deceive this Court, yet again, as to whether Power's activities generated any user complaints, stating "Facebook did 'provide [] evidence that in general, deceptive spam messages detract from Facebook user experiences and have been the source of complaints by Facebook users.'" FB Br.57. In other words, Facebook still cannot provide a single user (sender or recipient) complaint in response to the

subject messages sent by Facebook users through facebook.com. Facebook relies on grouping the subject messages together with what it considers "deceptive spam messages" to establish an inference of harm to Facebook's goodwill, yet Facebook has cited no feedback whatsoever from any of its users regarding the messages, including feedback that might support Facebook's contention that the subject messages can be categorized as "deceptive spam messages." FB Br.57. In the final judgment, the trial court noted that "specific and direct evidence" is not required to prove harm to goodwill, but Facebook provided no evidence, whatsoever, relevant to the facts of the instant case to support its claim of "irreparable harm." 1-ER-30; FB Br.57-58.

2) Facebook argues monetary damages are inadequate because they do not ensure Defendants will not attempt to spam Facebook users in the future, will not compensate Facebook for loss of goodwill and are insufficient given Defendants' insolvency, and 3) Facebook further argues the balance of hardships overwhelmingly prejudices Facebook' business and presents no risk of harm to Defendants. Significantly, Power has not been active in more than three years. Before this lawsuit was filed, Power agreed to—and subsequently did—implement Facebook Connect to accomplish exactly what Power was doing during the period when Facebook claimed to suffer severe and irreparable damage. The only difference between Power's activity pre- and post-Connect is that Power had to agree to Facebook's terms of use. Even if Power were to reemerge in the industry,

its only non-outdated technology with respect to Facebook implementation is its integration of Facebook Connect. Facebook failure to demonstrate any likelihood of future harm renders its arguments against Defendants' claims of imminent and certain hardship futile, as any harm to Defendants outweighs a lack of harm—or threatened harm—-to Facebook.

4) Facebook argues Defendants failed to show how the public interest would be substantially burdened by entry of the permanent injunction because "Defendants fail to appreciate the wrongfulness of their actions." FB Br.62. While the public may be capable influence subject to Facebook's mood, there is no such risk with respect to the emotion of an individual entrepreneur and a long-defunct organization.

**CONCLUSION**

For the foregoing reasons, Defendants respectfully ask this Court to end this litigation finally and fairly by reversing denial of Defendants' request for summary judgment entered in the district court on February 16, 2012 and vacating the order and final judgment entered in the district court on September 25, 2013. Alternatively, Defendants request this Court reverse grant of summary judgment entered in favor of Facebook on February 16, 2012 and remand this case for trial in the district court.

Defendants further request this Court vacate the permanent injunction issued by the trial court on September 25, 2013 with respect to both defendants and vacate

the order for discovery sanctions issued by the trial court on August 7, 2013 with

respect to Defendant Vachani.

AROPLEX LAW

Dated: August 4, 2014                    By    _s/ Amy Sommer Anderson_

FILER'S ATTESTATION: Pursuant to Circuit Rule 25-5(f), I attest under
penalty of perjury that all other parties on whose behalf the filing is
submitted concur in the filing's content.

Dated: August 4, 2014                    Respectfully submitted,

                                          s/ Amy Sommer Anderson

**CERTIFICATE OF COMPLIANCE**

I certify that this brief complies with the type-volume limitation set forth in

Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief uses a

proportional typeface and 14-point font and contains 5,538 words.


Dated: August 4, 2014                              <u>s/ Amy Sommer Anderson</u>

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, Appellants certify that in light of the Court's consolidation of Case No. 13-17102 with the instant case, Appellants are not aware of any related appeal pending in this court.


Dated: August 4, 2014                    s/ Amy Sommer Anderson

## CERTIFICATE OF SERVICE

I declare that:

I am a citizen of the United States, employed in the City and County of San Francisco, over the age of eighteen years, and not a party to the within case. My business address is AROPLEX LAW, 156 2nd Street, San Francisco, California 94105. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on August 4, 2014, at San Francisco, California.

s/ Amy Sommer Anderson